UNITED STATES COURT OF INTERNATIONAL TRADE

|   |   |   |
|---|---|---|
| OCP S.A., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 24-00227 |
| | ) | |
| UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

# COMPLAINT

Plaintiff OCP S.A. ("OCP"), by and through its attorneys, alleges and states as follows:

1. OCP contests aspects of the U.S. Department of Commerce's ("Commerce") *Final Results* and *Amended Final Results* in the second administrative review of the countervailing duty ("CVD") order on phosphate fertilizers from the Kingdom of Morocco ("Morocco"), covering the period from January 1, 2022 – December 31, 2022.[1] *See Phosphate Fertilizers From the Kingdom of Morocco: Final Results of Countervailing Duty Administrative Review; 2022*, 89 Fed. Reg. 88,952 (Nov. 12, 2024) ("*Final Results*") and accompanying Issues and Decision Memorandum ("IDM"); *Phosphate Fertilizers From the Kingdom of Morocco: Notice of Amended Final Results of Countervailing Duty Administrative Review; 2022*, 89 Fed. Reg. 104,979 (Dec. 26, 2024) ("*Amended Final Results*").

---

[1] Following the filing of OCP's Summons on December 12, 2024, ECF No. 1, and before the filing of this Complaint, Commerce published the *Amended Final Results* in the Federal Register on December 26, 2024. Because this Complaint relies on the same jurisdictional bases cited in OCP's Summons with respect to both the *Final Results* and *Amended Final Results*, OCP has not filed an Amended Summons.

**JURISDICTION**

2.    OCP brings this challenge to Commerce's *Final Results* and *Amended Final Results* pursuant to 19 U.S.C. §§ 1516a(a)(2)(A)(i)(I) and (a)(2)(B)(iii). This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1581(c).

**STANDING**

3.    OCP is a Moroccan producer and exporter of phosphate fertilizers. OCP is an interested party under 19 U.S.C. § 1677(9)(A).

4.    OCP was the sole foreign exporter/producer selected by Commerce for examination. OCP participated in the underlying administrative review giving rise to this action and is a "party to the proceeding in connection with which the matter arose." 28 U.S.C. § 2631(c); *see* 19 U.S.C. § 1516a(a)(2)(A).

**TIMELINESS OF THIS ACTION**

5.    Commerce published the *Final Results* in the *Federal Register* on November 12, 2024. *Final Results*, 89 Fed. Reg. at 88,952. OCP commenced this action on December 12, 2024, by filing its Summons, within the time period specified in 19 U.S.C. § 1516a(a)(2)(A)(i)(I). Commerce published the *Amended Final Results* in the *Federal Register* on December 26, 2024. *Amended Final Results*, 89 Fed. Reg. at 104,979.

6.    OCP timely files this Complaint within 30 days of the filing of its Summons, as required by 19 U.S.C. § 1516a(a)(2)(A) and U.S. Court of International Trade Rule 3(a)(2).

**STATEMENT OF FACTS**

7.    On June 12, 2023, Commerce initiated the second administrative review ("AR2") of the CVD order on phosphate fertilizers from Morocco, with a period of review ("POR") from

January 1, 2022 – December 31, 2022. *Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 88 Fed. Reg. 38,021 (June 12, 2023).

8. On June 27, 2023, Commerce selected OCP as the sole producer/exporter under examination in AR2. The other reporting entities in this administrative review included the following OCP affiliates: Jorf Fertilizer Company I, Jorf Fertilizer Company II, Jorf Fertilizer Company III, Jorf Fertilizer Company IV, Jorf Fertilizer Company V, and OCP Nutricrops S.A.

9. On June 27, 2023, Commerce issued the initial CVD Questionnaire to OCP and the Government of Morocco ("GOM"). OCP and the GOM timely submitted responses to the initial questionnaire in October 2023. From December 2023 to September 2024, OCP and the GOM timely filed factual submissions, including responses to supplemental and new subsidy allegation questionnaires issued by Commerce in March 2024, May 2024, and September 2024.

