## UNITED STATES COURT OF INTERNATIONAL TRADE
## BEFORE THE HONORABLE TIMOTHY C. STANCEU, JUDGE

| | |
|---|---|
| OCP S.A., | ) |
| Plaintiff, | ) |
| v. | ) **Consol. Court No. 24-00227** |
| UNITED STATES, | ) |
| Defendant, | ) |
| and | ) |
| THE MOSAIC COMPANY, | ) |
| Defendant-Intervenor, | ) |
| and | ) |
| THE GOVERNMENT OF THE KINGDOM OF MOROCCO, | ) |
| Defendant-Intervenor. | ) |

## OCP S.A.'S RULE 56.2 MOTION FOR JUDGMENT ON THE AGENCY RECORD

Pursuant to U.S. Court of International Trade ("CIT") Rule 56.2, Plaintiff OCP S.A.

("OCP"), a producer and exporter of phosphate fertilizers from the Kingdom of Morocco

("Morocco") respectfully moves for judgment on the agency record on the issues raised in its

Complaint challenging certain decisions made by the U.S. Department of Commerce

("Commerce") in the second administrative review of the countervailing duty ("CVD") order on

phosphate fertilizers from Morocco.  *See Phosphate Fertilizers From the Kingdom of Morocco:*

*Final Results of Countervailing Duty Administrative Review; 2022*, 89 Fed. Reg. 88,952 (Nov.

12, 2024) ("*Final Results*"), and accompanying Issues and Decision Memorandum ("IDM") ,

amended by, *Phosphate Fertilizers From the Kingdom of Morocco: Notice of Amended Final*

*Results of Countervailing Duty Administrative Review; 2022*, 89 Fed. Reg. 104,979 (Dec. 26,

2024).

 As described in the accompanying memorandum, Commerce's decisions were

unsupported by substantial evidence on the record or otherwise not in accordance with law.

Accordingly, OCP respectfully requests that this Court grant this motion and (1) hold that

Commerce's *Final Results* are unlawful; (2) remand the case to Commerce with instructions to

correct the errors identified by the Court; and (3) grant such other or further relief that the Court

deems just and proper.

       Respectfully submitted,

       /s/ William R. Isasi
Dated: September 30, 2025    William R. Isasi
       Shelby Anderson
       Wanyu Zhang
       Julia Shults
       Eliza Lafferty

       **COVINGTON & BURLING LLP**
       One CityCenter
       850 Tenth Street, N.W.
       Washington, D.C. 20001-4956

       Micaela R.H. McMurrough
       Hardeep K. Josan

       **COVINGTON & BURLING LLP**
       The New York Times Building
       620 Eighth Avenue, 42nd Floor
       New York, NY 10018

       *Counsel to OCP S.A.*

**UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE THE HONORABLE TIMOTHY C. STANCEU, JUDGE**

|  |  |  |
|---|---|---|
| OCP S.A., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | **Consol. Court No. 24-00227** |
| UNITED STATES, | ) | |
| | ) | |
| Defendant, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| THE MOSAIC COMPANY, | ) | |
| | ) | |
| Defendant-Intervenor, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| THE GOVERNMENT OF THE KINGDOM OF MOROCCO, | ) | |
| | ) | |
| Defendant-Intervenor. | ) | |

## <u>ORDER</u>

Upon consideration of the Rule 56.2 Motion for Judgment on the Agency Record of OCP

S.A., and all other papers and proceedings herein, it is hereby

**ORDERED** that OCP S.A.'s motion is **GRANTED**; and it is further

**ORDERED** that the decision of the U.S. Department of Commerce ("Commerce") in

*Phosphate Fertilizers From the Kingdom of Morocco: Final Results of Countervailing Duty*

*Administrative Review; 2022*, 89 Fed. Reg. 88,952 (Nov. 12, 2024) ("*Final Results*"), and

accompanying Issues and Decision Memorandum ("IDM"), amended by, *Phosphate*

*Fertilizers From the Kingdom of Morocco: Notice of Amended Final Results of Countervailing Duty Administrative Review; 2022*, 89 Fed. Reg. 104,979 (Dec. 26, 2024) is unsupported by substantial evidence and otherwise not in accordance with law, and that Commerce's subsequent investigation of programs never found countervailable or based on OCP's response to the "other benefits" question is void *ab initio*; and it is further

      **ORDERED** that the *Final Results* are hereby remanded to Commerce for reconsideration in accordance with the Court's opinion on this matter.

      **SO ORDERED.**

_____

      Hon. Timothy C. Stanceu, Judge

Dated: _____, 2026

      New York, New York

## UNITED STATES COURT OF INTERNATIONAL TRADE
## BEFORE THE HONORABLE TIMOTHY C. STANCEU, JUDGE

| | |
|---|---|
| OCP S.A., ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | **Consol. Court No. 24-00227** |
| ) | |
| UNITED STATES, ) | **<u>NON-CONFIDENTIAL VERSION</u>** |
| ) | |
| Defendant, ) | **Business Proprietary Information removed from pages 6-8, 11, 13-17, 21-22, 24, 27-30, 33-36, 38-41** |
| ) | |
| and ) | |
| ) | |
| THE MOSAIC COMPANY, ) | |
| ) | |
| Defendant-Intervenor, ) | |
| ) | |
| and ) | |
| ) | |
| THE GOVERNMENT OF THE KINGDOM OF MOROCCO, ) | |
| ) | |
| Defendant-Intervenor. ) | |

## MEMORANDUM IN SUPPORT OF OCP S.A.'s RULE 56.2 MOTION FOR JUDGMENT ON THE AGENCY RECORD

Dated:  September 30, 2025

William R. Isasi
Shelby Anderson
Wanyu Zhang
Julia Shults
Eliza Lafferty

**COVINGTON & BURLING LLP**
One CityCenter
850 Tenth Street, N.W.
Washington, D.C. 20001-4956

Micaela R.H. McMurrough
Hardeep K. Josan

**COVINGTON & BURLING LLP**
The New York Times Building
620 Eighth Avenue, 42nd Floor
New York, NY 10018

*Counsel to OCP S.A.*

Consol. Court No. 24-00227

# TABLE OF CONTENTS

RULE 56.2(C) STATEMENT ................................................................................................. 1

I.     Administrative Determination Under Review .................................................. 1

II.    Issues Presented ................................................................................................. 1

STATEMENT OF FACTS ..................................................................................................... 2

SUMMARY OF THE ARGUMENT ...................................................................................... 5

I.     Commerce's Methodology for Allocating HQ and Support Costs Is Unsupported
       by Substantial Evidence and Otherwise Contrary to Law ............................... 5

II.    Commerce's Calculation of an Amount for Profit Is Unsupported by Substantial
       Evidence and Otherwise Contrary to Law ....................................................... 6

III.   Commerce's Selection of a BPL Range for the Phosphate Rock Benchmark
       Calculation is Unsupported by Substantial Evidence and Otherwise Contrary to
       Law .................................................................................................................. 7

IV.    Commerce's Decision to Investigate Purported Programs That It Never
       Determined Were Countervailable Subsidies Is Unsupported by Substantial
       Evidence and Otherwise Contrary to Law ....................................................... 8

V.     Commerce's Decision to Investigate Twelve Potential Subsidies Based on OCP's
       Response to the "Other Benefits" Question Is Contrary to Law ....................... 8

STANDARD OF REVIEW ................................................................................................... 8

ARGUMENT ....................................................................................................................... 9

I.     Commerce's Methodology for Allocating HQ and Support Costs Is Unsupported
       by Substantial Evidence and Otherwise Contrary to Law ............................... 9

       A.    Commerce's New Revenue-Based Allocation for HQ and Support Costs
             Results in a Distorted CVD Rate for Mining Rights ............................. 10

       B.    Commerce's Reasons for Switching to the New Revenue-Based
             Allocation Are Unsupported by Substantial Evidence and Arbitrary ........ 17

             1.    Commerce's Finding That OCP S.A. Incurs HQ and Support Costs
                   On Behalf of Other Entities Lacks Record Support ................................ 18

             2.    Commerce's Conclusion That Its Original Cost-Based Allocation
                   Methodology Is Unreasonable Is Unsupported and Arbitrary ................ 20

II.    Commerce's Calculation of an Amount for Profit Is Unsupported by Substantial
       Evidence and Contrary to Law ....................................................................... 23

       A.    Commerce's Chosen Profit Rate Does Not Reflect Prevailing Market
             Conditions for Phosphate Rock in Morocco in Violation of the Law .............. 23

       B.    Commerce's Multiproduct Profit Rate Resulted in a CVD Rate That is
             Unsupported by the Record Evidence and Otherwise Contrary to Law .............. 26

i

Consol. Court No. 24-00227

| | C. | Commerce Should Have Used A Rock-Specific Profit Rate from JPMC's Financial Statements or from OCP | 31 |
| | | 1. A Surrogate Profit Rate for Phosphate Rock Is Warranted | 31 |
| | | 2. Alternatively, Commerce Should Have Applied OCP's Profit Rate for Rock | 34 |
| III. | | Commerce's Selection of a BPL Range for the Phosphate Rock Benchmark Calculation is Unsupported by Substantial Evidence and Otherwise Contrary to Law | 35 |
| IV. | | Commerce's Decision to Investigate Purported Programs That It Never Determined Were Countervailable Subsidies Is Unsupported by Substantial Evidence and Otherwise Contrary to Law | 41 |
| V. | | Commerce's Decision to Investigate Potential Subsidies Based on OCP's Response to the "Other Benefits" Question Is Contrary to Law | 45 |
| CONCLUSION | | | 47 |

Consol. Court No. 24-00227

## TABLE OF AUTHORITIES

**Cases**                                                                                      **Page(s)**

*Allegheny Ludlum Corp. v. United States,*
    25 CIT 816 (2001) ................................................................................................42, 46

*Am. Lamb Co. v. United States,*
    785 F.2d 994 (Fed. Cir. 1986)........................................................................................46

*Asociacion Colombiana de Exportadores de Flores v. United States,*
    23 CIT 148, 40 F. Supp. 2d 466 (1999)........................................................................20

*Comm. Overseeing Action for Lumber Int'l Trade Investigations or Negots. v.*
    *United States,*
    755 F. Supp. 3d 1317 (Ct. Int'l Trade 2025) ................................................................18

*Consol. Edison Co. of N.Y. v. NLRB,*
    305 U.S. 197 (1938)..........................................................................................................9

*Huvis Corp. v. United States,*
    570 F.3d 1347 (Fed. Cir. 2009)................................................................................17, 45

*Içdaş Celik Enerji Tersane ve Ulasim Sanayi A.S. v. United States,*
    498 F. Supp. 3d 1345 (Ct. Int'l Trade 2021) .........................................................36, 39

*KG Dongbu Steel Co., Ltd. v. United States,*
    695 F. Supp. 3d 1338 (Ct. Int'l Trade 2024) .........................................................43, 45

*KYD, Inc. v. United States,*
    35 CIT 475, 779 F. Supp. 2d 1361 (2011) ..............................................................26, 36, 39

*Loper Bright Enters. v. Raimondo,*
    603 U.S. 369 (2024)..........................................................................................................9

*NTN Bearing Corp. of Am. v. United States,*
    15 CIT 75, 757 F. Supp. 1425 (1991), *aff'd*, 972 F.2d 1355 (Fed. Cir. 1992) ........8

*POSCO v. United States,*
    557 F. Supp. 3d 1290 (Ct. Int'l Trade 2022) ................................................................26

*POSCO v. United States,*
    977 F.3d 1369 (Fed. Cir. 2020)......................................................................................26

*PPG Indus., Inc. v. United States,*
    978 F.2d 1232 (Fed. Cir. 1992)................................................................................43, 45

*Rhone Poulenc, Inc. v. United States,*
    899 F.2d 1185 (Fed. Cir. 1990)..............................................................................26, 36, 39

**Consol. Court No. 24-00227**

*SFK USA Inc. v. United States,*
263 F.3d 1369 (Fed. Cir. 2001)................................................................21

*Shenzhen Xinboda Indus. Co. v. United States,*
456 F. Supp. 3d 1272 (Ct. Int'l Trade 2020) ..........................................30

*Solarworld Americas, Inc. v. United States,*
182 F. Supp. 3d 1372 (Ct. Int'l Trade 2016) ..........................................21

*SolarWorld Americas, Inc. v. United States,*
910 F.3d 1216 (Fed. Cir. 2018)................................................................21

*Suramerica de Aleaciones Laminadas, C.A. v. United States,*
44 F.3d 978 (Fed. Cir. 1994)...................................................................37

*Suzano S.A. v. United States,*
589 F. Supp. 3d 1225 (Ct. Int'l Trade 2022) ..........................................30

