UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE: THE HONORABLE TIMOTHY C. STANCEU, JUDGE

| | |
|---|---|
| OCP S.A., | |
| Plaintiff, | |
| v. | |
| UNITED STATES, | |
| Defendant, | Consol. Court No. 24-00227 |
| and | |
| THE MOSAIC COMPANY, | |
| Defendant-Intervenor, | |
| and | |
| THE GOVERNMENT OF THE KINGDOM OF MOROCCO, | |
| Defendant-Intervenor. | |

## RULE 56.2 MOTION FOR JUDGMENT ON THE AGENCY RECORD SUBMITTED ON BEHALF OF THE MOSAIC COMPANY

Pursuant to Rule 56.2 of the Rules of the U.S. Court of International Trade, Consolidated Plaintiff and Defendant-Intervenor The Mosaic Company ("Mosaic") respectfully moves for judgment on the administrative record on the issues raised in its Complaint challenging the U.S. Department of Commerce's ("Commerce") final results and amended final results of the second administrative review of the countervailing duty order on phosphate fertilizers from Morocco. *See Phosphate Fertilizers From the Kingdom of Morocco: Final Results of Countervailing Duty Administrative Review; 2022*, 89 Fed. Reg. 88,952 (Nov. 12, 2024) ("*Final Results*"), and accompanying Issues and Decision Memorandum ("IDM"); *Phosphate Fertilizers From the*

*Kingdom of Morocco: Notice of Amended Final Results of Countervailing Duty Administrative Review; 2022*, 89 Fed. Reg. 104,979 (Dec. 26, 2024) ("*Amended Final Results*").

For the reasons set forth in the accompanying memorandum, certain aspects of the final results are unreasonable, unsupported by substantial evidence on the record, and otherwise not in accordance with law. Accordingly, Mosaic respectfully requests that the Court remand to Commerce with instructions to correct the errors identified by the Court; and grant such other or further relief that the Court deems just and proper.

Respectfully submitted,

/s/ Stephanie E. Hartmann
David J. Ross
Stephanie E. Hartmann
Alexandra S. Maurer
Lindsey A. Ricchi
Jacob A. Laband

Wilmer Cutler Pickering Hale and Dorr
    LLP
2100 Pennsylvania Avenue NW
Washington, DC 20037
Telephone: (202) 663-6300
Facsimile: (202) 663-6363
Email: stephanie.hartmann@wilmerhale.com

*Counsel for The Mosaic Company*

Dated: September 30, 2025

## UNITED STATES COURT OF INTERNATIONAL TRADE
### BEFORE: THE HONORABLE TIMOTHY C. STANCEU, JUDGE

OCP S.A.,

               **Plaintiff,**

    v.

UNITED STATES,

               **Defendant,**

   and

THE MOSAIC COMPANY,

        **Defendant-Intervenor,**

   and

THE GOVERNMENT OF THE KINGDOM OF MOROCCO,

       **Defendant-Intervenor.**

**Consol. Court No. 24-00227**

### ORDER

Upon consideration of Consolidated Plaintiff and Defendant-Intervenor The Mosaic Company's Rule 56.2 Motion for Judgment on the Agency Record, and the Memorandum in Support of The Mosaic Company's Rule 56.2 Motion for Judgment on the Agency Record, and all other papers and proceedings herein, it is hereby

**ORDERED** that Mosaic's motion is granted; it is further

**ORDERED** that the U.S. Department of Commerce's ("Commerce") final results of the second administrative review of the countervailing duty order on phosphate fertilizers from Morocco, published in the Federal Register in *Phosphate Fertilizers From the Kingdom of Morocco: Final Results of Countervailing Duty Administrative Review; 2022*, 89 Fed. Reg.

88,952 (Nov. 12, 2024) and *Phosphate Fertilizers From the Kingdom of Morocco: Notice of Amended Final Results of Countervailing Duty Administrative Review; 2022*, 89 Fed. Reg. 104,979 (Dec. 26, 2024), are unreasonable, unsupported by substantial evidence, and otherwise not in accordance with law; and it is further

      **ORDERED** that the matter is remanded to Commerce for further consideration consistent with this opinion.

      **SO ORDERED.**

_____
  Hon. Timothy C. Stanceu, Judge

Dated: _____
    New York, New York

## UNITED STATES COURT OF INTERNATIONAL TRADE
### BEFORE: THE HONORABLE TIMOTHY C. STANCEU, JUDGE

OCP S.A.,

                    Plaintiff,

        v.

UNITED STATES,

                    Defendant,

    and

THE MOSAIC COMPANY,

            Defendant-Intervenor,

    and

THE GOVERNMENT OF THE KINGDOM OF MOROCCO,

            Defendant-Intervenor.

Consol. Court No. 24-00227

**NON-CONFIDENTIAL VERSION**

**Business Proprietary Information Removed From Pages ii, 11-12, 14-19, 22, 32, 34, 37-45**

### MEMORANDUM IN SUPPORT OF DEFENDANT-INTERVENOR THE MOSAIC COMPANY'S RULE 56.2 MOTION FOR JUDGMENT UPON THE AGENCY RECORD

David J. Ross
Stephanie E. Hartmann
Alexandra S. Maurer
Lindsey A. Ricchi
Jacob A. Laband

Wilmer Cutler Pickering Hale and Dorr
    LLP
2100 Pennsylvania Avenue NW
Washington, DC 20037

*Counsel for The Mosaic Company*

Dated: September 30, 2025

NON-CONFIDENTIAL VERSION

## TABLE OF CONTENTS

I.    INTRODUCTION ................................................................................................. 1

II.   RULE 56.2 STATEMENT .................................................................................. 1

    A.    Administrative Decision Under Review ................................................... 1

    B.    Issues Presented and Summary of Arguments ......................................... 2

III.  STATEMENT OF FACTS .................................................................................. 3

    A.    The Preliminary Phase ............................................................................ 3

    B.    Commerce's Preliminary Results ............................................................ 5

    C.    Commerce's Final Results and Amended Final Results ......................... 9

IV.   STANDARD OF REVIEW ............................................................................... 10

V.    ARGUMENT ..................................................................................................... 11

    A.    Commerce's Benefit Determination for the Mining Rights for LTAR
        Program is Unreasonable, Unsupported by Substantial Evidence, and
        Otherwise Not in Accordance With Law ............................................... 11

        1.    Commerce's Treatment of OCP's HQ/Support Costs and Debt Costs
            in the Phosphate Rock Cost Buildup Is Unreasonable, Unsupported
            by Substantial Evidence, and Otherwise Not in Accordance with Law .............. 11

            a.    Commerce unlawfully imposed a burden on Mosaic to show
                that OCP's HQ/Support and Debt costs were not related to
                phosphate rock mining and beneficiation. ........................................ 13

            b.    Commerce unlawfully found that OCP's HQ/Support and Debt
                costs are relevant to OCP's production and beneficiation of
                phosphate rock. ................................................................................ 14

            c.    Commerce's inclusion of OCP's reported HQ/Support and Debt
                 costs unlawfully departed from Commerce's practice. .................... 15

        2.    Commerce's Refusal to Exclude HQ/Support and Debt Costs That the
            Record Shows Are Unrelated to Phosphate Mining or Rock Production
            Is Unreasonable, Unsupported by Substantial Evidence, and Otherwise
            Not in Accordance With Law ...................................................................... 17

    B.    Commerce's Selection of Phosphate Rock Benchmark Prices is
        Unreasonable, Unsupported by Substantial Evidence, and Otherwise
        Not in Accordance With Law ................................................................. 19

        1.    Commerce's Decision to Include Egyptian Phosphate Rock Prices in
            the Benchmark Is Unreasonable, Unsupported by Substantial Evidence,
            and Not in Accordance with Law ............................................................ 20

            a.    Commerce Unreasonably Rejected Mosaic's Arguments That MER
                Necessarily Affects the Comparability of Egyptian Phosphate Rock ........... 21

            b.    Commerce Unreasonably Rejected Mosaic's Arguments That
                Egyptian Export Prices Are Distorted ............................................. 26

i

Case 1:24-cv-00227-TCS   Document 41   Filed 09/30/25   Page 7 of 57

Consol. Court No. 24-00227   BUSINESS PROPRIETARY
INFORMATION REMOVED   NON-CONFIDENTIAL VERSION

2.   Commerce's Decision to Include Syrian Phosphate Rock Prices in the
Benchmark Is Unreasonable, Unsupported by Substantial Evidence,
and Not in Accordance with Law .................................................................. 28

C.   Commerce's Decision to Exclude Capital Goods Imported From FTA
Countries From the Benefit Calculation for the Customs Duty Exemptions
for Capital Goods, Machinery, and Equipment Program is Unreasonable,
Unsupported by Substantial Evidence, and Otherwise Not in Accordance
With Law ............................................................................................................. 31

D.   Commerce's Refusal to Countervail Port and Vessel Services that Marsa Maroc
Provided to OCP Is Unreasonable, Unsupported by Substantial Evidence, and
Otherwise Not in Accordance With Law ...................................................... 37

1.   Commerce's Determination that Marsa Maroc Takes its Own Costs
and Profitability Into Account Is Unsupported by Substantial Evidence ............ 37

2.   Commerce's Determination That Marsa Maroc Does not Engage in
[                              ] Is Unsupported by Substantial Evidence ....................... 38

E.   Commerce's Refusal to Countervail Port Services and Infrastructure that
ANP Provided to OCP Is Unreasonable, Unsupported by Substantial
Evidence, and Otherwise Not in Accordance With Law ............................ 39

1.   Commerce's failure to address whether the ANP's provision of port
services constituted a financial contribution is arbitrary, unsupported
by substantial evidence, and otherwise not in accordance with law .................. 39

2.   Commerce's determination that the ANP's provision of port services
and infrastructure did not confer a benefit on OCP is unreasonable,
unsupported by substantial evidence, and otherwise not in accordance
with law ............................................................................................................. 42

3.   Commerce's failure to address whether ANP's provision of port services
and infrastructure to OCP was de facto specific is unreasonable, arbitrary,
and otherwise not in accordance with law ........................................................ 44

VI.   CONCLUSION ................................................................................................ 45

Consol. Court No. 24-00227　　　　　　　　　　　**NON-CONFIDENTIAL VERSION**

# <u>TABLE OF AUTHORITIES</u>

**Statutes**

19 U.S.C. § 1516a(b)(1)(B)(i) ................................................................10

19 U.S.C. § 1677(5)(D) ..........................................................................42

19 U.S.C. § 1677(5)(E) .....................................................................20, 25

19 U.S.C. § 1677(5A)(D)(iii) .................................................................44

**Regulations**

19 C.F.R. § 351.511(a) ...........................................................6, 7, 20, 39

**Cases**

*ABB, Inc. v. United States*, 273 F. Supp. 3d 1200 (CIT 2017) .....................................31

*Acciai Speciali Terni, S.p.A. v. United States*, 217 F. Supp. 2d 1345 (CIT 2002) ........................10

*Ad Hoc Shrimp Trade Action Comm. v. United States*, 219 F. Supp. 3d 1286 (CIT 2017) ......................................26, 27, 31, 44

*Archer Daniels Midland Co. v. United States*, 779 F. Supp. 3d 1349 (CIT 2025) ......................24

*Bethlehem Steel Corp. v. United States*, 162 F. Supp. 2d 639 (CIT 2001) ...................................41

*Borusan Mannesmann Boru Sanayi ve Ticaret A.S. v. United States*, 61 F. Supp. 3d 1306 (CIT 2015) ..........................................13

*CS Wind Viet. Co. v. United States*, 832 F.3d 1367 (Fed. Cir. 2016) ..........................10, 31, 37, 44

*DAK Americas LLC v. United States*, 456 F. Supp. 3d 1340 (CIT 2020) .....................................10

*Greater Boston Television Corp. v. FCC*, 444 F.2d 841 (D.C. Cir. 1970) ...........................25, 38

*Jiangsu Senmao Bamboo & Wood Indus. Co. v. United States*, 769 F. Supp. 3d 1344 (CIT 2025) ..........................................19

*Mitsubishi Materials Corp. v. United States*, 820 F. Supp. 608 (CIT 1993) .............. 10, 38, 39-40

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983) ................................................10, 31, 44

*NTN Bearing Corp. of Am. v. United States*, 104 F. Supp. 2d 110 (CIT 2000) ................ 13, 35-36

*Pakfood Pub. Co. v. United States*, 453 F. App'x 986 (Fed. Cir. 2011) ........................................16

