**UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE THE HONORABLE TIMOTHY C. STANCEU, JUDGE**

| | | |
|---|---|---|
| OCP S.A.,<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES,<br><br>Defendant,<br><br>and<br><br>THE MOSAIC COMPANY,<br><br>Defendant-Intervenor,<br><br>and<br><br>THE GOVERNMENT OF THE KINGDOM OF MOROCCO,<br><br>Defendant-Intervenor. | ) | **Consol. Court No. 24-00227**<br><br>**<u>NON-CONFIDENTIAL VERSION</u>**<br><br>**Business Proprietary Information removed from pages 1, 4-6, 10-11, 15, 17, and 18** |

**REPLY BRIEF OF OCP S.A. IN SUPPORT OF OCP S.A.'S RULE 56.2 MOTION FOR JUDGMENT ON THE AGENCY RECORD**

Dated: October 14, 2026

William R. Isasi
Shelby Anderson
Kathleen McNulty
Wanyu Zhang
Christine Houle

**COVINGTON & BURLING LLP**
One CityCenter
850 Tenth Street, N.W.
Washington, D.C. 20001-4956

Micaela R.H. McMurrough
Hardeep K. Josan

**COVINGTON & BURLING LLP**
30 Hudson Yards
New York, NY 10001-2170

*Counsel to OCP S.A.*

**Consol. Ct. No. 24-00227**

## TABLE OF CONTENTS

SUMMARY OF ARGUMENT .......... 1

ARGUMENT .......... 2

I. Commerce's Finding That the Provision of Mining Rights Confers a Benefit Is Unsupported by Substantial Evidence and Contrary to Law .......... 2

A. Commerce's Revenue-Based Allocation Is Unsupported by Substantial Evidence and Contrary to Law .......... 3

1. Commerce's Revenue-Based Methodology Distorts the Allocation of HQ/Support Costs .......... 3

2. Commerce's Treatment of Internally Consumed Rock Is Distortive .......... 7

3. Commerce's Rejection of a Cost-Based Allocation Is Unsupported by Substantial Evidence .......... 9

B. Commerce's Use of a Multiproduct Profit Rate Is Unsupported by Substantial Evidence and Contrary to Law .......... 11

C. Commerce's BPL Range for the Rock Benchmark Is Unsupported by Substantial Evidence and Contrary to Law .......... 16

II. Commerce Unlawfully Investigated Five Purported Programs That It Previously Determined Were Not Countervailable Subsidies .......... 19

III. Commerce Unlawfully Investigated "Other Benefits" .......... 21

CONCLUSION .......... 23

## TABLE OF AUTHORITIES

**Cases** **Page(s)**

*Changzhou Trina Solar Energy Co. v. United States*,
195 F. Supp. 3d 1334 (Ct. Int'l Trade 2016) ....................22

*DAK Ams. LLC v. United States*,
456 F. Supp. 3d 1340 (Ct. Int'l Trade 2020) ....................5, 23

*F.C.C. v. Fox Television Stations, Inc.*,
556 U.S. 502 (2009)....................21

*Guizhou Tyre Co. v. United States*,
523 F. Supp. 3d 1312 (Ct. Int'l Trade 2021) ....................22, 23

*Jiangsu Dingsheng New Materials Joint-Stock Co. v. United States*,
798 F. Supp. 3d 1318 (Ct. Int'l Trade 2025) ....................13, 23

*Jiangsu Zhongji Lamination Materials Co. v. United States*,
405 F. Supp. 3d 1317 (Ct. Int'l Trade 2019) ....................22, 23

*KG Dongbu Steel Co. v. Nucor Corp.*,
181 F.4th 1335 (Fed. Cir. 2026) ....................3, 12, 21

*Mosaic Co. v. United States*,
160 F.4th 1340 (Fed. Cir. 2025) ....................17

*Mosaic Co. v. United States*,
659 F. Supp. 3d 1285 (Ct. Int'l Trade 2023) ....................7, 8, 13, 20, 22

*Mosaic Co. v. United States*,
744 F. Supp. 3d 1367 (Ct. Int'l Trade 2025) ....................13

*Mosaic Co. v. United States*,
774 F. Supp. 3d 1362 (Ct. Int'l Trade 2025) ....................3, 7, 9, 20, 22

*Nucor Corp. v. United States*,
927 F.3d 1243 (Fed. Cir. 2019)....................12

*Rhone Poulenc, Inc. v. United States*,
899 F.2d 1185 (Fed. Cir. 1990)....................18, 19

*RZBC Grp. Shareholding Co. v. United States*,
100 F. Supp. 3d 1288 (Ct. Int'l Trade 2015) ....................18

*Universal Camera Corp. v. NLRB*,
340 U.S. 474 (1951)....................14, 17

**Statutes** **Page(s)**

19 U.S.C. § 1677(5) .....20

19 U.S.C. § 1677(5)(E) .....11, 12, 13, 14, 15, 16, 19

19 U.S.C. § 1677(5)(E)(iv) .....17

19 U.S.C. § 1677d .....*2,* 19, 20, 22, 23

**Regulations** **Page(s)**

19 C.F.R. § 351.311 .....19

**Administrative Materials** **Page(s)**

*Phosphate Fertilizers from the Kingdom of Morocco: Final Affirmative Countervailing Duty Determination*, 86 Fed. Reg. 9,482 (Feb. 16, 2021) .....21

*Phosphate Fertilizers From the Kingdom of Morocco: Final Results of Countervailing Duty Administrative Review; 2022*, 89 Fed. Reg. 88,952 (Nov. 12, 2024) .....3, 11

*Phosphate Fertilizers From the Kingdom of Morocco: Notice of Amended Final Results of Countervailing Duty Administrative Review; 2022*, 89 Fed. Reg. 104,979 (Dec. 26, 2024) .....3

*Silicon Metal from Norway: Affirmative Final Determination of Sales at Less Than Fair Value, Final Determination of No Sales, and Final Negative Determination of Critical Circumstances*, 83 Fed. Reg. 9,829 (Mar. 8, 2018) .....5

OCP S.A. ("OCP"), Plaintiff in this consolidated action, submits this reply to the response briefs of the United States and The Mosaic Company ("Mosaic"). *See* ECF No. 55, ("Gov't Resp.); ECF No. 59 ("Mosaic Resp.).

