**UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE: THE HONORABLE TIMOTHY C. STANCEU, JUDGE**

**OCP S.A.,**

**Plaintiff,**

**v.**

**UNITED STATES,**

**Defendant,**

**and**

**THE MOSAIC COMPANY,**

**Defendant-Intervenor,**

**and**

**THE GOVERNMENT OF THE KINGDOM OF MOROCCO,**

**Defendant-Intervenor.**

**Consol. Court No. 24-00227**

**NON-CONFIDENTIAL VERSION**

**Business Proprietary Information Removed From Pages 3-9, 12-14, 21-22, 24-27**

# THE MOSAIC COMPANY'S REPLY IN SUPPORT OF ITS RULE 56.2 MOTION FOR JUDGMENT UPON THE AGENCY RECORD

David J. Ross
Stephanie E. Hartmann
Alexandra Maurer
Jake A. Laband

Wilmer Cutler Pickering Hale and Dorr LLP
2100 Pennsylvania Avenue NW
Washington, DC 20037

*Counsel for The Mosaic Company*

October 14, 2026

# TABLE OF CONTENTS

INTRODUCTION ........ 1
ARGUMENT ........ 2
I. Commerce's Acceptance of the Entirety of OCP's HQ/Support Costs Despite Evidence That the Vast Majority Bear No Relation to Phosphates Production Is Unreasonable, Unsupported by Substantial Evidence, and Otherwise Not in Accordance With Law ........ 2
II. The Government and OCP Fail to Rebut Mosaic's Arguments That Commerce Unreasonably Included Egyptian and Syrian Rock Prices in the Benchmark ........ 10
A. Commerce Failed to Address Record Evidence That MER, Not Just BPL, Determines the Comparability of Egyptian Phosphate Rock ........ 11
B. Commerce Failed to Address Record Evidence That Egyptian and Syrian Export Prices Are Distorted by Government Intervention ........ 16
III. Defendants Fail to Rebut Mosaic's Arguments That Commerce Failed to Address Substantial Record Evidence Demonstrating That Marsa Maroc Provided Services for LTAR ........ 21
IV. Defendants Fail to Rebut Mosaic's Arguments That Commerce Failed to Meaningfully Address Substantial Record Evidence Demonstrating That ANP Does Not Set Its Concession Fees in Accordance With Market Principles ........ 24
V. The Government and OCP Fail to Rebut Mosaic's Arguments that Commerce Unreasonably Excluded Capital Goods Imported From FTA Countries From the Benefit Calculation for the Customs Duty Exemptions for Capital Goods, Machinery, and Equipment Program ........ 26
CONCLUSION ........ 30

## TABLE OF AUTHORITIES

**Page(s)**

**Statutes**

19 U.S.C. § 1677(5)(E)(iv) ....11

**Regulations**

19 C.F.R. § 351.511(a)(2)(i)-(ii) ....11

19 C.F.R. § 351.511(a)(2)(iii) ....23

**Cases**

*Ad Hoc Comm. of AZ-NM-TX-FL Producers of Gray Portland Cement v. United States*, 13 F.3d 398 (Fed. Cir. 1994) ....10, 12

*Al Ghurair Iron & Steel LLC v. United States*, 65 F.4th 1351 (Fed. Cir. 2023) ....12, 15

*Altx, Inc. v. United States*, 167 F. Supp. 2d 1353 (CIT 2001), *aff'd*, 370 F.3d 1108 (Fed. Cir. 2004) ....26

*Archer Daniels Midland Co. v. United States*, 399 F. Supp. 3d 1296 (CIT 2019) ....29

*Archer Daniels Midland Co. v. United States*, 779 F. Supp. 3d 1349 (CIT 2025) ....15

*Archer Daniels Midland Co. v. United States*, 816 F. Supp. 3d 1371 (CIT 2026) ....15

*Atl. Sugar, Ltd. v. United States*, 744 F.2d 1556 (Fed. Cir. 1984) ....8

*CS Wind Viet. Co. v. United States*, 832 F.3d 1367 (Fed. Cir. 2016) ....28

*Dep't of Homeland Security v. Regents of the Univ. of Cal.*, 591 U.S. 1 (2020) ....7

*Fujitsu Gen. Ltd. v. United States*, 88 F.3d 1034 (Fed. Cir. 1996) ....29

*Hynix Semiconductor, Inc. v. United States*, 424 F.3d 1363 (Fed. Cir. 2005) ....3

*Maverick Tube Corp. v. United States*,
273 F. Supp. 3d 1293 (CIT 2017) ....................24

*Mitsubishi Materials Corp. v. United States*,
820 F. Supp. 608 (CIT 1993) ....................14

*Mosaic Co. v. United States*,
659 F. Supp. 3d 1285 (CIT 2023) ....................6

*Mosaic Co. v. United States*,
744 F. Supp. 3d 1367 (CIT 2025) ....................2, 9, 25

*Mosaic Co. v. United States*,
774 F. Supp. 3d 1362 (CIT 2025) ....................2

*Mukand, Ltd. v. United States*,
37 C.I.T. 443 (CIT 2013), *aff'd*, 767 F.3d 1300 (Fed. Cir. 2014) .................... 22-23

*Neenah Foundry Co. v. United States*,
142 F. Supp. 2d 1008 (CIT 2001) ....................10

*Nucor Corp. v. United States*,
927 F.3d 1243 (Fed. Cir. 2019) ....................23, 24, 26

*POSCO v. United States*,
977 F.3d 1369 (Fed. Cir. 2020) ....................23

*Rubberflex Sdn. Bhd. v. United States*,
59 F. Supp. 2d 1338 (CIT 1999) ....................12

*SEC v. Chenery Corp.*,
318 U.S. 80 (1943) ....................10, 12, 15

*Shandong Rongxin Imp. & Exp. Co. v. United States*,
163 F. Supp. 3d 1249 (CIT 2016) ....................4

*SKF USA Inc. v. United States*,
630 F.3d 1365 (Fed. Cir. 2011) ....................26

*Sugiyama Chain Co. v. United States*,
891 F. Supp. 619 (CIT 1995), *dismissed*, 70 F.3d 1290 (Fed. Cir. 1995) ....................23

*Timken Co. v. United States*,
630 F. Supp. 1327 (CIT 1986) ....................4, 7

*Timken Co. v. United States*,
894 F.2d 385 (Fed. Cir. 1990) ....................6, 8, 14

*Timken U.S. Corp. v. United States*,
421 F.3d 1350 (Fed. Cir. 2005) ....................26

*Universal Camera Corp. v. NLRB*,
340 U.S. 474 (1951)....................8

**Administrative Determinations**

*Citric Acid and Certain Citrate Salts From Thailand: Final Negative Countervailing Duty Determination, and Final Negative Critical Circumstances Determination*, 83 Fed. Reg. 26,004 (Dep't Commerce June 5, 2018), and accompanying Issues and Decision Memorandum ....................29

*Countervailing Duty Investigation of Fine Denier Polyester Staple Fiber from the People's Republic of China: Final Affirmative Determination*, 83 Fed. Reg. 3,120 (Dep't Commerce Jan. 23, 2018) and accompanying Issues and Decision Memorandum....................17

*Phosphate Fertilizers From the Kingdom of Morocco: Final Affirmative Countervailing Duty Determination*, 86 Fed. Reg. 9,482 (Dep't Commerce Feb. 16, 2021), and accompanying Issues and Decision Memorandum....................11

*Phosphate Fertilizers from the Russian Federation: Final Results of Countervailing Duty Administrative Review; 2020-2021*, 88 Fed. Reg. 76,182 (Dep't Commerce Nov. 6, 2023) and accompanying Issues and Decision Memorandum....................17, 18

*Phosphate Fertilizers From the Kingdom of Morocco: Final Results of Countervailing Duty Administrative Review; 2022,* 89 Fed. Reg. 88,952 (Int'l Trade Admin. Nov. 12, 2024), and accompanying Issues and Decision Memorandum.................... *passim*

*Phosphate Fertilizers From the Kingdom of Morocco: Notice of Amended Final Results of Countervailing Duty Administrative Review; 2022*, 89 Fed. Reg. 104,979 (Int'l Trade Admin. Dec. 26, 2024) ....................1

*Final Affirmative Countervailing Duty Determination: Steel Wire Rod From Germany*, 62 Fed. Reg. 54,990 (Dep't Commerce Oct. 22, 1997) ....................24

**CONGRESSIONAL MATERIALS**

S. Rep. No. 103-412 (1994)....................3

## INTRODUCTION

Plaintiff and Consolidated Defendant-Intervenor The Mosaic Company ("Mosaic") respectfully submits this reply brief in support of its Rule 56.2 motion for judgment on the agency record ("Mosaic Br.") challenging certain aspects of the U.S. Department of Commerce's ("Commerce") final determination in the second administrative review of the countervailing duty ("CVD") order on phosphate fertilizers from Morocco. *Phosphate Fertilizers From the Kingdom of Morocco: Final Results of Countervailing Duty Administrative Review; 2022*, 89 Fed.Reg. 88,952 (Int'l Trade Admin. Nov. 12, 2024) ("*Final Results*"), P.R.457, and accompanying Issues and Decision Memorandum ("IDM"), P.R.451, amended by *Phosphate Fertilizers From the Kingdom of Morocco: Notice of Amended Final Results of Countervailing Duty Administrative Review; 2022*, 89 Fed.Reg. 104,979 (Int'l Trade Admin. Dec. 26, 2024) ("*Amended Final Results*"), P.R.466.