10. Commerce's initial questionnaire sought information from OCP regarding the volume and bone phosphate of lime ("BPL") content of the phosphate rock produced by OCP during the POR. In response, OCP provided Commerce with detailed information from its audited books and records including the quantity and average BPL content of both locally consumed rock and exported rock during the POR from the two mining sites OCP owned and operated that were involved in the production of subject merchandise (Khouribga and Gantour). The information from OCP's audited books and records submitted in AR2 demonstrated that the majority of OCP's rock produced during the POR was locally consumed rock that had a lower BPL content than exported rock. Based on this information, OCP provided Commerce with a weighted average BPL content figure for all rock consumed locally and a weighted average BPL content figure for all exported rock produced during the POR. OCP also provided Commerce

3

with a single weighted average BPL content figure for all of its rock produced during the POR at the two mining sites involved in the production of subject merchandise.

11.     In response to requests contained in Commerce's initial questionnaire, OCP also provided Commerce with information regarding indirect expenses incurred by OCP, including HQ and support costs that supported OCP's rock production during the POR. OCP also explained that it allocates HQ and support costs to phosphate rock production and the other phases of the production value chain based on each phase's share of site costs and provided a detailed description of that allocation methodology.

12.     In addition, OCP provided in its initial questionnaire response detailed information demonstrating that phosphate rock was highly profitable during the POR. As was the case in both the Investigation and first administrative review ("AR1"), OCP explained that it is not possible to calculate a profit rate specific to phosphate rock directly from OCP's 2022 financial statements because those statements do not contain segmented financial data specific to OCP's phosphate rock production. For this reason, OCP also provided financial statements with segmented financial data for the Jordan Phosphate Mines Company ("JPMC"), a comparable producer of phosphate rock, from which it is possible to calculate a profit rate specific to phosphate rock. On February 16, 2024, OCP submitted additional information to measure the adequacy of renumeration for mining rights, including a step-by-step calculation to determine a profit rate specific to OCP's production and sale of phosphate rock in 2022 based on detailed cost and sales data in OCP's audited books and records.

13.     Commerce's initial questionnaire also sought information from OCP and the GOM regarding five purported subsidy programs that Commerce had previously found provided no benefit, and therefore were not countervailable subsidies as defined under U.S. law. These five

programs included: (1) Bonds, (2) Rail Transport Services, (3) the GOM's Purchases of Electricity, (4) the Provision of Port Services related to Agence Nationale de Ports ("ANP"), and (5) Reductions in Local Tax Fines and Penalties. Because the only information Commerce possessed—based on its prior examination of these purported programs—was that all five programs were not countervailable subsidies, the agency lacked any basis to continue investigating these programs in AR2. Nevertheless, under the threat of adverse facts available, OCP and the GOM submitted extensive, detailed responses to questions regarding these programs.

14. Furthermore, after having unlawfully required OCP to disclose information in both the Investigation and AR1 regarding "other forms of assistance" and "other benefits" OCP received from the GOM, Commerce again demanded that OCP disclose similar information in the present review, forcing OCP to expend great time and effort to prepare and submit thousands of pages of information, without having any evidence that such other assistance or benefits might constitute countervailable subsidies. Specifically, Commerce asked OCP:

> Has the government, or entities owned in whole or in part by the government, directly or indirectly, provided to the producers or exporters of the subject merchandise under review any other non-recurring benefits over the 10-year AUL (*i.e.*, the POR and preceding nine years), or recurring benefits during the POR? Please coordinate with Ozdemir to determine if it is reporting usage of any subsidy program(s) not previously examined. For each such program, please answer all questions in the **Standard Questions Appendix and any other applicable appendices** to this section separately for each program. If the government has not provided any other benefits, then please so state.

(hereinafter the "Other Benefits Question").