*The Mosaic Co. v. United States,*
659 F. Supp. 3d 1285 (Ct. Int'l Trade 2023) ................................. *passim*

*The Mosaic Co. v. United States,*
774 F. Supp. 3d 1362 (Ct. Int'l Trade 2025) ................................. *passim*

*Ulasim Sanayi A.S. v. United States,*
498 F. Supp. 3d 1345 (Ct. Int'l Trade 2021) ....................................36, 39

*Universal Camera Corp. v. NLRB,*
340 U.S. 474 (1951)............................................................................37, 38

*Yama Ribbons and Bows Co. v. United States,*
36 CIT 1250, 865 F. Supp. 2d 1294 (2012) ..............................................9

**Statutes**

19 U.S.C. § 1516a(b)(1)(B)(i).......................................................................8

19 U.S.C. § 1677(5)..............................................................................42, 45

19 U.S.C. § 1677(5)(E) ................................................................... *passim*

19 U.S.C. § 1677d..........................................................................42, 43, 46

**Regulations**

19 C.F.R. § 351.311 ..............................................................................42, 46

19 C.F.R. § 351.511(a)(2)(i)-(ii)................................................................25

Consol. Court No. 24-00227

19 C.F.R. § 351.511(a)(2)(iii) .............................................................................25

**Other Authorities**

*Certain Hot-Rolled Carbon Steel Flat Products from India: Final Results of CVD Administrative Review*, 73 Fed. Reg. 40,295 (July 14, 2008).............................32, 33

*Certain Uncoated Paper from Indonesia: Final Results of CVD Administrative Review; 2015–2016*, 83 Fed. Reg. 52,383 (Oct. 17, 2018)................................32, 33

*CVD Investigation of Certain Cold-Rolled Steel Flat Products from the Russian Federation: Final Affirmative CVD Determination and Final Negative Critical Circumstances Determination*, 81 Fed. Reg. 49,935 (July 29, 2016) ...........31, 32, 33

*Phosphate Fertilizers from the Kingdom of Morocco and the Russian Federation: CVD Orders*, 86 Fed. Reg. 18,037 (Apr. 7, 2021) ...................................................2

*Phosphate Fertilizers from the Kingdom of Morocco: Preliminary Results of the Countervailing Duty Administrative Review, 2020-2021*, 88 Fed. Reg. 29,089 (May 5, 2023) ........................................................................................................42

*Phosphate Fertilizers from the Kingdom of Morocco: Final Affirmative Countervailing Duty Determination*, 86 Fed. Reg. 9,482 (Feb. 16, 2021) .............................24

*Phosphate Fertilizers from the Kingdom of Morocco: Final Results of Countervailing Duty Administrative Review; 2020–2021*, 88 Fed. Reg. 76,726 (Nov. 7, 2023) ..............................................................................10, 28, 29

*Silicon Metal from Norway: Affirmative Final Determination of Sales at Less Than Fair Value, Final Determination of No Sales, and Final Negative Determination of Critical Circumstances*, 83 Fed. Reg. 9,829 (Mar. 8, 2018) ................19, 20

*Stainless Steel Sheet and Strip in Coils From France: Final Results of Countervailing Duty Administrative Review*, 67 Fed. Reg. 62,098 (Oct. 3, 2002) ........................................................................................................43

Consol. Court No. 24-00227

OCP S.A. ("OCP" or "OCP S.A."), in its role as Plaintiff in the above-captioned

consolidated action, respectfully submits this Memorandum in Support of its Motion for

Judgment on the Agency Record in accordance with Rule 56.2(c) of the Rules of the Court.

## RULE 56.2(C) STATEMENT

### I.    Administrative Determination Under Review

This action seeks judicial review of the *Final Results* issued by the U.S. Department of

Commerce ("Commerce") in the second administrative review of the countervailing duty

("CVD") order on phosphate fertilizers from the Kingdom of Morocco, covering the period from

January 1, 2022 to December 31, 2022.  *See Phosphate Fertilizers from the Kingdom of

Morocco: Final Results of Countervailing Duty Administrative Review; 2022*, 89 Fed. Reg.

88,952 (Nov. 12, 2024) ("*Final Results*") (P.R. 457), and accompanying Issues and Decision

Memorandum ("IDM") (P.R. 451), amended by, *Phosphate Fertilizers from the Kingdom of

Morocco: Notice of Amended Final Results of Countervailing Duty Administrative Review; 2022*,

89 Fed. Reg. 104,979 (Dec. 26, 2024) ("*Amended Final Results*") (P.R. 466).[1]

### II.    Issues Presented

1. **Is Commerce's methodology for allocating OCP S.A.'s headquarters ("HQ") and
   support costs to phosphate rock, based on the consolidated revenues of the OCP
   Group, unsupported by substantial evidence and contrary to law?**  Yes.
   Commerce's methodology for allocating HQ and support costs distorts the CVD rate, is
   unsupported by substantial evidence, and unreasonably departs from the cost-based
   methodology for allocating HQ and support costs that this Court affirmed.

2. **Is Commerce's methodology of using a company-wide, multiproduct profit rate in a
   cost build-up for phosphate rock unsupported by substantial evidence and contrary
   to law?**  Yes.  Commerce failed to select a profit rate for phosphate rock, as the law
   requires.  The selected company-wide, multiproduct profit rate is fundamentally
   inaccurate and unsupported by record evidence.

---

[1] Documents contained in the public administrative record are identified by name and date,
followed by "P.R." and the corresponding administrative record number.  Documents contained
in the confidential administrative record are identified by name and date, followed by "C.R." and
the corresponding administrative record number.

3. **Is Commerce's selection of a bone phosphate lime ("BPL") range for the phosphate rock benchmark unsupported by substantial evidence and contrary to law?**  Yes. Commerce's BPL range methodology fails to consider prevailing market conditions for phosphate rock in Morocco as required by law because it fails to reflect the quality and quantity of phosphate rock OCP produced during the period of review.

4. **Is Commerce's decision to investigate five purported programs that it never determined were countervailable subsidies unsupported by substantial evidence and contrary to law?**  Yes.  Commerce unlawfully required OCP to provide information for five purported programs that have never been determined to be countervailable subsidies.

5. **Is Commerce's decision to investigate twelve potential subsidies based on OCP's response to the "other benefits" question contrary to law?**  Yes.  Commerce unlawfully requested OCP to disclose all "other benefits" received from the GOM.

## <u>STATEMENT OF FACTS</u>

In 2021, Commerce published a CVD order on phosphate fertilizers from Morocco. *Phosphate Fertilizers from the Kingdom of Morocco and the Russian Federation: CVD Orders*, 86 Fed. Reg. 18,037 (Apr. 7, 2021).  Based on a request from Consolidated Plaintiff and Defendant-Intervenor, The Mosaic Company ("Mosaic"), Commerce initiated the second administrative review covering January 1, 2022 to December 31, 2022, as the period of review ("POR").  *Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 88 Fed. Reg. 38,021 (June 12, 2023) (P.R. 18).

In the initial questionnaire, Commerce sought information on the following "programs not used or provided no measurable benefits" and programs on which Commerce purportedly "has not yet made a final countervailable determination":  (1) the OCP Bond Program ("Bonds"); (2) Rail Transport Services; (3) Electricity; and (4) Provision of Port Services and Infrastructure related to Agence Nationale des Ports ("ANP") ("Port and Infrastructure from ANP").  Letter from Robert Palmer to Government of the Kingdom of Morocco, *Administrative Review of the Countervailing Duty Order on Phosphate Fertilizers from the Kingdom of Morocco:* Initial Questionnaire (June 27, 2023) ("*Initial Questionnaire*") at 59, 60 (P.R. 21).  Commerce also

Consol. Court No. 24-00227

sought information about "other benefits" that OCP may have received from the Government of Morocco ("GOM"). *Id.* at 60 (P.R. 21).

On April 29, 2024, Commerce published the *Preliminary Results*. *Phosphate Fertilizers from the Kingdom of Morocco: Preliminary Results of the Countervailing Duty Administrative Review, 2022*, 89 Fed. Reg. 35,800 (May 2, 2024) ("*Preliminary Results*") (P.R. 303), and accompanying Preliminary Decision Memorandum ("PDM") (P.R. 297).

In analyzing whether the GOM provided OCP with the right to mine phosphate ore for less than adequate renumeration ("LTAR"), Commerce determined that the GOM, in "continuing to grant OCP the exclusive right to extract ore from government-owned phosphate reserves, conferred a financial contribution in the form of the provision of a good." PDM at 9 (P.R. 297). Commerce measured the adequacy of remuneration under tier three by constructing a government price for an underlying good conveyed by the mining rights—phosphate rock. *Id.* To construct this government price, Commerce calculated a per-unit cost buildup based on OCP's 2022 reported costs to produce phosphate rock, including an allocated amount for HQ, support, and debt costs, and an amount for profit using a profit ratio derived from OCP S.A.'s unconsolidated profit and loss statement. Memorandum from Jaron Moore to The File, *OCP S.A. Calculations for the Preliminary Results* (Apr. 26, 2024) ("Preliminary Results Calculations") at 5-6 (P.R. 299, C.R. 288).

Commerce then compared the constructed government price to a benchmark price for phosphate rock. To calculate the benchmark price, Commerce selected world market prices for phosphate rock falling within a specified BPL range, with the lower BPL number equaling the BPL content of OCP's 2022 rock consumed locally in Morocco and the higher BPL number equaling the BPL content of OCP's 2022 rock exported as phosphate rock. Preliminary Results

Consol. Court No. 24-00227

Calculations at 3 (P.R. 299, C.R. 288).  Commerce then calculated a simple average of those world market prices and compared that simple average to OCP's constructed government price for phosphate rock.  *Id.*

Commerce published its *Final Results* on November 12, 2024, and *Amended Final Results* on December 26, 2024.  *Final Results* (P.R. 457); *Amended Final Results* (P.R. 466).  In the *Amended Final Results*, Commerce calculated a final subsidy rate for OCP of 16.60%.  *Amended Final Results* at 104,980 (P.R. 466).

For mining rights, Commerce continued to use the same approach established in the *Preliminary Results* but changed its allocation methodology for HQ and support costs.  Rather than allocating OCP *S.A.'s* HQ and support costs in proportion to OCP *S.A.'s* site-specific operating *costs*, Commerce allocated these costs in proportion to the OCP Group's sales *revenues* from the consolidated financial statements of the *OCP Group*.  Memorandum from Jaron Moore to The File, *Final Results Calculations for OCP S.A.* (Nov. 5, 2024) ("Final Calculation Memorandum") at 3 and Attach. 2 "Allocation of HQ Costs" (P.R. 453, C.R. 398 & 399).  Commerce found that this new allocation methodology was "more reasonable" because: (1) "OCP supports other business activities . . . within its corporate management beyond the mining and chemical production sites" upon which the initial cost-based allocation methodology was based; (2) a cost-based allocation relies on an unfounded "presumption" that incurring more site-specific costs would result in more HQ/support costs; and (3) OCP's allocation wrongly excluded certain costs "largely incurred on its chemical production sites."  IDM at 25 (P.R. 451).

With respect to profit, Commerce continued to use a profit based on the entirety of OCP SA's products and activities instead of a profit specific to phosphate rock, concluding that the rock-specific profit rates on the record "do not reflect th{e} commercial reality of OCP."  *Id.* at

Consol. Court No. 24-00227

30 (P.R. 451).  Lastly, Commerce maintained its benchmark methodology, which selected world

market prices using a BPL range and then calculated a simple average of those world market

prices.  *Id.* at 27 (P.R. 451).[2]

Commerce also rejected OCP's objections to the agency's request for information

regarding previously investigated programs that Commerce found were not countervailable

subsidies and all "other benefits" it received from the GOM.  *Id.* at 9-12 (P.R. 451).  Commerce

asserted that it has broad discretion to determine which information is relevant to its

determination and to request the information.  *Id.* at 9-10 (P.R. 451).  Commerce also disputed its

prior findings of non-countervailability and indicated that it would continue to seek information

in future reviews.  *Id.* at 11-12 (P.R. 451).

## SUMMARY OF THE ARGUMENT

### I.  Commerce's Methodology for Allocating HQ and Support Costs Is Unsupported by Substantial Evidence and Otherwise Contrary to Law

Commerce incorrectly rejected its prior allocation methodology for OCP's HQ and

support costs—an allocation methodology based on OCP's total operating costs that this Court

affirmed as reasonable in the first administrative review.  Instead, Commerce used a revenue-

based methodology that allocates HQ and support costs based on revenues reported for product

families included in OCP Group's consolidated financial reporting.  *Id.* at 25 (P.R. 451).