Case 1:24-cv-00227-TCS     Document 41     Filed 09/30/25     Page 9 of 57

Consol. Court No. 24-00227                              NON-CONFIDENTIAL VERSION

*Rubberflex Sdn. Bhd. v. United States*, 59 F. Supp. 2d 1338 (CIT 1999) ....................................31

*Shandong Rongxin Imp. & Exp. Co. v. United States*, 163 F. Supp. 3d 1249 (CIT 2016) ........................................................................................................................10

*The Mosaic Co. v. United States*, 2024 WL 208136 (CIT 2024) .....................................16

*The Mosaic Co. v. United States*, 774 F. Supp. 3d 1362 (CIT 2025) ............................40

**Administrative Determinations**

*Certain Hot-Rolled Carbon Steel Flat Products From India: Notice of Preliminary Results of Countervailing Duty Administrative Review*, 73 Fed. Reg. 1,578 (Jan. 9, 2008) ...........................................................................16

*Certain Softwood Lumber Products From Canada: Final Affirmative Countervailing Duty Determination, and Final Negative Determination of Critical Circumstances*, 82 Fed. Reg. 51,814 (Nov. 8, 2017), and accompanying IDM ............................................................................................26

*Certain Softwood Lumber Products From Canada: Final Results and Final Rescission, in Part, of the Countervailing Duty Administrative Review; 2021*, 88 Fed.Reg. 50,103 (Aug. 1, 2023), and accompanying PDM ..............................41

*Certain Softwood Lumber Products From Canada: Final Results and Rescission, in Part, of the Countervailing Duty Administrative Review; 2023*, 90 Fed.Reg. 38,755 (Aug 12, 2025), and accompanying PDM ................................42

*Circular Welded Austenitic Stainless Pressure Pipe from the People's Republic of China: Final Affirmative Countervailing Duty Determination*, 74 Fed.Reg. 4,936 (Jan. 28, 2009), and accompanying IDM ..............................................26

*Circular Welded Carbon Steel Pipes and Tubes From the Republic of Turkey: Final Results of Countervailing Duty Administrative Review; Calendar Year 2018*, 86 Fed. Reg. 6,866 (Jan. 25, 2021), and accompanying IDM ......................26

*Countervailing Duties; Final Rules*, 63 Fed. Reg. 65,348 (Nov. 25, 1998) ...........................41, 43

*Forged Steel Fluid End Blocks from Italy: Final Results of the Countervailing Duty Investigation*, 85 Fed. Reg. 80,022 (Dec. 11, 2020), and accompanying IDM ............................................................................................45

*Phosphate Fertilizers From the Kingdom of Morocco: Final Affirmative Countervailing Duty Determination*, 86 Fed. Reg. 9,482 (Feb. 16, 2021), and accompanying IDM........................................................................ 11-12, 13

**Consol. Court No. 24-00227**                    **NON-CONFIDENTIAL VERSION**

*Phosphate Fertilizers From the Kingdom of Morocco and the Russian
    Federation: Countervailing Duty Orders*, 86 Fed. Reg. 18,037 (Apr. 7,
    2021) .................................................................................................................4

*Phosphate Fertilizers From the Kingdom of Morocco: Final Results of
    Countervailing Duty Administrative Review, 2020-2021*, 88 Fed.Reg.
    76,726 (Nov. 7, 2023), and accompanying IDM ............................................ 30

*Phosphate Fertilizers From the Russian Federation: Final Affirmative
    Countervailing Duty Determination*, 86 Fed.Reg. 9,479 (Feb. 16, 2021),
    and accompanying IDM...................................................................... 15-16

**Other**

*Contribution*, *Black's Law Dictionary* (12th ed. 2024).................................................42

## I.    <u>INTRODUCTION</u>

On behalf of Plaintiff and Consolidated Defendant-Intervenor The Mosaic Company ("Mosaic"), we submit this brief in support of Mosaic's Rule 56.2 motion for judgment on the agency record. Mosaic challenges certain aspects of the U.S. Department of Commerce's ("Commerce") final results in the second administrative review of the countervailing duty ("CVD") order on phosphate fertilizers from Morocco. While Mosaic supports many aspects of Commerce's final results, Commerce made several findings that are unlawful and unsupported by substantial evidence.

As detailed below, Mosaic challenges five aspects of Commerce's final results: (1) Commerce's benefit calculation for the Phosphate Mining Rights for Less Than Adequate Remuneration ("LTAR") program, specifically the inclusion of the HQ/Support and Debt costs reported by the mandatory respondent, OCP S.A. ("OCP"), in the cost buildup for phosphate rock; (2) Commerce's selection of benchmarks for phosphate rock in the benefit calculation for this program; (3) Commerce's decision to disregard certain exemptions provided under the Customs Duty Exemptions for Capital Goods, Machinery, and Equipment program; (4) Commerce's decision not to countervail the Port Services and Infrastructure Subsidies provided by the Agence Nationale de Ports ("ANP"); and (5) Commerce's decision not to countervail the Port and Vessel Services provided by another Moroccan governmental authority, Marsa Maroc. The Court should remand to Commerce so that Commerce can reconsider and arrive at determinations that better reflect the reality of the GOM's extensive subsidization of OCP.

## II.   <u>RULE 56.2 STATEMENT</u>

### A.    **Administrative Decision Under Review**

Mosaic challenges certain aspects of the final results of Commerce's second administrative review of the CVD order on phosphate fertilizers from Morocco, covering the

period January 1, 2022 through December 31, 2022.  The *Final Results* are dated November 5,

2024, and were published in the Federal Register on November 12, 2024.  *Phosphate Fertilizers*

*From the Kingdom of Morocco: Final Results of Countervailing Duty Administrative Review;*

*2022*, 89 Fed.Reg. 88,952 (Nov. 12, 2024) ("*Final Results*"), P.R. 457, and accompanying Issues

and Decision Memorandum ("IDM"), P.R. 451.  Commerce amended the *Final Results* to correct

a ministerial error.  *Phosphate Fertilizers From the Kingdom of Morocco: Notice of Amended*

*Final Results of Countervailing Duty Administrative Review; 2022*, 89 Fed.Reg. 104,979 (Dec.

26, 2024) ("*Amended Final Results*"), P.R. 466.

     **B.**     **Issues Presented and Summary of Arguments**

          **1.**     **Whether Commerce's inclusion of costs that OCP categorized as 2022 HQ/Support costs and 2022 Debt costs in the phosphate rock cost buildup to measure the adequacy of remuneration for phosphate mining rights is unreasonable, unsupported by substantial evidence, and otherwise not in accordance with law.**

     Yes.  Commerce's inclusion of certain of OCP's costs categorized as 2022 HQ/Support

costs and 2022 Debt costs in the phosphate rock cost buildup is unreasonable, unsupported by

substantial evidence, and otherwise not in accordance with law, because Commerce uncritically

accepted OCP's reported costs without distinguishing between relevant and irrelevant costs.

          **2.**     **Whether Commerce's inclusion of Egyptian and Syrian phosphate rock prices in the phosphate rock benchmark is unreasonable, unsupported by substantial evidence, and otherwise not in accordance with law.**

     Yes.  Commerce's inclusion these prices in the benchmark is unreasonable, unsupported

by substantial evidence, and otherwise not in accordance with law, because Commerce failed to

address new evidence on the record demonstrating that Egyptian and Syrian phosphate rock is

not comparable to OCP's.

          **3.**     **Whether Commerce's decision to exclude capital goods imported from FTA countries from the benefit calculation for the Customs**

Case 1:24-cv-00227-TCS   Document 41   Filed 09/30/25   Page 13 of 57

Consol. Court No. 24-00227                          NON-CONFIDENTIAL VERSION

**Duty Exemptions for Capital Goods, Machinery, and Equipment Program is unreasonable, unsupported by substantial evidence, and otherwise not in accordance with law**

Yes, because Commerce failed to grasp the distinction between the "originating" country for non-preferential purposes and originating status under the preferential rules of origin set forth in FTAs. The mere fact that preferential rates pursuant to FTAs exist (and were accurately identified) does not mean those rates would have applied to specific imports from the respective countries. OCP submitted no evidence documenting that its relevant entries from FTA countries were in fact eligible for preferential treatment under the FTAs.

4.     **Whether Commerce's decision not to countervail the GOM's provision of port and vessel services that Marsa Maroc provided to OCP is unreasonable, unsupported by substantial evidence, and otherwise not in accordance with law.**

Yes. Commerce's finding that the Marsa Maroc's price-setting analysis accounts for the profitability of its individual contracts and that it sustained an operating profit on its port services provision in 2022 and the prior year is unreasonable, unsupported by substantial evidence, and otherwise not in accordance with law.

5.     **Whether Commerce's decision not to countervail the GOM's provision of port services and infrastructure that ANP provided to OCP is unreasonable, unsupported by substantial evidence, and otherwise not in accordance with law.**

Yes. Commerce's finding that OCP did not use this program is unreasonable, unsupported by substantial evidence, and otherwise not in accordance with law. Commerce also unlawfully failed to make findings regarding financial contribution and specificity regarding this program.

III.    **STATEMENT OF FACTS**

A.      **The Preliminary Phase**

Commerce issued the countervailing duty order on phosphate fertilizers from Morocco on April 7, 2021. *Phosphate Fertilizers From the Kingdom of Morocco and the Russian Federation: Countervailing Duty Orders*, 86 Fed.Reg. 18,037 (Apr. 7, 2021) (the "Order"). On April 28, 2023, Mosaic submitted a request to Commerce to conduct an administrative review with respect to OCP and its cross-owned affiliates. Request for Administrative Review (Apr. 28, 2023), P.R. 1. On June 12, 2023, Commerce initiated an administrative review of the Order for OCP and its cross-owned affiliates. *Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 88 Fed.Reg. 38,021, 38,030 (June 12, 2023), P.R. 18. The period of review ("POR") was January 1, 2022, to December 31, 2022. *Id.*

On June 27, 2023, Commerce issued its initial questionnaire to the Government of Morocco ("GOM") and OCP. Initial Questionnaire (June 27, 2023), P.R. 21. Commerce investigated fifteen subsidy programs that it had previously investigated in the original investigation and first administrative review ("AR1"), including the Provision of Phosphate Mining Rights for LTAR program; the Customs Duty Exemptions for Capital Goods, Machinery, and Equipment program; and the Provision of Port Services and Infrastructure for LTAR program. *Phosphate Fertilizers From the Kingdom of Morocco: Preliminary Results of the Countervailing Duty Administrative Review*, 2022, 89 Fed.Reg. 35,800 (May 2, 2024) ("*Preliminary Results*"), P.R. 303, and accompanying PDM at 9-13, P.R. 297. OCP and the GOM responded between July and October 2023. *Id.* at 2. Mosaic submitted new subsidy allegations on November 13, 2023, alleging that the GOM provided additional subsidies, including port and vessel services provided by Marsa Maroc. Mosaic, NSA (Nov. 13, 2023), P.R. 175, C.R. 187.

4

On February 16, 2024, Mosaic and OCP submitted information to measure the adequacy of remuneration of phosphate mining rights.  Mosaic 2/16/24 Benchmark, P.R. 216, C.R. 208; OCP 2/16/24 Benchmark, P.R. 215, C.R. 201.

Mosaic and OCP submitted rebuttal benchmark information on March 8, 2024.  Mosaic 3/8/24 Comments, P.R. 232, C.R. 218; OCP 3/8/24 Comments, P.R. 237-239, C.R. 227-231. Mosaic submitted new factual information demonstrating that phosphate rock prices from Egypt Syria are not suitable as a benchmark.  Mosaic 3/8/24 Comments at 2-4, Exhibits 1-23, P.R. 232-236, C.R. 218-222.

OCP submitted a second benchmark submission on March 27, 2024.  OCP 3/27/24 Comments, P.R. 253, C.R. 239.  Mosaic submitted a second rebuttal benchmark submission on April 26, 2024.  Mosaic 4/26/24 Comments, P.R. 293, C.R. 283.  Mosaic submitted new factual information demonstrating that phosphate rock prices from Syria are not suitable as a benchmark.  *Id*. at 3, Exhibits 7-13, P.R. 295, C.R. 287.

On April 26, 2024, simultaneous with the issuance of the *Preliminary Results*, Commerce initiated an investigation into one new subsidy program, the Provision of Port and Vessel Services for LTAR.  Dep't Memo, NSA (Apr. 26, 2024), P.R. 298.