**SUMMARY OF ARGUMENT**

First, the Government and Mosaic assert that a revenue-based allocation is "more accurate," but nothing in the record or law supports allocating OCP *S.A.'s* HQ/Support costs based upon the revenues of the OCP *Group*. Contrary to the Government and Mosaic's arguments, much of which rely on post hoc rationalization, there is no evidence that OCP S.A. sustained the activities of its subsidiaries. The Government and Mosaic also fail to support the Department of Commerce's ("Commerce") inclusion of only direct costs—and exclusion of HQ/Support costs and profit—in the estimation of revenues for internally consumed rock, further distorting the allocation. Finally, the arguments against a cost-based allocation disregard the correlation between site-specific costs and HQ/Support costs and that volatile [ ] are properly excluded from a cost-based allocation.

Second, the Government's and Mosaic's arguments do not support the use of a distortive multiproduct and company-wide profit rate in the cost of production ("COP") buildup. Under the statute, Commerce's profit rate must reflect prevailing market conditions for rock, not the myriad other products OCP sells. Moreover, that this Court sustained a company-wide profit rate in a prior segment of the proceeding is not controlling here where the record shows that OCP's overall profit rate is very different from a rock-specific profit rate. Further, the Government's and Mosaic's criticisms of the rock-specific profit rates for OCP and JPMC are belied by the record, which demonstrates that OCP's calculation of its own rock-specific rate was reasonable and that using JPMC's profit rate would be consistent with Commerce's practice in analogous circumstances.

Third, the Government and Mosaic's arguments in support of Commerce's bone phosphate of lime ("BPL") range fundamentally misconstrue OCP's arguments, rely on inapposite precedent, and disregard Commerce's obligation to calculate subsidy rates as accurately as possible. OCP maintains that Commerce must consider the prevailing market conditions for rock in Morocco, including the differing quantities of different BPL-level rock produced in the period of review ("POR"), and that Commerce's failure to do so in this case is contrary to law and unsupported by the record.

Fourth, the Government and Mosaic argue that Commerce possesses broad investigative discretion to identify practices that appear to be countervailable and that this Court already rejected OCP's claims, and should do so again here. The Government and Mosaic ignore the key factual difference here that Commerce not only lacked the factual predicate required under 19 U.S.C. § 1677d to investigate the five purported programs, but the evidence indicated the opposite because the programs had already been found to be *not* countervailable.

Finally, the Government and Mosaic argue that Commerce's request for information regarding "other benefits" is lawful because the law provides Commerce with broad investigative discretion. This argument fails because it relies on an unsupported reading of 19 U.S.C. § 1677d, which requires Commerce to possess information demonstrating the "appearance" of a countervailable subsidy before seeking information on unspecified programs for which no allegation has been made.

## ARGUMENT

### I. Commerce's Finding That the Provision of Mining Rights Confers a Benefit Is Unsupported by Substantial Evidence and Contrary to Law

Commerce made three errors with respect to the Government of Morocco's ("GOM") provision of mining rights. *First*, Commerce adopted a distortive, revenue-based method for

allocating OCP's HQ/Support costs instead of using the site cost-based allocation methodology affirmed by this Court. *Second*, it used a multiproduct profit rate to calculate the COP buildup for rock. *Third*, it selected an erroneous BPL range for the rock benchmark. Accordingly, Commerce's *Final Results*[1] are contrary to law and unsupported by substantial evidence. The Government's and Mosaic's contrary arguments are unavailing.

### A. Commerce's Revenue-Based Allocation Is Unsupported by Substantial Evidence and Contrary to Law

All parties agree that Commerce must provide a reasonable explanation for deviating from its prior approach, affirmed by this Court, to use a site cost-allocation methodology. *See Mosaic Co. v. United States*, 774 F. Supp. 3d 1362, 1371-75 (Ct. Int'l Trade 2025) ("*Mosaic III*"); *see also KG Dongbu Steel Co. v. Nucor Corp.*, 181 F.4th 1335, 1343 (Fed. Cir. 2026) (Commerce must "articulate a reasonable explanation" where it "shifts its position between successive actions"). The Government and Mosaic assert that a revenue-based allocation is "more accurate" than a cost-based allocation. Gov't Resp. at 21; Mosaic Resp. at 12. However, the reasoning provided by the Government and Mosaic does not withstand scrutiny and fails to justify Commerce's methodological change.

#### 1. Commerce's Revenue-Based Methodology Distorts the Allocation of HQ/Support Costs

Rather than leading to a "more accurate" CVD rate, Commerce's methodology is distortive. In the *Final Results*, Commerce allocated OCP ***S.A***.'s HQ/Support costs based on sales revenues reported for each product family in the consolidated financial reporting for OCP

---

[1] *Phosphate Fertilizers From the Kingdom of Morocco: Final Results of Countervailing Duty Administrative Review; 2022*, 89 Fed. Reg. 88,952 (Nov. 12, 2024) ("*Final Results*") (P.R. 457), and accompanying Issues and Decision Memorandum ("IDM") (P.R. 451), amended by, *Phosphate Fertilizers From the Kingdom of Morocco: Notice of Amended Final Results of Countervailing Duty Administrative Review; 2022*, 89 Fed. Reg. 104,979 (Dec. 26, 2024) (P.R. 466).

***Group***. IDM at 25-26 (P.R. 451); OCP Initial Questionnaire Response ("IQR") at Ex. GEN-9(j) at 16-18 (P.R. 65, C.R. 52) (identifying and describing revenues associated to each "product family"). But OCP Group comprises approximately 40 companies, IQR at 20 (P.R. 59, C.R. 44)—allocating OCP S.A.'s costs based on revenues across this panoply of companies disconnects the resulting CVD rate from OCP S.A.'s actual production activities or financial performance.