This reply brief addresses arguments that Consolidated-Plaintiff OCP, S.A. ("OCP"), Defendant-Intervenor the Government of Morocco ("GOM"), and Defendant, the United States ("Defendant"), made in their response briefs. *See* Response Brief of Consolidated-Plaintiff and Defendant-Intervenor OCP S.A. in Opposition to The Mosaic Company's Rule 56.2 Mot. for J. on the Agency R. (July 13, 2026), ECF No.62 ("OCP Resp."); Rule 56.2 Resp. Br. of the Government of the Kingdom of Morocco (July 13, 2026), ECF No.65 ("GOM Resp."); Def.'s Resp. to Pls.' Mot. for J. Upon the Administrative R. (May 27, 2026), ECF No.55 ("Def. Resp.").

As Mosaic demonstrates below, the opposing parties' arguments fail to rebut Mosaic's arguments in its opening and response brief regarding OCP's HQ/Support costs, the phosphate rock benchmark, Marsa Maroc, ANP, and the capital goods program. Accordingly, Mosaic

respectfully requests that the Court grant its motion for judgment on the agency record and remand to Commerce for redetermination consistent with the Court's opinion.

## ARGUMENT

### I. Commerce's Acceptance of the Entirety of OCP's HQ/Support Costs Despite Evidence That the Vast Majority Bear No Relation to Phosphates Production Is Unreasonable, Unsupported by Substantial Evidence, and Otherwise Not in Accordance With Law

Commerce improperly accepted all of OCP's HQ/Support costs for allocation in the cost buildup, even though OCP failed to show that these expenses relate to its phosphate rock production. IDM at 24-26. The Government argues that Commerce's approach is consistent with *Mosaic II* and *Mosaic III* and reasonable because "any attempt to further segregate OCP's reconciled and previously verified HQ, support, and debt costs in a manner inconsistent with its accounting methodology would be unreasonably complex." Def. Resp. at 11-12 (citing *Mosaic Co. v. United States*, 744 F.Supp.3d 1367, 1372-76 (CIT 2025) ("*Mosaic II*"); *Mosaic Co. v. United States*, 774 F.Supp.3d 1362, 1369-75 (CIT 2025) ("*Mosaic III*")). The Government's argument is contrary to the record evidence, and the Court should reject it.

As a threshold matter, the Government's alleged concern about further segregating OCP's costs "in a manner inconsistent with its accounting methodology" is a red herring, because the cost allocation methodology at issue is not one that OCP uses in the normal course of business. To the contrary, OCP created the methodology specifically for use in the CVD proceeding. Unlike its approach here, OCP does not assign *any amount* of HQ/Support costs to its phosphate operations in the normal course of business. *See* OCP IQR, Exhibit GEN-9(j) at 14, P.R.65, C.R.52.

Congress has expressed concern about the potential for respondents to distort Commerce's calculations by utilizing cost allocation methodologies that depart from their

normal course of business. Indeed, the Senate Report for the Uruguay Round Agreements Act ("URAA") questions whether Commerce should accept such methodologies at all:

> {I}n determining whether a producer's…records reasonably reflect the costs *associated with the production and sale of the product in question*, {Commerce should} examine the recorded production costs with a view to determining *as closely as possible* the costs that most accurately reflect *the resources actually used in the production of the merchandise in question*. Particularly where allocation methodologies are used, *the Committee expects Commerce to accept only those methodologies used by the exporter or producer in question in the normal course of its business…. Commerce should not, in any event, accept allocation methodologies that distort real costs*.

S.Rep.No. 103-412, at 75 (1994) (emphasis added).[1] Consistent with this direction, Commerce normally is skeptical of a respondent adopting new accounting methodologies during an investigation or review that do not reflect its actual production costs. *See Hynix Semiconductor, Inc. v. United States*, 424 F.3d 1363, 1369-70 (Fed.Cir. 2005) (affirming Commerce's decision that respondent's change of accounting methodologies distorted the cost of production).

Given OCP's departure from its normal accounting methodology, Commerce should have been particularly vigilant in examining the costs that OCP reported and confirmed that they related to phosphate production, if it accepted OCP's methodology at all. Instead, Commerce merely stated that OCP submitted "examples" of HQ/Support costs that OCP "was able to demonstrate are relevant to phosphate mining," and on this basis, it accepted *all* of the costs for allocation. IDM at 22-23.

Commerce's self-serving assertion ignored that the record evidence indicated at most only that some small fraction of OCP's HQ/Support costs might have been relevant. For example, while Commerce stated that OCP provided information on **[**

[1] Congress made this statement in the context of the antidumping law, where respondents have an incentive to underreport their costs. The same concern exists here, where respondents have the opposite incentive.

**]**, Def. Resp. at 16-17, it neglected to note that OCP only submitted **[ ]** and **[ ]** recorded at the HQ/Support level, accounting for less than **[ ]** of the HQ/Support costs OCP reported. OCP IQR, Exhibits MIN-12(a), MIN-16, P.R.74-75, C.R.80-81.[2] This amount is a rounding error on the over **[ ]** in HQ/Support costs that OCP reported for 2022, Final Calc. Memo., Attachment 2, P.R.453, C.R.398-99, for the vast majority of which there is *zero* record evidence that the costs are related to phosphates production. Commerce's contrary finding is premised on "isolated tidbits of data which suggest a result contrary to the clear weight of the evidence." *See Shandong Rongxin Imp. & Exp. Co. v. United States*, 163 F.Supp.3d 1249, 1252 (CIT 2016).

Further, Commerce's finding that it is reasonable to accept all of OCP's HQ/Support costs for allocation in the phosphate rock cost buildup is not even supported by the scraps of information on which it purports to rely. As Mosaic explained in its opening brief, the **[ ]** invoices that OCP submitted purporting to document the connection between HQ/Support costs and phosphates production include costs for entirely *unrelated* activities. For example, OCP submitted **[**

---

[2] OCP argues that "Commerce did not ask OCP to document all of its HQ/Support costs, nor did OCP attempt to do so. Instead, consistent with Commerce's request to support 'reported costs with documentation maintained in the normal course of business and reconcile those costs to the corresponding financial statements,' OCP provided sample documentation…." OCP Resp. at 14. OCP's argument proves Mosaic's point. In its initial questionnaire response, OCP chose to provide *no* documentation to support inclusion of the **[ ]**. Mosaic pointed out the **[ ]** HQ/Support costs and more than **[ ]** in comments on OCP's initial Section III questionnaire response, Mosaic 11/13/23 Def. Cmts. at 25-30, P.R.174, C.R.189, but Commerce failed to ask for any further documentation. *See* DOC Supp. QR to OCP, dated Mar. 25, 2024, P.R.247, C.R.234. The record thus lacks documentation of the relevance of OCP's HQ/Support costs because OCP limited its initial response to "sample" documentation, and because Commerce abdicated its investigative responsibility. *See Timken Co. v. United States*, 630 F.Supp. 1327, 1338 (CIT 1986).