15. Based on the information OCP provided in response to this unlawful Other Benefits Question, Mosaic filed two new subsidy allegations ("NSA") in November 2023 with respect to the Provision of Port and Vessel Services related to Marsa Maroc and the Provision of Land. *See* Letter to Sec'y Commerce from The Mosaic Company, *Phosphate Fertilizers From Morocco:*

*New Subsidy Allegations* (Nov. 13, 2023). In April 2024, Commerce initiated an investigation into the Provision of Port and Vessel Services related to Marsa Maroc and declined to formally initiate an investigation into the Provision of Land on the grounds that it had already issued supplemental questionnaires to OCP and the GOM regarding OCP's purchases of land from the GOM and was, therefore, already investigating this program. *See* Memorandum from Robert Palmer and Jaron Moore to Irene Darzenta Tzafolias, *Countervailing Duty Administrative Review of Phosphate Fertilizers from Morocco, 2022: New Subsidy Allegations* (Apr. 26, 2024). In May 2024, Commerce issued NSA questionnaires to OCP and the GOM. Under the threat of adverse facts available, OCP and the GOM expended substantial effort at great cost to submit extensive and detailed responses to these unlawful NSA questionnaires, also responding to supplemental NSA questionnaires between May and September 2024.

16. On April 8, 2024, OCP timely submitted comments for Commerce's consideration prior to the agency's issuance of the *Preliminary Results*. OCP explained why Commerce should use OCP's single weighted average BPL content of phosphate rock produced during the POR to select world market prices for the phosphate rock benchmark price calculation. In addition, OCP explained why Commerce should include: (1) a portion of OCP's HQ and support costs—allocated on the basis of OCP's site costs—in the constructed government price for phosphate rock, and (2) an amount for profit specific to phosphate rock.

17. On May 2, 2024, Commerce published notice of its *Preliminary Results* in the Federal Register. See *Phosphate Fertilizers From the Kingdom of Morocco: Preliminary Results of the Countervailing Duty Administrative Review*, 2022, 89 Fed. Reg. 35,800 (May 2, 2024) ("*Preliminary Results*"), and accompanying Preliminary Issues and Decision Memorandum ("PDM").

6

18.     In the *Preliminary Results*, Commerce determined to select the world market prices to include in the benchmark price calculation using the endpoints of a BPL range where the low end of the range equaled OCP's average BPL content for rock consumed locally and the high end of the range equaled OCP's BPL content for rock exported as rock and sourced from only one mine. Prelim. Calc. Memo at 2–3. This methodology failed to account for the material differences in the quantity of rock OCP produced at various BPL levels during the POR and resulted in a vastly overstated benchmark price. In calculating the constructed government price for rock, Commerce also preliminarily determined—without explanation—to utilize OCP's company-wide financial data to calculate an amount for profit that was not specific to OCP's production of phosphate rock, despite having OCP's and JPMC's rock-specific profit rates on the record.

19.     Compounding these errors, Commerce preliminarily calculated a CVD rate for certain alleged programs Commerce investigated only because of information OCP was required to submit in response to the Other Benefits Question in this review, as well as analogous questions used by Commerce in prior segments. *See, e.g.,* PDM at 11–12. Commerce did not include in the *Preliminary Results* a determination with respect to the Provision of Port and Vessel Services related to Marsa Maroc and the Provision of Land. PDM at 2.

20.     In determining the portion of OCP's HQ and support costs to include in the constructed government price for OCP's phosphate rock in the *Preliminary Results*, Commerce followed the approach it had adopted in prior segments of this proceeding, and preliminarily determined the portion of these costs to include using an allocation based on OCP's site costs. Prelim. Calc. Memo at 5–6.

21.     On October 10, 2024, Commerce issued a post-preliminary determination finding one of the alleged new programs countervailable—Provision of Land—and the other—Provision

7

of Port and Vessel Services related to Marsa Maroc—not countervailable. *See* Memorandum from Kathleen Marksberry to Scot Fullerton, *Post-Preliminary Analysis of the Countervailing Duty Administrative Review of Phosphate Fertilizers from the Kingdom of Morocco; 2022* (Oct. 10, 2024) ("*Post-Preliminary Memo*" or "*PPM*").

22.     In October 2024, interested parties, including OCP, the GOM, and Mosaic timely submitted case and rebuttal briefs addressing these and other issues covered in Commerce's *Preliminary Results* and *Post-Preliminary Memo*. In October 2024, interested parties, including OCP, the GOM, Mosaic, and Simplot participated in a public hearing before Commerce addressing issues raised in case and rebuttal briefs.