Commerce's methodology is flawed for several reasons.

As an initial matter, Commerce's methodology results in an obviously distorted CVD rate

because by allocating OCP *S.A.'s* HQ and support costs across OCP *Group's* product revenues,

Commerce unmoors the CVD rate from OCP's actual financial performance.  Commerce also

---

[2] Commerce constructed the benchmark in the *Final Results* in all relevant respects in the same
manner as it did in the *Preliminary Results*.

**NON-CONFIDENTIAL**

failed to identify evidence establishing a linkage between the level of HQ and support costs

incurred by OCP *S.A.* and the revenues of the broader OCP *Group*.  Finally, Commerce's attempt

to estimate a revenue for [                                    ] introduces further distortions to its already

distortive revenue-based methodology.

 Commerce also failed to provide a reasoned explanation supported by evidence for

adopting a new revenue-based allocation methodology in this review.  Commerce's key reason

for adopting this novel methodology—that "OCP supports other business activities, including the

activities of its subsidiaries, within its corporate management beyond the mining and chemical

production sites identified, and on which OCP based its allocation"—lacks any record support.

*Id*. (P.R. 451).  Moreover, Commerce did not consider evidence undermining its conclusion that

a cost-based allocation methodology relies on an unreasonable "presumption that incurring more

site-specific costs would result in more HQ/Support costs."  *Id.*  Finally, Commerce's

determination that a cost-based allocation does not provide a "reasonable reflection of OCP's

allocated costs" because it excludes certain expenses is unexplained and, therefore, arbitrary.  *Id.*

## II. Commerce's Calculation of an Amount for Profit Is Unsupported by Substantial Evidence and Otherwise Contrary to Law

 In addition to the other deficiencies, Commerce distorted the constructed government

price by failing to select a profit rate for the good or service being provided—phosphate rock—

as required by law.  Instead, Commerce used an overbroad company-wide profit rate that

reflected profits related to many products, not just phosphate rock.  As a result, Commerce's

profit rate is fundamentally inaccurate because the profit rate for phosphate rock in 2022 was

many times higher than Commerce's chosen multiproduct profit of 24.44%.[3]  Commerce ignored

---

[3] Although this rate is bracketed in Commerce's memoranda, this rate is derived entirely from public information in OCP's financial statements.  IQR at Ex. GEN-5(a)(iii) (P.R. 60, C.R. 48).

this evidence in the *Final Results*, rendering its determination unsupported by substantial evidence.

In light of the flaws with Commerce's company-wide multiproduct profit rate, it was unreasonable for Commerce to summarily reject the rock-specific profit sources on the record. Commerce should have relied on the audited financial statements of Jordan Phosphate Mines Company ("JPMC"), a comparable producer of phosphate rock or, alternatively, on OCP's rock-specific profit rate, rather than a company-wide, multiproduct rate that bears no reasonable relationship to actual rock-specific profits during the POR.

### III.   Commerce's Selection of a BPL Range for the Phosphate Rock Benchmark Calculation is Unsupported by Substantial Evidence and Otherwise Contrary to Law

Commerce's BPL range methodology to calculate a benchmark price is both unlawful and unsupported by substantial evidence.  Commerce failed to consider prevailing market conditions for phosphate rock in Morocco as required by law.  Specifically, Commerce's BPL range gave equal weight to the locally consumed, lower BPL rock price and the exported, higher BPL rock price—despite the record demonstrating conclusively that OCP produced [

].  Commerce also failed to address the extensive record evidence demonstrating that the selected range does not accurately reflect both the quality and quantity of rock OCP produced in 2022, thereby rendering its determination unsupported by substantial evidence.

Moreover, given that BPL content is the single greatest determinant of the price that phosphate rock commands on the market (*i.e.*, higher BPL content rock has a higher price), by relying on a range of BPL levels that plainly overstated the quantity of rock OCP produced with higher BPL content in 2022, Commerce calculated a benchmark price that is fundamentally distorted.  When the difference in the quality (as measured by BPL level) and quantity of rock

NON-CONFIDENTIAL

produced in 2022 is properly accounted for, this results in a weighted-average BPL content level

for all of OCP's rock produced in 2022 of [        ]%, rather than the BPL range Commerce used.

### IV.    Commerce's Decision to Investigate Purported Programs That It Never Determined Were Countervailable Subsidies Is Unsupported by Substantial Evidence and Otherwise Contrary to Law

Commerce unlawfully required OCP to provide information regarding five purported

programs that Commerce has never determined were countervailable subsidies.  Commerce's

decision to seek information regarding these five purported programs when the evidence before

it was that the agency had never found these purported programs to convey a benefit was

contrary to law and practice. The Court should void *ab initio* Commerce's investigation of them.

### V.    Commerce's Decision to Investigate Twelve Potential Subsidies Based on OCP's Response to the "Other Benefits" Question Is Contrary to Law

Commerce unlawfully asked OCP to disclose all "other benefits" it received from the

GOM, despite lacking any evidence or allegation that OCP received such benefits.  Under the

law and regulations, before Commerce may investigate a potential countervailable subsidy not

alleged in a Petition, Commerce must determine that a practice "appears to be a countervailable

subsidy," which is an evidentiary standard that, once met, permits Commerce to exercise its

investigatory powers.  Because Commerce acted outside of its authority by seeking information

about "other benefits," the Court should void *ab initio* Commerce's investigation of them.

### <u>STANDARD OF REVIEW</u>

The Court will hold unlawful a Commerce determination that is "unsupported by

substantial evidence on the record or otherwise not in accordance with law."  19 U.S.C.

§ 1516a(b)(1)(B)(i); *see NTN Bearing Corp. of Am. v. United States*, 15 CIT 75, 75-84, 757 F.

Supp. 1425, 1427-33 (1991), *aff'd*, 972 F.2d 1355 (Fed. Cir. 1992) (applying the substantial

evidence standard in reviewing initiation and final determinations).  "To be in accordance with

Consol. Court No. 24-00227

law, the agency's decision must be authorized by the statute, and consistent with the agency's regulations." *See Yama Ribbons and Bows Co. v. United States*, 36 CIT 1250, 1253, 865 F. Supp. 2d 1294, 1297 (2012) (citation omitted). The Court must determine the "best" interpretation of the statute by applying "the traditional tools of statutory construction." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 403 (2024). Substantial evidence "is more than a mere scintilla" and means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consol. Edison Co. of N.Y. v. NLRB*, 305 U.S. 197, 229-30 (1938).

## ARGUMENT

In the *Final Results*, Commerce's evaluation of OCP's right to mine phosphate ore was unsupported by substantial evidence and otherwise contrary to law because Commerce failed to construct a government price or benchmark price for phosphate rock that reflected the market conditions in Morocco and that were supported by the record evidence. Commerce also acted contrary to the law and its practice when it sought information regarding purported programs it previously investigated and never found conveyed a benefit and based on OCP's responses to the "Other Benefits" question.

### I.    Commerce's Methodology for Allocating HQ and Support Costs Is Unsupported by Substantial Evidence and Otherwise Contrary to Law

In the *Final Results*, Commerce evaluated the adequacy of remuneration for OCP's mining rights by analyzing the underlying good conveyed via those rights, phosphate rock. Specifically, Commerce constructed a government price for phosphate rock based on a buildup of OCP's total cost of production ("COP") for phosphate rock, including extraction taxes paid to the GOM and an amount for profit (a "COP buildup"), and compared that constructed price to a benchmark price for phosphate rock based on world market prices. However, when determining

9

Consol. Court No. 24-00227

the HQ and support costs to allocate to the cost to produce rock, Commerce incorrectly rejected its original methodology based on total operating costs that this Court affirmed as reasonable in the first administrative review.  *See* IDM at 25-26 (P.R. 451); *see also The Mosaic Co. v. United States*, 774 F. Supp. 3d 1362, 1371-75 (Ct. Int'l Trade 2025) ("*Mosaic III*").  Instead, Commerce used a revenue-based methodology that allocates OCP ***S.A.'s*** HQ and support costs based on product revenues reported in the OCP ***Group's***[4] consolidated financial reporting.  *See* IDM at 25-26 (P.R. 451).  Commerce's novel methodology is unsupported and results in an obviously inaccurate CVD rate.  Moreover, Commerce failed to provide a reasoned explanation for adopting this novel methodology.  Accordingly, this Court should remand for Commerce to reconsider its methodology for allocating HQ and support costs.

### A. Commerce's New Revenue-Based Allocation for HQ and Support Costs Results in a Distorted CVD Rate for Mining Rights

In the first administrative review, Commerce allocated OCP S.A.'s HQ and support costs to its four production sites (*i.e.*, OCP S.A.'s two mining sites that mine ore and produce phosphate rock and two chemical sites that produce phosphate products including fertilizers) based on the relative share of OCP S.A.'s total operating costs incurred by each of these production sites.  *See Phosphate Fertilizers from the Kingdom of Morocco: Final Results of Countervailing Duty Administrative Review*; 2020-2021, 88 Fed. Reg. 76,726 (Nov. 7, 2023) ("*AR1 Final Results*"), and accompanying IDM ("*AR1 IDM*") at 29-37.  This Court affirmed this methodology.  *See Mosaic III*, 774 F. Supp. 3d at 1371-75.

---

[4] As noted in the Initial Questionnaire Response, "OCP Group" is an informal designation of the consolidated entity, but it does not exist as a legal entity.  *Phosphate Fertilizers from the Kingdom of Morocco:* OCP S.A. Section III Initial Questionnaire Response (Oct. 6, 2023) ("IQR") at 20, n.20 (P.R. 59, C.R. 44).

In the *Final Results*, Commerce abandoned this methodology and, instead, allocated *OCP*

*S.A.*'s HQ and support costs in proportion to the OCP Group's sales revenues generated by each

"product family" identified in the consolidated financial reporting of the OCP ***Group*** (*i.e.*,

"Phosphates," "Phosphoric Acid," "Fertilizers," and "Other").   IDM at 25-26 (P.R. 451); Final

Calculation Memorandum at Attach. 2 "Allocation of HQ Costs" (P.R. 453, C.R. 399); IQR at

Ex. GEN-9(j) at 17-18 (P.R. 65, C.R. 52) (identifying and describing revenues associated to each

"product family").   Commerce then included in the COP buildup for phosphate rock only the HQ

and support costs allocated to the "Phosphates" family.   Final Calculation Memorandum at

Attach. 2 "Allocation of HQ Costs" (P.R. 453, C.R. 399).   Commerce's revenue-based

methodology should not be affirmed because it:  (1) unmoors the CVD rate from OCP S.A.'s

financial performance; (2) is unsupported by record evidence establishing a linkage between the

level of HQ and support costs incurred by OCP S.A. and the revenues of the broader OCP

Group; and (3) is inherently distortive because, [



] and Commerce's attempt to eliminate this distortion by estimating a

revenue for [                                ] introduces additional significant distortions into its

allocation methodology.

First, Commerce's novel revenue-based allocation methodology is fundamentally flawed

because it results in a mismatch between the costs being allocated (*i.e.*, OCP ***S.A.**'s* HQ and

support costs), and the basis on which those costs are allocated (*i.e.*, the OCP ***Group's*** product

revenues).   OCP S.A. is a single company and distinct from the OCP Group, which includes

approximately 40 distinct companies.   IQR at 20 (P.R. 59, C.R. 44).   It is OCP S.A.'s total cost

Consol. Court No. 24-00227

to produce phosphate rock that Commerce is attempting to identify for inclusion in the COP

buildup for phosphate rock.  *See* PDM at 10-11 (P.R. 297) (unchanged in *Final Results*).

Moreover, it is the HQ and support costs recorded in OCP S.A.'s audited financial

statements that Commerce is allocating to phosphate rock production, ***not*** HQ and support costs

recorded in the OCP Group's financial statement.  *See* IQR at Ex. MIN-18 (P.R. 76, C.R. 81)

(reconciling HQ, support, and other costs, to OCP S.A.'s 2022 financial statements).  Allocating

OCP S.A.'s HQ and support costs based on the revenues of the approximately 40 companies

comprising the OCP Group unmoors the resulting CVD rate from the financial performance of

OCP S.A.—the respondent in this CVD proceeding.  Instead, this novel revenue-based allocation

ties the CVD rate to the financial performance of a fictitious entity that is incurring HQ and

support costs on behalf of a large group of affiliated companies.