## B.    Commerce's Preliminary Results

Commerce issued the *Preliminary Results* on April 26, 2024.  PDM, P.R. 297. Commerce preliminarily determined that three subsidy programs were countervailable and conferred a measurable benefit during the POR.  *Id*. at 8-12.  Commerce preliminarily calculated a subsidy rate for OCP of 14.21 percent ad valorem.  *Preliminary Results*, 89 Fed.Reg. at 35,800, P.R. 303.  Commerce preliminarily found that OCP did not use the Port Services and Infrastructure for LTAR program during the POR and that additional information was needed

regarding the Port and Vessel Services for LTAR program and the Land Purchases for LTAR

program.  PDM at 12-13.

With respect to the Provision of Phosphate Mining Rights for LTAR program, Commerce

applied the hierarchy for selecting a benchmark under 19 C.F.R. § 351.511(a)(2).  Commerce

conducted a tier-three analysis under 19 C.F.R. § 351.511(a)(2)(iii).  *Id*. at 8-10.  Consistent with

its approach in the investigation and first review, Commerce constructed a world market

benchmark for the "underlying good conveyed via mining rights (*i.e.*, phosphate rock)."  *Id*. at 9.

Specifically, Commerce compared the actual per-unit cost buildup that OCP reported for its

beneficiated phosphate rock to an average of world market prices for phosphate rock Commerce

determined to be comparable to OCP's rock.  *Id*. at 9-10; OCP Prelim. Calc. Memo (Apr. 26,

2024), P.R. 299, C.R. 288.  Commerce derived a world market benchmark price using 2022

prices for phosphate rock from: CRU, Argus Phosphates, Fertecon, and Profercy Phosphates

Limited.  OCP Prelim. Calc. Memo. at 3, P.R. 299, C.R. 288.  Commerce stated that it limited its

analysis to these data sources because of the bone phosphate of lime ("BPL") content or

phosphorous pentoxide content, and that Commerce only included benchmark prices made on an

FOB basis.  *Id*.

To calculate the benefit in the Preliminary Results, Commerce multiplied the difference

between its calculated per-unit cost buildup and the benchmark per-unit price of phosphate rock

by the total amount of phosphate rock that OCP mined and beneficiated during the POR.  PDM

at 10.  To calculate OCP's per-unit cost build up, Commerce took the total mining costs that

OCP reported for 2022, including costs that OCP characterized as its 2022 HQ/Support costs and

its 2022 Debt costs.  OCP Prelim. Calc. Memo. at 5-6, P.R. 299, C.R. 288.  Commerce added an

Case 1:24-cv-00227-TCS   Document 41   Filed 09/30/25   Page 17 of 57

Consol. Court No. 24-00227                           NON-CONFIDENTIAL VERSION

amount for profit and then divided the sum by the total amount of rock that OCP reported that it produced in 2022. *Id*. at 6.

On October 10, 2024, Commerce issued a post-preliminary analysis memorandum regarding the Provision of Land for LTAR program, the Customs Duty Exemptions for Capital Goods, Machinery, and Equipment program, and the Provision of Port and Vessel Services for LTAR program. Post-Prelim. Memo (Oct. 10, 2024), P.R. 427.

For the Customs Duty Exemptions for Capital Goods, Machinery, and Equipment program, which Commerce had previously countervailed, Commerce found that the program provided a financial contribution and was specific. *Id*. at 9-10. For the calculation of benefit, Commerce stated that it was preliminarily excluding any exemptions for capital goods imported from countries with which Morocco has free-trade agreements ("FTA"). *Id*. at 10. Commerce stated that "the agreements substantiate that OCP and its cross-owned producers would have paid no import duties in the absence of this capital goods program." *Id*.

For the Provision of Port and Vessel Services for LTAR program, Commerce only addressed the issue of benefit and made no findings regarding financial contribution or specificity. *Id*. at 11-14. To assess benefit, Commerce conducted a tier-three analysis under 19 C.F.R. § 351.511(a)(2)(iii), and stated that it examined the price-setting methodology of the state-owned port service provider, Marsa Maroc, and concluded that its prices are "a market-based system designed to return a rate of return sufficient to ensure future operations for Marsa Maroc" and that it was in fact profitable during the POR. *Id*. at 14. Commerce preliminarily determined that Marsa Maroc's provision of port and vessel services conferred no benefit to OCP during the period of review. *Id*.

NON-CONFIDENTIAL VERSION

The Parties filed case briefs and rebuttal briefs on October 16, 2024, and October 21,

2024, respectively.  IDM at 3.  Mosaic argued in its case brief that Commerce erred in

calculating the benefit of the Phosphate Mining Rights for LTAR program.  Mosaic Case Br. at

4-30, P.R. 433, C.R. 390.  In particular, Mosaic argued that Commerce erred in including

Egyptian phosphate rock prices in the world market benchmark price.  IDM at 16-19.  Mosaic

also argued that Commerce should exclude OCP's reported HQ/Support and Debt costs in the

phosphate rock cost buildup or, in the alternative, use a different allocation methodology.

Mosaic Case Br. at 12-30.

With respect to the Customs Duty Exemptions for Capital Goods, Machinery, and

Equipment program, Mosaic argued that Commerce erred in excluding goods imported from

free-trade agreement countries to calculate the benefit.  *Id*. at 38-41.  Mosaic argued further that

Commerce erred by declining to countervail the ANP's provision of port services and

infrastructure to OCP for LTAR, because the record evidence demonstrated that this program

involved a financial contribution to OCP and that it was de facto specific.  *Id*. at 41-42, 46-47.

Additionally, Mosaic argued that the record evidence demonstrated that the concession

fees that ANP charges to OCP for port services and infrastructure are not set in accordance with

market principles and therefore confer a benefit on OCP.  *Id*. at 42-46.  Mosaic also argued that

Commerce should countervail Marsa Maroc's provision of port and vessel services because the

record showed Marsa Maroc's prices were not set consistent with market principles.  *Id*. at 48-

51.

Mosaic subsequently argued that Commerce should reject OCP's arguments for including

prices from Egypt and Syria in the phosphate rock benchmark.  Mosaic Rebuttal Br. at 7-11, P.R.

434, C.R. 391.

**NON-CONFIDENTIAL VERSION**

### C.    Commerce's Final Results and Amended Final Results

Commerce published the *Final Results* on November 12, 2024.  *Final Results*, 89

Fed.Reg. 88,952, P.R. 457.  With respect to the Provision of Phosphate Mining Rights for LTAR

program, Commerce rejected Mosaic's arguments that it should exclude phosphate rock

benchmark prices from Egypt and Syria.  IDM at 16-19.  Commerce also rejected Mosaic's

argument that it should exclude the costs that OCP characterized as 2022 HQ/Support costs and

2022 Debt costs from the cost build-up for phosphate rock.  Although Commerce accepted

Mosaic's proposal to change the allocation basis for HQ/Support costs, it rejected Mosaic's other

proposed alternative allocation methodologies for HQ/Support and Debt costs.  IDM at 19-27.

With respect to the Customs Duty Exemptions for Capital Goods, Machinery, and

Equipment program, Commerce rejected Mosaic's argument that it erred in excluding capital

goods imported from FTA countries in the benefit calculation.  *Id*. at 53.

Commerce also rejected Mosaic's argument that it erred in finding that OCP did not use

the Provision of Port Services and Infrastructure for LTAR program during the POR because

"ANP did not *per se* provide port services to OCP," and because "ANP does account for its

costs, revenues, and profits when it sets prices."  *Id*. at 57-58.

Commerce also rejected Mosaic's argument that it erred in preliminarily finding the

Provision of Port and Vessel Services for LTAR program provided no benefit, because it found

that "Marsa Maroc generated a profit from both the public fee ceilings set by ANP, which Marsa

Maroc used for its tariff schedules during the POR, and the bilateral services agreements (BSAs)

between OCP and Marsa Maroc."  *Id*. at 61.

On December 17, 2024, Commerce amended the *Final Results* to correct a ministerial

error.  *Phosphate Fertilizers From the Kingdom of Morocco: Notice of Amended Final Results of*

*Countervailing Duty Administrative Review; 2022*, 89 Fed.Reg. 104,979 (Dec. 26, 2024), P.R. 466.

## IV.    STANDARD OF REVIEW

In reviewing Commerce's determinations, the Court must hold unlawful any determination found "to be unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i). Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," *Acciai Speciali Terni, S.p.A. v. United States*, 217 F. Supp. 2d 1345, 1346-47, (CIT 2002) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477 (1951)), taking into account "whatever in the record fairly detracts" from the weight of supportive evidence. *CS Wind Viet. Co. v. United States*, 832 F.3d 1367, 1373 (Fed. Cir. 2016). The agency must "examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

In examining the record, Commerce cannot rely on "isolated tidbits of data which suggest a result contrary to the clear weight of the evidence," *Shandong Rongxin Imp. & Exp. Co. v. United States*, 163 F. Supp. 3d 1249, 1252 (CIT 2016), nor can it look only at evidence that supports its conclusion. *DAK Americas LLC v. United States*, 456 F. Supp. 3d 1340, 1352 (CIT 2020) ("The record as a whole must be examined, including evidence that 'fairly detracts from the substantiality of the evidence.'" (quoting *Nippon Steel Corp. v. United States*, 337 F.3d 1373, 1379 (Fed. Cir. 2003))). Commerce "cannot simply ignore significant contradictory evidence and assert that, nevertheless, its determination was supported by substantial evidence." *Mitsubishi Materials Corp. v. United States*, 820 F.Supp. 608, 624 (CIT 1993).

BUSINESS PROPRIETARY
INFORMATION REMOVED   NON-CONFIDENTIAL VERSION

## V.   ARGUMENT

### A.   Commerce's Benefit Determination for the Mining Rights for LTAR Program is Unreasonable, Unsupported by Substantial Evidence, and Otherwise Not in Accordance With Law

In the *Final Results*, Commerce made two errors that contributed to its unlawful

determination with respect to the Provision of Mining Rights for LTAR program.  First,

Commerce erred in its treatment of OCP's reported 2022 HQ/Support and 2022 Debt costs,

which OCP included in the cost buildup for phosphate rock.  Commerce unreasonably declined

to make any adjustments to OCP's reported costs, despite substantial record evidence

demonstrating that **[                    ]** reported costs were unrelated to OCP's phosphate mining

and rock production.  Second, Commerce erred in including phosphate rock prices from Egypt

and Syria in the phosphate rock benchmark when the record evidence demonstrated that rock

from these countries is not comparable to OCP's.  As a result of these errors, Commerce's cost

buildup and its benchmark selection are unreasonable, unsupported by substantial evidence, and

otherwise not in accordance with law.

### 1.   Commerce's Treatment of OCP's HQ/Support Costs and Debt Costs in the Phosphate Rock Cost Buildup Is Unreasonable, Unsupported by Substantial Evidence, and Otherwise Not in Accordance with Law

In the investigation, Commerce based its tier-three benefit calculation for OCP's

phosphate mining rights on "a comparison of the actual per-unit cost buildup of OCP's

beneficiated rock with a market price of phosphate rock."  *Phosphate Fertilizers From the*

*Kingdom of Morocco: Final Affirmative Countervailing Duty Determination*, 86 Fed.Reg. 9,482

(Feb. 16, 2021) and accompanying IDM ("Inv. IDM") at 23.  Commerce reasonably took into

consideration only "the relevant production costs *associated with producing the phosphate rock*

*from the minerals in the ground as well as the pricing of phosphate rock*."  *Id.* at 24 (emphasis

modified).  As part of this analysis, Commerce properly excluded OCP's reported HQ/Support

11

**BUSINESS PROPRIETARY INFORMATION REMOVED** NON-CONFIDENTIAL VERSION

and Debt costs from the cost buildup, because OCP failed to establish that these costs contributed to OCP's mining operations and that they were relevant to the pricing of phosphate rock. *Id.* Commerce's decision to exclude these costs is reasonable, supported by substantial evidence, and otherwise in accordance with law.

However, in the second review, Commerce reversed its position from the investigation and included OCP's reported HQ/Support and Debt costs in the cost buildup. In the *Preliminary Results*, Commerce allocated HQ/Support costs across OCP's phosphate rock mining and chemical production business units based on each unit's share of total site costs, [

]. Commerce allocated Debt costs across OCP's phosphate rock mining and chemical production business units based on each unit's share of capital expenditures. In the *Final Results*, the Department changed its approach to allocating the HQ/Support costs, accepting Mosaic's proposal to allocate these costs across the phosphate rock mining, chemical production, and "other" business units based on each business units' share of revenue, in accordance with standard accounting principles. While Mosaic supports Commerce's decision to allocate the HQ/Support costs based on revenues, Commerce's decision to accept all of OCP's reported HQ/Support or Debt costs in the amount to be allocated is unreasonable, unsupported by substantial evidence, and not in accordance with law.