Neither the Government nor Mosaic can justify this fundamental mismatch. Instead, the Government asserts that "OCP has the exclusive right to extract ore from government-owned phosphate reserves" and that "OCP identified no evidence that other companies within the OCP Group mine phosphate rock." Gov't Resp. at 22. The Government does not explain how this supports allocating OCP S.A.'s HQ/Support costs based on the revenues of dozens of companies in the OCP Group, nor could it. In 2022, OCP *S.A.* was principally a producer of phosphate rock ("rock") and related phosphate products. IQR at Ex. GEN-5(a)(iii) at 71, 91 (P.R. 60, C.R. 48) (demonstrating [ ] derived from sales of goods, not services). It incurred HQ/Support costs for these production activities, but Commerce's methodology spreads those costs across the entire OCP *Group*. This distorts the COP buildup on which the constructed government price is based by leading to an allocation unconnected to OCP S.A.'s actual production activities or financial performance.

The Government and Mosaic also assert that Commerce's methodology is reasonable because OCP S.A.'s HQ/Support costs purportedly sustained the activities of its subsidiaries. In support, the Government first cites the OCP *Group's* consolidated statements and asserts that "OCP S.A. has numerous subsidiaries…." *See* Gov't Resp. at 29-30. That OCP S.A. maintains shareholdings in other companies says nothing about how OCP S.A. incurs HQ/Support costs.

*See Silicon Metal from Norway: Affirmative Final Determination of Sales at Less Than Fair Value, Final Determination of No Sales, and Final Negative Determination of Critical Circumstances*, 83 Fed. Reg. 9,829 (Mar. 8, 2018), and accompanying IDM at 9-12 (disagreeing that a parent company with its own manufacturing operations necessarily incurs headquarters G&A expenses for subsidiaries).[2]

In an obvious post hoc rationalization, the Government relies on "corporate services" OCP purportedly provided to the Jorf Fertilizer Companies ("JFCs"). *See DAK Ams. LLC v. United States*, 456 F. Supp. 3d 1340, 1357 (Ct. Int'l Trade 2020) (court may not "accept post hoc rationalizations of the agency's analysis"). Commerce never found that such services were evidence that OCP incurred HQ/Support costs in support of the OCP Group. *See generally* IDM (P.R. 451); BPI Supplement to IDM ("IDM Supplement") (P.R. 452, C.R. 397). Instead, Commerce dismissed this evidence because it did not "demonstrat{e} that OCP's costs incurred from [ ] are included in OCP's HQ/Support costs." *See* IDM Supplement at 6 (P.R. 452, C.R. 397).

In any event, the record shows that [ ]. *See Benchmark Information and New Factual Information Submitted Pursuant to 19 C.F.R. §§ 351.301(c)(3)(ii) and (c)(5)* at Ex. NFI-21 (P.R. 256, C.R. 243) (presenting [ ]). Therefore, the existence of these services does not support the Government's post hoc assertion that OCP S.A. incurs HQ/Support costs for the JFCs.

[2] The Government and Mosaic dismiss *Silicon Metal* because it relates to an antidumping proceeding, but neither explains why this difference supports Commerce taking an inconsistent position here.

Mosaic's attempt to bolster Commerce's reasoning with additional evidence is procedurally improper because Commerce never relied on this evidence. *See supra* p. 5. Regardless, the examples do not support Commerce's conclusion. Mosaic cites [ ] invoices for services booked to HQ/Support that reference one affiliate and extrapolates that OCP S.A. supports the *entire* corporate group. Mosaic Resp. at 16-17. This limited evidence does not support a sweeping conclusion that OCP S.A.'s HQ/Support costs supported the *entire* corporate group. To the contrary, the record shows that [

]. This confirms that the provision of services was a miniscule part of OCP SA's activities in 2022, and instead the [

]. *See* IQR at Ex. GEN-5(a)(iii) at 112 (P.R. 60, C.R. 48) ([

]); *id.* at Ex. MIN-18 (P.R. 76, C.R. 81) (showing [ ] HQ/Support).[3]

Mosaic also cites OCP's annual report for the assertion that OCP "pays the [

] for the benefit of its subsidiaries." Mosaic Resp. at 16. But OCP reported that [

], meaning that these costs in 2022 were incurred for OCP S.A.'s employees, not the employees of subsidiaries. *See* IQR at 200 n.326 (P.R. 59, C.R. 44).

Mosaic's observation that OCP subsidiaries are "co-located at OCP S.A.'s headquarters" is irrelevant. Mosaic Resp. at 17. The mere fact that subsidiaries are in proximity to OCP S.A.

---

[3] Mosaic wrongly asserts that OCP recorded "nine percent of total revenues" to the HQ/Support segment. *Compare* Mosaic Resp. at 15-16, *with* OCP IQR at Ex. MIN-18 (P.R. 76, C.R. 81).

does not mean that OCP incurred HQ/Support costs on behalf of those subsidiaries. *See Mosaic III*, 774 F. Supp. 3d at 1374 (rejecting argument as "mere speculation" and "contradicted by the evidence that the costs at issue were recorded in OCP's audited books and records").

### 2. Commerce's Treatment of Internally Consumed Rock Is Distortive

Commerce's methodology is also distortive because it necessarily under-allocates OCP S.A.'s HQ/Support costs to rock. Commerce's estimation of the unrecorded revenue for OCP's internally consumed rock at only direct (*i.e.*, site-specific) costs significantly undervalues revenue for this rock by omitting any amount for HQ/Support costs and profit, while double-counting this revenue in its calculation. *See* OCP Br. at 10-17.[4] The Government and Mosaic fail to demonstrate otherwise.

Regarding the omission of HQ/Support costs, the Government and Mosaic assert that it is "duplicative" to include HQ/Support costs in the valuation of OCP's internal transfers. *See* Gov't Resp. at 25; Mosaic Resp. at 17-18. But inclusion of HQ/Support costs is necessary to achieve Commerce's objective of valuing internally consumed rock "at its production cost." IDM Supplement at 5 (P.R. 452, C.R. 397). Because production cost includes "direct, indirect and overhead costs," IDM at 21 (P.R. 451), failing to account for indirect costs of internally consumed rock necessarily undervalues this rock in the revenue-based allocation and undervalues the resulting constructed government price. Including HQ/Support costs is not "duplicative," but necessary to ensure the proper allocation under Commerce's own characterization of its methodology. *Mosaic Co. v. United States*, 659 F. Supp. 3d 1285, 1300

[4] In prior filings before Commerce and this Court, OCP bracketed certain information pertaining to internally consumed rock. OCP now withdraws its request for business proprietary treatment only with respect to the information unbracketed in this submission.