**]**. Mosaic 4/26/24 Comments, Exhibit 6, P.R.295, C.R.287. OCP also submitted **[** **]**. Because **[** **]** is a separate legal entity and because it is **[** **]**, costs incurred for its benefit are not related to *OCP's* phosphate production at all. Thus, the scant evidence OCP submitted does not support Commerce's decision to accept all of OCP's reported HQ/Support costs as related to phosphate production.[3]

The Government fails to address this evidence, asserting instead that Mosaic's arguments that certain costs are indisputably unrelated to the production of phosphate rock "rely on the faulty premise that Commerce may not include any of OCP's HQ/Support costs in the cost buildup unless OCP segregates these costs into those related and unrelated to phosphate rock production" and that "Mosaic essentially argues for the wholesale exclusion of OCP's HQ/Support costs…." Def. Resp. at 17-18. This mischaracterizes Mosaic's argument. It was Commerce that took an "all or nothing" approach, by taking the position that if OCP was able to substantiate that *any* of its HQ/Support costs related to phosphate mining, Commerce had no choice but to include *all* of OCP's HQ/Support costs for allocation in the cost buildup. *See*

---

[3] OCP argues that the invoice for **[** **]** is related to phosphate rock production because the article Mosaic submitted "explains that this green space is part of a 'mining zone requalification plan'" and "seeks more broadly to aid the 'economic and social development of the {r}egion.'" OCP Resp. at 14. OCP argues further that it incurs costs to rehabilitate mining soil, citing its 2022 financial statements. *Id.* at 15. This is a non sequitur. The article does not mention rehabilitation of mining soil, which could in theory be considered a cost associated with OCP's phosphate rock production. It is absurd for OCP to claim that costs associated with **[** **]** it built on a former mining site for "economic and social development" of the region are related to its phosphate rock production.

Mosaic Br. at 17; Def. Resp. at 12-13. The Government also ignores that Commerce made a threshold finding that OCP documented that the HQ/Support costs *are related* to phosphates production. Given the paucity of the documentation that OCP submitted, this finding is unreasonable and unsupported based on the record of this review. The Government cannot defend Commerce's unreasonable and unsupported decision by pointing to this Court's opinion in *Mosaic I* or Commerce's findings in prior reviews, which are legally distinct proceedings with different factual records.

Moreover, the Court did not hold in *Mosaic I* that Commerce must accept all of OCP's HQ/Support costs even if they are *unrelated* to production activities. Rather, the Court held that it was unreasonable to exclude all of OCP's corporate-wide SG&A costs. *Mosaic Co. v. United States*, 659 F.Supp.3d 1285, 1301 (CIT 2023) ("*Mosaic I*"). The record of this review confirms that OCP's HQ/Support segment incurs costs that are not corporate-wide SG&A costs and indeed not related to OCP's phosphates production at all—directly or indirectly. These are costs that OCP incurs in connection with its many business activities that are *wholly unrelated* to phosphate production. *See* Mosaic Br. at 17-18. This evidence fairly detracts from the reasonableness of Commerce's decision to accept all of OCP's reported HQ/Support costs for allocation between OCP's mining sites and its fertilizer and chemical production sites. *See Timken Co. v. United States*, 894 F.2d 385, 388 (Fed.Cir. 1990).

Commerce's decisionmaking in this review is particularly egregious when the record shows OCP's reported HQ/Support costs have dramatically **[ ]** since the original investigation, from **[ ]**, while its phosphates production costs **[ ]**. Mosaic 4/26/24 Comments, Exhibit 4, P.R.294, C.R.285-286; OCP IQR, Exhibit MIN-3, P.R.74, C.R.79. OCP argues that this difference does not demonstrate

that its records "are somehow unreliable or otherwise capable of being segregated." OCP Resp. at 12. Mosaic is not suggesting OCP's accounting is unreliable, but rather that given the significant difference between the AR1 and AR2 records, particularly in light of Congress' concern about distortive cost allocation methodologies, Commerce should have critically examined OCP's cost reporting and required sufficient documentation to support the acceptance of all of the HQ/Support costs for allocation to the cost buildup. Instead, according to the Government, Commerce relied on the fact that it had previously verified OCP's accounting. Def. Resp. at 14, 15.

As the Government itself acknowledges, "Commerce determines whether a countervailable benefit is conferred in each segment of a case based on an examination of the facts in each proceeding." Def. Resp. at 8. In this review, Commerce uncritically accepted OCP's HQ/Support cost reporting for 2022 based on its findings in prior reviews and OCP's handful of receipts for **[**

**]**, Def. Resp. at 17, and it justified its failure to conduct a more thorough investigation on the grounds that OCP did not provide the necessary information. IDM at 22-23 ("Further, we only have detailed underlying documentation from OCP related to a small subset of its HQ/Support costs, which renders an accurate line-drawing exercise based on the record of this proceeding impossible."). This is arbitrary and unreasonable decisionmaking and an abdication of Commerce's statutory responsibilities. *Dep't of Homeland Security v. Regents of the Univ. of Cal.*, 591 U.S. 1, 28-32 (2020) (holding that when an agency reaches a decision without considering an important aspect of the problem, that decision is arbitrary and capricious); *Timken*, 630 F.Supp. at 1338.

Commerce also ignored record evidence that fairly detracted from the reasonableness of its conclusion. The record of this review shows that **[ ]** of the HQ/Support costs that OCP reported were in the category of **[ ]**, which are *not* relevant to OCP's production and pricing of phosphate rock. OCP IQR, Exhibit MIN-18, P.R.76, C.R.81. This category of costs **[ ]** in 2019 to **[ ]** in 2022. Mosaic 4/26/24 Comments, Exhibit 4 at 18, P.R.294, C.R.285-286; OCP IQR, Exhibit MIN-18, P.R.76, C.R.81. Although Mosaic called this evidence to Commerce's attention, Mosaic Case Br. at 19-21, P.R.433, C.R.390, Commerce failed to address it at all.[4] This was patently unreasonable and renders Commerce's decision unsupported by substantial evidence. *See Timken*, 894 F.2d at 388; *Atl. Sugar, Ltd. v. United States*, 744 F.2d 1556, 1562 (Fed.Cir. 1984); *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951).

The Government asserts that OCP's **[ ]** are "indirect but are relevant to…OCP's phosphate rock production operations and are accounted for at the corporate, rather than operational, level" and that "OCP referenced examples of how its indirect costs, that are accounted for at an HQ accounting level, reflect phosphate rock production costs." Def. Resp. at 18. This post hoc rationalization mischaracterizes the record. In actuality, OCP provided no examples of how the **[ ]** category relates to phosphate rock production. Indeed, OCP provided no description or documentation of these costs. However, OCP's financial statements from 2022 indicate that they included at least **[**

[4] OCP argues that Mosaic waived this issue by "failing to develop *any* argument related to HQ/Support costs in its opening brief" and not explaining "where the record *shows* that these costs are unrelated to phosphate mining or rock production," and that Mosaic also failed to exhaust its administrative remedies by not citing specific evidence in its briefs to Commerce. OCP Resp. at 18. This is false. Mosaic argued in its opening brief that OCP failed to substantiate any evidence of the relationship between the cost categories of **[ ]**. Mosaic Br. at 19. Mosaic also pointed to record evidence showing that costs recorded to **[ ]** were unrelated to phosphate rock production and could be easily segregated. *Id.* at 17-19. Mosaic presented similar arguments in its case brief to Commerce. Mosaic Case Br. at 12, 19-21, P.R.433, C.R.390.

**]**. OCP IQR, Exhibit GEN-9(j) at 21, P.R.65, C.R.52. **[ ]** are not an indirect cost of OCP's phosphate rock production. The Government fails to rebut Mosaic's argument on this point.

Instead, the Government falls back to its position that "record evidence shows that OCP's reported HQ/Support costs are related, *at least in part*, to mining operations." Def. Resp. at 20 (emphasis added). This argument precisely illustrates the flaw in Commerce's analysis. Commerce argued that "{t}he wholesale exclusion of OCP's HQ/Support costs, which Mosaic argues for, would unreasonably distort our calculation by indiscriminately removing indirect costs clearly relevant to phosphate rock production." IDM at 22; *see also* Def. Resp. at 18. But if this is true, then the wholesale *inclusion* of OCP's HQ/Support costs was similarly distortive, as it resulted in the indiscriminate allocation of costs that are clearly *not* relevant to phosphate rock production.

Defendants argue that Commerce relied on this Court's prior decisions to find that HQ/Support costs cannot be segregated into "relevant" or "irrelevant" costs. Def. Resp. at 12-14; OCP Resp. at 11-17. Mosaic respectfully disagrees with and has appealed this Court's decision affirming Commerce's finding in AR1 that it could not segregate unrelated HQ/Support costs.[5] Regardless, the AR2 record shows that Commerce could have easily segregated the categories of costs that are demonstrably *unrelated*—i.e., neither directly nor indirectly related—to OCP's phosphate production activities, such as **[ ]**. This cost category is a single line item in the cost buildup, *see* OCP IQR, MIN-18, P.R.76, C.R.81 (**[ ]**), and it would have been a simple exercise in arithmetic to deduct this line item from OCP's total reported HQ/Support costs before allocating the

---

[5] *See Mosaic II*, *appeal docketed*, Nos. 2026-1458, -1460 (Fed.Cir. Feb. 20, 2026).

remaining costs between OCP's mining sites and its fertilizer and chemical production sites. Commerce's failure to meaningfully engage with Mosaic's arguments on this point renders its decision unlawful as contrary to prior practice and unsupported by substantial evidence. *See* Mosaic Br. at 17-19. The Court should remand to Commerce for reconsideration.