23.     On November 5, 2024, Commerce issued its *Final Results*, in which Commerce calculated an overall CVD rate of 16.81% for OCP. *Final Results* at 88,953.

24.     In the *Final Results*, Commerce continued to use the endpoints of a range of OCP's BPL levels to select the world market prices included in the phosphate rock benchmark price calculation. IDM at 15–16. The low end of the range was the average BPL content of OCP's rock consumed locally from both Gantour and Khouribga, and the high end of the range was the average BPL content of OCP's rock exported as rock from both Gantour and Khouribga. BPI IDM Supplement at 4. Commerce failed to address OCP's argument that this methodology does not account for prevailing market conditions in Morocco related to the quantity and quality of OCP's phosphate rock produced during the POR. Commerce also continued to calculate an amount for profit for use in the constructed government price for OCP's phosphate rock by using a company-wide profit rate that captured profits on all of OCP's products and not just the profit for phosphate rock. IDM at 28. Commerce did so despite its stated intention to calculate a constructed government price for phosphate rock specific to OCP's production and pricing of phosphate rock

8

during the POR, despite the evidence on the record demonstrating that phosphate rock had very high profits during the POR, and despite having rock-specific profit rates on the record.

25. In the *Final Results,* Commerce also abandoned its approach of determining the portion of OCP's HQ and support costs to include in the constructed government price for phosphate rock based on an allocation using OCP's site costs. IDM at 19–27. Instead, and without proper foundation, Commerce determined the portion of OCP's HQ and support costs to include in the constructed government price for phosphate rock by employing an entirely new allocation methodology based on the revenues attributed to the **OCP Group**, which includes dozens of companies, only one of which is **OCP S.A.**, the company under examination. IDM at 19–27. Among other errors, Commerce failed to explain its decision to rely on the financial reporting of the **OCP Group**—a corporate grouping that includes more than 40 entities within its reporting scope—rather than the financial reporting of OCP S.A. to generate its newly contrived revenue-based allocation of **OCP S.A.'s** HQ and support costs.

26. Also in the *Final Results*, Commerce calculated program-specific CVD rates for multiple purported programs as a result of information gathered through unlawfully required responses to the Other Benefits Question, as well as similar questions posed in both the Investigation and in AR1. In particular, Commerce unlawfully investigated twelve purported programs in the present review as a result of information it unlawfully gathered from OCP and it subsequently calculated subsidy rates for the following three: (1) Revenue Exclusions from Minimum Tax Contributions (0.05%); (2) Customs Duty Exemptions for Capital Goods, Machinery, and Equipment (0.01%); and (3) Provision of Land (0.07%). IDM at 6-7; Final Calc. Memo at Att. 1.

27. Additionally, with regard to its examination of certain programs it had previously found not countervailable, and for which Commerce lacked any basis to continue its investigation in AR2, Commerce again determined in the *Final Results* that these same five programs were not countervailable. In particular, Commerce determined that these programs: (1) did not confer a measurable benefit on OCP during the POR (Reductions in Local Tax Fines and Penalties), (2) did not confer a benefit on OCP during the POR (the GOM's Purchases of Electricity and Bonds), or (3) were not used during the POR (Rail Transport Services and the Provision of Port Services related to ANP).

28. On November 12, 2024, OCP submitted ministerial error comments identifying two ministerial errors that Commerce made in its calculations for the mining rights program.

29. On December 12, 2024, OCP timely filed its Summons initiating this action at this Court to challenge certain aspects of Commerce's *Final Results*.

30. On December 17, 2024, Commerce responded to OCP's ministerial error allegations. Commerce agreed that it made one ministerial error related to the exclusion of OCP's debt costs from the calculation of profit to include in the constructed government price for phosphate rock, but disagreed with OCP's second ministerial error allegation that Commerce should have calculated a simple average of two datasets for phosphate rock prices from one country just like it did for two datasets for phosphate rock prices for another country for inclusion in the phosphate rock benchmark price calculation. *See* Memorandum to Scot Fullerton from Kathleen Marksberry, *Countervailing Duty Administrative Review of Phosphate Fertilizers from the Kingdom of Morocco: Allegations of Ministerial Errors in the Final Results* (Dec. 17, 2024).