Second, implicit in Commerce's revenue-based allocation is the unsubstantiated

assumption that HQ and support costs are incurred in proportion to revenues.  Revenues,

however, rise and fall in relation to the prices for the goods sold rather than the costs of doing

business.  Notably, Commerce cites no evidence that OCP S.A. incurs HQ and support costs in

proportion to the OCP Group's revenues.  In contrast, as discussed at section I.B.2, the evidence

supports Commerce's original, judicially-affirmed, allocation methodology for HQ and support

costs based on total operating costs.  *See* AR1 IDM at 29-37; *Mosaic III*, 774 F. Supp. 3d at

1371-75.

Rather than cite evidence to support its allocation methodology, Commerce dismissed

OCP's arguments on irrelevant grounds.  After conceding that prices for OCP's products were

volatile during the POR, Commerce maintains that it is not problematic to allocate HQ and

support costs based on the resulting revenues because OCP "reports both export sales and local

sales for all three of its major business segments (phosphates, phosphoric acid, and fertilizers)."

IDM at 25-26 (P.R. 451).  That OCP sold multiple products to export and local markets says

nothing about whether it is reasonable to assume that OCP incurred HQ and support costs in

proportion to the revenues resulting from the volatile prices during the POR.

Similarly, Commerce's conclusion that any allocation methodology "will be an

estimation, and volatility that affects only certain parts of a business entity does not negate the

appropriateness of such an allocation" is meaningless.  *See id.* at 26 (P.R. 451).  Price volatility

*does* negate the appropriateness of an allocation methodology tied to such prices where that

methodology results in costs being allocated to products in proportions lacking any foundation in

economic reality or the factual record.

Third, a revenue-based allocation necessarily under-allocates OCP S.A.'s HQ and

support costs to phosphate rock.  As Commerce recognized, the record establishes that [



].  *Compare* OCP,

*Phosphate Fertilizers from the Kingdom of Morocco*: Benchmark Information and New Factual

Information (Feb. 16, 2024) ("OCP Feb. 16 Benchmark Information and NFI Submission") at 4

(P.R. 215, C.R. 201) ("[



]") *with* OCP, *Phosphate Fertilizers from the Kingdom of*

*Morocco*: Benchmark Information and New Factual Information Submitted Pursuant to 19

C.R.F. §§ 351.301(c)(3)(ii) and (c)(5) (Mar. 27, 2024) ("OCP Mar. 27 Benchmark Information &

NFI Submission") at Ex. NFI-23 (P.R. 256, C.R. 243) ([

]).  As a result, allocating HQ and support costs based on each site's share of revenue necessarily under-allocates OCP's HQ and support costs to OCP's rock-producing sites and over-allocates these costs to OCP's sites producing other products.

The constructed government price for rock that Commerce employs—which includes OCP S.A.'s costs to produce rock, including an allocated portion of HQ and support costs plus profit—is compared to a benchmark price for rock to determine the CVD rate for mining rights. *See The Mosaic Co. v. United States*, 659 F. Supp. 3d 1285, 1305 (Ct. Int'l Trade 2023) ("*Mosaic I*").  If the constructed government price for rock is less than the benchmark price, Commerce determines that OCP did not pay adequate remuneration for its right to mine phosphate ore.  The greater this difference between the constructed government price and the benchmark price, the greater the CVD rate, *i.e.*, the constructed government price for rock based on OCP's costs is *inversely* related to the CVD rate.  Consequently, when Commerce artificially *decreases* OCP's COP buildup to produce phosphate rock (as it does when it under-allocates HQ and support cost to phosphate rock), Commerce artificially *inflates* the CVD rate for mining rights.

In the *Final Results*, Commerce conceded that a distortion was inherent in its revenue-based methodology because OCP does not, [

].  *See Final Results of the 2022 Countervailing Duty Administrative Review of Phosphate Fertilizers from the Kingdom of Morocco:* Business Proprietary Information Accompanying the IDM for the Final Results (Nov. 5, 2024) ("IDM BPI Supplement") at 5 (P.R. 452, C.R. 397); *see also* IDM at 26 (P.R. 451) ("We agree that not accounting for this revenue could result in a misallocation of HQ/support costs and have accounted for the potential distortion within the calculated revenue allocation.").

But in a failed attempt to resolve this distortion, Commerce estimated the [          ] revenue

for OCP's internally consumed rock at only its direct (*i.e.*, [          ]) costs which

significantly undervalues the revenue for this phosphate rock.  Further compounding its error,

Commerce double-counted revenue when it not only added this estimated revenue to the OCP's

Group's reported phosphate revenues but also added this estimated revenue to the total revenue

reported in the OCP Group's financial statement.  *See* IDM BPI Supplement at 5 (P.R. 452, C.R.

397); *see also* Final Calculation Memorandum at Attach. 2 "Allocation of HQ Costs" (P.R. 453,

C.R. 399).

        To start, Commerce necessarily undervalues the [          ] revenue for OCP's

internally consumed rock when it estimates a value for this revenue based on only OCP's direct

cost to produce this rock.  Valuing this rock at only its direct costs assumes no amount of HQ or

support costs were incurred in its production.  However, Commerce and this Court have

repeatedly found that OCP necessarily incurs HQ and support costs to produce phosphate rock

which includes the rock it consumes internally.  *See, e.g.*, IDM at 22 (P.R. 451) ("Such expenses,

which are indirect but are relevant to {} OCP's phosphate rock production operations, are

accounted for at the corporate, rather than operational level."); *Mosaic I*, 659 F. Supp. 3d at 1300

("In light of record evidence that OCP engaged in mining activities and incurred SG&A costs in

doing so, the Department's exclusion of all SG&A expenses from the COP buildup was *per se*

unreasonable.").  Consequently, by undervaluing the estimated revenue for this internally

consumed rock, Commerce artificially reduces both the amount of HQ and support costs

allocated to OCP's COP buildup for phosphate rock and the resulting constructed government

price for rock, thereby artificially inflating the CVD rate.

NON-CONFIDENTIAL

More fundamentally, Commerce's attempt to resolve the distortions in its revenue-based allocation methodology using the cost of production for rock reveals a logical fallacy in its revenue-based approach.  In the [                                                                ], Commerce substitutes revenue **with OCP's cost of production for rock**.  But Commerce's allocation methodology is ultimately attempting to identify the HQ and support costs to allocate to OCP's phosphate rock production **to determine OCP's cost of production for rock**. Commerce cannot utilize an allocation methodology intended to ascertain the cost to produce rock that requires Commerce to know in advance the cost to produce rock—including the appropriate amount of HQ and support costs to allocate to these costs.  Simply put, in an attempt to eliminate the distortion in its allocation methodology, Commerce resorts to using as an input the very thing this allocation methodology is used to calculate, demonstrating the inherent logical flaw in Commerce's approach.

Additionally, Commerce's estimation of an [                ] revenue for OCP's internally consumed rock at only its direct COP fails to take account of any profit generated from this internally consumed rock.  Commerce found that this methodology was appropriate because OCP reported that it generated [             ] on the rock production for [                         ].  *See* IDM BPI Supplement at 5 (P.R. 452, C.R. 397).  But this is incorrect.  While OCP did not [         ] revenues on its internal transfers, and therefore did [                         ], OCP's internally consumed rock still generates profits for OCP because this rock is incorporated into fertilizers and phosphoric acid that OCP sells on the market for a profit.  For Commerce to attribute all of this profit to fertilizers and phosphoric acid is inherently distortive; Commerce cannot solve this distortion by simply assuming no profit from this rock production activity.

Finally, Commerce's calculation is distortive because it results in a double-counting of revenue when Commerce adds the estimated [         ] revenue for internally consumed rock, not only to the phosphate revenue to derive a total amount of revenue for phosphate rock (*i.e.*, the numerator), but also to the OCP Group's total reported revenue (*i.e.*, the denominator). Because the OCP Group's total revenue already includes the revenue from products derived from this internally consumed rock such as phosphoric acid and fertilizers, Commerce's inclusion of *additional* revenue for internally consumed rock effectively double counts these revenues in the denominator of its allocation methodology.  *See, e.g.*, IQR at Ex. GEN-9(j) at 14 (P.R. 65, C.R. 52) ("The phosphate extracted at Youssoufia and Benguérir is transported by rail to Safi, where it is processed into phosphoric acid and fertilizer.").

The denominator in Commerce's allocation methodology is used to determine the ratio to apply to HQ and support costs to allocate a portion of those costs to phosphate rock.  By double-counting revenue in the denominator, Commerce artificially increases that denominator, which results in a smaller ratio and less HQ and support costs allocated to phosphate rock. As a result, the amount of HQ and support costs included in OCP's COP buildup for phosphate rock and the resulting constructed government price for phosphate rock based on these costs are artificially *reduced*, once again improperly *inflating* OCP's CVD rate.  Commerce's novel revenue-based allocation methodology cannot be sustained.

### B. Commerce's Reasons for Switching to the New Revenue-Based Allocation Are Unsupported by Substantial Evidence and Arbitrary

Commerce failed to provide a reasoned explanation supported by the record for adopting a revenue-based allocation methodology in this review after having previously applied a cost-based allocation methodology.  *See, e.g.*, *Huvis Corp. v. United States*, 570 F.3d 1347, 1353 (Fed. Cir. 2009) (providing that Commerce must provide a reasoned explanation for departing

Consol. Court No. 24-00227

from previously applied methodologies); *Comm. Overseeing Action for Lumber Int'l Trade Investigations or Negots. v. United States*, 755 F. Supp. 3d 1317, 1326 (Ct. Int'l Trade 2025) (remanding where Commerce "failed to explain why the agency considered its methodology better than the proffered alternative").

Commerce attempts to justify its novel allocation methodology based on two findings: (1) "the record demonstrates that OCP supports other business activities, including the activities of its subsidiaries, within its corporate management beyond the mining and chemical production sites identified"; and (2) Commerce's original cost-based allocation did not provide a "reasonable reflection of OCP's allocated costs." IDM at 25 (P.R. 451). Neither of these findings provide a reasoned and substantiated basis to depart from the cost-based allocation methodology this Court has affirmed.

### 1.    Commerce's Finding That OCP S.A. Incurs HQ and Support Costs On Behalf of Other Entities Lacks Record Support

As an initial matter, Commerce's conclusion that OCP's cost-based allocation unreasonably omits other revenue-generating business segments is premised on a key assumption fundamentally lacking any record support that—"OCP supports other business activities, including the activities of its subsidiaries, within its corporate management beyond the mining and chemical production sites identified, and on which OCP based its allocation" and that it is "unreasonable to assume that these other business segments do not also incur overhead from HQ/support costs." *Id.* But as the sole purported support for its conclusion, Commerce cites "generally," and with no accompanying explanation, to "OCP IQR at Exhibit GEN-9(j)." *Id.* at 25 n.140 (P.R. 451). This exhibit is the consolidated statement of the OCP Group, which is not the same entity as OCP S.A. *See* IQR at 20 (P.R. 59, C.R. 44); Ex. GEN-9(j) (P.R. 65, C.R. 52).

Consol. Court No. 24-00227

The consolidated statements of the OCP Group do not state that OCP S.A. incurs HQ and support costs on behalf of the entire consolidated entity.  To the contrary, the record reflects that OCP S.A. is a single company and distinct from the OCP Group, which includes approximately 40 different companies.  *See* IQR at 20 (P.R. 59, C.R. 44).  OCP S.A. has reconciled its HQ and support costs reported in its audited books and records to OCP S.A.'s unconsolidated financial statements.  *See id.* at 89-90 (P.R. 59, C.R. 44) (explaining that OCP S.A. incurs HQ and support costs "on a corporate level"), Ex. MIN-18 (P.R. 76, C.R. 81) (reconciling HQ and support costs, to OCP S.A.'s 2022 financial statements).

To the extent that Commerce cites the consolidated financial statements to show that OCP S.A. has shareholdings in other entities, such holdings are not evidence that OCP S.A. books HQ and support costs on behalf of those entities in its own audited books and records. Indeed, Commerce rejected such an assumption in the antidumping investigation of silicon metal from Norway.  *See Silicon Metal from Norway: Affirmative Final Determination of Sales at Less Than Fair Value, Final Determination of No Sales, and Final Negative Determination of Critical Circumstances*, 83 Fed. Reg. 9,829 (Mar. 8, 2018), and accompanying IDM at 9-12.  In that investigation, respondent Elkem AS argued that Commerce should allocate a portion of its "headquarters" G&A expenses over the consolidated cost of goods sold of the Elkem Group because "Elkem AS also functions as the parent of the Elkem Group."  *Silicon Metal from Norway IDM* at 10.  Commerce disagreed, finding that "Elkem's primary responsibility is to manage its own operations" as "a large manufacturing company that produces many different products and has numerous manufacturing plants throughout Norway."  *Id.* at 11-12.  Commerce concluded that "{i}t is not supported or reasonable to expect all . . . Elkem AS administrative expenses to be incurred for the benefit of all of the international consolidated Elkem Group

19

companies, equally." *Id.* at 12.  Commerce's determination in the *Final Results* is directly at
odds with its analysis in *Silicon Metal from Norway*.