Since the investigation, OCP's reported HQ/Support costs have [            ], from [

], while its reported site-specific costs [            ]. Mosaic 4/26/2024 Comments, Exhibit 4, P.R. 294, C.R. 285-286; OCP IQR, Exhibit MIN-3, P.R. 74, C.R. 79. Although Commerce claims that these costs "cannot be reasonably further segregated into costs that are 'relevant' or 'irrelevant' to phosphate rock based

on how they are entered into OCP's books and records," IDM at 23, this is incorrect. It would

have been simple for Commerce to segregate costs with no documented connection to phosphate

mining or beneficiation, as Mosaic discusses below. Commerce's failure to conduct this exercise

– and its broader failure to critically examine OCP's reported HQ/Support and Debt costs –

violates its obligation to calculate OCP's subsidy rate "as accurately as possible." *Borusan*

*Mannesmann Boru Sanayi ve Ticaret A.S. v. United States*, 61 F.Supp.3d 1306, 1337 (CIT 2015).

### a. Commerce unlawfully imposed a burden on Mosaic to show that OCP's HQ/Support and Debt costs were not related to phosphate rock mining and beneficiation

In the investigation, Commerce explained its decision to reject OCP's HQ/Support and

Debt costs as follows:

> Although OCP itemized the expenses that constitute its HQ/support costs and cost of debt into generic categories, we do not have sufficient information on how each of these line items contributed to OCP's mining operations and how these costs are relevant to the pricing of phosphate rock. Moreover, to the extent that some items in OCP's HQ/support expenses in the cost build up could arguably be related to mining operations, the record does not contain sufficient evidence that would allow us to segregate and remove those costs which are considered unrelated to mining operations.

Inv. IDM at 24 (footnote omitted). In other words, Commerce properly placed the burden on

OCP to justify how each line item that it sought to include in the cost buildup was a "relevant

production cost *associated with producing the phosphate rock* from the minerals in the ground as

well as *the pricing of phosphate rock.*" *NTN Bearing Corp. of Am. v. United States*, 104

F.Supp.2d 110, 152 (CIT 2000) ("{T}he burden of proof {is} with the party who intends to

benefit from the claim made.").

In the *Final Results*, Commerce relieved OCP of the burden, and found that as long as

OCP could document that *any* of the line items that it reported as HQ/Support and Debt costs

could arguably be related to mining operations, it would accept *all* of OCP's HQ/Support and

BUSINESS PROPRIETARY
INFORMATION REMOVED    NON-CONFIDENTIAL VERSION

Debt costs, unless *Mosaic* could demonstrate that it is distortive to do so.  IDM at 21-22.  In

other words, Commerce established a presumption that OCP's reported costs related to

phosphate rock mining and beneficiation; although Mosaic theoretically could rebut the

presumption, this could only be done with information that is in OCP's sole possession, to which

Mosaic does not have access.

### b. Commerce unlawfully found that OCP's HQ/Support and Debt costs are relevant to OCP's production and beneficiation of phosphate rock

In attempting to justify its skewed approach, Commerce stated that OCP submitted

several examples that "OCP was able to demonstrate are relevant to phosphate rock mining."

IDM at 22.  In reality, OCP failed to provide evidence that the Phosphate Rock Mining business

unit accounts for more than a *de minimis* amount of HQ/Support costs.  OCP chose to provide

only [                    ] and job descriptions for [        ] positions recorded at the HQ/Support level.

OCP IQR, Exhibits MIN-14 and MIN-16, P.R. 74-75, C.R. 80-81.  These account for no more

than [                                        ] of the HQ/Support costs OCP reported.  OCP IQR,

Exhibits MIN-12(a) and MIN-16, P.R. 74-75, C.R. 80-81.  The costs that Commerce agreed to

allocate to the phosphate rock mining business unit account for [                    ] this

cherry-picked selection of costs.  Final Calc. Memo., Attachment 2, P.R. 453, C.R. 398-99.

Moreover, several of the [            ] that OCP submitted confirm that many of the

HQ/Support costs are disconnected from OCP's main business activities.  For example, OCP

provided [

].  Mosaic 4/26/24 Comments, Exhibit 6, P.R. 295, C.R. 287.  The

costs associated with [                            ] bear no discernible relationship to phosphate

**Consol. Court No. 24-00227**       **NON-CONFIDENTIAL VERSION**

rock mining. Therefore, rather than support OCP's claim, OCP's own submission provides a glimpse into the wide variety of activities unrelated to phosphate rock mining that OCP included in its reported HQ/Support costs.

Further, **[                    ]** of the HQ/Support costs are attributable solely to **[**

**]**. OCP IQR, Exhibit MIN-18, P.R. 76, C.R. 81 (recording **[**

**]**). OCP has provided no evidence that such costs have any bearing on the cost of phosphate rock production.

Despite the fact that OCP provided supporting evidence for **[                    ]** of the HQ/Support costs – and that the record indicates that the **[            ]** of the reported costs are not related to phosphate rock production – Commerce chose to allocate **[            ]** of HQ/Support costs to the cost buildup. Commerce's decision to do is unreasonable, unsupported by record evidence, and otherwise not in accordance with law.

### c. Commerce's inclusion of OCP's reported HQ/Support and Debt costs unlawfully departed from Commerce's practice

Commerce's practice is to include indirect costs in a tier-three cost buildup only when they have a demonstrated connection with production of the subject merchandise. Indeed, this is the approach that Commerce took in the companion investigation of *Phosphate Fertilizers From the Russian Federation*. In a decision affirmed by this Court, Commerce stated:

> Under this "Tier Three" approach, … our benefit analysis *focused on the production costs of phosphate ore extracted and phosphate rock produced* by {the respondent} during the POI from the mining deposit tied to the license in question.

*Phosphate Fertilizers From the Russian Federation: Final Affirmative Countervailing Duty Determination*, 86 Fed.Reg. 9,479 (Feb. 16, 2021), and accompanying IDM at 19. (emphasis added); *The Mosaic Co. v. United States*, 2024 WL 208136 (CIT Jan. 19, 2024). By contrast, in

**BUSINESS PROPRIETARY INFORMATION REMOVED** NON-CONFIDENTIAL VERSION

this case, Commerce unlawfully included *all* OCP's HQ/Support and Debt costs in the total amount to be allocated among OCP's business units, including expenses that are unrelated to OCP's phosphate rock mining.  By including irrelevant categories of costs, Commerce inflated the portion of costs it allocated to the phosphate rock mining business.  Such an unexplained departure from agency precedent is unlawful.  *Pakfood Pub. Co. v. United States*, 453 F.App'x 986, 989 (Fed. Cir. 2011).

In the *Final Results*, Commerce rejected this characterization of its practice, citing *Hot-Rolled Steel From India*.  IDM at 24.  However, in that case Commerce did not include corporate-wide expenses unrelated to the production of the subject merchandise in the cost buildup.  In fact, *Hot-Rolled Steel From India* confirms that Commerce's practice requires it not to accept OCP's reported HQ/Support and Debt costs wholesale for use in the cost buildup.

In *Hot-Rolled Steel From India*, Commerce included in the tier-three cost buildup for coal mining rights "*operational mining costs* . . . which consisted of materials, labor, depreciation, overhead, and royalties." *Certain Hot-Rolled Carbon Steel Flat Products From India: Notice of Preliminary Results of Countervailing Duty Administrative Review*, 73 Fed.Reg. 1,578, 1,591-92 (Jan. 9, 2008) (emphasis added).  However, Commerce did not include an allocation of headquarters-level costs with no documented connection to the respondent's mining operations in the buildup.  Here, Commerce had already included in the cost buildup approximately [                    ] in "site indirect costs" for OCP's Gantour and Khouribga mines, separate from the HQ/Support and Debt costs.  OCP IQR at Exhibit MIN-3, P.R. 74, C.R. 79.  These site-specific indirect costs include similar categories as those described in *Hot-Rolled Steel From India*, *i.e.*, purchases consumed, local taxes, depreciation, and personnel expenses.  Thus, this determination does not support Commerce's decision to include HQ/Support and Debt

BUSINESS PROPRIETARY
INFORMATION REMOVED    NON-CONFIDENTIAL VERSION

costs that have no documented connection to OCP's phosphate mining or rock production.

Rather, it supports the approach that Commerce originally took in the investigation.

     Accordingly, Commerce's wholesale inclusion of OCP's reported HQ/Support and Debt

costs in this case was unlawful and contrary to its practice.

     **2.    Commerce's Refusal to Exclude HQ/Support and Debt Costs That the
Record Shows Are Unrelated to Phosphate Mining or Rock
Production Is Unreasonable, Unsupported by Substantial Evidence,
and Otherwise Not in Accordance With Law**

     Commerce also erred by refusing to exclude specific categories of OCP's HQ/Support

and Debt costs that are unrelated to its phosphate mining and rock production.  Commerce

attempted to justify its "all or nothing" approach on the grounds that these costs "cannot be

reasonably further segregated into costs that are 'relevant' or 'irrelevant' to phosphate rock

production." IDM at 23.  On the contrary, the record evidence demonstrates that many of the

costs that OCP includes under HQ/Support and Debt costs are irrelevant to phosphate rock

production.  The [                    ] of OCP's 2022 HQ/Support costs consisted of [

                                     ].  OCP IQR, Exhibit MIN-18, P.R.

76, C.R. 81.  This category of expenses has soared since this case began, growing from [

       ] in 2019 to [                    ] in 2022.  Mosaic 4/26/2024 Comments, Exhibit 4 at

18, P.R. 294, C.R. 285-286 (recording [

             ]); OCP IQR, Exhibit MIN-18, P.R. 76, C.R. 81 (recording [

                     ]).  This equates

to roughly [                ] of OCP's revenues.  Mosaic 4/26/2024 Comments, Exhibit 4 at 18, P.R.

294, C.R. 285-286 (recording [

           ]); OCP IQR, Exhibit MIN-18, P.R. 76, C.R. 81 (recording [

                ]).

**BUSINESS PROPRIETARY INFORMATION REMOVED**    NON-CONFIDENTIAL VERSION

OCP argued that "there is nothing exceptional about corporate entities making **[**

**]**," citing the financial statements of other phosphate mining companies on the record.

Actually, the record shows that OCP's **[            ]** in 2022 are not only exceptional, but

dramatically so.  For example, Jordan Phosphate Mining Company's annual report shows that its

**[            ]** in 2022 were less than **[      ]** percent of its revenues.  OCP IQR, Exhibit MIN-19 at

54 and 110, P.R. 76, C.R. 81.  Other phosphate mining companies – such as Yara International,

Incitec Pivot Limited, and Phosphate Resources Ltd. – did not report any **[            ]** in their

annual financial reports, indicating that this category of expenses was not material for those

companies.  Mosaic 2/16/24 Benchmark, Exhibits 33, 35, 37, P.R. 221-223, C.R. 213-215.  Thus,

it is not reasonable to infer that the benchmark prices that Commerce used to calculate the

benefit from this program would reflect [                    ].  The opposite is true.

Further, none of OCP's **[                ]** are attributable to this category of

costs.  OCP IQR, Exhibits MIN-14 and MIN-16, P.R. 74-75, C.R. 80-81.  This is unsurprising,

as any documentation on this category of costs would have demonstrated that they are unrelated.

For example, OCP's 2022 financial statements indicate that at least **[**

**]**.  OCP IQR, Exhibit GEN-9(j)

at 21, P.R. 65, C.R. 52.  To the extent that **[                ]** are attributable to a production

related activity, they should be allocated to OCP's chemical production business, because the **[**

**]** is produced by chemical sites.  OCP IQR, Exhibit GEN-9(j) at 14,

P.R. 65, C.R. 52 (noting that **[          ]** is produced in the chemical production sites, Safi, and

Khouribga).

Commerce rejected Mosaic's argument that it should exclude costs that are clearly

unrelated to phosphate mining or beneficiation on the grounds that "documentation from OCP

**BUSINESS PROPRIETARY INFORMATION REMOVED** NON-CONFIDENTIAL VERSION

{is} related to a small subset of its HQ/Support costs, which renders an accurate line-drawing exercise based on the record of this proceeding impossible." IDM at 23.  This is unreasonable for two reasons.  First, it is untrue.  It would have been a simple matter to exclude categories of costs that OCP failed to substantiate with any evidence of a relationship to phosphate mining or rock beneficiation – including [                         ], [                         ], [

     ], [                    ], and [                    ] – prior to their allocation among OCP's various business units.