(Ct. Int'l Trade 2023) ("*Mosaic I*") (inclusion of HQ/support costs is necessary to calculate a complete rock cost).

Similarly, the Government asserts that including profit in the cost of internally consumed rock "would introduce further distortions in Commerce's methodology" because OCP as an accounting matter reported "no profit" on such rock. Gov't Resp. at 26. Mosaic further asserts that this profit is already accounted for in OCP's fertilizer operations. Mosaic Resp. at 18-19. But this is precisely the issue—by assigning *all* profit for internally consumed rock to downstream fertilizer sales, Commerce distorts the allocation by overvaluing fertilizer and undervaluing rock.

The Government and Mosaic also fail to explain why Commerce's methodology for accounting for internally consumed rock did not double-count revenues. The Government asserts that adding the production cost of this rock to both the numerator and denominator of Commerce's calculation is appropriate because "Commerce seeks to identify revenues from the mining business as a share of OCP's entire revenue." Gov't Resp. at 27. Similarly, Mosaic asserts that there was no double-counting because "the OCP Group's {reported} revenues did not reflect revenue" from {internal transfers}, such that the value needed to be added to both the numerator and denominator. Mosaic Resp. at 19-20. These arguments miss the point.

To determine what percentage of HQ/Support costs to allocate to rock, Commerce relied on a ratio of revenues earned on the "Phosphates" product family to total revenues reported in OCP Group's consolidated financial statements. Commerce correctly recognized that it would be distortive to calculate the ratio without including estimated revenues for internally consumed rock in the *numerator*, as OCP incurred HQ/Support costs to produce such internally consumed

rock. *See* IDM Supplement at 5 (P.R. 452, C.R. 397). But this same rationale does not justify adding estimated revenue to the *denominator.*

The denominator consisting of the total revenues reported in the audited financial statements of the OCP Group is accurate and complete. This revenue is for all of the Group's phosphate products, including products that were derived from OCP S.A.'s internally consumed rock. There was no basis for Commerce to *add* estimated revenues for this same rock in the denominator. Indeed, adding this estimated revenue to the denominator reintroduces the very distortion that Commerce sought to avoid, rendering the determination distortive and unsupported by substantial evidence.

### 3. Commerce's Rejection of a Cost-Based Allocation Is Unsupported by Substantial Evidence

Commerce's reasons for rejecting the judicially affirmed, cost-based allocation methodology are arbitrary and unsupported by the record. *See Mosaic III*, 774 F. Supp. 3d at 1372-73 (affirming cost-based allocation).

Commerce's revenue-based allocation assumes without evidence that HQ/Support costs are incurred in proportion to OCP Group revenues. *See* OCP Br. at 20-21. Neither the Government nor Mosaic disputes that there is *zero* evidence that HQ/Support costs are incurred in proportion to revenues—let alone revenues for the OCP Group.[5] Instead, the Government and Mosaic simply assert that a revenue-based allocation is "more reasonable" and "more accurate" because (1) OCP S.A. is incurring significant HQ/Support costs on behalf of its subsidiaries; (2) a cost-based allocation relies on an unreasonable "presumption" that incurring more site-specific

[5] The Government restates Commerce's finding that OCP "reports both export sales and local sales for all three of its major business segments" to support its revenue-based allocation. Gov't Resp. at 23. But this rationale says nothing about whether it is reasonable to assume that OCP incurred HQ/Support costs in proportion to revenues. *See* OCP Br. at 12-13.

costs results in more HQ/Support costs; and (3) OCP's proposed cost allocation wrongly excludes certain cost categories. This reasoning is not supported by the record.

First, as explained above, Commerce's conclusion that OCP S.A. incurs significant HQ/Support costs in support of its affiliates is unsupported by evidence and cannot justify rejecting OCP S.A.'s cost-based allocation. *See supra* pp.3-5.

Second, the record *does* support a correlation between the level of site-specific costs and HQ/Support costs. OCP cited evidence demonstrating that *both* site-specific costs and HQ/Support costs are incurred in support of OCP's day-to-day operations. OCP Br. at 21 (citing, e.g., IQR at 82-84 (P.R. 59, C.R. 44), Exs. MIN-14–MIN-16 (P.R. 74-75, C.R. 80-81)).

Mosaic attempts to discredit this evidence as only relating to a "[ ]" of OCP's total HQ/Support costs, Mosaic Resp. at 13, apparently believing that all remaining HQ/Support costs somehow do *not* support OCP's day-to-day operations.[6] Similarly, Mosaic asserts that total site costs are [ ] with its HQ/Support costs because site-specific costs [ ] during a time when HQ/Support costs [ ]. But Mosaic's parsing of the record fails because there is *zero* evidence supporting that OCP's HQ/Support costs are incurred in proportion to the OCP Group's revenues. Therefore, it is not Commerce's site-based allocation methodology that lacks evidentiary support, but rather Commerce's new revenue-based allocation that is based on zero evidence. In any event, OCP never suggested HQ/Support costs correlate to *all* site costs. That is why OCP's allocation excluded certain categories of costs, such as highly variable [ ].

---

[6] Mosaic also asserts that OCP's HQ/Support costs are largely *unrelated* to OCP S.A.'s mining, fertilizer, and chemical operations, because some costs are for [ ]. Mosaic Resp. at 14. Mosaic misapprehends the nature of indirect costs and [ ] do support OCP's operations. OCP Resp. at 10-17.