## II. The Government and OCP Fail to Rebut Mosaic's Arguments That Commerce Unreasonably Included Egyptian and Syrian Rock Prices in the Benchmark

Commerce's selection of benchmark prices for phosphate rock is unsupported by substantial evidence in two respects. First, record evidence—including OCP's own admissions—demonstrates that MER, in addition to BPL, is an important determinant of phosphate rock quality, and that Egyptian rock's elevated MER renders it non-comparable to OCP's rock. Commerce never addressed this evidence. Second, record evidence demonstrates that both Egyptian and Syrian export prices are distorted by government intervention—in Egypt, through preferential pricing by state-owned mining companies, and in Syria, through Western economic sanctions. Commerce never meaningfully engaged with this evidence either. As explained below, Defendant's and OCP's responses to both arguments consist of post hoc rationalizations that cannot substitute for the reasoned explanation Commerce was required to, but did not, provide. *See, e.g.*, *SEC v. Chenery Corp.*, 318 U.S. 80, 87 (1943); *Ad Hoc Comm. of AZ-NM-TX-FL Producers of Gray Portland Cement v. United States*, 13 F.3d 398, 401 & n.8 (Fed.Cir. 1994) ("It is well settled that an agency's action may not be upheld on grounds other than those relied on by the agency."); *Neenah Foundry Co. v. United States*, 142 F.Supp.2d 1008, 1020 (CIT 2001).

### A. Commerce Failed to Address Record Evidence That MER, Not Just BPL, Determines the Comparability of Egyptian Phosphate Rock

Quality is one of several factors bearing on comparability that the statute requires Commerce to consider in selecting benchmark prices. 19 U.S.C. §1677(5)(E)(iv); 19 C.F.R. §351.511(a)(2)(i)-(ii). Record evidence establishes that MER, in addition to BPL/$P_2O_5$, is an important determinant of phosphate rock quality. For example, a 2019 study not previously on the record shows that Egyptian phosphate rock has a MER of approximately 0.19, more than double the 0.08 threshold generally required to produce specification-grade DAP fertilizer. Indeed, OCP's own submission to the ITC confirms that "the BPL *and the Minor Elements Ratio*…is an essential parameter…which impacts the quality of the final fertilizer."[6] Mosaic Br. at 20-26 (citing Mosaic 3/8/24 Comments, Exhibit 19, P.R.234-235, C.R.220; Mosaic 11/13/23 Comments, Exhibit 22, P.R.180, C.R.195).

Commerce never engaged with this evidence. It offered only the conclusory statement that Mosaic's MER-related claims are "insufficiently supported by factual evidence, as this ratio does not consider BPL content." IDM at 18. This is a non sequitur. Mosaic argued that MER is a relevant factor of phosphate rock quality, *in addition to* BPL content. The fact that the two factors measure different aspects of quality does not support Commerce's decision to disregard the record evidence related to MER levels. Commerce's conclusory rejection of the new record evidence pertaining to MER levels falls short of its obligation to "reasonably explain its

[6] OCP asserts that Mosaic "cherry-picks OCP's statements to the {ITC}" and that Commerce has "already found" these statements to "merely 'confirm that BPL and P2O5 levels determine OCP's phosphate rock prices,' rather than MER levels." OCP Resp. at 22. This is false. Commerce's Investigation IDM findings are based on a different record and, in any case, do not discuss MER levels. *See Phosphate Fertilizers From the Kingdom of Morocco: Final Affirmative Countervailing Duty Determination*, 86 Fed.Reg. 9,482 (Dep't Commerce Feb. 16, 2021) and accompanying IDM at 18-19; s*ee also* Mosaic 11/13/23 Comments, Exhibit 22, P.R.180, C.R.195 (quoting OCP as stating that "{s}ome fertilizers like TSP *cannot be produced* without certain specifications relative to the quality of the *rock* (BPL and MER)") (emphasis added).

findings" so that it is clear it "at least considered counterarguments to its position." *Al Ghurair Iron & Steel LLC v. United States*, 65 F.4th 1351, 1362 (Fed.Cir. 2023).

OCP and Defendant offer a series of arguments in defense of Commerce's determination. These arguments are merely post hoc justifications: none appeared in the *Final Results*, and none can substitute for the reasoned explanation Commerce was required to, but did not, provide. *See, e.g.*, *Chenery Corp.*, 318 U.S. at 87; *Ad Hoc Comm. of AZ-NM-TX-FL Producers*, 13 F.3d at 401 & n.8. Even if these arguments were not post hoc rationalizations, they would still fail on their own terms.

First, OCP and Defendant assert that this Court "already rejected" Mosaic's MER-related arguments in the investigation and AR1. Def. Resp. at 41-42; OCP Resp. at 20-21. However, each administrative review is a separate proceeding decided on its own record, and Commerce cannot "rely on documents issued in a prior proceeding." *Rubberflex Sdn. Bhd. v. United States*, 59 F.Supp.2d 1338, 1348 (CIT 1999). Mosaic introduced numerous new exhibits in this review that were not before Commerce or this Court in the investigation or AR1, which Commerce failed to address. *See, e.g.*, Mosaic Pre-Prelim. Comments at 6-9, P.R.277, C.R.261. Commerce cannot simply rely on its findings from the original investigation and AR1 when the record of this review contains new evidence about the importance of MER levels to rock quality and that Egyptian rock has "very high" MER of 0.19, well above the "acceptable range" to be usable in fertilizer production. Mosaic Case Br. at 8-10, P.R.433, C.R.390. Critically, OCP itself is on the record as affirming that its "*TSP cannot be produced* without certain specifications relative to the quality of the rock (BPL and MER)." Mosaic 11/13/23 Comments, Exhibit 22, P.R.180, C.R.195 (emphasis added). The record shows that the **[ ]** of OCP's fertilizer exports to the United States during the POR were of **[ ]**. *See* CBP Data for Respondent Selection,

Attachment, P.R.3, C.R.1-2; OCP IQR at 17, P.R.59, C.R.44 (showing that OCP shipped **[**

**]**, against just **[** **]** of any other covered merchandise). This new evidence demonstrates that MER of Egyptian phosphate rock is too high to be used to produce fertilizers, and the subject merchandise that OCP actually produced and exported to the United States during the POR *cannot be produced* using phosphate rock with high MER levels. Commerce's inclusion in the benchmark of non-comparable Egyptian phosphate rock that could not be used to produce OCP's subject merchandise is plainly unreasonable and necessitates a remand.

Second, Defendant and OCP incorrectly assert that "Mosaic has not actually identified record evidence showing numerical differences between the MER levels of Egyptian (and non-Egyptian) rock and OCP's rock." Def. Resp. at 47; *see also* OCP Resp. at 22. In fact, new record evidence that Mosaic submitted shows that Egyptian phosphate rock "has a very high {MER} of about 0.19," but that "most phosphate rocks and the corresponding phosphoric acids made from those rocks, should have a MER below 0.08." Mosaic Br. at 22 (quoting Mosaic 3/8/24 Comments, Exhibit 19, P.R.234-235, C.R.220).[7] The record also contains the information necessary to compare the MER of OCP's rock against the 0.19 figure. *See* OCP IQR, Exhibit

[7] OCP mischaracterizes the *Final Results* by claiming that Commerce found the 2019 study insufficient because it relates to only a "single mine," and was therefore entitled to disregard it entirely. OCP Resp. at 22-23 (citing IDM at 19). That is not the reasoning Commerce provided in its discussion of the study. Defendant likewise asserts that Commerce addressed this evidence, Def. Resp. at 45, but ignores that Commerce conceded that this study shows that "the particular MER of Abu Tartour phosphate rock may affect its applicability for certain uses." Commerce then drew the unsupported conclusion from a separate article that "'{t}his does not mean that {Abu Tartour} contain{s} bad quality phosphates….'" IDM at 19. In fact, the article continues: "customer needs and the application that will us{e} phosphate determines which one is better." Mosaic 3/8/24 Comments, Exhibit 21, P.R.236, C.R.221. Moreover, despite acknowledging this study shows that Egyptian rock is not suitable for certain end uses, Commerce concluded that the study "does not explain how MER may or may not affect the export price of Egyptian phosphate rock." IDM at 19. This is a non sequitur, as Mosaic's argument pertained to the quality of Egyptian phosphate rock and its suitability as a benchmark for the phosphate rock that OCP uses to produce its fertilizer. Defendants fail to rebut this argument.