31. On December 26, 2024, Commerce issued its *Amended Final Results*. *Amended Final Results*, 89 Fed. Reg. at 104,979. In the *Amended Final Results*, Commerce lowered OCP's

CVD rate to 16.60% after correcting for the ministerial error related to the calculation of profit included in the constructed government price for phosphate rock.

## STATEMENT OF CLAIMS

32.  Paragraphs 1 through 31 of this Complaint are incorporated by reference.

33.  Commerce's *Final Results* and *Amended Final Results* are "unsupported by substantial evidence on the record, or otherwise not in accordance with law" as provided by 19 U.S.C. § 1516a(b)(1)(B)(i) for the following reasons:

## COUNT ONE

34.  Paragraphs 1 through 33 are incorporated by reference.

35.  The BPL range identified and used by Commerce to select world market phosphate rock prices for the phosphate rock benchmark price calculation fails to account for prevailing market conditions for phosphate rock because Commerce ignored record evidence demonstrating that the majority of OCP's rock produced during the POR was rock consumed locally with a lower BPL content and that a minority of OCP's rock produced during the POR was rock exported as rock with a higher BPL content. Commerce's BPL range thereby improperly gave equal weight to OCP's BPL levels for rock consumed locally and rock exported as rock, and thus failed to account for the material differences in the quantity and quality of rock actually produced by OCP during the POR.

36.  Accordingly, for these reasons among others, Commerce's decision to use a BPL range instead of a weighted average BPL content figure to select world market prices for the

phosphate rock benchmark price calculation is unsupported by substantial evidence on the record or otherwise not in accordance with law.

## COUNT TWO

37. Paragraphs 1 through 36 are incorporated by reference.

38. Commerce's use of an OCP company-wide profit rate that is not specific to phosphate rock but instead incorporates profits associated with OCP's many other products results in an inaccurate calculation of the remuneration OCP provided to the GOM to mine phosphate ore. Commerce failed to support with substantial evidence its decision to utilize OCP's company-wide profit rate instead of rock-specific profit rates on the record. In fact, record evidence demonstrates that Commerce's decision to use OCP's company-wide profit rate in the constructed government price for phosphate rock is distortive because phosphate rock was much more profitable during the POR than the other products captured by OCP's company-wide profit rate.

39. Accordingly, for these reasons among others, Commerce's methodology for calculating an amount of profit to include in the constructed government price for phosphate rock is unsupported by substantial evidence on the record or otherwise not in accordance with the law.

## COUNT THREE

40. Paragraphs 1 through 39 are incorporated by reference.

41. In determining the portion of OCP's HQ and support costs to include in the constructed government price for phosphate rock, Commerce failed to support with substantial record evidence its decision, made for the first time in the *Final Results*, to allocate OCP's HQ and support costs on the basis of revenue instead of using an allocation based on site costs. Among other errors, Commerce failed to address the record evidence demonstrating that OCP's production sites did not benefit from OCP's HQ and support spending in proportion to the revenues generated

from OCP's sales of phosphate rock, fertilizers, and other products. In addition, Commerce failed to explain why it allocated HQ and support costs for only the unconsolidated OCP S.A. entity using revenues reported in the consolidated financial reporting for the entire OCP Group—a corporate group that includes over 40 entities within its reporting scope.

42. Accordingly, for these reasons among others, Commerce's determination of the portion of OCP's HQ and support costs to include in the constructed government price for phosphate rock is unsupported by substantial evidence on the record or otherwise not in accordance with law.