Moreover, this Court recently rejected a similarly speculative argument that OCP is
recording significant HQ and support costs in its audited books and records on behalf of its
affiliates.  In *Mosaic III*, Mosaic claimed that OCP S.A. incurred significant HQ and support
costs on behalf of the entities in the OCP Group simply because these entities shared the same
address as OCP's headquarters offices.  *See Mosaic III*, 774 F. Supp. 3d at 1374.  The Court
rejected this claim as "mere speculation" and "contradicted by the evidence that the costs at issue
were recorded in OCP's audited books and records." *Id.*  Commerce's conclusion that OCP S.A.
is incurring HQ and support costs on behalf of other entities in the OCP Group, simply because it
is a parent company with numerous shareholdings, is similarly speculative.  Speculation is not
substantial evidence. *Asociacion Colombiana de Exportadores de Flores v. United States*, 23
CIT 148, 154, 40 F. Supp. 2d 466, 472 (1999) ("Speculation, however, is not support for a
finding.").

### 2.     Commerce's Conclusion That Its Original Cost-Based Allocation Methodology Is Unreasonable Is Unsupported and Arbitrary

Commerce also found that its original, judicially affirmed cost-based allocation
methodology: (1) relied on the unreasonable "presumption that incurring more site-specific costs
would result in more HQ/Support costs"; and (2) impermissibly excluded expenses largely
incurred by the chemical production sites.  IDM at 25 (P.R. 451).  But these justifications ignore
record evidence and do not provide a reasoned basis for Commerce to abandon its original
allocation methodology.

As an initial matter, it is not merely a "presumption" that incurring more site-specific
costs would result in more HQ and support costs.  Instead, the record demonstrates that OCP

NON-CONFIDENTIAL

incurs HQ and support costs in support of its day-to-day operations. *See, e.g.*, IQR at 82-84 (P.R. 59, C.R. 44), Exs. MIN-14 (P.R. 74, C.R. 80) & MIN-16 (P.R. 75, C.R. 81) (explaining that HQ and support costs include salaries for HQ personnel who support mining activities and [

                                         ]); Ex. MIN-15 (P.R. 75, C.R. 80) ("The Group depends on its senior management for…the management of day-to-day activities."). Similarly, the record demonstrates that OCP's site costs (*e.g.*, [

      ]) are also incurred in support of OCP's day-to-day operations. *See, e.g.*, IQR at Exs. MIN-3 (P.R. 74, C.R. 79) & MIN-12(b) (P.R. 74, C.R. 80) (listing costs booked to production sites). Thus, the record supports that allocating HQ and support costs based on each site's share of total site costs is reasonable because HQ and support and total site costs are both incurred in support of day-to-day company activities.

        Commerce did not address this evidence, which directly contradicts its conclusion that a cost-based allocation relies on an unreasonable "presumption." *SolarWorld Americas, Inc. v. United States*, 910 F.3d 1216, 1225 (Fed. Cir. 2018) ("{T}he substantiality of evidence must take into account whatever in the record fairly detracts from its weight, including contradictory evidence or evidence from which conflicting inferences could be drawn . . . ."). Nor did Commerce consider that its *own* revenue-based allocation methodology relies on an unsupported presumption that HQ and support costs are incurred in proportion to revenues. *Solarworld Americas, Inc. v. United States*, 182 F. Supp. 3d 1372, 1379 (Ct. Int'l Trade 2016) ("{A}gency action is arbitrary when {it} . . . treat{s} similar situations differently" without explanation.) (quoting *SFK USA Inc. v. United States*, 263 F.3d 1369, 1382 (Fed. Cir. 2001)).

        Additionally, Commerce's conclusion that OCP's cost-based allocation does not "provide a reasonable reflection of OCP's allocated costs" because it excludes [                   ] is

**Consol. Court No. 24-00227**

unreasonable.[5]  OCP explained that inclusion of these costs in the total operating costs on which OCP's HQ and support costs are allocated would be distortive.  *See Phosphate Fertilizer from the Kingdom of Morocco:* OCP S.A. Rebuttal Brief (Oct. 21, 2024) at 27-28 (P.R. 435, C.R. 392). In particular, the record demonstrates that [

].  *See* IQR at Ex. GEN-9(j) at [

] (P.R. 65, C.R. 52).  By including these raw material costs in OCP S.A.'s total operating costs used for allocating HQ and support costs, Commerce would be assuming that OCP S.A.'s production sites incur HQ and support costs in proportion to these volatile raw material prices. But there is no evidence for this assumption and, accordingly, including [                          ] in the allocation would be distortive.

Notwithstanding this distortion, Commerce concluded that the exclusion of [

] was unreasonable because the costs were "significant" and their exclusion created a bias in allocation given that the [

].  *See* IDM BPI Supplement at 4-5 (P.R. 452, C.R. 397).  In other words, according to Commerce, it was better to over-allocate HQ and support expenses to OCP's [                          ] based solely on an unfounded assumption that HQ and support is incurred in relation to [                    ]. Such a rationale lacking evidentiary support does not provide an adequate basis for Commerce to abandon its original, judicially affirmed allocation methodology.

---

[5] In the IDM, Commerce states that OCP's methodology excludes "certain expenses that are largely incurred on its chemical production sites."  IDM at 25 (P.R. 451).  However, in the BPI Supplement to the IDM, the only expenses identified that are largely incurred on chemical sites are [                    ].  IDM BPI Supplement at 4-5.  Accordingly, Commerce has not made a finding that exclusion of other expenses ([
           ] was unreasonable or, at least, has identified zero support for any such finding.

Consol. Court No. 24-00227

In sum, Commerce's justifications for rejecting a cost-based allocation methodology are inadequate. Accordingly, a remand is warranted for Commerce to reconsider its choice of allocation methodology.

## II.    Commerce's Calculation of an Amount for Profit Is Unsupported by Substantial Evidence and Contrary to Law

Commerce incorrectly applied OCP's multiproduct company-wide profit rate rather than a rate that was specific to the production of phosphate rock. *See* IDM at 28 (P.R. 451). By using an overbroad profit rate that includes numerous products distinct from rock, Commerce failed to measure the adequacy of remuneration "in relation to prevailing market conditions for the good or service provided" (here, phosphate rock). *Id.* at 30 (P.R. 451). Moreover, Commerce's selected profit rate is fundamentally inaccurate because it bears no rational relationship to profits for phosphate rock during the POR. Indeed, ample record evidence demonstrates that OCP's company-wide profit rate does not reasonably approximate phosphate rock profits, which were significantly higher during the 2022 POR than the rate Commerce selected. Commerce had rock-specific profit rates on the record from JPMC, a comparable producer of phosphate rock in Jordan, and from OCP itself, yet Commerce unreasonably rejected those sources in favor of a distorted and unlawful profit rate. The Court should remand Commerce's COP buildup calculation with instructions for the agency to calculate an amount for profit based on a profit rate that is specific to the production of phosphate rock.

## A.    Commerce's Chosen Profit Rate Does Not Reflect Prevailing Market Conditions for Phosphate Rock in Morocco in Violation of the Law

19 U.S.C. § 1677(5)(E) requires Commerce to determine the adequacy of remuneration "in relation to prevailing market conditions *for the good or service being provided*. . ." in the country that is the subject of the review. *Id.* (emphasis added). In this CVD proceeding, Commerce has determined that, because there are no market prices for phosphate mining rights

or ore, as neither is commercially traded, it would construct a government price for a good

conveyed by these mining rights: phosphate rock. *See, e.g., Phosphate Fertilizers from the*

*Kingdom of Morocco: Final Affirmative Countervailing Duty Determination*, 86 Fed. Reg. 9,482

(Feb. 16, 2021), and accompanying IDM ("Investigation IDM") at 29.  Accordingly, the "good

or service being provided" for purposes of the LTAR analysis is phosphate rock. *See* 19 U.S.C.

§ 1677(5)(E).  Yet, in the *Final Results*, Commerce unlawfully failed to select a profit rate for

phosphate rock.

Instead, Commerce calculated an amount for profit based on OCP's company-wide

financial statements, which recorded profits for *all* of OCP's products and activities in 2022.  *See*

Memorandum from Jaron Moore to The File, *Countervailing Duty Administrative Review of*

*Phosphate Fertilizers from the Kingdom of Morocco; 2022:* Correction to the Final Results

Calculations for OCP S.A. (Dec. 17, 2024) ("Amended Final Calculation Memorandum") at

Attach. 2 "Profit Calculations" (P.R. 465, C.R. 403 & 404).  In particular, relying on OCP S.A.'s

Profit and Loss Statement, Commerce calculated an amount for profit by "divid{ing} OCP's

company-wide income before tax by OCP's phosphate rock production costs . . . then

multiply{ing} OCP's profit rate by the sum of OCP's calculated total cost of production for

phosphate mining during the POR, in Moroccan Dirham . . . and OCP's allocated debt

costs . . . ."  Amended Final Calculation Memorandum at 1-2 (P.R. 465, C.R. 403).  Because

OCP produces and sells more than phosphate rock, Commerce's methodology necessarily

captured profits on unrelated products like [

            ] that in some instances have significantly lower profit margins than phosphate rock.

*See* IQR at 9 (P.R. 59, C.R. 44), Ex. GEN-3 (P.R. 60, C.R. 47) (listing all products OCP

produced and sold in 2022); *see also* IQR at Ex. MIN-19 at 166 (P.R. 76, C.R. 81); *infra* section

Consol. Court No. 24-00227

II.B (describing the rock-specific profit rate for JPMC's Phosphate Unit of 207%, while JPMC's Fertilizer Unit had a profit rate of only 31.7%).

Commerce's profit calculation did not account for the prevailing market conditions for phosphate rock in Morocco and, as such, it is unlawful. Commerce does not dispute that its profit calculation is not specific to phosphate rock, but rather asserts that this fact is "immaterial." IDM at 30 (P.R. 451). According to Commerce, in calculating OCP's COP buildup, its goal is to achieve a "valuation based on OCP's specific commercial realities" rather than attempting "to create a reasonable market price" as a benchmark. *Id.* But this is incorrect. By Commerce's own framing, its goal is to construct an "actual per-unit cost buildup of OCP's beneficiated phosphate rock . . . ." PDM at 9-10 (P.R. 297). The COP buildup that Commerce constructed is fundamentally not for OCP's beneficiated phosphate rock because it includes profits for unrelated products and activities.

It is irrelevant under the Statute that Commerce's COP buildup for phosphate rock is "not a benchmark." *See* IDM at 30 (P.R. 451). In most cases, Commerce measures the adequacy of remuneration for a government-provided good or service by focusing on the price actually paid to the government in the subject country. *See* 19 C.F.R. § 351.511(a)(2)(i)-(ii). Therefore, Commerce's focus is normally on ensuring that its benchmark price reflects prevailing market conditions in the subject country.

But in this case, Commerce is measuring the adequacy of remuneration by evaluating whether the constructed government price is consistent with market principles. *See* PDM at 9-10 (P.R. 297) (citing 19 C.F.R. § 351.511(a)(2)(iii)). In particular, Commerce's constructed government price is for "the value of the underlying good conveyed via mining rights (**i.e., phosphate rock**)." *See id.* at 9-10 (P.R. 297) (emphasis added). Having chosen this

Consol. Court No. 24-00227

methodology, Commerce is not free to disregard prevailing market conditions *for phosphate rock* simply because such conditions are relevant to the constructed government price for phosphate rock rather than the benchmark price for this rock. *See POSCO v. United States*, 557 F. Supp. 3d 1290, 1298-99 (Ct. Int'l Trade 2022) (holding, in context of a tier-three analysis, that Commerce must consider the "prevailing market conditions" in the Korean electricity market in determining whether the Korean electricity price is consistent with market principles) (citing *POSCO v. United States*, 977 F.3d 1369, 1376-78 (Fed. Cir. 2020)). Indeed, Commerce cannot accurately measure the adequacy of remuneration for phosphate rock in relation to prevailing market conditions for phosphate rock by constructing a government price that is not specific to phosphate rock.