Second, Commerce's rejection of Mosaic's argument on the grounds that the record lacks the necessary documentation is unreasonable because it is OCP's burden to create an adequate record, not Mosaic's.  *Jiangsu Senmal Bamboo & Wood Indus. Co. v. United States*, 769 F. Supp. 3d 1344, 1380 (CIT 2025).  OCP chose to include [

          ] in the cost buildup, and it is also possesses the information that would have enabled Commerce to assess whether these costs are relevant to the production and processing of phosphate rock.  By relieving OCP of its burden to substantiate the relevance of these costs, Commerce abdicated its responsibility under the statute to accurately calculate the full amount of the subsidies that OCP received during the POR.  In sum, Commerce's decision to uncritically accept OCP's reported HQ/Support and Debt costs is unreasonable, unsupported by substantial evidence, and otherwise not in accordance with law.

**B.**     **Commerce's Selection of Phosphate Rock Benchmark Prices is Unreasonable, Unsupported by Substantial Evidence, and Otherwise Not in Accordance With Law**

Section 771(5)(E)(iv) requires Commerce to determine the adequacy of remuneration for a government-provided good "in relation to prevailing market conditions" for the good in the country under review, which include "price, quality, availability, marketability, transportation, and other conditions of purchase or sale." 19 U.S.C. § 1677(5)(E)(iv).  Section 351.511(a) of

19

Commerce's regulations further directs Commerce to consider "product similarity . . . and other factors affecting comparability" in selecting benchmark prices, 19 C.F.R. § 351.511(a)(2)(i), and to make "due allowance for factors affecting comparability," § 351.511(a)(2)(ii).  In assembling a benchmark, Commerce does not use prices which are distorted by government intervention.  *Preamble*, 65 Fed.Reg. at 65,377.  Although Commerce is constructing a tier-three benchmark for phosphate rock, it has nevertheless stated that it is selecting prices for rock that is "comparable" to OCP's.  IDM at 15 ("{P}rices were selected based on their similarity in BPL level, and therefore, comparability, to OCP's …."); *id.* at 18 ("{Egyptian phosphate rock} has a similar BPL content as OCP's phosphate rock and is thus of *comparable* quality") (emphasis added); PDM at 10 (describing the benchmark as "a world market price of *comparable* phosphate rock, … exclude{ing} data which relate to phosphate rock which does not compare to" OCP's) (emphasis added).

Commerce erred in including phosphate rock prices for Egypt and Syria.  Mosaic placed substantial new evidence on the record of this review demonstrating that Egyptian phosphate rock quality is not comparable to OCP's, and that export prices from Egypt and Syria are distorted.  Commerce failed to address this evidence or the arguments that Mosaic made with respect to this evidence.  Commerce also failed to provide adequate reasoning in support of its findings.  For these reasons, Commerce's decision is unreasonable, unsupported by evidence, and otherwise not in accordance with law.

### 1.    Commerce's Decision to Include Egyptian Phosphate Rock Prices in the Benchmark Is Unreasonable, Unsupported by Substantial Evidence, and Not in Accordance with Law

Commerce dismissed Mosaic's arguments regarding Egyptian phosphate rock prices on two grounds.  First, Commerce claimed that Mosaic's arguments about the "Minor Element Ratio" (MER) in Egyptian phosphate rock were insufficiently supported by record evidence, "as

this ratio does not consider BPL content." IDM at 18. Second, Commerce rejected Mosaic's argument that market-distorting behavior by entities in Egypt rendered the Egyptian prices unusable because "distortion in a country's domestic market is not determinative of whether the prices of *exports* from a domestic market are suitable benchmarks." *Id.* at 18-19. Commerce's arguments in defense of its determination lack merit.

### a. Commerce Unreasonably Rejected Mosaic's Arguments That MER Necessarily Affects the Comparability of Egyptian Phosphate Rock

Although BPL content is an important indicator of quality, the level of impurities and unwanted elements like heavy metals are also important factors that affect how consumers of phosphate rock evaluate its quality, price, marketability, and downstream uses. Mosaic Case Br. at 7-8, P.R. 433, C.R. 390; Mosaic Rebuttal Br. at 8, P.R. 434, C.R. 391. Mosaic submitted extensive new evidence – which was not on the record of the investigation or AR1 – demonstrating that the "very high" MER of Egyptian phosphate rock limits its potential applications as compared to higher quality rock. Mosaic Pre-Prelim Comments at 5-9, P.R. 277, C.R. 261. This lower quality affects its marketability and makes it unsuitable for use in production of downstream phosphate fertilizers. *Id.* Commerce failed to address this new evidence. Instead, Commerce focused solely on the BPL content of the phosphate rock, which Commerce claimed is "determinative of the quality of phosphate rock." IDM at 18.

However, OCP has confirmed that MER is an important determinant of rock quality that affects end use. In the original injury investigation before the U.S. International Trade Commission ("ITC"), OCP stated that "the BPL *and the Minor Elements Ratio* … is an essential parameter calculated from ore composition which impacts the quality of the final fertilizer. Some fertilizers like TSP *cannot be produced* without certain specifications relative to the quality of the rock (BPL and MER)." Mosaic 11/13/23 Comments, Exhibit 22, P.R. 180, C.R.

BUSINESS PROPRIETARY
INFORMATION REMOVED   NON-CONFIDENTIAL VERSION

195 (emphasis added).  If the quality of certain phosphate rock is such that it cannot be used to produce certain fertilizers, this will necessarily impact its price relative to other rock of higher quality.

The certificates that OCP submitted as evidence of the BPL content of the phosphate rock that it sold to customers and consumed locally during the POR also support this conclusion, as they [

].  OCP IQR, Exhibit MIN-23, P.R. 76, C.R. 81.  This evidence further confirms that MER is relevant to the Department's assessment of the comparability of Egyptian phosphate rock to that produced by OCP.

Although Commerce acknowledges that Mosaic placed a study on the record stating that "the particular MER of {certain Egyptian} phosphate rock may affect its applicability for certain uses," IDM at 19 (citing Mosaic 3/8/24 Comments, Exhibit 19, P.R. 234-235, C.R. 220), it summarily dismissed the report's relevance on the grounds that it allegedly "does not explain how MER may or may not affect the export price of Egyptian phosphate rock." *Id*. This was erroneous.  In actuality, the study explained the importance of MER to consumers of "merchant grade acid" ("MGA"), which is a key input into the subject merchandise, phosphate fertilizer:

> The one major drawback {of Egyptian phosphate rock} is that it has a very high {MER} of about 0.19….  As a rule of thumb, most phosphate rocks and the corresponding phosphoric acids made from those rocks, should have a MER below 0.08 if the acid is to be used to make specification grade diammonium phosphate (DAP) {*i.e.*, phosphate fertilizer}.  In addition to the higher MER, a secondary problem is that acid made from this rock has a particularly high iron content, and this adds to its unattractiveness.

Mosaic 3/8/24 Comments, Exhibit 19, P.R. 234-235, C.R. 220.  Commerce failed to address any of this evidence.

Phosphate rock with high MER (like Egyptian phosphate rock) would need to be processed and further refined before it could potentially be considered comparable to OCP's

phosphate rock – an additional step that would require additional costs, and thus necessarily affect the rock's comparability to OCP's own rock.  Mosaic Case Br. at 10-12, P.R. 433, C.R. 390.  For example, the same 2019 research paper discussed above examined a planned production project for Phosphate Industries and Fertilizers in Egypt (the WAPHCO Project), which aimed to render Abu Tartour rock "suitable to produce phosphoric acid that can be used to manufacture high analysis phosphate and compound fertilizers." Mosaic 3/8/24 Comments, Exhibit 19, P.R. 234-235, C.R. 220.  August 2023 reporting indicates that the project has not yet begun.  *Id.*, Exhibit 20, P.R. 236, C.R. 221-222.  Even if production does begin, it is not clear whether the technology will be effective: a study from 2015 found that the Egyptian industry's rock processing capabilities are "primitive," *id.*, Exhibit 16, P.R. 234-235, C.R. 220, and a study from 2023 states that there is "currently no economically viable methods or technologies to remove these heavy metals" from phosphate rock. Mosaic 2/16/24 Benchmark, Exhibit 29, P.R. 220, C.R. 212.  It remains to be seen whether this rock will ever be comparable to OCP's phosphate rock.  However, the evidence suggests it was not comparable during the 2022 POR. Commerce failed to address this evidence.

A report from CRU similarly describes Egyptian phosphate rock as being of low quality and, as a consequence, most Egyptian phosphate rock is used in "lower value SSP {single super phosphate} or direct application (DAPR) markets" – *i.e.*, where the phosphate rock is itself applied directly to the soil, rather than used to produce higher value-added types of phosphate fertilizer that are within the scope of the CVD order. Mosaic 3/8/24 Comments, Exhibit 15, P.R. 234-235, C.R. 220.  Unlike Egyptian phosphate rock, there is no record evidence that OCP's phosphate rock is used for SSP or direct application.  To the contrary, OCP has stated to the ITC

Case 1:24-cv-00227-TCS   Document 41   Filed 09/30/25   Page 34 of 57

Consol. Court No. 24-00227                          NON-CONFIDENTIAL VERSION

that its "ore is of high quality." Mosaic 11/13/2023 Comments, Exhibit 22, P.R. 180, C.R. 195. Commerce failed to address this evidence.

Other record evidence similarly underscores how MER impacts the quality and marketability of phosphate rock, and how MER distinguishes Egyptian phosphate rock from other benchmark prices – none of which Commerce addressed.  *See, e.g.*, Mosaic 11/23/23 Comments, Exhibit 21, P.R. 180, C.R. 195 (noting that ""$P_2O_5$ alone is not an adequate indicator of the suitability of a rock as feed for conventional wet process phosphoric acid production. *Other chemical constituents ... must also be evaluated*.") (emphasis added).

This Court recently addressed a similar situation involving natural gas and found that raw natural gas was not comparable to refined natural gas for purposes of constructing a benchmark. *Archer Daniels Midland Co. v. United States*, 779 F. Supp. 3d 1349, 1367 (CIT 2025) ("Gazprom only purchases raw gas, which it then refines and primarily exports back to Kazakhstan.  JSC's gas purchases, however, were of refined natural gas, and presumably the benchmark would reflect the subsidized product {*i.e.*, refined natural gas}, not some other product {*i.e.*, raw gas}.").  On remand, Commerce rejected the raw natural gas as a benchmark. Final Results of Redetermination (Aug. 4, 2025) at 13-14 (Access Barcode 4805352-01).  The same conclusion should pertain here: the benchmark that Commerce uses to calculate the benefit must reflect prices for products similar to OCP's – that is, phosphate rock with low MER levels – and not phosphate rock that would require further processing and costs before it could be considered comparable.

In sum, there is substantial evidence on the record demonstrating that BPL level is not the sole indicator of phosphate rock quality.  Rather, MER is also an important factor that affects how consumers of phosphate rock evaluate quality, price, marketability, and downstream uses.

NON-CONFIDENTIAL VERSION

This evidence also demonstrates that Egyptian phosphate rock is lower quality and suitable for fewer end purposes – or, at least requires greater processing than does Moroccan phosphate rock. In short, the evidence demonstrates that the market for phosphate rock accounts for MER in the ordinary course of business. But instead of grappling with this evidence, Commerce summarily stated that there is "insufficient information regarding the effect of MER on Egyptian phosphate rock export prices." IDM at 19. This conclusion is unreasonable.

Commerce's focus on how a given factor affects export prices (and only export prices) fails to satisfy statutory requirements and deviates from its established practice. The statute requires Commerce to determine the adequacy of remuneration "in relation to prevailing market conditions" for the good in the country under review, which include "price, quality, availability, marketability, transportation, and other conditions of purchase or sale." 19 U.S.C. § 1677(5)(E)(iv). Commerce's claim that Mosaic submitted "insufficient" evidence of the effect MER has on export prices – and its corresponding failure to grapple with the evidence in question – is inconsistent with this requirement.

The substantial evidence standard requires Commerce to do more than dismiss Mosaic's evidence as "insufficient." Commerce must take a "hard look" at the record evidence, including contradictory evidence. *Greater Boston Television Corp. v. FCC*, 444 F.2d 841, 851 (D.C. Cir. 1970) (requiring the court to reverse determinations where "the agency has not really taken a 'hard look at the salient problems'"). It "cannot simply ignore significant contradictory evidence and assert that, nevertheless, its determination was supported by substantial evidence." *Mitsubishi Materials Corp.*, 820 F.Supp. at 624. This is precisely what Commerce did – it acknowledges that a phosphate rock's MER "may affect its applicability for certain uses," IDM at 19, but it fails to explain "why this evidence is insufficient to support the claim" that Egyptian

phosphate rock is nevertheless comparable to OCP's. *Ad Hoc Shrimp Trade Action Comm. v. United States*, 219 F. Supp. 3d 1286, 1297 (CIT 2017).