In this regard, OCP's cost-based allocation reasonably excludes [ ] because the record demonstrates that [ ]. *See* OCP Br. at 21-23; IQR at Ex. GEN-9(j) at 20, 22 (P.R. 65, C.R. 52). Neither Mosaic nor the Government identifies evidence supporting that the sites benefit from OCP's HQ/Support spending at similarly volatile levels, nor did Commerce explain why the [ ] would be related to the level of HQ/Support costs. Instead, the Government simply asserts that [ ] are large and predominantly borne by the chemical sites, Gov't Resp. at 23-24—which leaves unaddressed the price volatility identified by OCP, rendering Commerce's determination unsupported by substantial evidence.[7]

**B. Commerce's Use of a Multiproduct Profit Rate Is Unsupported by Substantial Evidence and Contrary to Law**

Commerce must determine the adequacy of renumeration "in relation to prevailing market conditions for the good or service being provided …" in the country that is the subject of the review. 19 U.S.C. § 1677(5)(E). Here, rock is the good, meaning Commerce was required to select a profit rate reflective of the market conditions for rock, not OCP's myriad other products. By using OCP's multiproduct, company-wide profit rate, rather than a rock-specific rate, Commerce's calculation is contrary to law. It is also unsupported by substantial evidence because OCP's multiproduct profit rate was significantly lower than rock profits during the POR. *See* OCP Br. at 26-30. Accordingly, Commerce should have relied on the two profit rates on the

[7] Commerce's analysis in the *Final Results* only mentioned [ ] and Commerce never made a finding regarding other costs excluded from OCP's HQ/Support cost allocation (i.e., [ ]). OCP Br. at 22 n.5. The Government's assertion that Commerce was not required to discuss these other costs "at a granular level," *see* Gov't Resp. at 28-29, misses the point. Commerce cannot support a finding with substantial evidence that it never made.

record that were specific to rock: a rate based on JPMC's audited financial statements and OCP's calculated profit rate for rock. *See id.* at 31-35.

The Government does not dispute that Commerce's profit rate relates to products other than rock but maintains that this outcome is not contrary to law. The Government asserts that 19 U.S.C. § 1677(5)(E) is "inapposite" because it applies only when Commerce uses a benchmark rather than calculates a COP buildup.[8] Gov't Resp. at 33 (citing *Nucor Corp. v. United States*, 927 F.3d 1243, 1251 (Fed. Cir. 2019)). *Nucor* involved the distinct question of whether non-discriminatory pricing could alone establish the absence of a countervailable benefit. 927 F.3d at 1251-52. Concluding that it could not, the Federal Circuit found in dicta that the "prevailing market conditions" provision did not justify ignoring the "charging of consistently low prices that no market participant could sustain" and instead directed "attention to any competitive-market prices…." *Id.* at 1251. The Federal Circuit did not hold—as the Government suggests—that the statute is irrelevant where Commerce compares a constructed government price and world market benchmark. Indeed, such an interpretation would contravene the statute, which applies in *all* cases where "goods … are provided." Moreover, even if *Nucor* were applied as the Government advocates, Commerce's methodology here *does* entail a benchmark comparison because Commerce compares the constructed government price based on the COP buildup to a world market benchmark.

The Government next suggests that OCP has "oversimplif{ied}" the issue because the good being provided is the provision of a mining right and it is appropriate to assume that any

[8] The Government also asserts that OCP has not identified "a single" prevailing market condition "that Commerce did not consider." Gov't Resp. at 33. OCP explained that the "COP buildup that Commerce constructed is fundamentally not for OCP's beneficiated phosphate rock because it includes profits for unrelated products and activities," and thus necessarily does not take into account relevant factors for rock, such as price and quality. OCP Br. 23-26.

subsidy would also be "passed to {OCP's} production and sale of fertilizer." Gov't Resp. at 34. But Commerce is not assessing benefit for mining rights by comparing a COP buildup for rock and fertilizer to a world market price for rock and fertilizer. Instead, Commerce has "conducted {its} benefit analysis using benchmarks not based on mining rights *per se*, but on the value of the underlying good conveyed *via* mining rights (*i.e.*, phosphate rock)." Preliminary Decision Memorandum ("PDM") at 9 (P.R. 297). Having chosen this methodology, Commerce may not base its analysis on prevailing market conditions in Morocco for other downstream phosphate products.

And contrary to the Government's and Mosaic's contention, this Court in *Mosaic I* did not reject OCP's position that the profit rate should be specific to rock production. Mosaic Resp. at 21; Gov't Resp. at 37. Instead, the Court acknowledged that several factors contribute to whether Commerce's profit rate calculation is reasonable, including, the "specificity to phosphate rock production," in addition to "prevailing market conditions" "in the country which is subject to the investigation." *Mosaic I*, 659 F. Supp. 3d at 1302-03 (quoting 19 U.S.C. § 1677(5)(E)). The Court held that Commerce's balancing of these factors and reliance on company-wide data was not unreasonable based on the record of the investigation. *See id.* at 1303; *see also Mosaic Co. v. United States*, 744 F. Supp. 3d 1367, 1377 (Ct. Int'l Trade 2025) ("*Mosaic II*") (describing the profit rate options in *Mosaic I* as "two imperfect data bases").

The record here is fundamentally different, warranting a different result. *See, e.g.*, *Jiangsu Dingsheng New Materials Joint-Stock Co. v. United States*, 798 F. Supp. 3d 1318, 1321 (Ct. Int'l Trade 2025) ("Each administrative review is a separate exercise of Commerce's authority that allows for different conclusions based on different facts."). OCP has provided substantial evidence demonstrating that OCP's overall profit rate is not similar to a rock-specific

profit rate. The record shows a dramatic increase in global rock profits from the AR1 POR to the AR2 POR while fertilizer profits were substantially lower. OCP Br. at 28-30 (citing, e.g., IQR at Ex. MIN-20 (P.R. 76, C.R. 81); *id.* at Ex. MIN-19 at 166 (P.R. 76, C.R. 81)). Requiring Commerce to consider contrary evidence is not the Court "reweigh{ing} evidence," Gov't Resp. at 37, but mandated under the standard of review, *see Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487-88 (1951).

Mosaic asserts that Commerce's calculated profit rate accounted for this dramatic increase because the profit rate increased from AR1 to AR2 at a pace either "less" than or "on par" with the increase in global rock benchmark profit rates. Mosaic Resp. at 25-26. But the chart Mosaic provides to demonstrate this point shows that nearly all of the benchmark prices increased by a substantially greater margin, with one-third of the examples demonstrating *doubled* profit rates. *Id.* Moreover, Mosaic's focus on the precise increase from AR1 to AR2 misses the bigger picture—it is unreasonable to rely on OCP's multiproduct profit rate when the record reflects that fertilizer and rock profits were markedly dissimilar during the POR.