MIN-23, P.R.76, C.R.81 (containing **[**

**]**); OCP Resp. at 22 (acknowledging that this exhibit contains the necessary information). Mosaic directed Commerce's attention to the record evidence needed to make this comparison in its rebuttal brief. Mosaic Rebuttal Br. at 8, P.R.434, C.R.391. Commerce's failure to account for this information that fairly detracts from its conclusion renders its decision unsupported. *See Timken*, 894 F.2d at 388.

Third, OCP argues the evidence Mosaic submitted "does not outweigh the detailed record evidence demonstrating that BPL level is the single greatest determinant of comparability and price," pointing to a 2018 presentation that it characterizes as offering only a "high-level discussion" of Egyptian phosphate rock. OCP Br. at 23 (citing Mosaic Br. at 24; Mosaic 11/13/23 Comments, Exhibit 21, P.R.180, C.R.195). In fact, this exhibit undermines OCP's argument that BPL level alone determines comparability. What the exhibit actually shows is that it is "extremely difficult, if not impossible" to produce the phosphoric acid necessary to make phosphate fertilizers from phosphate rock with a high MER level—despite that phosphate rock having a $P_2O_5$ content of 31.8 percent—because of its chemical composition. Mosaic 11/13/23 Comments, Exhibit 21, P.R.180, C.R.195. In any event, it is not for OCP to declare what evidence "outweighs" what on this record—that responsibility falls to Commerce, which Commerce failed to properly exercise. An agency "cannot simply ignore significant contradictory evidence and assert that, nevertheless, its determination was supported by substantial evidence." *Mitsubishi Materials Corp. v. United States*, 820 F.Supp. 608, 624 (CIT 1993). Rather, Commerce must "reasonably explain its findings" and "consider{}

counterarguments to its position." *Al Ghurair Iron & Steel*, 65 F.4th at 1362; *see also Chenery Corp.*, 318 U.S. at 87. Commerce failed to do so here.

Fourth, Defendant and OCP argue that the CIT rejected Mosaic's arguments in *Archer Daniels Midland*. Def. Resp. at 44-45. This is incorrect. As Mosaic explained in its opening brief, the CIT held in *Archer Daniels Midland* that differences in quality between raw "sour" natural gas and processed gas are relevant to the comparability of natural gas benchmarks. Mosaic Br. at 24 (quoting *Archer Daniels Midland Co. v. United States*, 779 F.Supp.3d 1349, 1367 (CIT 2025) ("*ADM I*")). On remand, Commerce agreed, and this Court *sustained* that finding, holding that "Commerce reasonably concluded" the two products "were not comparable." *Archer Daniels Midland Co. v. United States*, 816 F.Supp.3d 1371, 1381 (CIT 2026) ("*ADM II*"). Likewise, the record evidence here shows that, because of its elevated MER, Egyptian rock cannot be used to produce the same downstream fertilizer products that OCP produced and exported to the United States during the POR. *See* Mosaic 11/13/23 Comments, Exhibit 22, P.R.180, C.R.195. A product that cannot serve the same end uses as the subsidized good is not a comparable product.[8]

OCP separately attempts to distinguish the *ADM* cases by asserting that there is a distinction between phosphate "ore" and phosphate "rock." OCP Resp. at 24. However, OCP fails to rebut Mosaic's argument based on the CIT's holdings in *ADM I* regarding comparability of natural gas benchmarks. Nonetheless, as noted above, the CIT's holdings in *ADM I* and *ADM II* regarding the comparability of phosphate ore pertained to evidentiary differences in *production cost and beneficiation processes* for igneous- and sedimentary-origin phosphate ore

---

[8] Defendant also attempts to redirect attention to a different dispute in *ADM II* that is not at issue here—namely, differences between phosphate rock of sedimentary and igneous origin. Def. Resp. at 44-45; *ADM II*, 816 F.Supp. 3d at 1378. No party has raised arguments regarding this distinction in these proceedings.

and resulting differences in beneficiated rock quality. The question here is whether two different *sources* of sedimentary phosphate rock—OCP's in Morocco and Egypt's—are comparable in light of each source's chemical composition and quality. The record evidence indicates that they are not: the 2017 CRU report describes how the low $P_2O_5$ grade of Egyptian phosphate rock "makes it cheap and most is used in lower value SSP or direct application (DAPR) markets," Mosaic 3/8/24 Comments, Exhibit 15, P.R.234-235, C.R.220. The 2019 study likewise addresses "Abu Tartour *Phosphate Rock*" with a $P_2O_5$ content of 28.7% and a MER of 0.19. Mosaic 3/8/24 Comments, Exhibit 19, P.R.234-235, C.R.220 (emphasis added). Both sources speak directly to the marketability and end uses of phosphate rock. *See also* Mosaic 11/13/23 Comments, Exhibit 22, P.R.180, C.R.195 (containing OCP's statement to the ITC that "{s}ome fertilizers like TSP *cannot be produced* without certain specifications relative to the quality of the *rock* (BPL and MER)") (emphasis added). A product that cannot serve the same end uses as the subsidized good is not a comparable product.

In sum, record evidence establishes that MER, as a distinct quality factor independent of BPL levels, renders Egyptian rock non-comparable to OCP's rock—evidence Commerce never addressed. Its determination is thus unreasonable, unsupported by substantial evidence, and otherwise not in accordance with law.

### B. Commerce Failed to Address Record Evidence That Egyptian and Syrian Export Prices Are Distorted by Government Intervention

#### 1. OCP's and Defendant's Post Hoc Justifications Cannot Cure Commerce's Failure to Address Record Evidence Indicating That Egyptian Export Prices Are Distorted

Commerce erroneously dismissed Mosaic's arguments that Egypt's state-owned phosphate mining companies distort export prices, stating only that "'distortion' in a country's domestic market is not determinative of whether the prices of *exports* from that domestic market

are suitable benchmarks." IDM at 18-19. But the sentences that follow are a non sequitur: they discuss MER, not whether Egyptian state-owned companies distort export prices. Mosaic Br. at 27. Defendant compounds this with a non sequitur of its own, reciting Commerce's observation that its "benchmark price is necessarily comprised of prices both above and below the average benchmark price." Def. Resp. at 47 (citing IDM at 18). But Commerce made that statement in response to Mosaic's argument about quality, not about distortion, IDM at 18, and Mosaic never argued that Commerce should exclude Egyptian prices simply because they fell below the average. Neither Commerce nor Defendant addresses Mosaic's actual argument: that record evidence indicates that the preferential prices state-owned companies provide to exporters distort Egypt's export prices. *See* Mosaic Br. at 26-28.

As another post hoc justification Commerce did not raise, Defendant and OCP both focus on Mosaic's alleged failure to "point to market dynamics in the destination countries for Egyptian exports that would lead to a finding of distortion." Def. Resp. at 47-50 (citing *Phosphate Fertilizers from the Russian Federation: Final Results of Countervailing Duty Administrative Review; 2020-2021*, 88 Fed.Reg. 76,182 (Dep't Commerce Nov. 6, 2023) and accompanying IDM at 48-49 ("*Russia AR1 IDM*")); OCP Resp. at 25 (citing *Countervailing Duty Investigation of Fine Denier Polyester Staple Fiber from the People's Republic of China: Final Affirmative Determination*, 83 Fed.Reg. 3,120 (Dep't Commerce Jan. 23, 2018) and accompanying IDM at 35 ("*PSF From China IDM*")). This argument fails.

First, each of the determinations Defendant and OCP cite involved a Tier 2 benchmark, not the Tier 3 benchmark at issue here. *Russia AR1 IDM* at 46-47; *PSF From China IDM* at 35. Second, both Russia and China—the countries at issue in the cited determinations—are non-market economies, a distinction Commerce considers in evaluating distortion. Third, and most

fundamentally, the "destination countries" concept in the Russia determination involved a different factual scenario: natural gas transported by pipeline to a limited number of identifiable countries, where the relevant question was whether prices at the pipeline's endpoint were distorted. *See Russia AR1 IDM* at 46-48 (referring to "information regarding Russia's natural gas pipeline network"). Here, by contrast, the benchmark prices that Commerce utilized are reported on an aggregate FOB basis, rather than on a destination-specific basis.[9] Defendant and OCP identify no record evidence that would have permitted the country-specific analysis they insist Mosaic was required to perform, let alone explain why Commerce could fault Mosaic for failing to produce evidence that does not exist.