## **COUNT FOUR**

43. Paragraphs 1 through 42 are incorporated by reference.

44. Commerce may investigate a potential subsidy program in an administrative review where the program was included in a new subsidy allegation that contains sufficient evidence, or because Commerce finds a practice that "appears to be a countervailable subsidy" within the meaning of 19 U.S.C. § 1677d. However, in the present review, Commerce continued to examine programs for which the only evidence before the agency was that the program was not countervailable. As noted above, these five purported programs included: (1) Bonds, (2) Rail Transport Services, (3) the GOM's Purchases of Electricity, (4) the Provision of Port Services related to ANP, and (5) Reductions in Local Tax Fines and Penalties. With respect to each, Commerce made a determination in prior segments of this CVD proceeding that these purported programs were not countervailable subsidies. Consequently, Commerce lacked the factual predicate to investigate these programs in later segments, including in AR2.

45. Accordingly, for these reasons, among others, Commerce's decision to examine these five programs in the instant review is unsupported by substantial evidence on the record or otherwise not in accordance with law.

## COUNT FIVE

46. Paragraphs 1 through 45 are incorporated by reference.

47. Commerce has authority to investigate a countervailable subsidy not alleged by the petitioner only if a practice discovered during the proceeding "appears to be a countervailable subsidy" within the meaning of 19 U.S.C. § 1677d. As it did in the Investigation and AR1, however, Commerce unlawfully engaged in a "fishing expedition" in the present review, seeking information about potentially countervailable subsidies pursuant to the Other Benefits Question without a scintilla of evidence on the record indicating that any such "benefits" exist or "appear to be a countervailable subsidy."

48. Because Commerce exceeded its statutory authority and should never have investigated potential subsidies based on information provided by OCP in response to the unlawful Other Benefits Question, its findings on these matters were *ultra vires*. Specifically, Commerce unlawfully investigated in this review the following potential subsidies based on information gathered from the unlawful Other Benefits Question in the Investigation, AR1, or the present review: (1) Reductions in Tax Fines and Penalties; (2) Revenue Exclusions from Minimum Tax Contributions; (3) Customs Duty Exemptions for Capital Goods, Machinery, and Equipment; (4) Rail Transport Services; (5) Reductions in Local Tax Fines and Penalties; (6) the Inter-Enterprise Mining Vocational Training Fund; (7) GOM's Purchases of Electricity; (8) Vocational Training Tax Reimbursements (also referred to as "OFPPT"); (9) Commercial Paper Offering; (10) Provision of Port Services and Infrastructure from ANP; (11) Provision of Land; and

(12) Provision of Port and Vessel Services related to Marsa Maroc. Because Commerce lacked a legal basis to seek out the underlying information related to these potential programs, it was unlawful for Commerce to include these potential subsidies in this review and to determine that some of them are countervailable.

49. Accordingly, for these reasons, among others, Commerce's Other Benefits Question, its decision to include these twelve potential programs in the review, as well as its subsequent decision to countervail three of them, is unsupported by substantial evidence on the record or otherwise not in accordance with law.

## COUNT SIX

50. Paragraphs 1 through 49 are incorporated by reference.

51. In light of the discussion above, and for other reasons evidenced in the record of the administrative proceeding, several aspects of Commerce's *Final Results* and *Amended Final Results*, which are the subject of this action, are unsupported by substantial evidence on the record or otherwise not in accordance with the law.

\*     \*     \*

## PRAYER FOR RELIEF

For the reasons stated above, OCP respectfully requests that this Court:

1. Hold that Commerce's *Final Results* and *Amended Final Results* are unsupported by substantial evidence on the record, and otherwise not in accordance with law;

2. Remand the *Final Results* and *Amended Final Results* to Commerce for disposition consistent with any orders and opinions of this Court; and

3. Grant such other or further relief as this Court deems just and proper.

|  |  |
|---|---|
|  | Respectfully submitted, |
| Dated:  January 13, 2025 | /s/  William R. Isasi<br>William R. Isasi<br>Kathleen McNulty<br>Edward J. Thomas III<br>Wanyu Zhang<br>Julia H. Shults<br>**COVINGTON & BURLING LLP**<br>One CityCenter<br>850 10th Street, NW<br>Washington, DC  20001<br><br>Micaela McMurrough<br>Jordan B. Bakst<br>**COVINGTON & BURLING LLP**<br>The New York Times Building<br>620 Eighth Avenue<br>42nd Floor<br>New York, NY  10018<br><br>*Counsel to OCP S.A.* |