### B. Commerce's Multiproduct Profit Rate Resulted in a CVD Rate That is Unsupported by the Record Evidence and Otherwise Contrary to Law

As set forth above, 19 U.S.C. § 1677(5)(E) requires that Commerce account for rock-specific profits in determining the adequacy of remuneration for mining rights. But even apart from this statutory obligation, Commerce also has an obligation under the CVD law to calculate a rate as accurately as possible and to consider evidence fairly detracting from its conclusions. *See, e.g.*, *KYD, Inc. v. United States*, 35 CIT 475, 496-97, 779 F. Supp. 2d 1361, 1380-81 (2011) (citing *Rhone Poulenc*, 899 F.2d 1185, 1191 (Fed. Cir. 1990)). Here, the record evidence demonstrates in compelling detail that the profit rate for phosphate rock in 2022 was much higher than Commerce's multiproduct profit of 24.44%. By ignoring record evidence demonstrating that a multiproduct profit rate results in an inaccurate profit rate, Commerce failed to meet its statutory obligations.

The record demonstrates that the profit rate selected by Commerce bears no reasonable relationship to actual phosphate rock profits during the POR. To start, financial statements

confirm that in 2022, JPMC, a producer comparable to OCP, had rock-specific profit rates of

207%, more than eight times higher than the 24.44% rate Commerce applied.  *See* IQR at Ex.

MIN-19 at 166 (P.R.76, C.R. 81).[6]  Similarly, OCP's rock-specific profit rate on the record was

[      ]% for 2022, which is [                        ] than the 24.44% profit rate Commerce

used.  *See* OCP Feb. 16 Benchmark Information and NFI Submission at 3-7 and Ex. NFI-5(a)

(P.R. 215, C.R. 201 & 205) (explaining OCP's [        ]% rock-specific profit rate).  As Figure 1

below illustrates, company-wide profit rates of both JPMC and OCP are not even remotely

accurate proxies for their rock-specific profit rates.

**Figure 1: JPMC and OCP 2022 Profit Rates[7]**



---

[6] The 207% profit rate for JPMC's Phosphate unit is calculated by dividing segment profit before tax (696,434 thousand Jordanian Dinars) by segment costs at the level of profit before tax. Segment costs at the level of profit before tax are calculated by subtracting segment profit before tax of 696,434 thousand Jordanian Dinars from segment total sales of 1,032,953 thousand Jordanian Dinars.

[7] OCP calculates JPMC's company-wide profit rate of 117% using the same methodology Commerce used to calculate OCP's company-wide profit rate.  *See* Amended Final Calculation Memorandum at 1-2 (P.R. 465, C.R. 403).  Specifically, OCP divides JPMC's total profit before tax by JPMC's total costs at the level of profit before tax.  JPMC's total profit before tax is 943,928 thousand Jordanian Dinars.  JPMC's total costs at the level of profit before tax is calculated by subtracting total profit before tax of 943,928 thousand Jordanian Dinars from total sales of 1,748,265 thousand Jordanian Dinars.  *See* IQR at Ex. MIN-19 at 166 (P.R. 76, C.R. 81); *see also supra* note 6 (explaining how OCP calculated JPMC's rock-specific profit rate of 207%; Amended Final Calculation Memorandum at Attach. 2 "Profit Calculations" (P.R. 465, C.R. 404) (continued…)

NON-CONFIDENTIAL

The record also establishes that phosphate rock prices increased dramatically during the

2022 POR as compared to prior years, supporting the higher profit rates associated with

phosphate rock in 2022.  At the beginning of 2022, worldwide phosphate rock prices stood at a

nine-year high, up 150% from 20 months prior.  *See Is Co. Undervalued as Phosphate Prices

Soar?*, MENAFN (Feb. 3, 2022), at 2 (submitted at IQR at Ex. MIN-20 (P.R. 76, C.R. 81)).

Phosphate rock pricing data from publishers Commerce relied on for benchmarking purposes

underscore this trend, reflecting increases in rock prices of over 100%—*i.e.*, more than

doubling—between the 2021 POR in AR1 and the 2022 POR in AR2.  *Compare* OCP Mar. 27

Benchmark Information & NFI Submission at Ex. NFI-19 (P.R. 256, C.R. 242), *with Phosphate

Fertilizer from the Kingdom of Morocco:* Information to Rebut, Clarify, or Correct Petitioner's

February 16, 2024 Submission (Mar. 8, 2024) at Ex. RFI-1 (P.R. 238, C.R. 228) (showing, *e.g.*,

that the annual average FOB price reported by CRU for Algerian phosphate rock with a BPL 63-

66 increased by 119.25% between 2021 and 2022).  Even the world market benchmark price for

phosphate rock Commerce calculated at various points in this CVD proceeding [

         ] between the *Final Results* of AR1 (POR 2021) and the *Preliminary Results* of AR2

(POR 2022). *Compare* OCP Feb. 16 Benchmark Information and NFI Submission at Ex. NFI-7

(AR1 Final Results Calculations at Attach. I "Rock Benchmark") (P.R. 215, C.R. 206), *with*

Final Calculation Memorandum at Attach. 2 "Rock Benchmark" (P.R. 453, C.R. 399).

Despite these well-documented increases in rock profits and prices during the 2022 POR,

Commerce's calculated profit rate fails to take account of these market realities.  Notably, the

calculated profit rate only increased nominally from the AR1 to this review despite the dramatic

---

(setting the COP buildup as 24.44%); OCP Feb. 16 Benchmark Information and NFI Submission
at 3-7 and Ex. NFI-5(a) (P.R. 215, C.R. 201 & 205) (explaining how OCP calculated its rock-
specific profit rate of [       ]%).

increase in phosphate rock prices.  *See* OCP Feb. 16 Benchmark Information and NFI

Submission at Ex. NFI-7 (AR1 Final Results Calculations at Attach. I "Profit Calculations")

(P.R. 215, C.R. 206) (showing a profit rate of [      ]% for POR 2021).

This undervalued profit rate results from Commerce using a profit rate that includes

profits from all of OCP's products rather than limited to phosphate rock.  The record

demonstrates that other products captured in the multiproduct profit rate experienced

*substantially* lower profits in 2022, as compared to phosphate rock.  For instance, while the rock-

specific profit rate for JPMC's Phosphate Unit was 207%, JPMC's Fertilizer Unit had a profit

rate of only 31.7% in 2022.[8]  Additionally, as demonstrated in Figure 2 below, OCP's [

].[9]  This underscores that OCP's company-wide financial

data are *not* an accurate surrogate for measuring profits associated with OCP's phosphate rock.

---

[8] Using Commerce's profit calculation methodology, the 31.7% profit rate for JPMC's Fertilizer Unit is calculated by dividing segment profit before tax (115,492 thousand Jordanian Diners) by segment costs at the level of profit before tax.  Segment costs at the level of profit before tax are calculated by subtracting segment profit before tax of 115,492 thousand Jordanian Dinars from segment total sales of 479.748 thousand Jordanian Dinars.  IQR at Ex. MIN-19 at 166 (P.R. 76, C.R. 81).

[9] *See* IQR at Ex. GEN-5(a)(iii) (P.R. 60, C.R. 48) (listing OCP's total revenues of 133,772,696,042 MAD); OCP Feb. 16 Benchmark Information and NFI Submission at 3-7 and Ex. NFI-5(a) (P.R. 215, C.R. 201 & 205) (explaining how OCP calculates its rock-specific revenues of [                    ]).

**Figure 2: Rock Revenue as a Percentage of OCP's Total Revenues**



Commerce disregarded this substantial evidence establishing that OCP's company-wide profit rate is not an accurate proxy for phosphate rock profit. Instead, Commerce repeated its findings from the investigation and AR1 and found "no compelling reason or new evidence" warranting a different decision in this review. IDM at 29 (P.R. 451). But this conclusion ignores that there *was* a significant quantity of new evidence in this review confirming the exceptionally high rock profit in 2022 relative to other phosphate products. Commerce must make its determination based on the record before it and consider evidence that fairly detracts from its conclusions. *See, e.g.*, *Shenzhen Xinboda Indus. Co. v. United States*, 456 F. Supp. 3d 1272, 1285 n.22 (Ct. Int'l Trade 2020) ("{E}ach administrative review is a separate segment of an antidumping proceeding . . . with its own, unique administrative record"); *Suzano S.A. v. United States*, 589 F. Supp. 3d 1225 (Ct. Int'l Trade 2022) (remanding where Commerce "failed to address the record evidence" supporting a party's arguments because Commerce "is obligated to discuss issues material to {its} determination . . . and must take into account whatever in the record fairly detracts from its conclusion") (cleaned up)). Because Commerce has not demonstrated how its decision on *this* record resulted in an accurate CVD rate, remand is warranted.

Consol. Court No. 24-00227

### C. Commerce Should Have Used A Rock-Specific Profit Rate from JPMC's Financial Statements or from OCP

As discussed above, Commerce must rely on a rock-specific profit rate to construct a government price for phosphate rock and the record of this review contains two such profit rates: (1) a rock-specific profit rate derived from the 2022 Annual Report of JPMC, a comparable producer of phosphate rock; and (2) a rock-specific profit rate for OCP's 2022 rock production, derived from information in OCP's financial statements. As demonstrated below, consistent with its practice in other proceedings, Commerce should have relied on the rock-specific profit rate for JPMC for OCP's COP buildup. Alternatively, Commerce should have relied on OCP's rock-specific rate. Commerce's summary rejection of both alternatives in favor of OCP's company-wide multiproduct profit rate was unreasonable.

### 1.    A Surrogate Profit Rate for Phosphate Rock Is Warranted

In contrast to the general OCP corporate profit rate Commerce used, the JPMC profit rate is properly limited to the production of phosphate rock. While JPMC is an integrated producer of phosphate rock, fertilizer, phosphoric acid, and aluminum fluoride, its audited financial statements segment revenues and profits by business units, including breaking out the phosphate unit, which extracts, mines, and sells phosphate rock to international and local markets. *See* IQR at Ex. MIN-19 at 114, 166 (P.R. 76, C.R. 81). By using this audited financial information for the mining and rock producing business unit, Commerce can calculate a rock-specific profit rate for JPMC of 207%. *See supra* section II.B. Thus, unlike OCP's financial statements, Commerce can construct a profit rate specific to phosphate rock production using JPMC's financial statements.

While JPMC's profit is not specific to OCP, there is precedent for Commerce relying on "surrogate" profit rates in other proceedings where it was constructing a COP buildup under a

tier-three LTAR analysis.  In *CRS from Russia*, Commerce utilized an out-of-country profit rate

from India in its tier-three cost buildup for coal.  *CVD Investigation of Certain Cold-Rolled Steel

Flat Products from the Russian Federation: Final Affirmative CVD Determination and Final

Negative Critical Circumstances Determination*, 81 Fed. Reg. 49,935 (July 29, 2016) ("*CRS

from Russia*"), and accompanying IDM at 31, 102.  Similarly, in *HRS from India*, where the

producer was vertically integrated and thus did not have a profit component associated with its

mining and extraction activities, Commerce calculated a profit rate using the financial reports of

two Indian mining companies.  *Certain Hot-Rolled Carbon Steel Flat Products from India: Final

Results of CVD Administrative Review*, 73 Fed. Reg. 40,295 (July 14, 2008) ("*HRS from India*"),

and accompanying IDM at 18-20, 73 & n.18.  Additionally, in *Certain Uncoated Paper from

Indonesia*, Commerce adjusted benchmark prices for timber using data from a third-party study.

*See Certain Uncoated Paper from Indonesia: Final Results of CVD Administrative Review;

2015–2016*, 83 Fed. Reg. 52,383 (Oct. 17, 2018) ("*Uncoated Paper from Indonesia*"), and

accompanying IDM at 22-24.

  In rejecting JPMC's profit rate, Commerce stated that it has only relied on surrogate

profit data where there was no other "reliable and documented information available on the

record" or where the "profit earned during the mining/extraction phase . . . exists in the

benchmark, but does not exist in the data {the respondent} submitted."  IDM at 29 (P.R. 451)

(citing *Uncoated Paper from Indonesia*; *HRS from India*; and *CRS from Russia*).  Finding that

those circumstances did not apply here, Commerce concluded that "OCP's financial information,

from which Commerce has the ability to calculate a profit rate, is the most suitable information

to use for the calculation."  IDM at 29 (P.R. 451).  Commerce's conclusion is unsupported by its

past practice and the record in this review, which demonstrates that OCP's company-wide

financial data are not "suitable" to calculate a rock-specific profit rate.

    As an initial matter, Commerce mischaracterizes its past practice.  No language in *CRS*

*from Russia* or *Uncoated Paper from Indonesia* supports Commerce's interpretation of those

determinations as articulating a practice of only using surrogate profit rates where such rates are

the only "reliable" ones on the record.  And, while Commerce correctly states that the company

in *HRS from India* did not record a separate profit on mining/extraction, Commerce fails to

appreciate that the [                                                    ] given that OCP [

      ] its mining/extraction activity.  In any event, even if Commerce had a practice of

relying on surrogate profit rates only where no other "reliable" profit rates existed, the company-

wide profit rate for OCP is *not* a "reliable" proxy for phosphate rock profit during *this* POR.