Commerce also deviated from established practice without explanation in dismissing the evidence pertaining to MER. Commerce in these proceedings has consistently evaluated the "comparability" of phosphate rock for inclusion in the benchmark price. More broadly, it "delineates by grade or product characteristic when such data are available and where record information indicates that the market for the good in question accounts for such grade or product characteristics in the ordinary course of business." *Circular Welded Carbon Steel Pipes and Tubes From Turkey: Final Results of Countervailing Duty Administrative Review; Calendar Year 2018*, 86 Fed.Reg. 6,866 (Jan. 25, 2021), and accompanying IDM at 17. Commerce has also assessed "comparability" in other instances. *See, e.g.*, *Certain Softwood Lumber Products from Canada: Final Affirmative Countervailing Duty Determination, and Final Negative Determination of Critical Circumstances*, 82 Fed.Reg. 51,814 (Nov. 8, 2017) and accompanying IDM at 63-65 (constructing a tier-three benchmark that includes U.S. log prices because, in part, the species in question "are very similar and, therefore, comparable"); *Circular Welded Austenitic Stainless Pressure Pipe from the People's Republic of China: Final Affirmative Countervailing Duty Determination*, 74 Fed.Reg. 4,936 (Jan. 28, 2009) and accompanying IDM at 20-21 (excluding certain data from the benchmark because they "do not delineate the prices by {steel} grade"). Here, data is available showing that both BPL and MER are important determinants of rock quality and marketability, as both affect potential downstream uses. Thus, consistent with its past practice, Commerce should have made such delineations here.

### b. Commerce Unreasonably Rejected Mosaic's Arguments That Egyptian Export Prices Are Distorted

Commerce also erroneously dismissed Mosaic's arguments concerning the distortion of Egyptian phosphate rock export prices by its state-owned mining companies on the grounds that "'distortion' in a country's domestic market is not determinative of whether the prices of *exports* from a domestic market are suitable benchmarks." IDM at 18.  But Commerce failed to provide a reasoned basis for this conclusion: the sentences that follow are a non-sequitur, as they discuss the presence of MER in Egyptian phosphates, not whether Egypt's state-owned mining companies do in fact distort export prices.

In any event, the record demonstrates that they do.  For example, Mosaic submitted evidence stating that:

> El Nasr Mining's preferential prices apparently extend to local traders who sell for export.  "Normally, due to differences in P2O5 grade, Egypt's phosphate should sell for 7 to 10 percent less than Jordan's," he says, adding that in the last quarter of 2008, Jordan's prices were well over $300 per ton while El Nasr Mining customers were paying $130.  For the past year, El Nasr's prices have been consistently 50 percent less than Jordan's.

Mosaic 3/8/24 Comments, Exhibit 17, P.R. 234-235, C.R. 220.  This exhibit explicitly describes how Egyptian *export prices* are distorted – that is, "consistently 50 percent less than Jordan's" – and yet, Commerce concludes that this is "insufficient evidence to indicate that Egyptian export prices are distorted." IDM at 19.  Again, Commerce has not explained "why this evidence is insufficient to support the claim" that Egyptian phosphate rock export prices are distorted.  *Ad Hoc Shrimp Trade Action Comm.*, 219 F.Supp.3d at 1297.

In sum, because Commerce fails to meaningfully address whether Egypt's state-owned mining companies distort export prices (in the face of evidence indicating that they do), and because Commerce disregards its statutory and regulatory directives to undertake a holistic analysis of the comparability of Egyptian phosphate rock to the rock produced by OCP – which, as detailed in the record, confirms that MER (in addition to BPL) is an important determinant of

phosphate rock quality – Commerce's determination is unreasonable, unsupported by substantial evidence, and otherwise not in accordance with law.

> ### 2. Commerce's Decision to Include Syrian Phosphate Rock Prices in the Benchmark Is Unreasonable, Unsupported by Substantial Evidence, and Not in Accordance with Law

In the *Final Results*, Commerce reversed course from its findings in the *Preliminary Results* and included Syrian phosphate rock prices in the benchmark. It justified this reversal on the grounds that Mosaic failed to "point to market dynamics in Syria … that would lead to a finding of distortion, nor has it provided sufficient information to support its argument that government influence in these respective countries is causing *prices of exports* from Syria to other markets to be distorted." IDM at 17.

In fact, Mosaic submitted substantial new evidence not on the record in prior segments of this proceeding that contradict Commerce's findings, showing instead that Syrian export prices for phosphate rock are not suitable as a tier-three benchmark because of distortion resulting from government interventions and Western economic sanctions. Mosaic Pre-Prelim Comments at 10-11, P.R. 277, C.R. 261; Mosaic Rebuttal Br. at 11-13, P.R. 434, C.R. 391. Despite this significant new evidence, Commerce rejected Mosaic's arguments in *nearly verbatim* language as it did in the prior review – thereby failing to meaningfully engage with the record evidence and, thus, to satisfy the substantial evidence standard.

Mosaic introduced new evidence showing that preceding and continuing through the POR, the U.S. and the EU imposed multiple rounds of economic sanctions on Syria, as well as on the Russian company that controls much of Syria's phosphate mining operations. *See, e.g.*, Mosaic 4/26/24 Comments, Exhibit 9 (noting that EU sanctions "ban deals with the Syrian minister of oil and mineral resources, who is in charge of phosphates. European companies also risk running afoul of the global reach of US sanctions on the Syrian government"); *id.*, Exhibit

Case 1:24-cv-00227-TCS    Document 41    Filed 09/30/25    Page 39 of 57

Consol. Court No. 24-00227                          NON-CONFIDENTIAL VERSION

11 (identifying the Ministry of Petroleum and Mineral Resources of Syria as subject to U.S.

blocking sanctions); *id.*, Exhibit 12 (discussing Russia's monopolization of Syrian phosphate

production through Stroytransgaz); *id.*, Exhibit 13 (noting that the United States has sanctioned

Stroytransgaz since 2014), P.R. 295, C.R. 287. These sanctions operate as "coercive economic

means" to effect political change in Syria. *See, e.g.*, Mosaic Case Br. at 12 & n.40, P.R. 433,

C.R. 390 ("It is the policy of the United States that diplomatic and coercive economic means

should be utilized to compel the government of Bashar al-Assad to halt its murderous attacks on

the Syrian people…"). In response to this economic pressure, the Syrian Government has

"regulated trade through a chaotic series of ad hoc measures designed to limit foreign currency

outflows and to capture revenue," and this "sort of interference hurts productive sectors by

making it harder to access raw materials." Mosaic 4/26/24 Comments, Exhibit 8, P.R. 295, C.R.

287.

  These sanctions policies dramatically reduce demand for phosphate rock from Syria,

which in turn reduces the price of its exported phosphate rock. Phosphate rock that is

unmarketable internationally and that is available only on black markets or markets involving

countries that flout the Western sanctions regime is not comparable to OCP's phosphate rock.

No legitimate company seeking to transact through the Western financial system – presumably

including OCP – could reasonably hope to purchase phosphate rock from Syria. In short, these

sanctions distort Syrian prices for phosphate rock, including export prices, by design.

  None of this evidence was on the record in the first review. Nevertheless, Commerce

rejected Mosaic's arguments in language that was nearly identical to its findings in the first

review. Specifically, Commerce stated:

> This is consistent with the logic that export prices would reflect "the commercial realities
> on the world market for such goods and services." The petitioner has failed to point to

market dynamics in the destination countries for the exports in question that would lead to a finding of distortion, nor has it provided sufficient information to support that argument that government influence in these respective countries is causing *export prices* to other markets to be distorted. The objective of the creation of a world benchmark price is to provide a reasonable measure of world prices for phosphate rock, and not domestic prices. We continue to find that the benchmark we used in the *Preliminary Results* meets this objective. Therefore, we continue to include phosphate rock export prices from … Syria in our benchmark.

*Phosphate Fertilizers From the Kingdom of Morocco: Final Results of Countervailing Duty*

*Administrative Review, 2020-2021*, 88 Fed.Reg. 76,726 (Nov. 7, 2023), and accompanying IDM

("AR1 IDM") at 28 (citation omitted). In the second review, Commerce stated:

> This is consistent with Commerce's findings that export prices normally reflect "the commercial realities on the world market for such goods and services." In its rebuttal case brief, Mosaic has failed to point to market dynamics in Syria for the exports in question that would lead to a finding of distortion, nor has it provided sufficient information to support its argument that government influence in these respective countries is causing *prices of exports* from Syria to other markets to be distorted. The objective of the creation of a world benchmark price is to provide a reasonable measure of world prices for phosphate rock, and not domestic prices.
>
> We find that the inclusion of Syrian benchmark export prices meets this objective. Therefore, for the final results, we include phosphate rock export prices from Syria in our benchmark.

IDM at 17 (citations omitted). Remarkably, Commerce's determination fails even to use the

word "sanctions," let alone acknowledge the evidence pertaining to the U.S. and EU sanctions

regimes and their impact on Syrian export prices. IDM at 17. This was plainly unreasonable.

First, Commerce cannot simply rely on a cut-and-paste recitation of its own conclusion

from a prior segment of the proceeding that involved a different factual record. Rather,

Commerce must examine the evidence for the instant administrative review. This court has

repeatedly held that each administrative review is a separate proceeding with its own unique

record and, accordingly, Commerce cannot "rely on documents issued in a prior proceeding."

*Rubberflex Sdn. Bhd. v. United States*, 59 F.Supp.2d 1338, 1348 (CIT 1999) ("each

administrative review is a separate proceeding … and thus neither Commerce, nor a respondent,

can rely on documents issued in a prior proceeding"); *ABB, Inc. v. United States*, 273 F. Supp. 3d

1200, 1205 (CIT 2017) ("each administrative review is a separate proceeding, and the records

may differ between the two administrative reviews"). Commerce did not address any of the

evidence that is new on the record of this second review.

Second, based on the evidence in the record of the instant review, Commerce must

"articulate a satisfactory explanation for its action including a rational connection between the

facts found and the choice made," *State Farm*, 463 U.S. at 43 – that is, Commerce must actually

assess evidence in the record – while accounting for whatever in the record "fairly detracts" from

its conclusion. *CS Wind Viet. Co.*, 832 F.3d at 1373. If Commerce determines that Mosaic's

evidence is insufficient, it must explain "why this evidence is insufficient." *Ad Hoc Shrimp*

*Trade Action Comm.*, 219 F.Supp.3d at 1297.

Commerce has done none of this. Accordingly, it unreasonably rejected Mosaic's

arguments that U.S. and EU sanctions on Syria rendered Syrian export prices unsuitable as a tier-

three benchmark; indeed, it failed to even mention "sanctions." Commerce also unreasonably

rejected Mosaic's arguments that Syrian phosphate rock is not comparable to OCP's phosphate

rock in terms of availability and marketability. Thus, its determination is unsupported by

substantial evidence and not in accordance with law.

> **C.    Commerce's Decision to Exclude Capital Goods Imported From FTA Countries From the Benefit Calculation for the Customs Duty Exemptions for Capital Goods, Machinery, and Equipment Program is Unreasonable, Unsupported by Substantial Evidence, and Otherwise Not in Accordance With Law**

In the *Final Results*, Commerce rejected Mosaic's argument that it should include all

OCP's imports from FTA countries in the benefit calculation for the customs duty exemptions

for capital goods, machinery, and equipment program. IDM at 53. Commerce justified this on

that grounds that "the agreements substantiated that OCP and its cross-owned companies would

have paid the rate in the FTA absent the customs duty exemptions program." *Id.* This determination is erroneous, because Commerce mischaracterizes the utility of these agreements and other alleged evidence, none of which – whether taken individually or collectively – supports Commerce's findings.  Accordingly, Commerce's exclusion of the relevant imports from the benefit calculation is unreasonable, unsupported by substantial evidence, and otherwise not in accordance with law.