The Government's and Mosaic's arguments seeking to discredit OCP's alternative rock-specific profit rate are similarly misplaced. The Government asserts that OCP's rock-specific profit rate is "not reflective of OCP's actual phosphate rock mining business" because "OCP did not record revenue, much less generate a profit on internal transfers of phosphate rock". Gov't Resp. at 37. But OCP's multiproduct profit rate is itself "not reflective of OCP's actual phosphate rock mining business." *Id.*

The Government also conflates OCP's business and accounting practices—the fact that OCP does not record revenues/profits on its internally consumed rock—with the actual "prevailing market conditions" for "the good or service being provided." 19 U.S.C.

§ 1677(5)(E). Internally consumed rock has value, as evidenced by OCP's sales of rock in local and export markets. OCP's rock-specific profit rate simply assigns a commercial value to that internally consumed rock to derive a rock-specific profit rate.[9]

Mosaic's attempts to discredit OCP's rock-specific profit rate as "convoluted" and "cherry-picked" also fail. Mosaic Resp. at 25-26. Because OCP does not record revenue for internally consumed rock, OCP used "sales of phosphate rock to both unaffiliated and affiliated parties [ ]" to calculate an estimated value for this rock. *Benchmark Information and New Factual Information* at 5 (P.R. 215, C.R. 201). Rather than "cherry-pick" data, OCP considered all sales to affiliated and unaffiliated entities and selected prices for rock that was similar in BPL to internally consumed rock. This calculation was reasonable given Commerce's recognition of the relevance of BPL level to rock price, supported by the record, and explained in step-by-step detail in OCP's submissions to Commerce. *Id.* at 4-7.

The Government and Mosaic also fail to justify Commerce's rejection of JPMC's profit rate, claiming that the statute focuses on the prevailing market conditions in the country subject to the review and "Jordan is not the country subject to this review." Gov't Resp. at 35; Mosaic Resp. at 21. OCP has never argued that Jordan is the country subject to the review. Rather, OCP's position is that Commerce must use a profit rate for rock where its methodology entails comparing a constructed government price for rock to a world benchmark for rock, and JPMC's financial statements offer one such rate.

Commerce has previously relied on surrogate profit rates where in-country rates were not available or were unreliable. OCP Br. at 31-32; *see also* IDM at 29 (P.R. 451) (explaining that

---

[9] Commerce itself recognized the commercial value of OCP's rock when it agreed with OCP that the value of internally consumed rock needed to be included in its revenue-based allocation. IDM Supplement at 5 (P.R. 452, C.R. 397).

Commerce's practice is to rely on surrogate profit rates where there are no other reliable profit rates on the record). Moreover, where Commerce is relying on world market prices to construct its benchmark, concerns about using a profit rate that is based on rock JPMC sold into the world market are particularly misplaced. IQR at Ex. MIN-19 at 27 (P.R. 76, C.R. 81).

Mosaic's reference to the profit rate of a Finnish company, Yara, Mosaic Resp. at 23, does not demonstrate that Commerce's profit rate is supported by substantial evidence. This is because there is no evidence that Yara is a *producer* of rock: its financial statements listing finished products and "external revenues by product group," do not include rock. *Information to Rebut, Clarify, or Correct Petitioner's February 16, 2024 Submission* at 6 (P.R. 237, C.R. 227) (citing Petitioner's Submission of Factual Information to Measure the Adequacy of Remuneration (Feb. 16, 2024) ("Mosaic's Benchmark Submission") at Ex. 33 at 72-73, 153 (P.R. 221, C.R. 213)). Instead, the evidence shows that Yara *purchases* rock from third parties. *See* Mosaic's Benchmark Submission at Ex. 33 at 65 (P.R. 221, C.R. 213). Thus, Yara's "rock-specific profit rate" does not approximate a profit rate for an integrated rock producer such as OCP.

### C. Commerce's BPL Range for the Rock Benchmark Is Unsupported by Substantial Evidence and Contrary to Law

It was also patently unreasonable for Commerce to select a BPL range for the rock benchmark that accounted for only the quality, but not the quantity, of rock OCP produced in 2022. Instead, law and substantial evidence require using a weighted-average BPL level that accounts for both the quality and quantity of rock OCP produced in 2022.

Commerce must measure the adequacy of remuneration for government-provided goods by considering prevailing market conditions for the good in the country subject to the review. 19 U.S.C. § 1677(5)(E). Prevailing market conditions include the "price, quality, availability,

marketability, transportation, and other conditions of purchase or sale." *Id.* Commerce acknowledges that the quality of rock (*i.e.*, the BPL level) "is the primary driver of the price," Gov't Resp. at 43, but nonetheless *ignored* that OCP produced far more of lower BPL rock in the POR. *See* PDM at 9-10 (P.R. 297). By relying on a range of BPL levels that overstated the quantity of rock OCP produced with higher BPL content in 2022, Commerce's benchmark price is distorted and contrary to law.

Commerce's approach is also unsupported by the evidence because its calculation ignored the evidence demonstrating the vastly different quantities of low BPL rock OCP produced in 2022 (for local consumption) as compared to the high BPL rock (for export). *See* IDM at 15-16 (P.R. 451). A decision that does not account for evidence that fairly detracts from its conclusion is unsupported by substantial evidence. *See Universal Camera*, 340 U.S. at 487-88.

Mosaic and the Government assert that the statute does not require Commerce to account for prevailing market conditions by weight-averaging BPL levels, Mosaic Resp. at 28; Gov't Resp. at 40, but that is not OCP's claim. OCP asserts that Commerce must consider the prevailing market conditions for rock in Morocco—which includes the fact that OCP produced [ ] different quantities of lower BPL content and higher BPL content rock.