Defendant evidences its confusion when it asserts that "Mosaic does not point to a determination by Commerce with respect to the market forces affecting *gas* prices within Egypt and any perceived effect from distortion on either domestic or export prices." Def. Resp. at 48 (emphasis added). This case does not involve gas—it involves phosphate rock—and Mosaic is not required to "point to a determination by Commerce." Instead, Mosaic identified record evidence that Egypt's state-owned phosphate mining companies extend preferential pricing to exporters, and it argued that Commerce's determination is unsupported because it fails to grapple with that evidence. *See* Mosaic Br. at 26-28. Whatever the source of Defendant's error—apparently repurposed from a brief addressing a different product—it does not remedy Commerce's failure to address the record evidence Mosaic submitted.

---

[9] For example, the CRU Fertilizer Week Methodology Guide reports a single FOB Egyptian phosphate rock price series that spans multiple, simultaneously-listed "Main Consumer Markets" of "India, Bangladesh, Indonesia, and Malaysia" rather than disaggregating the price by destination. Mosaic 2/16/24 Benchmark, Exhibit 2 at 73, P.R.217, C.R.209. Likewise, the Argus Phosphates Methodology Guide assesses Egyptian rock solely as an origin-based "Fob Egypt" price, with no destination attached. *See id.*, Exhibit 4 at 9.

In sum, neither OCP nor Defendant identifies any reasoned basis in this record for Commerce's inclusion of Egyptian phosphate rock prices in the benchmark. Commerce's determination rests on the unsupported premise that BPL is the *exclusive* measure of comparability, disregards unrebutted record evidence—including OCP's own admissions—that MER independently bears on quality and marketability, and fails to engage with the new evidence Mosaic placed on this record. Its determination is thus unreasonable, unsupported by substantial evidence, and otherwise not in accordance with law.

**2. The Government's and OCP's Post Hoc Justifications Cannot Cure Commerce's Failure to Address Record Evidence Indicating That Syrian Export Prices Are Distorted**

As Mosaic explained in its opening brief, Western economic sanctions on Syria's phosphate industry operate as "coercive economic means" that dramatically reduce foreign demand for Syrian phosphate rock and, in turn, depress the export prices Syria can command. Mosaic Br. at 28-31. The record indicates that these sanctions force Syria to sell its phosphate rock "at a political discount because its goods are so toxic to handle," resulting in "{c}heap Syrian phosphate exports." Mosaic 4/26/24 Comments, Exhibit 9, P.R.295, C.R.287. None of this evidence was on the record in the investigation or AR1. Mosaic Br. at 29. Nevertheless, Commerce rejected Mosaic's arguments using language nearly identical to its findings in prior segments, without engaging with the substantial new evidence Mosaic placed on this record for AR2. Mosaic Br. at 29-31.

As with Egypt, Defendant's and OCP's efforts to defend Commerce's determination are post hoc rationalizations that cannot cure Commerce's failure to grapple with this evidence in the first instance. Two aspects of their arguments warrant brief responses. First, Defendant asserts, as it does for Egypt, that Mosaic "failed to establish any market dynamics in the destination

countries for exports that would support a finding of distortion." Def. Resp. at 48.[10] This argument fails for the same reasons discussed above. The focus on "destination countries" has no application here, where the phosphate rock export price data on this record is reported without regard to the destination of any given shipment.[11] Neither Commerce, Defendant, nor OCP has identified record evidence that would permit the destination-specific analysis Defendant insists Mosaic was required to perform.

Second, OCP uses misleading selective quotations to mischaracterize Mosaic's evidence. For example, OCP states that Syrian exports have "boomed" in recent years and that the sanctions "do not explicitly prohibit phosphate imports." OCP Resp. at 27. In fact, the evidence states that "*{c}heap* Syrian phosphate exports have boomed in recent years," and that "this secretive trade" is the result of payments to "a convoluted network of shell companies and middlemen to buy Syrian phosphates." Mosaic 4/26/24 Comments, Exhibit 9, P.R.295, C.R.287 (emphasis added). Rather than supporting OCP's assertion that this source is, apparently, evidence of an undistorted market, it instead shows that Syria's export prices are "cheap," to account for the "political discount" necessary where trade must be routed through shell companies, disguised shipping routes, and a "secretive," "convoluted" supply chain to avoid the consequences of purchasing sanctioned goods. In any case, OCP's assertions are post hoc justifications that cannot remedy Commerce's failure to address this evidence itself.

[10] Defendant purports to quote the IDM at 17. However, no such language appears in the IDM's discussion of Syria, or anywhere else in the IDM. As with Defendant's citation regarding "gas" prices discussed above, this appears to be a quotation lifted from an unrelated brief or determination and mistakenly attributed to the record in this proceeding. The correct quotation reads: "Mosaic has failed to point to market dynamics *in Syria* for the exports in question that would lead to a finding of distortion…." IDM at 17 (emphasis added).

[11] Like the Egypt-related data above, Syrian prices are reported only as "Syria fob", without regard to destination. *See* OCP 3/8/24 Comments, Exhibit RFI-1, P.R.238, C.R.228.

Relatedly, OCP argues that "the fact that Profercy reports Syrian prices at all refutes Mosaic's position that such exports are 'unmarketable internationally.'" OCP Resp. at 27. This, too, misses the point. That a price-reporting service publishes a Syrian price says nothing about the conditions under which that price was set, or which buyers are purchasing Syrian phosphate rock. The more plausible inference is that Syria continues to find buyers who may exist outside of U.S. or European jurisdiction, or who are not concerned about violating U.S. or EU sanctions. That an exporter subject to sanctions-driven distortion can still find some buyer, on some terms, does not establish that the resulting price reflects ordinary "commercial realities on the world market." IDM at 17.

In sum, neither Defendant nor OCP identifies any reasoned basis in this record for Commerce's continued inclusion of Syrian phosphate rock export prices in the benchmark. Commerce's cursory, boilerplate treatment of Mosaic's evidence fails to satisfy Commerce's obligation to engage with the evidence before it. Its determination is thus unreasonable, unsupported by substantial evidence, and otherwise not in accordance with law.

## III. Defendants Fail to Rebut Mosaic's Arguments That Commerce Failed to Address Substantial Record Evidence Demonstrating That Marsa Maroc Provided Services for LTAR

As Mosaic explained in its opening brief, Commerce based its rejection of Mosaic's subsidy allegation for this program on a GOM submission that purportedly contained "Marsa Maroc's **[** **]**, notwithstanding record evidence indicating that the **[** **]** did not exist during the POR, and the lack of record evidence indicating that Marsa Maroc actually used the **[** **]** in its negotiations with OCP. Mosaic Br. at 37-38. Defendants argue in response that Commerce's determination relied on other evidence in

addition to the **[ ]**, including the GOM's explanation of Marsa Maroc's price-setting methodology and its description of Marsa Maroc's contract negotiation process. Def. Resp. at 61-62; OCP Resp. at 29; GOM Resp. at 18-19. However, the GOM's explanation of Marsa Maroc's pricing methodology and description of its contract negotiating process is that "the party initiating the discussion for the agreement 'will propose a rate, which Marsa Maroc will evaluate **[ ]**.'" IDM Supp. at 10, P.R.452, C.R.397. Given the lack of evidence that Marsa Maroc used the **[ ]** in its negotiations with OCP, or that **[ ]** even existed during the POR, this additional "evidence" proves nothing.