    We acknowledge that, in the investigation of this proceeding, this Court sustained

Commerce's use of OCP's overall corporate profit rate over a surrogate profit rate.  *See*

*Mosaic I*, 659 F. Supp. 3d at 1302-03 ("Neither profit data set was perfect, but *on this record*

OCP has not shown that it was unreasonable for Commerce to rely upon the data set specific to

OCP's own business operations") (emphasis added)).  In *Mosaic I*, this Court found that

Commerce reasonably elevated specificity to OCP's operations over specificity to phosphate

rock when choosing from among two imperfect data sources.  *See id.* at 1303.  But the record of

this review is different from the record in the investigation in a crucial way because OCP

provided compelling evidence demonstrating that OCP's overall profit rate bears no reasonable

relationship to a rock-specific profit rate.  Commerce failed to address this evidence.

Additionally, the Court found in *Mosaic I* that OCP provided "no statute, regulation, or binding

precedent in support of" its contention that Commerce must select a profit rate that is specific to

phosphate rock. *See id.* at 1302. Here, OCP has explained in detail why Commerce's actions violate 19 U.S.C. § 1677(5)(E). Accordingly, we respectfully submit that this Court should reach a different conclusion here, based on the record and arguments in this review.

**2.     Alternatively, Commerce Should Have Applied OCP's Profit Rate for Rock**

In the *Final Results*, Commerce expressed a preference for a profit rate that is specific to OCP. *See* IDM at 29-30 (P.R. 451). Yet, Commerce also unreasonably rejected an OCP-specific profit rate for phosphate rock derived by: (1) summing OCP's actual sales of phosphate rock to unaffiliated and affiliated parties and an estimated value for internally consumed phosphate rock for which, as discussed above, [

]; (2) subtracting OCP's total rock production costs; and (3) dividing the resulting value by OCP's total rock production costs. *See* OCP Feb. 16 Benchmark Information and NFI Submission at 3-7 and Ex. NFI-5(a) (P.R. 215, C.R. 201 & 205) (explaining how OCP's rock-specific profit rate of [       ]% may be derived by calculating the value of OCP's 2022 rock production). In particular, Commerce found that OCP's rock-specific profit was "theoretical" and "not reflective of OCP's phosphate rock actual mining business during the POR." IDM BPI Supplement at 7 (P.R. 452, C.R. 397); IDM at 29 n.172 (P.R. 451).

Commerce's reasoning cannot withstand scrutiny because substantial evidence demonstrates that the company-wide rate upon which Commerce relied is itself "not reflective of OCP's actual mining business during the POR." IDM BPI Supplement at 7 (P.R. 452, C.R. 397). To the contrary, as discussed *supra* section II.A, Commerce applied a company-wide profit rate for OCP that reflected profit rates from other products with significantly lower profit margins. In this review, where the record evidence demonstrates conclusively that rock profits in 2022 were substantially higher than profits for other phosphate products, and OCP's rock-specific profit rate

was [                                    ] than OCP's overall (multiproduct) profit rate, Commerce

cannot reasonably support its rejection of OCP's rock-specific rate on grounds that a vastly

understated company-wide profit rate is somehow more accurate or reliable.

For similar reasons, Commerce's conclusion that a company-wide profit rate better

reflects OCP's "commercial reality" is unfounded.  IDM at 30 (P.R. 451); IDM BPI Supplement

at 7 (P.R. 452, C.R. 397).  According to Commerce, because OCP reported that [


] and "any profit OCP could have generated from mining phosphate rock

would be passed to its production and sale of fertilizer."  IDM BPI Supplement at 7 (P.R. 452,

C.R. 397).  In addition to relying on nothing other than mere speculation about the extent to

which profits are [                         ], Commerce's apparent belief that a company-wide rate

approximates OCP's rock profit is contradicted by the extensive evidence showing that OCP's

company-wide rate is *not* an accurate proxy for phosphate rock profits in 2022.

In sum, Commerce had useable rock-specific profit rates on the record from JPMC and

from OCP itself, yet Commerce unreasonably rejected those sources in favor of a distorted and

unlawful multiproduct company-wide profit rate.  Commerce's decision to use a company-wide

profit rate must be remanded because it is unsupported by substantial evidence and contrary to

law.

### III.   Commerce's Selection of a BPL Range for the Phosphate Rock Benchmark Calculation is Unsupported by Substantial Evidence and Otherwise Contrary to Law

As discussed above, Commerce determines the adequacy of remuneration for the right to

mine phosphate ore by constructing a government price for phosphate rock and comparing that

government price to a benchmark price for phosphate rock.  Commerce calculated a benchmark

price using world market prices for phosphate rock falling within a specified BPL range, with the

lower BPL number equaling the BPL content of OCP's 2022 rock consumed locally and the

higher BPL number equaling the BPL content of OCP's 2022 rock exported as phosphate rock.

Preliminary Results Calculations at 3 (P.R. 299, C.R. 288) (unchanged in *Final Calculation*

*Memorandum*).  Under this approach, Commerce gave equal weight to the locally consumed,

lower BPL rock price and the exported, higher BPL rock price—despite the record

demonstrating conclusively that OCP produced [                                    ]. *Id.* (P.R. 299,

C.R. 288); IQR at 91 (P.R. 59, C.R. 44).  Commerce's methodology is both contrary to law and

unsupported by substantial evidence.

       First, Commerce's BPL range methodology is unlawful because it does not account for

prevailing market conditions for phosphate rock in Morocco as required by the Statute, namely it

fails to consider the [        ] different quantities of lower quality (*i.e.*, lower BPL content) and

higher quality (*i.e.*, higher BPL content) rock that OCP produced in 2022.  *See* 19 U.S.C.

§ 1677(5)(E).  Second, Commerce's conclusion that its methodology yielded a "representative"

range of BPL levels for the benchmark is unsupported by substantial evidence because

Commerce failed to address the extensive evidence demonstrating that the selected range does

not accurately reflect both the quality and quantity of rock OCP produced in 2022.  By relying on

a range of BPL levels that plainly overstated the quantity of rock OCP produced with higher BPL

content in 2022, Commerce calculated a benchmark price that is fundamentally distorted and

contrary to Commerce's obligation to calculate CVD margins as accurately as possible.  *See*

*KYD*, 35 CIT at 496-97, 779 F. Supp. 2d at 1380-81 (citing *Rhone Poulenc*, 899 F.2d at 1191);

*Içdaş Celik Enerji Tersane ve Ulasim Sanayi A.S. v. United States*, 498 F. Supp. 3d 1345, 1353

(Ct. Int'l Trade 2021)).

Consol. Court No. 24-00227

In the *Final Results*, Commerce correctly included world market prices for rock in its benchmark price calculation based on the BPL level content of that rock.  IDM at 15 (P.R. 451).  As Commerce has found in every segment of this proceeding, and this Court has affirmed, BPL content (which is a measure of quality) is the single greatest determinant of the price that phosphate rock is able to command on the market.[10]  However, in determining what BPL range to use in selecting prices to include in its benchmark price calculation, Commerce failed to account for prevailing market conditions, as required by 19 U.S.C. § 1677(5)(E).  Specifically, Commerce failed to consider that OCP produced significantly more phosphate rock of a lower BPL content in 2022.  PDM at 9-10 (P.R. 297).  Therefore, Commerce's phosphate rock benchmark price is contrary to law.

In defending its selection of world market prices, Commerce explained that it "used the lowest and highest average BPL levels of OCP's phosphate rock to create {a} representative range of BPL levels" from which to select rock benchmarks.  IDM at 15 (P.R. 451).  Commerce's conclusion that this methodology resulted in a "representative" benchmark price is unsupported by the record because the agency failed to address conclusive evidence demonstrating the vastly different quantities of low BPL rock OCP produced in 2022 (for local consumption) as compared to the high BPL rock (for export).  *Id.* at 15-16 (P.R. 451).  Because Commerce ignored this record evidence, its benchmark price and the resulting LTAR analysis is unsupported by substantial evidence, inaccurate, and distortive.  *Suramerica de Aleaciones*

---

[10] *See, e.g.*, *Mosaic I*, 659 F. Supp. 3d at 1308 (noting that "'phosphate content/BPL content' is the industry's own standard . . . metric of comparability for phosphate rock") (internal quotations omitted); OCP Mar. 27 Benchmark Information & NFI Submission at Ex. NFI-16 (P.R. 256, C.R. 242) (containing an excerpt of Verification Exhibit 15 presented during AR1 explaining that "BPL, or bone phosphate of lime content (sometimes expressed as $P_2O_5$), is the primary driver of the price of phosphate rock").

*Laminadas, C.A. v. United States*, 44 F.3d 978, 985 (Fed. Cir. 1994) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487-88 (1951)) (explaining that substantial evidence must account for "whatever in the record fairly detracts from" the conclusion).

Commerce's conclusion that its phosphate rock benchmark price was "representative" of the rock OCP produced in 2022 is directly contradicted by the record, which shows that [

] of the rock produced by OCP in 2022 was lower BPL rock that OCP consumes internally.  As Figure 3 below illustrates, OCP's locally consumed rock, with a relatively low average BPL content [            ], comprised [                ] of OCP's rock production in 2022 whereas OCP's exported rock, with a relatively high BPL content [            ], constituted [                ] of OCP's rock production in 2022.  *See* IQR at 91 (P.R. 59, C.R. 44). Commerce's benchmark calculation, in contrast, effectively presumes that OCP produced equal quantities of low and high BPL content rock in 2022.

**Figure 3:  OCP Rock Production**



Commerce's failure to consider the difference in quantity results in a benchmark price that is fundamentally distorted.  BPL content is the single greatest determinant of the price that

phosphate rock commands on the market (*i.e.*, higher BPL content rock has a higher price).  *See supra* note 10.  Accordingly, Commerce's use of a BPL range to select world market prices that fails to account for the quantity of rock OCP produced at high and low BPL levels violates the agency's obligation to calculate CVD margins as accurately as possible.  *KYD*, 35 CIT at 496-97, 779 F. Supp. 2d at 1380-81 (citing *Rhone Poulenc*, 899 F.2d at 1191); *Içdaş*, 498 F. Supp. 3d at 1353.

　　　　Instead of using a range that gave outsized weight to the BPL of the [            ] share of OCP's high BPL rock produced for export, Commerce should have used a weighted-average BPL level to select world market prices for inclusion in the benchmark price calculation.  When the difference in the quality (as measured by BPL level) and quantity of rock produced in 2022 is properly accounted for, this results in a weighted-average BPL content level for all of OCP's rock produced in 2022 of [      ]%,[11] rather than the range of [      ]%-[      ]% used by Commerce (which assumes equal quantities of high- and low-content BPL rock).  IDM BPI Supplement at 4 (P.R. 452, C.R. 397) (citing OCP Case Brief and Request for a Closed Hearing (Oct. 16, 2024) ("OCP Case Br.") at 14-15 (P.R. 431, C.R. 388).  Put differently, through its provision of mining rights in 2022, the GOM provided OCP with access to phosphate ore from which OCP produced phosphate rock in 2022 with a weighted-average BPL content of [      ]%.  Therefore, to correctly evaluate whether the provision of mining rights conveyed a benefit to

---

[11] This weighted-average BPL figure is calculated as follows: Step 1: Calculate the percentage of rock consumed locally and the percentage of rock exported as rock. In this case, the percentage of rock consumed locally is [            ], and the percentage of rock exported is [                    ].  *See* IQR at 91, Ex. MIN-22 (P.R. 59 & 76, C.R. 44 & 81).  Step 2: Multiply these percentages by the average BPL for each type of rock for 2022 (*i.e.*, multiplying [            ] and [                          ]).  *Id.*  Step 3: Sum the results from Step 2.  The equation would be [                                    ].  OCP Case Br. at 20 n.82 (P.R. 431, C.R. 388).

OCP in 2022, Commerce should calculate a benchmark price based on world market prices for rock with a BPL level of [     ]%.

Commerce refused to use the weighted-average BPL content of OCP's rock produced during the POR because Commerce believed it "would narrow the number of comparable world benchmark prices and not capture the full range of BPL levels that OCP produces." IDM at 16 (P.R. 451). Commerce's conclusion is both unreasonable and unsupported by the record. As an initial matter, OCP disagrees that selecting world market prices that correspond more precisely to both the quality and quantity of phosphate rock OCP produced in 2022 "does not capture the full range of BPL levels OCP produces." To the contrary, using a weighted-average BPL level that accounts for not only quality, but also the quantity, of rock OCP produced in 2022 results in a more accurate benchmark price and resulting CVD rate.