The fundamental flaw in Commerce's analysis lies in a failure to grasp the distinction between the "originating" country for non-preferential purposes and originating status under the preferential rules of origin set forth in FTAs.  OCP and the GOM claimed that the duty rates that would apply to OCP's imports of certain capital goods, machinery, and equipment imported from FTA countries would be the preferential rates.  OCP IQR at 95, P.R. 59, C.R. 44, Exhibit CUSTOMS-5(a), P.R. 77, C.R. 93.  In support of this claim, the OCP and the GOM submitted [



]. OCP IQR, Exhibit CUSTOMS-5(a), P.R. 77, C.R. 93; Mosaic 4/15/24 Comments on GOM SQR at 4, P.R. 283, C.R. 264 (quoting GOM 04/05/24 SQR at 14, Exhibit SUPP-10, P.R. 267, C.R. 252-53).  OCP asserted that, "{i}n filling in" these columns "the Moroccan customs authority took into consideration any Free Trade Agreements ('FTA') between Morocco and other countries, and the FTA duty rates that would have been applicable to OCP's imports from certain countries absent customs duty exemptions from investment

agreements."[1] OCP IQR at 101, P.R. 59, C.R. 44. None of this is evidence that the merchandise in question would have been entitled to preferential treatment under the relevant FTAs.

As Mosaic explained in its case brief, "the mere existence of FTAs that provide for the possibility of preferential tariff treatment of relevant HTS codes does not demonstrate that OCP's imports of capital goods classified under those codes would have been entitled to duty-free treatment." Mosaic Case Br. at 38-39, P.R. 433, C.R. 390.  Indeed, the FTAs in question contain detailed rules on origination, and neither OCP nor the GOM have provided any evidence that OCP's goods met these requirements.  *Id.*; Mosaic 7/15/24 Comments GOM 2SQR at 2-5, P.R. 350, C.R. 332; OCP IQR at 93-102, P.R. 59, C.R. 44.

Commerce asserts that documentation provided by the GOM substantiates that OCP imported capital goods eligible for duty-free treatment under various FTAs.  For example, Commerce references the GOM's import declarations, which "allow for a selection of either an FTA or exemption and waiver code." IDM at 54, citing GOM 2SQR, P.R. 343, C.R. 309. Actually, these "declarations" are a user guide detailing the Moroccan customs clearance process, not specific customs declarations.  GOM 2SQR, Exhibit 2-Supp-8, P.R. 343-346, C.R. 318-321.  Further, the GOM explains that "{f}or imports carried out within the framework of a free trade agreement, the declarant provides the code of the relevant agreement in box 28 of the DUM ('Packages and description of goods') or box 38 ('Additional details')," and that "{t}he declarant also attaches any documents to be annexed to the DUM, such as a proof of origin if required by the agreement." GOM 2SQR at 33, P.R. 343, C.R. 309.  In other words, these declarations are not FTA-specific, and a user guide that explains how to fill out certain FTA-

---

[1] OCP itself never claimed that its entries of capital goods and equipment from FTA countries would have been eligible to claim preferential treatment under those FTAs, only that the GOM "took into consideration" the FTAs in "filling in" the duty rates that would have applied in the absence of the customs duty exemption program.  OCP IQR at 101, P.R. 59, C.R. 44.

**BUSINESS PROPRIETARY INFORMATION REMOVED**   NON-CONFIDENTIAL VERSION

related fields in a customs form does not demonstrate that OCP's entries were eligible for duty-free treatment under the relevant FTAs.  To the contrary, as the GOM acknowledges, importers must attach documents establishing, *e.g.*, proof of origin to verify eligibility.  GOM 2SQR at 33, P.R. 343, C.R. 309; Mosaic Case Br. at 38-41, P.R. 433, C.R. 390.  Thus, Commerce's reliance on the GOM's responses is misplaced because the evidence the GOM cites does not establish that OCP's goods were actually FTA-eligible.

Moreover, Commerce asked the GOM to provide contemporaneous documentation regarding duty exemptions approved for OCP and its affiliates.  First Supplemental Questionnaire (Mar. 15, 2024) at 5, P.R. 242, C.R. 232.  In response, the GOM provided "screenshots taken from the Moroccan Customs Service's statistical data system," and stated that "{f}rom its search query, the Moroccan Customs Service pulled transaction-specific data for import duty exemptions received by OCP during 2022." Mosaic 4/15/24 Comments on GOM SQR at 3-4, P.R. 283, C.R. 264 (quoting GOM 04/05/24 SQR at 14, Exhibit SUPP-10, P.R. 267, C.R. 252-53).  This "documentation" consists of [

].

Mosaic 4/15/24 Comments on GOM SQR at 4, P.R. 283, C.R. 264 (quoting GOM 04/05/24 SQR at 14, Exhibit SUPP-10, P.R. 267, C.R. 252-53).  These *post hoc* annotations – prepared for purposes of this review – are a glaring indicator that this is not contemporaneous documentation showing OCP's entries were entitled to preferential rates under FTAs.[2]

---

[2]  The GOM never answered Commerce's specific question, despite Mosaic raising this issue in its April 15, 2024 Deficiency Comments.  Mosaic 4/15/24 Comments at 2, P.R. 283, C.R. 264.

NON-CONFIDENTIAL VERSION

Further, based on the GOM's 2SQR, if OCP's entries had been eligible for preferential treatment under an FTA, the GOM should have been able to provide contemporaneous evidence to substantiate its claims.  Specifically, the GOM reported that the "{Automated Base for Network Customs, or} BADR system checks whether the code entered corresponds to the declared origin and whether the imported goods are covered by the preferential benefits provided for by the {FTA} in question," including any supporting documentation filed with the entry. GOM 2SQR at 33, P.R. 343, C.R. 309.  An inspector reviews all the information to verify eligibility, and once confirmed, the BADR system automatically liquidates duties and taxes at the specified rate.  GOM 2SQR at 33-34, P.R. 343, C.R. 309.  The GOM did not provide records showing that the relevant OCP imports were subjected to and passed this eligibility review. Thus, all the "evidence" that purportedly demonstrates OCP's imports were eligible for duty-free treatment under an FTA is nothing more than generalizations and *post-hoc* revisions meant to further the GOM's, and OCP's, position in this proceeding.

Moreover, Commerce's determination ignores the evidence that Mosaic submitted demonstrating that OCP and the GOM did not meet their burden to show that the relevant imports could benefit from preferential treatment under the respective FTAs.  *NTN Bearing Corp. of Am.*, 104 F. Supp. 2d at 152 ("{T}he burden of proof {is} with the party who intends to benefit from the claim made.").  Specifically, Commerce states that there is "no record evidence that the specific FTA rates reported by OCP as the duty rate in lieu of the customs duty exemption program were either not available to OCP or inaccurate." IDM at 54.  Commerce's reasoning misses the point.  The mere fact that preferential rates pursuant to FTAs exist (and were accurately identified) does not mean those rates would have applied to specific imports from the respective countries.  To the contrary, the availability of those rates to OCP would have

depended on whether the items in question satisfied the preferential rules of origin set forth in the relevant FTAs, as well as other requirements, such as direct transport/no transshipment through third countries.  Mosaic Case Br. at 38-39, P.R. 433, C.R. 390.  OCP submitted no evidence documenting that its entries of capital goods, machinery, and equipment from FTA countries were in fact eligible for preferential treatment under the FTAs.  Mosaic Case Br. at 39-40, P.R. 433, C.R. 390.  By stating that there is "no record evidence" the FTA rates were "not available," Commerce has once again flipped the evidentiary burden on its head.

In addition, Commerce concedes that Mosaic is correct that some FTAs require documentation regarding the country of origin to be eligible for duty-free treatment.  However, Commerce dismisses the issue, stating that this fact "does not preclude{} the FTA duty exemption from being available to OCP" and that it "cannot fault OCP for selecting one available rate over another and filling out documentation accordingly." IDM at 54.  But Commerce assumes that OCP would have had a choice whether to claim FTA preferential treatment or the customs exemption for capital goods, machinery, and equipment.  Commerce's leap of logic ignores that there is no record evidence that OCP's goods actually qualified for FTA preferential treatment.  Commerce cannot rest its findings on unsupported assumptions.  Further, Commerce failed to account for "whatever in the record fairly detracts" from the weight of supportive evidence, rendering its decision unlawful.  *CS Wind Viet. Co.*, 832 F.3d at 1373.

For these reasons, Commerce's determination to exclude capital goods imported from FTA countries from the benefit calculation for the customs duty exemptions for Capital Goods, Machinery, and Equipment program is unreasonable, unsupported by substantial evidence, and otherwise not in accordance with law.

**BUSINESS PROPRIETARY INFORMATION REMOVED** NON-CONFIDENTIAL VERSION

### D. Commerce's Refusal to Countervail Port and Vessel Services that Marsa Maroc Provided to OCP Is Unreasonable, Unsupported by Substantial Evidence, and Otherwise Not in Accordance With Law

In the Post-Preliminary Determination, Commerce found that Marsa Maroc, a governmental entity, provided port and vessel services to OCP. Post-Prelim. Determ. at 11, P.R. 427. Nevertheless, Commerce found that this program did not provide a benefit to OCP because "Marsa Maroc's price-setting analysis accounts for the profitability of its individual contracts" and "Marsa Maroc sustained an operating profit on its port services provision in 2022 and the prior year." *Id.* at 14. Commerce sustained these findings in the *Final Results*. IDM at 61-62. These findings are unreasonable, unsupported by substantial evidence, and otherwise not in accordance with law.

### 1. Commerce's Determination that Marsa Maroc Takes its Own Costs and Profitability Into Account Is Unsupported by Substantial Evidence

Commerce based its rejection of Mosaic's subsidy allegation on the grounds that Marsa Maroc takes its own costs and profitability into account when setting prices for its bilateral service agreements ("BSAs") with OCP. IDM at 62; IDM BPI Supp. at 9-10, P.R. 452, C.R. 397. Specifically, it relied upon a GOM submission that which purportedly contains "Marsa Maroc's [

                                                    ]. GOM 2SQR at 10, P.R. 343, C.R. 309.

As Mosaic argued, however, there is no evidence on the record showing that Marsa Maroc actually [                                                    ], because it is [


                                                    ]. Mosaic

Case Br. at 49, P.R. 433, C.R. 390 (citing GOM 2SQR, Exhibit 2-SUPP-7, P.R. 343, C.R. 318).

Mosaic also pointed out that there was no evidence on the record [

**BUSINESS PROPRIETARY INFORMATION REMOVED** NON-CONFIDENTIAL VERSION

] showing that Marsa Maroc did in fact take its own costs and profitability into account in setting its prices to OCP.

In rejecting Mosaic's arguments, Commerce stated that "Marsa Maroc conducted its normal market operations in its negotiations of rates for its BSAs with OCP, and no information on the record contradicts this statement." IDM at 62. Commerce also stated that it "can identify no reason on the record to disregard the GOM's description of Marsa Maroc's negotiation process for [                                                    ], and how in the normal course of business Marsa Maroc [

]." IDM BPI Supp. at 10, P.R. 452, C.R. 397.

The substantial evidence standard requires more than this unquestioning acceptance of one party's unsubstantiated assertions. Commerce must take a "hard look" at the record evidence, including contradictory evidence. *Greater Boston Television Corp.*, 444 F.2d at 851. It "cannot simply ignore significant contradictory evidence and assert that, nevertheless, its determination was supported by substantial evidence." *Mitsubishi Materials Corp.* 820 F.Supp. at 624. And yet this is precisely what Commerce did here – it ignored significant evidence showing that Marsa Maroc [

]. This was unlawful.

### 2.   Commerce's Determination That Marsa Maroc Does not Engage in [ ] Is Unsupported by Substantial Evidence

When evaluating whether a government set a price "consistent with market principles," Commerce's regulations require it to consider "possible price discrimination." 19 C.F.R. § 351.511(a)(2)(iii). In the *Final Results*, Commerce "acknowledge{d} that port and vessel service fees charged by Marsa Maroc, and within Morocco, differ based on both BSAs and the

**BUSINESS PROPRIETARY INFORMATION REMOVED** NON-CONFIDENTIAL VERSION

tariffs charged at the specific port." IDM at 62. Nonetheless, Commerce concluded that this was not [                    ], because it found that "there is no evidence on the record that any of the fees charged are for LTAR{.}"

Commerce's finding is unreasonable because it begs the question it is supposed to be answering. The relevant question is not whether a given fee viewed in isolation was for LTAR, but rather whether Marsa Maroc engaged in [

                        ]. If it did, then Marsa Maroc did provide port services for LTAR to the recipient that [                                    ]. As Mosaic demonstrated in its case brief, record evidence shows that the rates that Marsa Maroc charges to OCP for port and vessel services are in fact [

] the rates that it charges at Tanger Med, the only Moroccan port not subject to the jurisdiction of ANP. Mosaic Case Br. at 50, P.R. 433, C.R. 390 (citing Mosaic NSA at 9-11, P.R. 175, C.R. 187). Therefore, the record contains evidence of that Marsa Maroc does [

] and thus that its prices are not set consistent with market principles.