And contrary to the Government's argument, Gov't Resp. at 40, *Mosaic Co. v. United States*, 160 F.4th 1340, 1349 (Fed. Cir. 2025) does not support rejecting a weighted-average BPL level. There, the Federal Circuit rejected a claim that Commerce needed to adopt a specific data adjustment methodology or explain its failure to do so under 19 U.S.C. § 1677(5)(E)(iv). The Court noted that the statute only requires Commerce to determine the adequacy of renumeration in relation to "prevailing market conditions." But that is precisely what Commerce failed to do

here when it ignored evidence of the quantity of low-quality rock OCP produced during the POR. *Mosaic* also left undisturbed Commerce's legal obligation to calculate subsidy margins as accurately as possible—an obligation Commerce did not fulfill by overlooking the quantity of OCP's lower BPL rock. *See, e.g.*, *Rhone Poulenc, Inc. v. United States*, 899 F.2d 1185, 1190 (Fed. Cir. 1990).

Mosaic and the Government also fail to meaningfully address the fact that the benchmark price is distorted because it effectively presumes that OCP produced equal quantities of low and high BPL content rock in 2022. They instead assert that a weighted-average benchmark price results in a "less accurate" calculation because certain benchmark prices are excluded under this methodology. Gov't Resp. at 40-41; Mosaic Resp. at 29.[10] But a benchmark calculation is not more "accurate" simply because it contains more prices. To the contrary, Commerce has recognized—and the Court has agreed—that "benchmarks made with simple averages were inferior {to} those made with weighted averages." *RZBC Grp. Shareholding Co. v. United States*, 100 F. Supp. 3d 1288, 1308-09 (Ct. Int'l Trade 2015) (A simple average benchmark can be distortive where it "gives equal weight to all prices regardless of the quantities sold.").

The Government's and Mosaic's weak assertion that a benchmark price need not "match precisely all of the characteristics of the subsidized product" does not save Commerce's determination. Gov't Resp. at 41; Mosaic Resp. at 28. Commerce must still consider the evidence and explain why it is appropriate to rely on a *less* precise benchmark when the record permits calculation of a *more* precise benchmark. Moreover, Commerce must comply with the

---

[10] The Government complains that OCP's chart illustrating the benchmark prices that fall within OCP's weighted-average BPL level includes the [ ] that Commerce rejected for other reasons. Gov't Resp. at 41. This is a distraction from OCP's point, which is that Commerce must rely on OCP's weighted-average BPL level—the benchmarks falling within that weighted-average is a question for a future remand proceeding.

statute, which requires that Commerce account for "prevailing market conditions" and calculate subsidy rates as accurately as possible. *See* 19 U.S.C. § 1677(5)(E); *Rhone Poulenc*, 899 F.2d at 1190. During the AR2 POR, it is uncontested that OCP sold a meaningfully larger quantity of lower BPL rock, but Commerce's approach failed to account for these "prevailing market conditions" and thus is unlawful and unsupported by substantial evidence.[11]

## II. Commerce Unlawfully Investigated Five Purported Programs That It Previously Determined Were Not Countervailable Subsidies

Commerce must possess information demonstrating the "appearance" of a countervailable subsidy before seeking information on purported programs for which no allegation has been made. *See* OCP Br. at 41-45; *see also* 19 U.S.C. § 1677d; 19 C.F.R. § 351.311. Yet, despite lacking any such information, Commerce investigated five purported programs not alleged in the review. Indeed, the evidence that Commerce possessed affirmatively indicated that the agency lacked a basis to investigate, as the agency had only ever determined that these purported programs never conferred a benefit on OCP and therefore did not constitute countervailable subsidies. *See* IDM at 12 (P.R. 451). Commerce's investigation into these purported programs is therefore unlawful.

The Government and Mosaic argue that OCP's reading of the statute is too narrow and that Congress's intent was to write the statute "as an expansion, not a limitation" on Commerce's investigative authority. Gov't Resp. at 72; Mosaic Resp. at 33. However, the statute does *not* imbue Commerce with unbridled discretion to "discover" practices that may constitute

[11] Mosaic asserts that OCP "misunderstand{s}" Commerce's approach because Commerce did not "presume{} that OCP produced equal quantities of low and high BPL content rock in 2022." Mosaic Resp. at 30. But that is the logical consequence of Commerce failing to account for the varying quantities of the different BPL levels of rock produced during the POR—regardless of Commerce's characterization of its methodology.

countervailable subsidies. A plain reading of Section 1677d makes clear that, as a predicate to seeking information on unspecified programs for which no allegation has been made, Commerce must possess information demonstrating the "appearance" of a countervailable subsidy beforehand.

The Government and Mosaic further assert that Commerce never found that the five programs were not countervailable subsidies but rather determined no benefit. Gov't Resp. at 69-70; Mosaic Resp. at 33-34. They continue that a no benefit finding by Commerce does not preclude the agency from examining whether a benefit has been conferred in subsequent segments. Gov't Resp. at 69-70; Mosaic Resp. at 33-34. Their assertions ignore the fundamental requirements of the statute.

A countervailable subsidy requires three elements, it must: be specific, provide a financial contribution, and confer a benefit. *See* 19 U.S.C. § 1677(5). For each of the five purported programs, Commerce previously investigated them and never found a benefit, and as a result, one of the elements necessary for a countervailable subsidy was not met. Thus, regardless of how Commerce chooses to characterize its prior determinations, the agency in fact determined these purported five programs were "not countervailable."

Relatedly, the Government's and Mosaic's reliance on this Court's prior findings in *Mosaic I* and *Mosaic III* is misplaced. Neither of those earlier opinions addressed directly the question presented here—Commerce's investigation of programs it had previously determined to not be countervailable subsidies. As OCP explained, OCP Br. at 43, the facts here are materially different because Commerce not only had no basis to investigate the purported programs, it had affirmative evidence that none were countervailable subsidies. Accordingly, we respectfully submit that this Court should reach a different conclusion here.

Further, Commerce's established practice is not to inquire into purported programs already determined not countervailable, a practice reflected in the agency's own questionnaires. *See, e.g.*, Initial Questionnaire at II-1 (P.R. 21) ("Commerce is inquiring into each subsidy program previously examined in the investigation or prior review, except for programs already determined to be terminated or not countervailable."). Because the five programs were found not countervailable, Commerce's continued inquiry into them without offering a reasoned explanation for doing so is arbitrary, contrary to its practice and unlawful. *See, e.g.*, *KG Dongbu Steel*, 181 F.4th at 1343 (citing *F.C.C. v. Fox Television Stations, Inc*., 556 U.S. 502, 515-16 (2009)).