Defendant also argues that "the GOM reported that Marsa Maroc conducted its normal market operations in its negotiation of rates for its BSAs with OCP, {that} no information on the record contradicts this statement," and that the **[ ]** is simply "an illustrative model to show how Marsa Maroc **[ ]** Def. Resp. at 61-62. OCP and the GOM argue similarly that Mosaic failed to provide any evidence that Marsa Maroc did not follow its stated methodology. OCP Resp. at 29; GOM Resp. at 17-18. To the contrary, the fact that the only documentary support the GOM provided as evidence is an "illustrative model" that didn't exist during the POR undermines the reliability of all of the GOM's statements. And while Defendant asserts it is possible to "draw{} two inconsistent conclusions from the evidence," Def. Resp. at 62, the only reasonable conclusion here is that the GOM failed to substantiate its claims that Marsa Maroc's price-setting to OCP was consistent with market principles. Defendants' argument that the GOM's responses are certified to be accurate, *see* Def. Resp. at 62, is also unavailing because Commerce's acceptance of the GOM's unsupported assertions is unreasonable and contrary to prior practice. *See Mukand, Ltd. v. United States*, 37 C.I.T. 443, 450 & n.6 (CIT 2013), *aff'd*,

767 F.3d 1300 (Fed.Cir. 2014) (affirming Commerce's decision to "disregard Mukand's narratives" containing "vague, unsupported assertions"); *Sugiyama Chain Co. v. United States*, 891 F.Supp. 619, 627 (CIT 1995), *dismissed*, 70 F.3d 1290 (Fed.Cir. 1995).

Defendants also fail to rebut Mosaic's argument that Commerce unreasonably disregarded evidence of price discrimination. Def. Resp. at 60-61; OCP Resp. at 30; GOM Resp. at 20. Although Defendant asserts that Commerce acknowledged the existence of price discrimination, Def. Resp. at 60, in actuality Commerce declined to incorporate the evidence of price discrimination into its analysis, because it had already determined that there was "no evidence on the record that any of the fees charged are for LTAR." IDM at 62. Commerce's determination on this point is unsupported and contrary to law because evidence of price discrimination *is* evidence that services were provided for LTAR. 19 C.F.R. §351.511(a)(2)(iii); *see also Nucor Corp. v. United States*, 927 F.3d 1243, 1252 (Fed.Cir. 2019).

For its part, OCP argues that "price discrimination" is a "defunct" legal standard that the "Federal Circuit has explained cannot be the basis for an LTAR determination." OCP Resp. at 30. OCP's argument ignores the plain language of 19 C.F.R. §351.511(a)(2)(iii) and mischaracterizes the Federal Circuit's holdings in *Nucor* and *POSCO v. United States*, 977 F.3d 1369 (Fed.Cir. 2020). In *Nucor* and *POSCO*, the Federal Circuit held that Commerce cannot rely *solely* on price discrimination in assessing the adequacy of remuneration—not that evidence of price discrimination is irrelevant to Commerce's LTAR analysis, which is how Commerce treated the evidence here. *Nucor*, 927 F.3d. at 1250; *POSCO*, 977 F.3d at 1376. In fact, the Federal Circuit explicitly stated:

> This is not to deny that discrimination in the price-lowering direction might be some evidence that a rate fails to be adequately remunerative: that a price is *discriminatorily* low can be an

> indication that the seller is subsidizing the beneficiaries of that price and not receiving adequate compensation.

*Nucor*, 927 F.3d at 1252 (citing *Maverick Tube Corp. v. United States*, 273 F.Supp.3d 1293, 1307 (CIT 2017) (discussing *Steel Wire Rod from Germany*, 62 Fed.Reg. 54,990, 54,994 (Dep't Commerce Oct. 22, 1997))). Given the record evidence showing that the rates Marsa Maroc charged to OCP are **[ ]** the rates it charges at Tanger Med, this is precisely the concern here.

OCP and the GOM further argue that there is no evidence of price discrimination because the services at Marsa Maroc and Tanger Med were not "comparable." OCP Resp. at 31-32; GOM Resp. at 20-21. In support of this argument, OCP notes that its rates **[ ]** that Tanger Med appears not to offer. OCP Resp. at 32. The fact that OCP acknowledges that it received **[ ]** further demonstrates that Marsa Maroc's price setting is not consistent with market principles.

In sum, Commerce failed to account for the record evidence of price discrimination in its LTAR analysis. Contrary to Defendants' claims, neither the legal standard nor Commerce's reliance on the GOM's unsupported assertions in its questionnaire responses justified this omission. The Court should remand for reconsideration.

## IV. Defendants Fail to Rebut Mosaic's Arguments That Commerce Failed to Meaningfully Address Substantial Record Evidence Demonstrating That ANP Does Not Set Its Concession Fees in Accordance With Market Principles

Defendant and the GOM argue that Commerce reasonably relied on its AR1 findings that ANP's pricing is consistent with market principles, as affirmed by this Court, because the same concession agreements between ANP and OCP remained in effect in AR2. Def. Resp. at 65; GOM Resp. at 22-23. Defendant argues further that the AR2 record shows "ANP uses a concession fee methodology that accounts for its costs, revenues, and profits when setting

prices." Def. Resp. at 66; *see also* GOM Resp. at 23. Mosaic respectfully disagrees with the Court's decision in *Mosaic II* and has appealed Commerce's decision in AR1. Moreover, Defendant mischaracterizes the record evidence. As Mosaic explained in its opening brief, ANP's methodology for setting concession fees only takes into account **[ ]**, not ANP's costs or profits. Mosaic Br. at 43. OCP does not dispute this fact, arguing instead that it is reasonable because the concession fees would be lower if tied exclusively to ANP's costs. OCP Resp. at 35. However, this argument rests on the false assumption that profit-maximizing actors would only set prices at the minimum level needed to recover their costs. In reality, a profit-maximizing actor selling something of value—*e.g.*, a port concession—would set prices at the highest level the market would bear.

The GOM similarly does not dispute that ANP's model only accounts for **[ ]** but argues that ANP "relied upon **[ ]**." GOM Resp. at 24. However, as Mosaic explained in its case brief to Commerce, the section of the **[ ]** report that the GOM cites focuses on the financial profitability analysis of a project from the perspective *of the concessionaire*. GOM 4/5/2024 SQR at 16, P.R.264, C.R.249 (citing Exhibit SUPP-13 at 50-51). The economic analysis that a port authority such as the ANP should perform is discussed elsewhere in the **[ ]** report, and it is not based on the concessionaire's costs or revenues. *Id.* Exhibit SUPP-13 at 42-44, P.R.267, C.R.253. This evidence thus does not support Commerce's finding that ANP sets concession fees in accordance with market principles.

Defendants also fail to rebut Mosaic's argument that Commerce unreasonably disregarded evidence of price discrimination. Defendant does not even address the relevance of this evidence, but merely cites to Commerce's prior findings in AR1 and the fact that ANP was

profitable in 2022. Def. Resp. at 65; *see also* GOM Resp. at 25. However, as discussed in Section III, price discrimination is a material and relevant factor in Commerce's LTAR analyses, particularly where the evidence suggests that the overall profitability of the government provider is masking discriminatorily low prices to a particular subsidy recipient. *Nucor*, 927 F.3d at 1252.

Mosaic directed Commerce's attention to evidence that **[**

**]**. Mosaic Case Br. at 43, P.R.433, C.R.390. The GOM argues that Mosaic failed to support this assertion. GOM Resp. at 25. However, Mosaic cited its Case Brief from the administrative proceedings, which reads:

> OCP only paid an average of **[**
> **]** in concession fees to ANP at the three ports where it operates. {}
> Conversely, **[**
> **]**.

Mosaic Case Br. at 46, P.R.433, C.R.390 (citations omitted). Commerce unreasonably disregarded this evidence, thus failing in its obligation to address all factors and arguments that are material and relevant. *Altx, Inc. v. United States*, 167 F.Supp.2d 1353, 1374 (CIT 2001), *aff'd*, 370 F.3d 1108 (Fed.Cir.2004); *SKF USA Inc. v. United States*, 630 F.3d 1365, 1373-74 (Fed.Cir.2011) (quoting *Timken U.S. Corp. v. United States*, 421 F.3d 1350, 1358 (Fed.Cir.2005)).

## V. The Government and OCP Fail to Rebut Mosaic's Arguments That Commerce Unreasonably Excluded Capital Goods Imported From FTA Countries From the Benefit Calculation for the Customs Duty Exemptions for Capital Goods, Machinery, and Equipment Program

Defendant argues that substantial evidence supports Commerce's exclusion of OCP's imports from FTA countries from the benefit calculation for the customs duty exemptions for capital goods, machinery, and equipment program because "FTA rates…were available to OCP's

imports" and "Commerce…had no reason to question the reliability of the sample import data showing that OCP's goods originated from countries that maintained FTA agreements with the GOM." Def. Resp. at 52-53; *see also* GOM Resp. at 8-11. Defendant concedes "that the record in this case supports that some FTAs require documentation," but argues "that does not mean the nonexistence of FTA-specific declarations for the relevant OCP imports were not FTA eligible" {*sic*}. Def. Resp. at 54; GOM Resp. at 11. OCP argues similarly that it could not provide such documentation "{b}ecause OCP received duty-free treatment under Customs Duty Exemptions, it did not have to claim FTA treatment and therefore did not create documents in 2022, at the time of importation, required to claim preferential treatment under the FTAs." OCP Resp. at 42-43.