In any event, the world market prices on the record covered phosphate rock with a range of BPL levels, rather than a precise BPL level. As Figure 4 below illustrates, the world market prices for phosphate rock with a BPL level of [     ]% are for rock with a BPL range as low as [     ] and as high as [     ]. IQR at 91 (P.R. 59, C.R. 44); OCP Mar. 8 Rebuttal Benchmark Submission at Ex. RFI-1 (P.R. 238, C.R. 228; *see also* OCP Case Br. at 21-22 (P.R. 431, C.R. 388).

**Figure 4: BPL Range of Benchmark Prices**



Therefore, contrary to Commerce's conclusion, using a weighted-average BPL level of [        ]%

to select world market prices captures world market prices that reflect the full range of BPL

levels of the rock that OCP produced in 2022.

In sum, Commerce's BPL range methodology is unlawful and unsupported by substantial

evidence because Commerce ignored the [        ] different quantities of lower quality (*i.e.*, lower

BPL content) and higher quality (*i.e.*, higher BPL content) rock that OCP produced in 2022, as

required by law.  Commerce should have used a weighted-average BPL level to select world

market prices for inclusion in the benchmark price calculation.

**IV.    Commerce's Decision to Investigate Purported Programs That It Never
         Determined Were Countervailable Subsidies Is Unsupported by Substantial
         Evidence and Otherwise Contrary to Law**

Commerce unlawfully investigated five purported programs in the challenged review that

it previously investigated but ***never*** found conferred a benefit on OCP.  *See* IDM at 12 (P.R.

451).[12]  The law defines a subsidy as a financial contribution that provides a benefit.  19 U.S.C.

§ 1677(5).  Because Commerce never found a benefit for these purported programs, Commerce

never determined them to be subsidies—countervailable or otherwise.  As discussed below,

Commerce's decision to seek information during the challenged review regarding these five

purported programs when the evidence before it was that the agency had never found these

programs to convey a benefit was contrary to law and Commerce's practice.

Under the law and regulations, Commerce must possess information demonstrating the

"appearance" of a countervailable subsidy before seeking information on purported programs for

which no allegation has been made. 19 U.S.C. § 1677d; 19 C.F.R. § 351.311; *see also Allegheny*

*Ludlum Corp. v. United States*, 25 CIT 816, 825 (2001) (internal quotation marks and citation

omitted) (affirming Commerce's remand redetermination where it stated that it does not go on

"fishing expeditions, investigating any and all government practices that might affect the

respondents").  In demanding that OCP respond to full questionnaire responses for five purported

programs that Commerce had previously investigated but never determined constituted subsidies,

let alone countervailable subsidies, Commerce exceeded its statutory authority.  Not only did

Commerce lack evidence demonstrating an appearance of a countervailable subsidy, the

affirmative evidence at the time it sought information regarding these five purported programs—

Commerce's prior determinations that these purported programs never constituted a

---

[12] The five purported programs include: (1) Bonds; (2) Rail Transport Services; (3) Electricity;
(4) Port and Infrastructure from ANP; and (5) Local Reductions.  During the investigation and
first administrative review, Commerce found each program to confer "no benefit" and thus not
be countervailable.  *See, e.g.*, Investigation IDM at 61-63; *Phosphate Fertilizers from the
Kingdom of Morocco: Preliminary Results of the Countervailing Duty Administrative Review,
2020-2021*, 88 Fed. Reg. 29,089 (May 5, 2023), and accompanying PDM at 14 n.72 (unchanged
in final results) (Bonds); Investigation IDM at 87 and AR1 IDM at 12 (Rail Transport Services);
AR1 IDM at 12 (Electricity); AR1 IDM at 53 (Port and Infrastructure from ANP); AR1 IDM at
12 (Local Reductions).

Consol. Court No. 24-00227

countervailable subsidy—affirmatively indicated that the agency lacked a basis to seek such information.

We acknowledge this Court's prior rulings on the interpretation of 19 U.S.C § 1677d but respectfully submit that the factual context differs here. In *Mosaic I* and *Mosaic III*, this Court found that Commerce did not exceed its statutory authority when it requested information from OCP about other assistance or benefits it received from the GOM. *See Mosaic I*, 659 F. Supp. 3d at 1312-14; *Mosaic III*, 774 F. Supp. 3d at 1383. But in this review, Commerce sought information for, and investigated, purported programs that it had previously investigated and never found constituted countervailable subsidies. Accordingly, we respectfully submit that this Court should reach a different conclusion here based on these different facts—that Commerce's investigations of these purported programs violated the law because it not only had no basis to investigate the purported programs, Commerce had affirmative evidence *that none were countervailable subsidies.*

Commerce's inquiry into these five purported programs is also contrary to its practice. *See, e.g.*, *KG Dongbu Steel Co., Ltd. v. United States*, 695 F. Supp. 3d 1338, 1345 (Ct. Int'l Trade 2024); *PPG Indus., Inc. v. United States*, 978 F.2d 1232, 1242 (Fed. Cir. 1992) (citing five different cases dating back to 1983 where Commerce explained that it will not re-investigate a program determined to be not countervailable unless presented with new evidence justifying reconsideration of a prior finding); *Stainless Steel Sheet and Strip in Coils From France: Final Results of Countervailing Duty Administrative Review*, 67 Fed. Reg. 62,098 (Oct. 3, 2002), and accompanying IDM at 7-8 (explaining that Commerce removed a program from the first administrative review questionnaire after it determined that such program was not countervailable during the investigation two years earlier). Commerce's own questionnaires

Consol. Court No. 24-00227

make clear that Commerce will not inquire into purported programs already deemed to not be countervailable. *See, e.g.*, Initial Questionnaire at II-1 (P.R. 21) ("Commerce is inquiring into each subsidy program previously examined in the investigation or prior review, **except for programs already determined to be terminated or not countervailable**.") (emphasis added); *id*. at Section I (General Instructions) at II-8, Section II at II-21, and Section III at 50 (P.R. 21).

Here, Commerce asserted that its continued investigation into the five purported programs was consistent with its practice because its practice is to cease re-investigating purported programs only when it determines the purported programs are "not countervailable." IDM at 11 (P.R. 451). According to Commerce, it previously determined for these five purported programs only that "there was no benefit provided during the examined period in question" and it never found these programs "not countervailable" because the agency "did not make a determination with respect to the financial contribution or specificity elements of the program." *Id.* Commerce also found that the lack of a benefit finding for recurring subsidies during a specific POR does not mean that the "legal basis for the program does not have an 'appearance of a countervailable subsidy,' or that the alleged program is not subject to further investigation." *Id.* at 11-12 (P.R. 451). Commerce's rationales for why its actions were consistent with its practice are unsupported by the law and contradicted by the record evidence.

First, Commerce's rationale for seeking information for these purported programs plainly does not apply to the Bond program. Commerce explained that it sought information regarding these five programs (including the Bond program) because, "{w}hether Commerce determines a benefit is conferred for recurring subsidies, in particular, is based on a POI or POR specific basis . . . ." *Id.* at 12 (P.R. 451). But as Commerce concedes, the Bonds program is *not* a recurring subsidy. *See id.* at 11-12 (P.R. 451). Thus, Commerce failed to establish any reason

44

Consol. Court No. 24-00227

why the investigation of the Bond program is consistent with its practice, effectively conceding it acted contrary to its practice in violation of the law. *Huvis*, 570 F.3d at 1353.

Second, a countervailable subsidy requires three elements: it must be specific, provide a financial contribution, and confer a benefit. *See* 19 U.S.C. § 1677(5). Because Commerce previously found that no benefit was conferred with respect to the five purported programs, one of the elements necessary for a countervailable subsidy was not met, meaning regardless of how Commerce chooses to characterize its prior determinations, the agency in fact determined these purported five programs were "not countervailable." *See KG Dongbu Steel*, 695 F. Supp. 3d at 1345; *see also PPG Indus.*, 978 F.2d at 1242. Importantly, this is not a situation where Commerce had in some prior segment of the CVD proceeding found a benefit for a recuring countervailable subsidy but then, in some intervening year, Commerce found no benefit. For each of the five purported programs, Commerce previously investigated them and ***never*** found a benefit. Accordingly, Commerce lacked any evidentiary basis to seek information regarding these purported programs in this review.

In sum, the evidence before Commerce at the time it sought information regarding the five purported programs was that the agency had only ever found them to be not countervailable. Thus, Commerce's decision to seek information regarding these purported programs was not supported by substantial evidence, not in accordance with the law, and not consistent with the agency's practice.

## V.    Commerce's Decision to Investigate Potential Subsidies Based on OCP's Response to the "Other Benefits" Question Is Contrary to Law

Commerce continued without statutory authority to demand information from OCP regarding any "other benefits" it received from the GOM and then investigated 12 potential subsidies based on OCP's responses. *See* Initial Questionnaire at 60 (P.R. 21); *see also* OCP

Consol. Court No. 24-00227

Case Br. at 49-50 (P.R. 431; C.R. 388).[13]  Under the law and regulations, Commerce must

possess information demonstrating the "appearance" of a countervailable subsidy before seeking

such information on unspecified programs for which no allegation has been made.  19 U.S.C.

§ 1677d; 19 C.F.R. § 351.311; *see also Allegheny*, 25 CIT at 825 (2001) (internal quotation

marks and citation omitted) (affirming Commerce's remand redetermination where it stated that

it does not go on "fishing expeditions, investigating any and all government practices that might

affect the respondents").  In requesting that respondents like OCP must disclose any other

"benefits" that Commerce might imagine  OCP had received from the GOM—without any

evidentiary or legal basis for doing so—and examining 12 potential programs based on OCP's

responses, Commerce exceeded its statutory authority.  The Court should void *ab initio*

Commerce's investigation of these purported programs.

 Commerce's unlawful "fishing expedition" impermissibly bypasses the requirement for

predicate evidence that Congress and the Statute impose upon Commerce before the agency is

allowed to initiate an investigation, forcing OCP to prepare and submit thousands of pages of

responses and exhibits, expending great time and effort.  *See, e.g., Allegheny*, 25 CIT at 824

(finding CVD proceedings to be "costly and time consuming") (citing *Am. Lamb Co. v. United

States*, 785 F.2d 994, 1002-04 (Fed. Cir. 1986)).  We acknowledge that this Court previously

rejected OCP's argument regarding the other assistance and benefits question in the Investigation

and first administrative review litigation, respectively.  *See Mosaic I*, 659 F. Supp. 3d at 1312-

---

[13] These 12 programs include: (1) Reduction in National Tax Fines And Penalties; (2) Local
Reductions; (3) Revenue Exclusions From Minimum Tax Contributions; (4) Customs Duty
Exemptions; (5) Rail Transport Services; (6) Electricity; (7) Port Services and Infrastructure
from ANP; (8) The Inter-Enterprise Mining Vocational Training Fund; (9) OCP's Issuance of
Commercial Paper; (10) The Vocational Training Tax Reimbursements; (11) Land Transactions;
And (12) Port And Vessel Services Related To Marsa Maroc.

Consol. Court No. 24-00227

14; *Mosaic III*, 774 F. Supp. 3d at 1383.  However, as these decisions are not yet final and conclusive, OCP respectfully raises this argument again in this action for purposes of preserving it for any future appeal.

## <u>CONCLUSION</u>

For all these reasons, OCP respectfully requests that the Court hold the *Final Results* unsupported by substantial evidence and otherwise not in accordance with law, and remand to Commerce accordingly.

Respectfully submitted,

Dated:  September 30, 2025

/s/ William R. Isasi
William R. Isasi
Shelby Anderson
Wanyu Zhang
Julia Shults
Eliza Lafferty

**COVINGTON & BURLING LLP**
One CityCenter
850 Tenth Street, N.W.
Washington, D.C. 20001-4956

Micaela R.H. McMurrough
Hardeep K. Josan

**COVINGTON & BURLING LLP**
The New York Times Building
620 Eighth Avenue, 42nd Floor
New York, NY 10018

*Counsel to OCP S.A.*

**Consol. Court No. 24-00227**

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to paragraphs 2(B)(1) and (2) of the U.S. Court of International Trade's Standard Chambers Procedures, the undersigned hereby certifies that the attached Memorandum of Law in Support of  OCP S.A.'s Rule 56.2 Motion for Judgment on the Agency Record, filed September 30, 2025, contains 13,993 words, including footnotes, and excluding the table of contents, table of authorities, counsel's signature block, and this certificate, according to the word count function of the word-processing system used to prepare this brief, and therefore complies with the maximum word count limitation set forth in the Court's Standard Chambers Procedures.

<u>/s/ William R. Isasi</u>
William R. Isasi