Again, Commerce "cannot simply ignore significant contradictory evidence and assert that, nevertheless, its determination was supported by substantial evidence." *Mitsubishi Materials Corp.* 820 F.Supp. at 624. But it did precisely that. Consequently, its determination is unreasonable, unsupported by substantial evidence, and otherwise not in accordance with law.

### E. Commerce's Refusal to Countervail Port Services and Infrastructure that ANP Provided to OCP Is Unreasonable, Unsupported by Substantial Evidence, and Otherwise Not in Accordance With Law

#### 1. Commerce's failure to address whether the ANP's provision of port services constituted a financial contribution is arbitrary, unsupported by substantial evidence, and otherwise not in accordance with law

Commerce determined that OCP "did not use this program" during the POR because, according to Commerce, "ANP did not *per se* provide port services to OCP," and because "OCP

**BUSINESS PROPRIETARY INFORMATION REMOVED** NON-CONFIDENTIAL VERSION

did not receive infrastructure from ANP." IDM at 58. Based on these findings, Commerce concluded that a finding of "whether OCP received a financial contribution for the program" was unnecessary. The record evidence contradicts Commerce's finding, and Commerce's reasoning is inconsistent with the text of the statute and contrary to the holdings of this Court.[3]

First, Commerce's determination appears not to recognize that the provision of port infrastructure constitutes a financial contribution within the meaning of the Act. This is clear from the plain language of Section 771(5)(D)(iii), as well as the preamble to Commerce's regulations. Specifically, Section 771(5)(D)(iii) states that the term "financial contribution" includes situations where an authority provides "goods or services, other than general infrastructure." Commerce's preamble confirms that this definition includes the provision of port infrastructure to a specific enterprise or industry, as was the case here:

> Any infrastructure that satisfies this public welfare concept is general infrastructure and therefore, by definition, is not countervailable and not subject to any specificity analysis. Any infrastructure that does not satisfy this public welfare concept is not general infrastructure and is potentially countervailable. *The provision of* industrial parks and *ports*, special purpose roads, and railroad spur lines, to name some examples (some of which we have encountered in our cases), *that do not benefit society as a whole, does not constitute general infrastructure and will be found countervailable if the infrastructure is provided to a specific enterprise or industry and confers a benefit.*

*Preamble to Countervailing Duties: Final Rule*, 63 Fed.Reg. 65,348, 65,378-79 (Nov. 25, 1998) (emphasis added); *see also Bethlehem Steel Corp. v. United States*, 162 F.Supp.2d 639, 645 (CIT 2001).

The record clearly shows that ANP's concession agreements with OCP allow OCP [

]

and thus constitute financial contributions within the meaning of the statute. Specifically, OCP

---

[3] Mosaic acknowledges this Court's ruling in *The Mosaic Company v. United States*, 774 F.Supp.3d 1362, 1377-78 (CIT 2025). Nevertheless, Mosaic respectfully raises this issue again in order to preserve it for appeal.

**BUSINESS PROPRIETARY INFORMATION REMOVED** NON-CONFIDENTIAL VERSION

reported in its initial questionnaire that it purchased port services from ANP and also maintained concession arrangements with the ANP to operate terminals at the ports of Jorf Lasfar, Casablanca, and Safi during the POR.  OCP IQR at 148-53, P.R. 59, C.R. 44.  These concession agreements provided OCP with [

].  *Id*. at 147, 150; Mosaic Pre-Prelim.  Rebuttal at 8-9, P.R. 288, C.R. 265.  Commerce admits as much, noting that these "agreements provide the concession holder, in this case OCP, with certain rights and responsibilities{.}"  IDM at 57.  Commerce's subsequent statement that "OCP did not receive infrastructure from ANP, and was only allowed the use of infrastructure as part of the agreements," is a non sequitur that cannot be squared with this undisputed record evidence.  *Id.* It also cannot be squared with Commerce's own longstanding practice to find that, regardless of whether the Government Authority is providing a good or a right to access, it is nevertheless a financial contribution.  *See, e.g.*, *Certain Softwood Lumber Products From Canada: Final Results and Final Rescission, in Part, of the Countervailing Duty Administrative Review; 2021*, 88 Fed.Reg. 50,103 (Aug. 1, 2023), and accompanying IDM at 36 ("Commerce has repeatedly stated that, regardless of whether the provinces were supplying timber or making it available through a right of access, they were providing standing timber") (internal quotations omitted); *Certain Softwood Lumber Products From Canada: Final Results and Rescission, in Part, of the Countervailing Duty Administrative Review; 2023*, 90 Fed.Reg. 38,755 (Aug 12, 2025), and accompanying IDM at 43 (referring to "stumpage prices, i.e., prices charged to the purchaser for the right to harvest timber").

     Furthermore, OCP's own questionnaire responses confirm that ANP provided it with the

[                                                                                              ]. OCP

BUSINESS PROPRIETARY
INFORMATION REMOVED   NON-CONFIDENTIAL VERSION

IQR at 147, P.R. 59, C.R. 44.  Commerce's finding that OCP received an **[**

**]** from ANP but, at the same time, "did not receive

infrastructure from ANP" is inconsistent with the plain language of the statute.  The provision of

an **[** **]** is

indisputably a financial contribution to OCP.  19 U.S.C. § 1677(5)(D)(iv); *see also Contribution*,

*Black's Law Dictionary* (12th ed. 2024) (defining "contribution" to mean "Something that one

gives or does in order to help an endeavor be successful").

Thus, because neither OCP nor the GOM disputes that ANP is a "government authority"

within the meaning of section 771(5)(B), ANP's provision of the **[**

**]** to OCP constitutes a "financial contribution"

within the meaning of section 771(5)(D)(iii).

### 2. Commerce's determination that the ANP's provision of port services and infrastructure did not confer a benefit on OCP is unreasonable, unsupported by substantial evidence, and otherwise not in accordance with law

In addition to rejecting Mosaic's argument that the ANP's provision of port services and

infrastructure constituted a financial contribution to OCP, Commerce also disagreed with Mosaic

that the financial contribution conferred a benefit.  Commerce rationalized this conclusion on the

grounds that "ANP reported both an operating and net profit in 2022" and that, accordingly, its

"previous analysis regarding ANP's price setting methodology and the underlying market

principles remains relevant." IDM at 58.  Repeating its conclusion from the first review,

Commerce stated that "ANP's prices are set in accordance with market principles." *Id.* As in the

AR1, Commerce's conclusion is unreasonable, unsupported by substantial evidence, and

otherwise not in accordance with law.

The record shows that the GOM's provision of port services and infrastructure was for LTAR, and thus conferred a benefit.  In AR1, the Department engaged in a tier-three analysis to determine whether OCP received a benefit under this program.  AR1 IDM at 52-53.  It considered whether the government price is set "consistent with market principles" based on factors such as "the government's price-setting philosophy, costs (including rates of return sufficient to ensure future operations), or possible price discrimination." *Preamble*, 63 Fed.Reg. at 65, 378.  Application of these factors to the evidence on the record of this review confirms that ANP did not set the prices that OCP pays for port services and infrastructure consistent with market principles for two reasons.

*First*, the GOM submitted evidence confirming that **[                    ]** that ANP used in setting fees for the concession agreement at the port of Jorf Lasfar only considered **[**

**]**; it did not consider what level of concession fees would maximize **[                         ]**, which would have been the focus of a market-based actor.  Mosaic 11/13/23 Comments, Exhibit 4, P.R. 177, C.R. 191 (showing GOM 8/28/22 NSA SSQR); Mosaic Case Br. at 43-46, P.R. 433, C.R. 390.

*Second*, the record evidence also indicates that the ANP engages in **[**

**]** in setting the terms of the arrangements, because the **[**

**]** on a tonnage basis than **[**

**]**.  Mosaic Case Br. at 46, P.R. 433, C.R. 390 (citing GOM 4/5/24 SQR at 19, P.R. 264, C.R. 249; Mosaic 11/13/23 Deficiency Comments, Exhibit 5, P.R. 177, C.R. 191).

Commerce failed to engage with any of this evidence, or Mosaic's arguments citing this evidence.  Instead, it repeated its findings from AR1.  The substantial evidence standard requires

BUSINESS PROPRIETARY
INFORMATION REMOVED  NON-CONFIDENTIAL VERSION

more than this.  Commerce's determination must be "the product of reasoned decisionmaking," which requires an examination of the evidence on the record and an explanation connecting the facts to the conclusion drawn while addressing any evidence that "fairly detracts" from the agency's conclusion.  *State Farm*, 463 U.S. at 52, 43; *CS Wind Viet. Co.*, 832 F.3d at 1373.  If Commerce determines that Mosaic's evidence is insufficient, it must explain "why this evidence is insufficient." *Ad Hoc Shrimp Trade Action Comm.*, 219 F.Supp.3d at 1297.

> **3.     Commerce's failure to address whether ANP's provision of port services and infrastructure to OCP was *de facto* specific is unreasonable, arbitrary, and otherwise not in accordance with law**

Under section 771(5A)(D)(iii), a subsidy is *de facto* specific if, *inter alia*, the actual recipients of the subsidy are limited in number; an enterprise or industry is a predominant user of the subsidy; or an enterprise or industry receives a disproportionately large amount of the subsidy.  In the *Final Results*, Commerce declined to consider whether this program is *de facto* specific.  IDM at 58.  However, the record shows that [

].

Specifically, there are [




].  Mosaic 11/13/23 Comments, Exhibit 5 at 6-7, P.R. 177, C.R. 191.  These numbers are "limited" in light of the plain language of the statute and the Department's prior practice.  *See, e.g.*, *Forged Steel Fluid End Blocks from Italy: Final Results of the Countervailing Duty Investigation*, 85 Fed.Reg. 80,022 (Dec. 11, 2020), and accompanying IDM at 17-18.

Additionally, the concession revenue data that the GOM submitted in AR1, which Mosaic placed on the record of this review, show that OCP is ANP's [

], accounting for [                                        ]

in 2021.  Mosaic 11/13/23 Comments, Exhibit 5 at 6-7, P.R. 177, C.R. 191.  OCP also accounted

for nearly **[              ]** of ANP's revenues from concessions in 2021.  *Id.*  The GOM did not

submit equivalent data for 2022 in this review, but the limited information that it did provide

shows that OCP accounted for approximately **[              ]** of ANP's invoiced concession fees

in 2022.  GOM IQR at XI-13, 14, P.R. 93, C.R. 70.  Thus, the record shows that this program is

*de facto* specific because the actual recipients of the subsidy are limited in number, and because

OCP is a predominant user of the subsidy, within the meaning of section 771(5A)(D)(iii).

Commerce's failure to engage with this evidence and Mosaic's arguments citing this evidence is

unreasonable, not supported by substantial evidence, and otherwise not in accordance with law.

## VI.    <u>CONCLUSION</u>

Mosaic requests that the Court find that Commerce's findings on the Provision of Mining

Rights for LTAR, the Customs Duty Exemptions for Capital Goods, Machinery, and Equipment,

the Marsa Maroc Provision of Port and Vessel Services for LTAR, and the ANP Port Services

and Infrastructure for LTAR subsidy programs, as discussed above, are unreasonable,

unsupported by substantial evidence and otherwise not in accordance with law. Mosaic requests

that the Court remand for redetermination consistent with the Court's opinion.

Respectfully submitted,

/s/ Stephanie E. Hartmann
David J. Ross
Stephanie E. Hartmann
Alexandra S. Maurer
Lindsey A. Ricchi
Jacob A. Laband

Wilmer Cutler Pickering Hale and Dorr
    LLP
2100 Pennsylvania Avenue NW
Washington, DC 20037
Telephone: (202) 663-6300
Facsimile: (202) 663-6363
Email: stephanie.hartmann@wilmerhale.com

*Counsel for The Mosaic Company*

Dated: September 30, 2025

**Consol. Court No. 24-00227**

<u>**CERTIFICATE OF COMPLIANCE**</u>

Pursuant to paragraphs 2(B)(1) and (2) of the U.S. Court of International Trade's

Standard Chambers Procedures, the undersigned certifies that this Memorandum in Support of

Mosaic's Rule 56.2 Motion for Judgment on the Agency Record complies with the word

limitation requirement.  The word count for the Memorandum, as computed by WilmerHale's

word processing system, is 13,996 words, including footnotes, and excluding the title page, table

of contents, table of authorities, counsel's signature block, and this certificate.

<u>/s/ Stephanie E. Hartmann</u>
(Signature of Attorney)

<u>Stephanie E. Hartmann</u>
(Name of Attorney)

<u>The Mosaic Company</u>
(Representative Of)

<u>September 30, 2025</u>
(Date)