Commerce's error in investigating these programs is particularly pronounced for bonds because bonds are treated as non-recurring subsidies. OCP Br. at 44. In response, the Government makes the nonsensical argument that Commerce may investigate OCP's *receipt* of bonds in future segments. Gov't Resp. at 71. But Commerce has examined OCPs' *issuance*, not receipt, of bonds. *See* IQR at 102-106 (P.R. 59, C.R. 44). Mosaic incorrectly argues that Commerce would examine interest rates for these bonds in a future segment. Mosaic Br. at 36. However, there would be nothing for Commerce to evaluate in a future segment. These bonds were fully subscribed, *see* IQR at 106 (P.R. 59, C.R. 44), at terms that do not constitute a subsidy. *Phosphate Fertilizers from the Kingdom of Morocco: Final Affirmative Countervailing Duty Determination*, 86 Fed. Reg. 9,482 (Feb. 16, 2021), and accompanying IDM at 16.

## III. Commerce Unlawfully Investigated "Other Benefits"

As OCP explained, Commerce acted unlawfully when it sought information from OCP regarding "other benefits" received from the GOM. *See* OCP Br. at 45-47. In demanding that OCP disclose any other "benefits" Commerce might imagine OCP had received from the

GOM—without any evidentiary or legal basis for doing so—and examining 12 potential programs based on OCP's responses, Commerce exceeded its statutory authority and engaged in an unlawful "fishing expedition" contrary to the requirements of 19 U.S.C. § 1677d.

Relying largely on the same arguments described in Section II, the Government and Mosaic argue that Commerce's "other benefits" question is reasonable and lawful because the statute provides Commerce with broad investigative discretion. Gov't Resp. at 73-75; Mosaic Resp. at 38-39. They further contend that the Court has already rejected OCP's objection to this inquiry in other cases, including those involving prior segments of this proceeding. Gov't Resp. at 71-75; Mosaic Resp. at 32-38.

As an initial matter, OCP recognizes that this Court previously rejected the argument regarding the "Other Benefits" question in *Mosaic I* and *Mosaic III* and that the Court in *Changzhou* recognized Commerce's inquiry into other forms of government assistance beyond those specifically alleged in petition was within agency's independent investigative authority. *Changzhou Trina Solar Energy Co. v. United States*, 195 F. Supp. 3d 1334, 1341 (Ct. Int'l Trade 2016). However, as *Mosaic I* and *Mosaic III* are not yet final and conclusive, OCP is raising this argument again for purposes of preserving it for any future appeal.

Moreover, other cases relied on by Mosaic are inapposite. *See* Mosaic Resp. at 32-36 (citing *Guizhou Tyre Co. v. United States*, 523 F. Supp. 3d 1312, 1339 (Ct. Int'l Trade 2021); *Jiangsu Zhongji Lamination Materials Co. v. United States,* 405 F. Supp. 3d 1317 (Ct. Int'l Trade 2019)). *Guizhou Tyre* did not consider the issue of whether Commerce violated Section 1677d by investigating purported programs prior to making a threshold determination that they appear to be countervailable subsidies. 523 F. Supp. 3d at 1338-41. Moreover, the Government in *Guizhou Tyre* argued that Commerce had asked "specific" questions of the respondent beyond

merely inquiring into "other subsidies," which is not the case here. *See id.* at 1335. Additionally, in *Jiangsu*, the Government of China refused to answer questions inquiring into potential subsidies that the respondent had already disclosed to Commerce. *See* 405 F. Supp. 3d at 1342-43. Thus, *Jiangsu* did not address the question presented here: whether it was permissible for Commerce to use its investigatory powers to demand information regarding purported programs for which it had no information whatsoever.

The Government and Mosaic also dispute OCP's claim that Commerce's request for information regarding other benefits constituted an impermissible "fishing expedition." Mosaic claims that Commerce found two of the purported programs—the revenue exclusions for minimum tax contributions and customs duty exemptions—countervailable. Mosaic Resp. at 39. The Government asserts Mosaic filed new subsidy allegations with respect to two of the 12 purported programs, while others were properly alleged in prior segments of this proceeding. Gov't Resp. at 74. These post hoc rationalizations must be rejected. *DAK Ams.*, 456 F. Supp. 3d at 1357. The law puts the onus on the petitioner to allege the existence of potential countervailable subsidies in its petition, or on Commerce to "discover{} a practice" which may appear to be a countervailable subsidy. 19 U.S.C. § 1677d. The requirements of the statute cannot be circumvented simply by claiming that the ends justify the means, as the Government and Mosaic do here.

## CONCLUSION

Based on the foregoing, OCP respectfully requests that the Court grant OCP's Rule 56.2 motion for judgment on the agency record.

Dated: October 14, 2026

Respectfully submitted,

/s/ William R. Isasi
William R. Isasi
Shelby Anderson
Kathleen McNulty
Wanyu Zhang
Christine Houle

**COVINGTON & BURLING LLP**
One CityCenter
850 Tenth Street, N.W.
Washington, D.C. 20001-4956

Micaela R.H. McMurrough
Hardeep K. Josan

**COVINGTON & BURLING LLP**
30 Hudson Yards
New York, NY 10001-2170

*Counsel to OCP S.A.*

**CERTIFICATE OF COMPLIANCE**

Pursuant to paragraphs 2(B)(1) and (2) of the U.S. Court of International Trade's Standard Chambers Procedures, the undersigned hereby certifies that the attached Reply Brief of Plaintiff and Defendant-Intervenor OCP S.A., filed October 14, 2026, contains 6,987 words, including footnotes, and excluding the table of contents, table of authorities, counsel's signature block, and this certificate, according to the word count function of the word-processing system used to prepare this brief, and therefore complies with the maximum word count limitation set forth in the Court's Standard Chambers Procedures.

/s/ William R. Isasi
William R. Isasi