Defendants' arguments prove Mosaic's point: there is no evidence on the record demonstrating that the imported capital goods and equipment did, in fact, satisfy the preferential rules of origin and eligibility criteria for the relevant FTAs—including, in some cases, direct transport to Morocco—in order to be eligible for the reduced duty rates.[12] *See* GOM Exhibit 2-Supp-9, P.R.346, C.R.321; OCP Exhibit Customs-5(a), P.R.77, C.R.35; OCP Exhibit Customs-4(c), P.R.77, C.R.92-93; GOM IQR Exhibit VI-7, P.R.147, C.R.140; GOM SQR at Exhibit

[12] Defendant, OCP, and the GOM argue that Mosaic failed to raise its argument regarding the lack of contemporaneous documentation during the administrative proceeding. Def. Resp. at 56; OCP Resp. at 42; GOM Resp. at 11. This is false. *See* Mosaic 4/15/24 Comments GOM SQR at 2-6, P.R.283, C.R.264; Mosaic Pre-Prelim. Rebuttal at 7-8, P.R.288, C.R.266; Mosaic 7/15/24 Comments GOM 2SQR, P.R.350, C.R.332. In response to Mosaic's deficiency comments, Commerce specifically instructed the GOM to provide "*contemporaneous documentation* showing OCP's imports **[ ]**," GOM SSQR, P.R.242, C.R.232 (emphasis added), which the GOM failed to do. In response, Mosaic provided extensive arguments demonstrating that neither the GOM nor OCP provided contemporaneous documentation from the period of review showing that OCP's imports would have been entitled to preferential treatment under the relevant FTAs. *See* Mosaic 4/15/24 Comments GOM SQR at 2-6, P.R.283, C.R.264; Mosaic Pre-Prelim. Rebuttal at 7-8, P.R.288, C.R.266; Mosaic 7/15/24 Comments GOM 2SQR, P.R.350, C.R.332. Mosaic then argued in its rebuttal brief that the GOM had failed to substantiate its claims regarding FTA eligibility. Mosaic Rebuttal Br. at 42, P.R.434, C.R.391. Mosaic thus exhausted its administrative remedies.

SUPP-7, P.R.266, C.R.252. Commerce's reliance on the GOM's and OCP's unsupported assertions is unreasonable.

Defendant and OCP contend that the evidence Commerce cited supports its finding that OCP would have had a *choice* of either claiming FTA preferential treatment or exemption and waiver from customs duties. Def. Resp. at 53-56; OCP Resp. at 42. This is false and beside the point. OCP only would have had a "choice" if its imported goods did in fact qualify as originating under the relevant FTA rules—i.e., not just that they "originated" in an FTA country, but that they actually satisfied the preferential rules of origin for the FTA in question. Defendant and OCP fail to respond to Mosaic's argument that a user guide and screenshots that explain how to fill out FTA-related fields in a customs form cannot serve as proof of FTA originating status that could demonstrate the goods' entitlement to preferential tariff rates. Mosaic Br. at 33-34. The Court should reject Defendant's and OCP's reliance on a hypothetical "choice" to excuse the absence of any record evidence demonstrating that OCP's imported capital goods and equipment would in fact have been eligible to claim duty-free treatment under the FTAs.

Defendant and OCP next seek to shift the evidentiary burden to Mosaic, arguing that Mosaic did not provide any evidence demonstrating that OCP's imports failed to meet the criteria for FTA eligibility. *See* OCP Resp. at 41; Def. Resp. at 54-55. To the contrary, Mosaic *did* identify such evidence. *See* Mosaic Case Br. at 40, P.R.433, C.R.390 (showing that revisions to the Morocco-Turkey FTA during the POR increased tariffs on HTS codes "listed in GOM's Exhibit SUPP-4"); *see also* Mosaic Pre-Prelim. Rebuttal at 8, P.R.288, C.R.266; Mosaic 4/15/24 Comments GOM SQR at 2-4, P.R.283, C.R.264. Commerce's failure to account for such detracting evidence is unlawful and must be rejected. *See CS Wind Viet. Co. v. United States*, 832 F.3d 1367, 1373 (Fed.Cir. 2016).

In any case, OCP is the party seeking to benefit from the preferential tariff treatment available to eligible imports under the FTAs. Further, OCP, as the importer, is the only party in possession of the documentation necessary to establish that its imports were eligible for preferential treatment under the relevant FTAs, regardless of whether OCP did in fact prepare declarations of FTA eligibility at the time of entry. Thus, it is OCP, not Mosaic, that bears the burden of demonstrating that the imported goods would have qualified for FTA preferential treatment.[13] *See Fujitsu Gen. Ltd. v. United States*, 88 F.3d 1034, 1040 (Fed.Cir. 1996) ("Commerce has reasonably placed the burden to establish entitlement to adjustments on {the Respondent}, the party seeking the adjustment and the party with access to the necessary information.").

In sum, Commerce's reliance on the GOM's and OCP's narrative responses, a user guide, and screenshots—which do not prove the goods at issue were entitled to preferential treatment under the relevant FTAs—was unreasonable, regardless of whether the GOM and OCP certified to the accuracy of their responses. This Court should hold Commerce's decision unsupported by substantial evidence and remand to Commerce for reconsideration.

[13] The GOM cites a prior Commerce case to argue that "Commerce need not require contemporaneous documentation demonstrating compliance with all administrative requirements of an FTA to demonstrate eligibility." GOM Resp. at 11-14 (discussing *Citric Acid and Certain Citrate Salts From Thailand: Final Negative Countervailing Duty Determination, and Final Negative Critical Circumstances Determination*, 83 Fed.Reg. 26,004 (Dep't Commerce June 5, 2018), and accompanying IDM ("*Citric Acid from Thailand IDM*"); *Archer Daniels Midland Co. v. United States*, 399 F.Supp.3d 1296, 1302-04 (CIT 2019) ("*ADM Thailand*")). That case is inapposite. It involved the ASEAN-China FTA, under which goods exported from China qualified as originating, and Commerce verified that the imports were of Chinese origin and therefore eligible. *See Citric Acid from Thailand IDM* at 18 ("The respondent firms have demonstrated, by means of import documentation verified by Commerce, that the imports in question were, in fact, Chinese-origin and that, accordingly, the duty payable on the machinery and equipment in question would have been zero absent eligibility under Section 28 IPA program."). Here, by contrast, Commerce performed no such verification, and Mosaic identified evidence that at least some of OCP's imports would *not* have qualified. Mosaic Case Br. at 40, P.R.433, C.R.390. Moreover, unlike ASEAN-China, the FTAs at issue here contain detailed rules of origin, some of which require a tariff shift for non-originating content or certain level of originating content, and in some cases also condition originating status on other requirements (e.g., "direct transport" or "movement certificate" requirements)—so the mere fact that a good may have been exported from an FTA partner is insufficient to establish eligibility for preferential tariff treatment. *See id.*

## CONCLUSION

For the reasons discussed above, Mosaic respectfully requests that the Court grant Mosaic's Motion for Judgment on the Agency Record in its entirety and remand to Commerce for redetermination consistent with the Court's opinion.

Respectfully submitted,

/s/ Stephanie E. Hartmann
David J. Ross
Stephanie E. Hartmann
Alexandra Maurer
Jake A. Laband

Wilmer Cutler Pickering Hale and Dorr LLP
2100 Pennsylvania Avenue NW
Washington, DC 20037
Telephone: (202) 663-6300
Facsimile: (202) 663-6363
Email: stephanie.hartmann@wilmerhale.com

*Counsel for The Mosaic Company*

Dated: October 14, 2026

**Consol. Court No. 24-00227**

## CERTIFICATE OF COMPLIANCE

Pursuant to Chamber Procedure 2(B)(1), the undersigned certifies that this Memorandum as a Reply in Support of Mosaic's Rule 56.2 Motion for Judgment upon the Agency Record complies with the word limitation requirement. The word count for the Memorandum, as computed by WilmerHale's word processing system, is 9,817 words, including footnotes, and excluding the title page, table of contents, table of authorities, counsel's signature block, and this certificate.

/s/ Stephanie E. Hartmann
(Signature of Attorney)

Stephanie E. Hartmann
(Name of Attorney)

The Mosaic Company
(Representative Of)

October 14, 2026
(Date)