**UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE THE HONORABLE TIMOTHY C. STANCEU, JUDGE**

**OCP S.A.,**

**Plaintiff,**

**v.**

**UNITED STATES,**

**Defendant,**

**and**

**THE MOSAIC COMPANY,**

**Defendant-Intervenor,**

**and**

**THE GOVERNMENT OF THE KINGDOM OF MOROCCO,**

**Defendant-Intervenor.**

**Consol. Court No. 24-00227**

**NON-CONFIDENTIAL VERSION**

**Business Proprietary Information Removed From Pages 7, 8, 11-20, 23-26, 28-30**

# THE MOSAIC COMPANY'S MEMORANDUM IN OPPOSITION TO OCP'S RULE 56.2 MOTION FOR JUDGMENT UPON THE AGENCY RECORD

David J. Ross
Stephanie E. Hartmann
Alexandra Maurer
Jake A. Laband
Min Seong Kim

Wilmer Cutler Pickering Hale and Dorr LLP
2100 Pennsylvania Avenue NW
Washington, DC 20037

*Counsel for The Mosaic Company*

July 13, 2026

## TABLE OF CONTENTS

INTRODUCTION ..... 1

RULE 56.2 STATEMENT ..... 2

I. Administrative Decision Under Review ..... 2

II. Issues Presented and Summary of Arguments ..... 2

STATEMENT OF FACTS ..... 4

STANDARD OF REVIEW ..... 5

ARGUMENT ..... 6

I. Commerce's Decision to Use a Revenue-Based Allocation for HQ/Support Costs is Reasonable, Supported by Substantial Evidence, and in Accordance With Law ..... 6

A. Commerce's Adoption of a Revenue-Based Allocation Method Was Reasonable and Supported by Substantial Evidence ..... 10

B. Commerce's Revenue Allocation Basis Was Not an Unreasoned Departure From Prior Practice ..... 15

C. Commerce Reasonably Relied Upon OCP Group's Revenue in Calculating the Revenue-Based Allocation Basis ..... 16

D. Commerce Reasonably Accounted for Revenues Attributable to OCP's Internally Consumed Rock ..... 17

II. Commerce's Calculation of the Profit Ratio for the Phosphate Rock Cost Buildup Is Reasonable, Supported by Substantial Evidence, and Otherwise in Accordance With Law ..... 20

III. Commerce's Methodology for Selecting a BPL Range for the Benchmark Comparison Is Reasonable, Supported by Substantial Evidence, and Otherwise in Accordance With Law ..... 26

IV. Commerce's Decision to Seek Information Regarding "Other Assistance" Is Lawful ..... 31

V. Commerce's Decision to Seek Information About Potential Subsidies Based on OCP's Response to the "Other Benefits" Question is Lawful ..... 38

CONCLUSION ..... 39

## TABLE OF AUTHORITIES

Page(s)

### STATUTES, RULES, AND REGULATIONS

19 U.S.C. § 1516a ........................................ 5

19 U.S.C. § 1671a ........................................ passim

19 U.S.C. § 1677 ........................................ 8, 21, 22, 28, 31

19 U.S.C. § 1677d ........................................ passim

1979 U.S.C.C.A.N. 381, 484 ........................................ 32

### CASES

*Acciai Speciali Terni, S.p.A. v. United States*, 217 F. Supp. 2d 1345 (CIT 2002) ........................................ 6

*Allegheny Ludlum Corp. v. United States*, 25 CIT 816 (2001) ........................................ 35, 36, 37, 39

*Apex Frozen Foods Priv. Ltd. v. United States*, 862 F.3d 1322 (Fed. Cir. 2017) ........................................ 9

*Brit. Steel PLC v. United States*, 127 F.3d 1471 (Fed. Cir. 1997) ........................................ 10

*Changzhou Trina Solar Energy Co., Ltd. v. United States*, 195 F. Supp. 3d 1334 (CIT 2016) ........................................ passim

*CS Wind Viet. Co. v. United States*, 832 F.3d 1367 (Fed. Cir. 2016) ........................................ 6

*DAK Ams. LLC v. United States*, 456 F. Supp. 3d 1340 (CIT 2020) ........................................ 6

*Fujitsu Gen. Ltd. v. United States*, 88 F.3d 1034 (Fed. Cir. 1996) ........................................ 9

*Guizhou Tyre Co., Ltd. v. United States*, 523 F. Supp. 3d 1312 (CIT 2021) ........................................ 33

*Inland Steel Bar Co. v. United States*, 155 F.3d 1370 (Fed. Cir. 1998) ........................................ 10

*JBF RAK LLC v. United States*, 790 F.3d 1358 (Fed. Cir. 2015) ........................................ 9

*Jiangsu Zhongji Lamination Materials Co. v. United States*, 405 F. Supp. 3d 1317 (CIT 2019) ........................................ 32, 37, 38

*KG Dongbu Steel Co., Ltd. v. United States*, 695 F. Supp. 3d 1338 (CIT 2024) ........................................ 35

*Koyo Seiko Co. v. United States*, 36 F.3d 1565 (Fed. Cir. 1994) ........................................ 10

*Matsushita Elec. Indus. Co. v. United States*, 750 F.2d 927 (Fed. Cir. 1984) ........................................ 24

*Mitsubishi Materials Corp. v. United States*, 820 F. Supp. 608 (CIT 1993) ....................................6

*Mosaic Co. v. United States*, 659 F. Supp. 3d 1285 (CIT 2023) ......................................... passim

*Mosaic Co. v. United States*, 774 F. Supp. 3d 1362 (CIT 2025) ......................................... passim

*Motor Vehicle Mfrs. Ass'n. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983) .......................6

*Nippon Steel Corp. v. United States*, 337 F.3d 1373 (Fed. Cir. 2003)...........................................6

*Nippon Steel Corp. v. United States*, 458 F.3d 1345 (Fed. Cir. 2006)...................................10, 24

*Nucor Corp. v. United States*, 633 F. Supp. 3d 1302 (CIT 2023)..................................................9

*Nucor Corp. v. United States*, 927 F.3d 1243 (Fed. Cir. 2019) ......................................................9

*PPG Indus., Inc. v. United States*, 746 F. Supp. 119 (CIT 1990) .................................................35

*PPG Indus., Inc. v. United States*, 978 F.2d 1232 (Fed. Cir. 1992)..............................................35

*Saarstahl AG v. United States*, 78 F.3d 1539 (Fed. Cir. 1996) ....................................................10

*Shandong Rongxin Imp. & Exp. Co. v. United States*, 163 F. Supp. 3d 1249 (CIT 2016) ....................................................................................................6

*Shandong Rongxin Imp. & Exp. Co. v. United States*, 203 F. Supp. 3d 1327 (CIT 2017) ..................................................................................................10

*SolarWorld Ams., Inc. v. United States*, 910 F.3d 1216 (Fed. Cir. 2018) .....................................9

*Thai Plastic Bags Indus. Co. v. United States*, 746 F.3d 1358 (Fed. Cir. 2014) ............................9

*U.S. Steel Grp. v. United States*, 225 F.3d 1284 (Fed. Cir. 2000) ................................................10

*Universal Camera Corp. v. NLRB*, 340 U.S. 474 (1951) ..............................................................6

*Usinor v. United States*, 342 F. Supp. 2d 1267 (CIT 2004)..........................................................24

**ADMINISTRATIVE DETERMINATIONS**

*Certain Uncoated Paper from Indonesia: Final Results of CVD Administrative Review; 2015-2016*, 83 Fed. Reg. 52,383 (Int'l Trade Admin. Oct. 17, 2018) and accompanying Issues and Decision Memorandum....................................22, 23

*Countervailing Duty Investigation of Certain Cold-Rolled Steel Flat Products From the Russian Federation: Final Affirmative Countervailing Duty Determination and Final Negative Critical Circumstances Determination*, 81 Fed. Reg. 49,935 (Int'l Trade Admin. July 29, 2016) and accompanying Issues and Decision Memorandum ....................................................22, 23

*Notice of Final Results of Countervailing Duty Administrative Review: Certain Softwood Lumber Products*, 70 Fed. Reg. 73,448 (Int'l Trade Admin. Dec. 12, 2005), and accompanying Issues and Decision Memorandum ..................................29

*Phosphate Fertilizers from the Kingdom of Morocco: Final Affirmative Countervailing Duty Determination*, 86 Fed. Reg. 9,842 (Int'l Trade Admin. Feb. 16, 2021), and accompanying Issues and Decision Memorandum .................................................................................................36

*Phosphate Fertilizers From the Kingdom of Morocco: Final Results of Countervailing Duty Administrative Review; 2020-2021*, 88 Fed. Reg. 76,726 (Int'l Trade Admin. Nov. 7, 2023), and accompanying Issues and Decision Memorandum .....................................................................................27

*Phosphate Fertilizers From the Kingdom of Morocco: Final Results of Countervailing Duty Administrative Review; 2022*, 89 Fed. Reg. 88,952 (Int'l Trade Admin. Nov. 12, 2024), and accompanying Issues and Decision Memorandum ................................................................................ passim

*Phosphate Fertilizers From the Kingdom of Morocco: Notice of Amended Final Results of Countervailing Duty Administrative Review; 2022*, 89 Fed. Reg. 104,979 (Int'l Trade Admin. Dec. 26, 2024) ........................................................ passim

*Silicon Metal from Norway: Affirmative Final Determination of Sales at Less Than Fair Value, Final Determination of No Sales, and Final Negative Determination of Critical Circumstances*, 83 Fed. Reg. 9,829 (Int'l Trade Admin. Mar. 8, 2018), and accompanying Issues and Decision Memorandum ...........................................................................................15, 16

*Stainless Steel Sheet and Strip in Coils From France: Final Results of Countervailing Duty Administrative Review*, 67 Fed. Reg. 62,098 (Int'l Trade Admin. Oct. 3, 2002), and accompanying Issues and Decision Memorandum .................................................................................................35

**INTRODUCTION**

On behalf of Plaintiff and Consolidated Defendant-Intervenor The Mosaic Company ("Mosaic"), we submit this brief in opposition to the Rule 56.2 motion for judgment upon the agency record filed on September 30, 2025, by Consolidated Plaintiff OCP, S.A. ("OCP"). *See* OCP's Rule 56.2 Mot. for J. Upon the Agency R. (Sept. 30, 2025), ECF No. 38 ("OCP Br."). OCP challenges five aspects of the final results of the U.S. Department of Commerce's ("Commerce") second administrative review of the countervailing duty ("CVD") order on phosphate fertilizers from Morocco. *Phosphate Fertilizers From the Kingdom of Morocco: Final Results of Countervailing Duty Administrative Review; 2022*, 89 Fed. Reg. 88,952 (Int'l Trade Admin. Nov. 12, 2024) ("*Final Results*"), P.R. 457, and accompanying Issues and Decision Memorandum ("IDM"), P.R. 451, amended by *Phosphate Fertilizers From the Kingdom of Morocco: Notice of Amended Final Results of Countervailing Duty Administrative Review; 2022*, 89 Fed. Reg. 104,979 (Int'l Trade Admin. Dec. 26, 2024) ("*Amended Final Results*"), P.R. 466. Specifically, OCP challenges: (1) Commerce's methodology for allocating headquarters ("HQ")/Support costs; (2) Commerce's calculation of the profit rate; (3) Commerce's selection of a bone phosphate lime ("BPL") range for the phosphate rock benchmark; (4) Commerce's investigation of five "other assistance" programs; and (5) Commerce's investigation of potential subsidies based on OCP's response to the "other benefits" question.

As demonstrated below, Commerce's determinations with respect to these five issues are reasonable, supported by substantial evidence, and otherwise in accordance with law. Accordingly, Mosaic respectfully requests that the Court deny OCP's motion in its entirety.

## RULE 56.2 STATEMENT

### I. Administrative Decision Under Review

The administrative determination under review is the final results of the second administrative review of the CVD order on phosphate fertilizers from Morocco, covering the period January 1, 2022 to December 31, 2022. The final results were published in the Federal Register on November 12, 2024. *See Final Results* and IDM. Commerce amended the Final Results to correct a ministerial error on December 26, 2024. *See Amended Final Results*.

### II. Issues Presented and Summary of Arguments

#### A. Whether Commerce's methodology for allocating HQ/Support costs is reasonable, supported by substantial evidence, and otherwise in accordance with law.

Yes. Commerce's adoption of a revenue-based methodology for allocating OCP's HQ/Support costs is a methodological choice within Commerce's discretion, to which this Court owes substantial deference. Commerce reasonably rejected OCP's proposed "total site cost"-based allocation, which arbitrarily excluded major cost centers and biased the allocation toward OCP's mining operations, and instead adopted a revenue-based allocation that accounts for all of OCP's business segments. Commerce's determination is reasonable, supported by substantial evidence, and otherwise in accordance with law.

#### B. Whether Commerce's calculation of the profit ratio is reasonable, supported by substantial evidence, and otherwise in accordance with law.

Yes. Commerce reasonably continued to rely on OCP's entity-wide profit rate, derived from OCP's own financial statements, in the phosphate rock cost buildup. Commerce has twice rejected—both in the investigation and the first administrative review—OCP's argument that it should instead derive a surrogate or rock-specific profit rate, and it reasonably found no compelling reason or new evidence warranting a departure from that approach. OCP's own

financial information remains the most suitable basis for calculating the profit rate. Accordingly, Commerce's calculation of the profit ratio is reasonable, supported by substantial evidence, and otherwise in accordance with law.

**C. Whether Commerce's selection of a BPL range for the phosphate rock benchmark calculation is reasonable, supported by substantial evidence, and otherwise in accordance with law.**

Yes. Commerce's selection of a BPL range for the phosphate rock benchmark reasonably reflects the range of BPL content in the rock OCP produced during the period of review, including both its locally consumed and exported rock. Accordingly, the benchmarks represent world market prices for phosphate rock that are comparable to OCP's rock in terms of BPL content. OCP fails to identify any errors in Commerce's approach, and this Court should affirm Commerce's lawful and accurate methodology.

**D. Whether Commerce's decision to seek information regarding five "other assistance" programs is reasonable, supported by substantial evidence, and otherwise in accordance with law.**

Yes. Commerce's decision to seek information regarding the five "other assistance" programs was a lawful exercise of its broad discretion to determine what information is relevant to its subsidy determination and to request that information from respondents. Nothing in the statute or Commerce's regulations barred Commerce from gathering this information, and OCP identifies no authority requiring Commerce to make a threshold countervailability finding before requesting it.

**E. Whether Commerce's decision to seek information about potential subsidies based on OCP's response to the "other benefits" questions is reasonable, supported by substantial evidence, and otherwise in accordance with law.**

Yes. Commerce's decision to seek information about potential subsidies based on OCP's response to the "other benefits" question was a lawful exercise of Commerce's investigatory authority. Commerce reasonably sought the information necessary to conduct a complete and

accurate review, and OCP's contrary reading would improperly constrain Commerce's ability to identify and investigate potential countervailable subsidies.

## STATEMENT OF FACTS

Consistent with Rule 81(k) of the Rules of this Court, the facts in this section are limited to those necessary to correct inaccuracies and omissions in OCP's brief. Other facts relevant to specific issues are discussed below in the context of each argument.

In the *Final Results*, Commerce accepted Mosaic's proposal to adopt a revenue-based allocation to determine OCP's HQ/Support costs. *See* IDM at 25-27. Commerce found that OCP "supports other business activities, including the activities of its subsidiaries, within its corporate management beyond the mining and chemical production sites identified, and on which OCP based its allocation." *Id.* at 25. Commerce also found that "as shown in its financial statements, OCP has other revenue generating business segments that are not included in OCP's cost-based allocation, with nine percent of its revenue generated from 'other products' that are not phosphate rock, phosphoric acid, or fertilizers." *Id.* In light of these findings, Commerce determined that "it is unreasonable to assume that {OCP's} other business segments do not also incur overhead from HQ/Support costs, and OCP's cost-based allocation only includes the phosphate rock and fertilizer sites." *Id.* Commerce also stated that it "agree{s} with Mosaic that OCP's allocation . . . does not provide a{} reasonable reflection of OCP's allocated costs" because OCP's methodology would exclude certain expenses that are largely incurred on its chemical production sites. *Id.*

With respect to the profit rate, Commerce continued to find that OCP's entity-wide profit rate is the most appropriate rate for use in determining the value of OCP's phosphate rock mining. *See id.* at 28. Commerce noted that it had twice rejected OCP's argument that it should derive OCP's profit rate from a surrogate company, first in the investigation, and again in the

first administrative review, and that the proceedings OCP cited in support of its contrary position were distinguishable. *Id*. at 28-29. Commerce also found that there was "no compelling reason or new evidence" that would lead it to alter its determination in this review, and that "OCP's financial information, from which Commerce has the ability to calculate a profit rate, is the most suitable information to use for the calculation." *Id.* at 29. Commerce also rejected OCP's argument that it should use a "calculated phosphate rock-specific profit rate from its financial data" because it found that OCP's calculated rate "does not accurately reflect OCP's rock-specific profit rate, and accordingly we do not consider it a reasonable value to use in lieu of OCP's consolidated profit rate used in the *Preliminary Results*." *Id.*

Concurrently with the *Final Results*, Commerce issued a supplemental memorandum discussing certain business proprietary information related to its findings on, among other things, its HQ/Support allocation methodology and its treatment of OCP's internally transferred phosphate rock. *See Final Results of the 2022 Countervailing Duty Administrative Review of Phosphate Fertilizers from the Kingdom of Morocco*: Business Proprietary Information Accompanying the IDM for the Final Results (Nov. 5, 2024) ("BPI IDM"), P.R. 452, C.R. 397; IDM at 1 n.3.

## STANDARD OF REVIEW

In reviewing Commerce's determinations, the Court must hold unlawful any determination found "to be unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i). Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," *Acciai Speciali Terni, S.p.A. v. United States*, 217 F. Supp. 2d 1345, 1346-47 (CIT 2002) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477 (1951)), taking into account "whatever in the record fairly detracts" from the weight of supportive evidence. *CS Wind Viet. Co. v. United*

*States*, 832 F.3d 1367, 1373 (Fed. Cir. 2016) (citation omitted). The agency must "examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Motor Vehicle Mfrs. Ass'n, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (citation omitted).

In examining the record, Commerce cannot rely on "isolated tidbits of data which suggest a result contrary to the clear weight of the evidence," *Shandong Rongxin Imp. & Exp. Co. v. United States*, 163 F. Supp. 3d 1249, 1252 (CIT 2016) (citation omitted), nor can it look only at evidence that supports its conclusion. *DAK Ams. LLC v. United States*, 456 F. Supp. 3d 1340, 1352 (CIT 2020) ("The record as a whole must be examined, including evidence that 'fairly detracts from the substantiality of the evidence.'" (quoting *Nippon Steel Corp. v. United States*, 337 F.3d 1373, 1379 (Fed. Cir. 2003))). Commerce "cannot simply ignore significant contradictory evidence and assert that, nevertheless, its determination was supported by substantial evidence." *Mitsubishi Materials Corp. v. United States*, 820 F. Supp. 608, 624 (CIT 1993).

## ARGUMENT

### I. Commerce's Decision to Use a Revenue-Based Allocation for HQ/Support Costs is Reasonable, Supported by Substantial Evidence, and in Accordance With Law

Mosaic agrees with the Defendant that Commerce's reliance on a revenue-based methodology for allocating HQ/Support costs is supported by substantial evidence and in accordance with law, and hereby incorporates those arguments by reference. Def.'s Resp. to Rule 56.2 Mot. for J. Upon the Agency R. (May 27, 2026), ECF No. 55 ("Def. Br.") at 20-31.

In its *Final Results*, Commerce chose to allocate HQ/Support costs on the basis of revenue, as Mosaic proposed, rather than according to OCP's proposed "total site cost"-based methodology. This decision is a methodological choice within Commerce's discretion under the

countervailing duty statute—a choice to which this Court owes substantial deference. Before explaining why Commerce's decision was reasonable, supported by substantial evidence, and in accordance with law, it is helpful to describe what Commerce did and the standard against which that decision must be reviewed.

In the *Final Results*, Commerce stated that it would undertake a "tier-three benefit calculation . . . based on a comparison of a per-unit cost build-up based on OCP's actual cost of mining beneficiated phosphate rock against a world market average benchmark price of phosphate rock." IDM at 20-21. Commerce explained that, "consistent with Commerce practice, when calculating OCP's cost of mining phosphate rock, {it} take{s} into consideration the production costs associated with producing and pricing the phosphate rock, inclusive of direct, indirect and overhead costs, as appropriate." *Id.* at 21. OCP reported those production costs in two categories: the direct and indirect costs associated with its mining cost centers, and an additional category of "HQ/Support and Debt" costs, which OCP characterized as indirect costs that it accounts for at the corporate/headquarters accounting level. *Id.*

OCP reported a total of **[ ]** in HQ/Support costs for the POR. *See* BPI IDM at 4; OCP IQR at 75, P.R. 59, C.R. 44; OCP IQR at MIN-12(b), P.R. 74, C.R. 80. These costs refer to a broad set of "corporate-level, indirect expenses" that include **[**

**]**. BPI IDM at 4 (citing OCP IQR at 82-84, P.R. 59, C.R. 44, Exhibits MIN-14, MIN-15, MIN-16, and MIN-26, P.R. 74-76, C.R. 80-81, 90). Commerce concluded that it is "appropriate to include a portion of OCP's overhead, including HQ/Support,

in the cost of mining phosphate rock," and to "take an allocated proportion of the HQ/Support costs and apply it to the calculated cost build-up of OCP's mining costs." IDM at 24.[1]

Commerce evaluated the two allocation methodologies that the parties proposed: OCP's proposed "total site cost"-based allocation and Mosaic's proposed revenue-based allocation. Relying on "the information in OCP's consolidated financial statements," Commerce selected Mosaic's revenue-based approach, explaining that "revenue is a more reasonable allocation basis than cost when expenses cannot be traced to a specific product line, and {Commerce is} able to account for all of OCP's identified business segments within the allocation." *Id.* at 25-26.

Commerce's selection of an allocation methodology is precisely the kind of methodological choice to which this Court owes substantial deference. The countervailing duty statute directs Commerce to measure the adequacy of remuneration for government-provided goods or services "in relation to prevailing market conditions," 19 U.S.C. § 1677(5)(E)(iv). However, it does not prescribe any particular methodology for constructing a cost buildup or allocating indirect corporate expenses. Nor do Commerce's regulations. Commerce accordingly has discretion to develop a suitable methodology for carrying out its tier-three analysis, and the Court's role is to determine whether Commerce's chosen methodology is reasonable—not whether the Court, or an interested party, would have selected a different one. *See Nucor Corp.*

[1] Commerce declined Mosaic's request to require OCP "to substantiate the relation of every item in its HQ/support costs to phosphate rock mining," IDM at 21, explaining that "the record contains evidence that OCP's HQ/Support costs are relevant to OCP's production and pricing of phosphate rock." *Id.* at 23. Mosaic argued in its opening brief, and continues to assert, that Commerce should *not* uncritically accept all of OCP's alleged HQ/Support and Debt costs, and instead should require OCP to justify the inclusion of each line item and exclude those that are clearly unrelated to phosphate mining or beneficiation. Mosaic's Rule 56.2 Mot. for J. Upon the Agency R. (Sept. 30, 2025), ECF No. 40 ("Mosaic Br.") at 11-19. For example, one line item that is clearly *unrelated* to phosphate mining or beneficiation is **[** **]**. Clearly, costs associated with **[** **]** bear no relation to phosphate mining or beneficiation. The same is true for the **[** **]** of the HQ/Support costs that are attributable solely to **[** **]**. OCP IQR, Exhibit MIN-18, P.R. 76, C.R. 81. OCP provided zero documentation explaining how any portion of this line item relates to the production and pricing of phosphate rock.

*v. United States*, 927 F.3d 1243, 1254-55 (Fed. Cir. 2019) (explaining that the "statutory standard of adequate remuneration . . . leaves a large range of potential implementation choices," and that "Commerce has considerable prima facie leeway to make a reasonable choice within the permissible range, and properly justify its choice, based on the language and policies of the countervailing-duty statute as well as practicality and other relevant considerations"); *Nucor Corp. v. United States*, 633 F. Supp. 3d 1302, 1309 (CIT 2023) ("Nucor does not dispute Commerce's discretion to develop a suitable methodology for carrying out a Tier 3 analysis."); *SolarWorld Ams., Inc. v. United States*, 910 F.3d 1216, 1226 (Fed. Cir. 2018) ("{T}he decision to select a particular methodology rests solely within Commerce's sound discretion." (citation omitted)); *Apex Frozen Foods Priv. Ltd. v. United States*, 862 F.3d 1322, 1331 (Fed. Cir. 2017) ("{W}hen a statute fails to make clear 'any Congressionally mandated procedure or methodology for assessment of the statutory tests,' Commerce 'may per-form its duties in the way it believes most suitable.'" (quoting *JBF RAK LLC v. United States*, 790 F.3d 1358, 1363 (Fed. Cir. 2015))).

The Federal Circuit has repeatedly explained that Commerce's methodological choices are entitled to a "great degree of deference" precisely because "{a}ntidumping and countervailing duty determinations involve complex economic and accounting decisions of a technical nature, for which agencies possess far greater expertise than courts." *Fujitsu Gen. Ltd. v. United States*, 88 F.3d 1034, 1039 (Fed. Cir. 1996); *see also id.* at 1044 ("The methodologies relied on by Commerce in making its determinations are presumptively correct."); *Thai Plastic Bags Indus. Co. v. United States*, 746 F.3d 1358, 1368 (Fed. Cir. 2014). Under that standard, the Court "must uphold" Commerce's chosen methodology "as long as {it is} not arbitrary or illogical," even "if the approach supported by the Court of International Trade is even more fair

or logical." *Koyo Seiko Co. v. United States*, 36 F.3d 1565, 1573 (Fed. Cir. 1994); *see also U.S. Steel Grp. v. United States*, 225 F.3d 1284, 1290 (Fed. Cir. 2000). Indeed, the Federal Circuit has reversed decisions of this Court where it has substituted a judicially-preferred methodology for Commerce's. *See, e.g.*, *Brit. Steel PLC v. United States*, 127 F.3d 1471, 1475 (Fed. Cir. 1997); *Inland Steel Bar Co. v. United States*, 155 F.3d 1370, 1375 (Fed. Cir. 1998); *Saarstahl AG v. United States*, 78 F.3d 1539, 1544 (Fed. Cir. 1996) ("In the absence of explicit mandates, however, Commerce's approach must be accorded deference.").

OCP's challenge to Commerce's revenue-based allocation methodology must therefore clear a high bar. It is not enough for OCP to argue that a different methodology would have been preferable. OCP must instead demonstrate that Commerce's selected methodology is *unreasonable*—i.e., that "no reasonable factfinder could reach" the determination Commerce reached. *Shandong Rongxin Imp. & Exp. Co. v. United States*, 203 F. Supp. 3d 1327, 1340 (CIT 2017); *see also Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1352 (Fed. Cir. 2006) (explaining that substantial evidence presents a "high barrier to reversal" (citation omitted)). As demonstrated below, OCP's challenge falls well short of this standard.

### A. Commerce's Adoption of a Revenue-Based Allocation Method Was Reasonable and Supported by Substantial Evidence

OCP argues that Commerce did not explain why its revenue-based allocation was "more appropriate" than OCP's edited calculation of total site cost. OCP Br. at 10. To the contrary, Commerce explained why the revenue-based allocation is more reasonable. As explained below, Commerce's conclusion is reasonable, supported by substantial evidence, and otherwise in accordance with law.

In the *Final Results*, Commerce reasonably rejected OCP's proposed "total site cost"-based methodology—which allocates all HQ/Support costs to the two mining sites and two

fertilizer and chemical production sites based on certain site-specific costs. Commerce concluded that OCP's proposed methodology unreasonably excludes "certain expenses that are largely incurred on {OCP's} chemical production sites." IDM at 25. It explained further that "revenue is a more reasonable allocation basis than cost when expenses cannot be traced to a specific product line, and {Commerce is} able to account for all of OCP's identified business segments within the allocation." *Id.* at 25-26. Commerce's discussion in the IDM, as well as in the proprietary supplement accompanying the *Final Results*, demonstrates that its analysis was thorough, and that its conclusion was reasonable, supported by substantial record evidence, and otherwise in accordance with law. *See* BPI IDM.

Specifically, Commerce found that the vast majority of the [ ] OCP excluded from its allocation base were [ ]. *Id.* at 4 (citing OCP IQR, Exhibit GEN-9(j), Note 4.2, P.R. 65, C.R. 52). OCP identified these [ ] in its own production process chart as [ ]. BPI IDM at 4-5 (citing OCP IQR, Exhibit GEN-4, P.R. 60, C.R. 47). Commerce concluded that, because [ ] are concentrated at OCP's chemical sites, excluding them from the allocation base "predominantly lowers the costs attributed to [ ] but has relatively little effect on [ ]." *Id.* at 5. As Commerce explained, OCP's approach biased the cost allocation because it unreasonably [ ]. *Id.*

The magnitude of the costs that OCP excluded further confirms the reasonableness of Commerce's conclusion. As Commerce explained, the total value of the [ ] that OCP excluded accounted for [

]. *Id.* Yet OCP's proposed "total site costs" base (i.e., the denominator OCP asked Commerce to use to allocate HQ/Support costs, *see* OCP IQR, Exhibit MIN-12(a), P.R. 74, C.R. 80) totaled just [ ] after OCP's exclusions. BPI IDM at 5. In other words, the [ ] costs that OCP excluded were more than two and a half times the size of its entire proposed allocation base. Commerce reasonably concluded that "{r}egardless of any volatility in costs, the exclusion of [ ] represents a significant omission in the allocation between OCP's mining and chemical sites." *Id.* OCP offers no response that would undermine Commerce's conclusion.

Commerce also correctly identified other faults in OCP's proposed cost-based allocation, which OCP limited to the mining and fertilizer and chemical production sites. As Commerce noted, "OCP has other revenue generating business segments that are not included in OCP's cost-based allocation, with nine percent of its revenue generated from 'other products' that are not phosphate rock, phosphoric acid, or fertilizers." IDM at 25 (citing OCP IQR, Exhibit GEN-9(j), P.R. 65, C.R. 52). As Commerce concluded, "it is unreasonable to assume that these other business segments do not also incur overhead from HQ/Support costs." *Id.*

With this evidence in mind, Commerce correctly determined that "revenue is a more reasonable allocation basis than cost when expenses cannot be traced to a specific product line." *Id.* *See also* Mosaic Case Br. at 26-28, P.R. 433, C.R. 390 ("As a matter of accounting, costs should be allocated across cost objects using an allocation basis that reasonably and accurately approximates how the costs were incurred. … It is standard accounting procedure to allocate joint product costs on the basis of revenue."); Mosaic 2024/04/26 Benchmark Rebuttal Exhibit 5 at 646-647, P.R. 295, C.R. 287 ("Two approaches are used to allocate joint costs. Approach 1. Allocate joint costs using *market-based* data such as revenues."). Commerce explained that the

revenue-based allocation reasonably "reflect{s} the POR revenue generated for each of OCP's business segments (*i.e.*, phosphates, phosphoric acid, fertilizers, and 'other'), accounting for both identified external revenue and intercompany sales." IDM at 26. Commerce therefore properly found that the revenue-based allocation is a more reasonable methodology than OCP's biased site cost-based allocation, as it allows Commerce to "account for all of OCP's identified business segments within the allocation." *Id.* at 25.

Commerce also properly concluded that OCP's assertion "that incurring more site-specific costs would result in more HQ/Support costs" was not a reasonable presumption. *Id.* Although OCP disputes that its assertion is a mere presumption, its argument is not persuasive. OCP points to only **[ ]** and **[ ]** (which, in aggregate account for **[ ]** of OCP's total HQ/Support costs) as evidence that "OCP incurs HQ and support costs in support of its day-to-day operations." OCP Br. at 20-21; OCP IQR, Exhibits MIN-14, MIN-15, and MIN-16, P.R. 74-75, C.R. 80-81. However, even if OCP does incur these HQ/Support costs "in support of its day-to-day operations," OCP fails to demonstrate that an increase in site-specific costs would result in a corresponding increase in the kind of HQ/Support costs it identified. For example, one of the **[ ]** that OCP chose to submit as documentation for its HQ/Support costs was for costs associated with **[ ]**. OCP IQR, Exhibit MIN-16 at 99-104, P.R. 75, C.R. 81; *see also* Mosaic Case Br. at 17-18, P.R. 433, C.R. 390. This expense bears no obvious relationship to phosphate mining or beneficiation, and there is no record evidence demonstrating that this category of costs would increase in line with an increase in site-specific costs.

To the contrary, the record shows that the HQ/Support costs would *not* increase in this way, because OCP's HQ/Support costs are largely *unrelated* to its phosphate mining or fertilizer

and chemical production operations. For example, [ ] of OCP's HQ/Support costs are attributable to [ ], a category of costs that has no relationship to OCP's day-to-day production activities. OCP IQR, Exhibit MIN-12(a) and MIN-18 (recording [ ]), P.R. 74, 76, C.R. 81, 81. Contrary to OCP's contention, the record of this review shows that OCP's total site costs are [ ] with its HQ/Support costs. Between 2019 and 2022, OCP's [ ]. Mosaic 11/13/2023 Comments at 21, P.R. 174, C.R. 189. It would have been arbitrary and unreasonable for Commerce to use OCP's biased calculation of total site costs as the allocation basis when those costs bear no relation to the vast majority of the HQ/Support costs being allocated.

Moreover, OCP's claim that Commerce implicitly decided to use revenue as an allocation basis based on an unproven assumption that "{r}evenues . . . rise and fall in relation to the prices for the goods sold rather than the costs of doing business" mischaracterizes Commerce's decision. OCP Br. at 12. Commerce did not state (implicitly or otherwise) that revenue serves as a proxy for the movement of costs, and Commerce did not base its decision on an "unproven assumption" about revenues rising or falling. Rather, Commerce carefully analyzed OCP's proposed cost-based methodology and concluded that it was biased and inappropriate as an allocation methodology because it "does not provide a{} reasonable reflection of OCP's allocated costs" and arbitrarily excludes major cost centers. IDM at 25-26. Commerce reasonably relied on Mosaic's proposed revenue-based methodology—namely, the revenues generated by all of OCP's business segments, including "both export sales and local sales for all three of its major business segments" (*i.e.*, phosphate mining, phosphate fertilizer/chemicals, and

HQ/Support). *See id.* As noted above, the record shows that fully nine percent of OCP's revenue is generated from non-phosphate operations. *Id.* at 25 (citing OCP IQR, Exhibit GEN-9(j), P.R. 65, C.R. 52).

In sum, although OCP argues that Commerce's decision to use revenue as an allocation basis for OCP's HQ/Support costs was flawed, OCP Br. at 11, OCP fails to demonstrate that Commerce's decision was unreasonable, unsupported by substantial evidence, or otherwise not in accordance with law. Instead, OCP is asking this Court to reweigh the evidence and substitute its judgment for the agency's, which is not the role of a reviewing court. The Court should reject OCP's arguments and affirm Commerce's decision to use a revenue-based allocation methodology as reasonable, supported by substantial evidence, and in accordance with law.

### B. Commerce's Revenue Allocation Basis Was Not an Unreasoned Departure From Prior Practice

OCP argues that Commerce's "assumption" that OCP S.A. incurred headquarters costs on behalf of more than one member of the corporate group is contrary to Commerce's determination in *Silicon Metal from Norway*. OCP Br. at 19-20. That proceeding is inapposite, however, because in *Silicon Metal from Norway*, Commerce found that the respondent's assertion that its headquarters expenses supported all members of its corporate group was not supported by record evidence. *Silicon Metal from Norway: Affirmative Final Determination of Sales at Less Than Fair Value, Final Determination of No Sales, and Final Negative Determination of Critical Circumstances*, 83 Fed. Reg. 9,829 (Int'l Trade Admin. Mar. 8, 2018), and accompanying Issues and Decision Memorandum at 11. In this proceeding, by contrast, the record evidence—including **[ ]**—overwhelmingly demonstrates that OCP S.A. does record costs that it incurs on behalf of other OCP Group entities under OCP S.A.'s HQ/Support costs. The record also shows that OCP recorded **[**

**]**—or fully nine percent of total revenues—to the HQ/Support segment, indicating that OCP S.A. engages in extensive business activities unrelated to either its mining or chemical production sites. OCP IQR, Exhibit MIN-18, P.R. 76, C.R. 81; IDM at 25. Therefore, Commerce's conclusion that "the record demonstrates that OCP supports other business activities, including the activities of its subsidiaries, within its corporate management beyond the mining and chemical production sites identified" was reasonable. IDM at 25. OCP's argument to the contrary is without merit.

### C. Commerce Reasonably Relied Upon OCP Group's Revenue in Calculating the Revenue-Based Allocation Basis

OCP argues that because OCP S.A. is legally distinct from the OCP Group, Commerce's decision to use financials derived from OCP Group in calculating the revenue-based allocation basis created a "mismatch." OCP Br. at 11-12. This argument is baseless, because ample record evidence shows that OCP S.A.'s HQ/Support costs include costs that OCP S.A. incurred on behalf of subsidiaries of the OCP Group.

For example, Commerce correctly found that the record demonstrates that OCP S.A. "supports other business activities, including the activities of its subsidiaries, within its corporate management beyond the mining and chemical production sites . . . on which OCP based its allocation." IDM at 25 (citing OCP IQR, Exhibit GEN-9(j), P.R. 65, C.R. 52). More specifically, the record shows that, of the **[ ]** sample invoices that OCP submitted to support the **[ ]** that it claimed as alleged HQ/Support costs, **[ ]** include costs incurred by **[ ]**, a subsidiary of the OCP Group that is legally distinct from OCP S.A. *See* OCP IQR, Exhibit MIN-16 at 56, 68, P.R. 75, C.R. 81.

Similarly, OCP reported in its annual report that it pays the **[ ]** for the benefit of its subsidiaries **[**

]. *Id.*, Exhibit OA-17, P.R. 80, C.R. 107. OCP's annual reports also show that over **[ ]** subsidiaries are co-located at OCP S.A.'s headquarters at 2, rue Al Abtal, Hay Erraha, Casablanca Morocco. OCP 2023/07/21 Affiliation QR, Exhibit AFF-1, P.R. 28, C.R. 3.

In light of this record evidence, Commerce's determination that OCP S.A. incurred HQ/Support costs on behalf of subsidiaries of the OCP Group, and its decision to account for those costs in the allocation methodology, was reasonable. The Court should affirm Commerce's determination.

### D. Commerce Reasonably Accounted for Revenues Attributable to OCP's Internally Consumed Rock

OCP makes four arguments challenging Commerce's decision to value OCP's internally consumed phosphate rock at OCP's **[ ]** for purposes of the revenue-allocation denominator. OCP Br. at 15-17; *see also* BPI IDM at 5. None of these arguments has merit. To the contrary, Commerce's approach was reasonable and supported by substantial evidence.

First, OCP argues that Commerce's decision to value the internally consumed rock at a **[ ]** cost artificially depresses the revenue attributable to phosphate rock because it assumes that OCP incurred no HQ or Support costs in producing the rock. OCP Br. at 15. This is a mischaracterization of Commerce's approach. Commerce did not make any assumption about the HQ/Support costs attributable to OCP's **[ ]** rock. In actuality, Commerce affirmatively agreed with OCP—in response to the very concern OCP now raises—that "it is necessary to include revenue generated **[ ]**, because the **[ ]**." BPI IDM at 5. Commerce accordingly took "the **[ ]** of phosphate rock into account in the allocation by **[ ]** to OCP's

phosphate revenues." *Id.* Commerce concluded that this was a "reasonable basis for the value of **[ ]** phosphate rock because OCP reported that it generated **[ ]** on the rock production for **[ ]**." *Id.* In short, Commerce did not make any assumptions about the HQ/Support costs attributable to such **[ ]**, it simply determined the total amount of revenue attributable to such **[ ]** so that it could properly attribute a portion of OCP's overall HQ/Support costs to these transactions.

Further, once the **[ ]** rock is properly accounted for, the HQ/Support costs attributable to those **[ ]** are captured automatically through the phosphates segment's share of the revenue-based allocation. Thus, Commerce did not assume that OCP incurred no HQ/Support costs in producing its internally consumed rock. Rather, it made a reasoned, evidence-based decision on how to value that rock for purposes of properly allocating HQ/Support costs, as OCP had urged it to do.

Second, OCP contends that Commerce's approach reflects a "logical fallacy" because it involves the substitution of revenue "with OCP's cost of production for rock." OCP Br. at 16 (emphasis omitted). This argument is baseless. As discussed above, Commerce found that "the **[ ]** {is} a reasonable basis for the value of **[ ]** phosphate rock because OCP reported that it generated **[ ]** on the rock production for **[ ]**." BPI IDM at 5. Where OCP itself does not **[ ]**, production cost necessarily *is* the transfer value—and therefore an appropriate revenue proxy.

Third, OCP argues that Commerce's methodology fails to account for any profit on the internally consumed rock, which "still generates profits for OCP because this rock is incorporated into fertilizers and phosphoric acid that OCP sells on the market for a profit." OCP

Br. at 16. This argument also fails, and not just because it contradicts what OCP itself admits is an accurate reflection of its own accounting. BPI IDM at 5 ("OCP reported that it generated **[ ]** on the rock production for **[ ]**."). More importantly, Commerce expressly addressed where OCP realizes profits on **[ ]** rock: because OCP's fertilizer operations "**[ ]**," any **[ ]** OCP could have **[ ]** is "passed to its production and sale of fertilizer," which **[ ]**. *Id.* at 7.

In other words, Commerce's revenue-based allocation already captures those downstream profits through OCP's fertilizer and phosphoric acid revenue. Adding a separate **[ ]** of rock would therefore count the same profit twice—a distortion Commerce reasonably declined to introduce into its calculations. Moreover, it was reasonable for Commerce to base its decision on OCP's own accounting practices. OCP's argument that Commerce's revenue-based methodology is distortive thus fails for two reasons. It is inconsistent with OCP's own accounting and pricing strategies, and it would have required Commerce to assign an artificial profit amount that is already accounted for elsewhere—an arbitrary and distortive result.

Fourth and finally, OCP claims that Commerce double-counted revenues by adding "estimated **[ ]** revenue for internally consumed rock, not only to the phosphate revenue to derive a total amount of revenue for phosphate rock (i.e., the numerator), but also to the OCP Group's total reported revenue (i.e., the denominator)." OCP Br. at 17; *see also* Final Calc. Memo at 3, P.R. 453, C.R. 398. However, OCP reported that it **[ ]**. OCP Rebuttal Br. at 25-26 (emphasis in original), P.R. 435, C.R. 392; *see*

*also* BPI IDM at 5. Because OCP did not **[**

**]**, that revenue was absent from both the numerator (OCP's phosphate revenue) and the denominator (the OCP Group's total revenue) of Commerce's allocation ratio. Commerce corrected this omission by adding the value of the **[** **]** phosphate rock to both figures—precisely as OCP's own concern about **[** **]** revenue required. *See* BPI IDM at 5; *see also* OCP Rebuttal Br. at 25-26, P.R. 435, C.R. 392. Adding the same amount to each side of the ratio does not "double-count" anything. By OCP's own admission, the OCP Group's **[** **]** revenues did not reflect revenue **[** **]**, so accounting for it once in the numerator and once in the denominator merely captures revenue that OCP's accounting had **[** **]**; it does not count the same revenue twice. OCP Rebuttal Br. at 25-26, P.R. 435, C.R. 392.

In sum, OCP fails to demonstrate that Commerce's decision to allocate OCP's HQ/Support costs based on revenues is contrary to law or unsupported by substantial evidence. The Court should reject OCP's arguments and affirm Commerce's use of a revenue-based allocation methodology as reasonable, supported by substantial evidence, and otherwise in accordance with law.

## II. Commerce's Calculation of the Profit Ratio for the Phosphate Rock Cost Buildup Is Reasonable, Supported by Substantial Evidence, and Otherwise in Accordance With Law

In the *Final Results*, Commerce used OCP's entity-wide profit rate of 24.44% to add an amount for profit to the phosphate rock cost buildup, following the same approach as in the Investigation and First Administrative Review. IDM at 28. OCP argues that Commerce's use of OCP's entity-wide profit rate was unlawful because it is not "specific to the production of phosphate rock" and therefore does not reflect "prevailing market conditions for phosphate rock in Morocco." OCP Br. at 23. OCP argues that Commerce should instead have used a surrogate

profit ratio from a Jordanian mining company, Jordan Phosphate Mines Company ("JPMC"), or a profit ratio for its own phosphate mining operations that OCP calculated for purposes of this proceeding. *Id.*

In *Mosaic Co. v. United States*, this Court rejected OCP's argument that the statute requires Commerce to resort to a surrogate profit ratio that is specific to phosphate rock production in order to reflect "prevailing market conditions." 659 F. Supp. 3d 1285, 1302 (CIT 2023) ("*Mosaic I*") (quoting 19 U.S.C. § 1677(5)(E)). The statute directs Commerce to measure the adequacy of remuneration for a good or service "in relation to prevailing market conditions for the good or service being provided . . . in the country which is subject to . . . review." 19 U.S.C. § 1677(5)(E)(iv). As the Court previously held, "the statute {does} not require Commerce to use a surrogate profit rate from a company not operating in Morocco." *Mosaic I*, 659 F. Supp. 3d at 1302. OCP cites no contrary legal authority. While OCP argues that Commerce "is not free to disregard prevailing market conditions for phosphate rock," OCP Br. at 25-26, OCP ignores that a profit ratio for a Jordanian mining company does not reflect "prevailing market conditions" of phosphate rock production *in Morocco*.

Further, as OCP concedes, this Court held in *Mosaic I* that OCP provided "no statute, regulation, or binding precedent in support" of its contention that Commerce is obligated to select a profit rate that is specific to the production of the good that is the subject of a cost buildup. 659 F. Supp. 3d at 1302. OCP claims that it explained in detail why Commerce's profit rate selection is contrary to 19 U.S.C. § 1677(5)(E). OCP Br. at 34. But OCP's argument is premised entirely on the "prevailing market conditions" language that the Court addressed in *Mosaic I*. *See* OCP Br. at 23-26. OCP points to no other language in the statute, regulation, or other binding precedent to support its argument. The Court should therefore reach the same

conclusion as in *Mosaic I* and reject OCP's claim that Commerce's selection of a profit ratio was inconsistent with the statute.

OCP also argues that Commerce's selection of a profit rate was contrary to its prior practice of using surrogate profit rates. *See* OCP Br. at 31-33. Commerce explained in the Final Results that its practice of resorting to surrogate financial information is limited to cases where such information was the only usable profit rate on the record. IDM at 29. OCP claims that Commerce "mischaracterizes its past practice," because in the two cases cited, *CVD Investigation of Certain Cold-Rolled Steel Flat Products from the Russian Federation: Final Affirmative CVD Determination and Final Negative Critical Circumstances Determination*, 81 Fed. Reg. 49,935 (Int'l Trade Admin. July 29, 2016) and accompanying Issues and Decision Memorandum ("*Cold-Rolled Steel from Russia* IDM") and *Certain Uncoated Paper from Indonesia: Final Results of CVD Administrative Review; 2015-2016*, 83 Fed. Reg. 52,383 (Int'l Trade Admin. Oct. 17, 2018) and accompanying Issues and Decision Memorandum ("*Uncoated Paper From Indonesia* IDM"), Commerce did not "articulat{e} a practice of only using surrogate profit rates where such rates are the only 'reliable' ones on the record." OCP Br. at 33. To the contrary, in *Cold-Rolled Steel from Russia*, Commerce expressly declined to rely on the financial statements of a subsidiary of the mandatory respondent Severstal, explaining that it "would not be appropriate to {} rely on an alternative, unverified data source of the Severstal Companies' choosing after the companies had failed to provide the requested information during the questionnaire and answer process of the investigation." *Cold-Rolled Steel from Russia* IDM at 103. Commerce thus made clear that its decision was based on the "reliability" of the potential sources of profit information. Similarly, in *Uncoated Paper from Indonesia*, Commerce stated that it selected a study of Indonesian timber and harvesting costs and profit

because the study provided the "only reliable and documented information" on the record. *Certain Uncoated Paper From Indonesia* IDM at 23. Thus, contrary to OCP's arguments, Commerce accurately characterized the prior cases where it has resorted to surrogate financial information. Commerce's decision not to do so here is thus consistent with—not an unreasoned departure from—its prior practice.

Finally, OCP argues that Commerce's selection of a profit amount is unsupported by substantial evidence and contrary to the statutory requirement to calculate subsidy rates as accurately as possible because OCP's entity-wide profit rate of 24.44% "bears no reasonable relationship to actual phosphate rock profits during the POR" and, according to OCP, "the profit rate for phosphate rock in 2022 was much higher." OCP Br. at 26. The two points of comparison OCP proffers are JPMC's rock-specific profit ratio of 207% and its own purportedly rock-specific profit ratio that it derived for purposes of this proceeding, **[ ]**. *Id.* at 27. Contrary to OCP's arguments, this evidence does not fairly detract from the reasonableness of Commerce's conclusions.

While OCP points to JPMC's rock-specific profit rate of 207% and company-wide profit rate of 117% from its phosphate mining and fertilizer operations in Jordan,[2] the record also contains the financial statements of another phosphate producer in Finland, Yara, whose rock-specific profit rate was only 24%. *See* Mosaic Rebuttal Br. at 22 n.82, P.R. 434, C.R. 391 (citing Mosaic 2024/2/16 Benchmark Submission, Exhibit 34, P.R. 221, C.R. 213). This evidence corroborates Commerce's calculated profit ratio for OCP in 2022 of 24.44% as a reasonable profit amount to be added to OCP's phosphate rock cost buildup. The mere fact that one Jordanian producer had a higher rock-specific profit rate does not preclude Commerce's

[2] OCP calculated these figures using the methodology Commerce used to calculate OCP's company-wide profit rate. *See* OCP Br. at 27, nn. 6 & 7.

conclusion from being supported by substantial evidence.[3] *Matsushita Elec. Indus. Co. v. United States*, 750 F.2d 927, 933 (Fed. Cir. 1984) ("the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." (citation omitted)). Rather, "when adequate evidence exists on both sides of an issue, assigning evidentiary weight falls exclusively within the authority of {the agency}," *Nippon Steel*, 458 F.3d at 1358, and the court "may not reweigh the evidence or substitute its own judgment for that of the agency." *Usinor v. United States*, 342 F. Supp. 2d 1267, 1272 (CIT 2004).

Further, OCP fails to acknowledge the significant limitations in the data underpinning its calculations of its own purported rock-specific profit rate. As Mosaic explained in its rebuttal brief, OCP had to construct a rock-specific profit rate because, "{w}ith respect to the rock volume OCP consumed internally, **[**

**]**." Mosaic Rebuttal Br. at 21, P.R. 434, C.R. 391 (citing OCP 2/16/24 Benchmark and NFI Submission at 4, P.R. 215, C.R. 201). OCP proposed to estimate a profit amount for **[** **]** based on **[**

[3] JPMC's profit rate is also not suitable as a benchmark for a world market profit rate, because it reflects a significant amount of related-party transactions that are not at arms-length. As shown on page 166 of JPMC's 2022 financial statements, JPMC's Phosphate unit "inter-segment sales" (JD 118,861 million) accounted for 11.5% of that unit's total sales (JD 1,032,953 million), but there is no break-out of Phosphate unit profit on an external/intersegment sales basis. *See* OCP IQR, Exhibit MIN-19 at 166, P.R. 76, C.R. 81. Further, the amount of inter-segment eliminations from JPMC's consolidated profit figure (JD -286 million) is significant, equivalent to 26.7 percent of the amount of pre-tax profit for the consolidated JPMC entity (JD 1,071 million, after eliminations) and 39.8 percent of the post-tax profit (JD 717 million, after eliminations) for the consolidated entity. *Id.* JPMC's financial statements do not assign those eliminations to particular segments; rather, the eliminations are stated on an aggregated basis for all segments. Therefore, the available information on JPMC's Phosphate business unit shows that its 2022 revenues and profits reflect inter-segment sales to a significant degree, and the distortions from affiliated party transactions cannot be eliminated for the Phosphates segment. Thus, the JPMC Phosphate unit profit ratio is not a reliable comparator for a market-based profit amount for phosphate mining and rock beneficiation.

]. *See id.* OCP's convoluted series of calculations reflects cherry-picked data and results-driven assumptions—namely that the price [

]. There is no record evidence to support this assumption. Contrary to OCP's arguments, the weight of the evidence does not show that OCP's calculated rock-specific profit rate is more accurate than the profit rate Commerce derived from OCP's audited financial statements.

Finally, OCP criticizes Commerce's calculated profit rate for allegedly "fail{ing} to account of {} market realities," namely what OCP alleges are significant global increases in phosphate rock prices in 2022. OCP Br. at 27-29. OCP misleadingly asserts that Commerce's calculated profit rate "only increased nominally from the AR1 to this review." *Id.* at 28. In fact, the profit ratio Commerce calculated in this review represents a [ ] percent year-over-year increase from AR1. *See* Mosaic Rebuttal Br. at 22, P.R. 434, C.R. 391. OCP points to one example of the CRU price for Algerian rock increasing more significantly, OCP Br. at 28, but it ignores that other global rock benchmarks increased *less* significantly or on par with the increase in OCP's profit rate:[4]

| **Benchmark Prices** | | | | | | |
|---|---|---|---|---|---|---|
| **Country** | **Source** | **Cost Average 2021 (USD/MT)** | | **Cost Average 2022 (USD/MT)** | **% Increase** | |
| **Algeria** | CRU | 59.69 | [ | | | ] |
| **Jordan** | CRU | 108.19 | [ | | | ] |
| **Egypt** | CRU | 55.58 | [ | | | ] |
| **Peru** | CRU | 75.54 | [ | | | ] |
| | | | | | | |
| **Peru** | Profercy Phosphates | 84.37 | [ | | | ] |

[4] Bracketed information in this table is bracketed in the original. *See* Final Calc. Memo, Attachment 2, Calculation Worksheet: "Rock Benchmark" Tab, P.R. 453, C.R. 399. However, Mosaic does not claim proprietary treatment for this information.

| | | | | | | |
|---|---|---|---|---|---|---|
| **Algeria** | Profercy Phosphates | 85.44 | [ | | | ] |
| **Egypt** | Profercy Phosphates | 80.43 | [ | | | ] |
| **Syria** | Profercy Phosphates | 55.89 | [ | | | ] |
| | | | | | | |
| **Peru** | Fertecon | 70.25 | [ | | | ] |
| | | | | | | |
| **Algeria** | Argus | 61.71 | [ | | | ] |
| **Egypt** | Argus | 63.73 | [ | | | ] |
| **Jordan** | Argus | 103.48 | [ | | | ] |

*Compare* OCP 2/16/24 Benchmark Submission, Exhibit NFI-7, Tab "Rock Benchmark," P.R. 215, C.R. 206, *with* Final Calc. Memo, Attachment 2, Calculation Worksheet: "Rock Benchmark" Tab, P.R. 453, C.R. 399. Thus, evidence of the relative increases of world market prices for phosphate rock between 2021 and 2022 does not "fairly detract" from the reasonableness of Commerce's calculated profit ratio.

In sum, OCP fails to demonstrate that Commerce's calculation of a profit amount for the phosphate rock buildup is contrary to law or unsupported by substantial evidence. Indeed, Commerce followed the same approach that this Court affirmed in *Mosaic I*. The Court should reject OCP's arguments and affirm Commerce's profit rate calculation as reasonable, supported by substantial evidence, and otherwise in accordance with law.

## III. Commerce's Methodology for Selecting a BPL Range for the Benchmark Comparison Is Reasonable, Supported by Substantial Evidence, and Otherwise in Accordance With Law

In the *Final Results*, Commerce correctly rejected OCP's argument that it must adopt a weighted average of OCP's phosphate rock to determine the representative BPL range against which to compare the world price benchmark. *See* IDM at 15-16. Instead, Commerce "used the lowest and highest average BPL levels of OCP's phosphate rock to create {a} representative range of BPL levels." *Id.* at 15. It then selected countries "which had export sales of phosphate

rock with levels of BPL comparable to OCP's levels." *Id.* Commerce explained that "{s}uch a methodology accounts for variations within the BPL levels of OCP's phosphate rock and reflects the full range of the type(s) of phosphate rock (in terms of BPL content) OCP produces," thereby "enabl{ing} Commerce to create a reasonable comparison with world benchmark phosphate rock prices." *Id.* at 16. Commerce specifically rejected OCP's proposed weight-averaged approach because it "would narrow the number of comparable world benchmark prices and not capture the full range of BPL levels that OCP produces." *Id.*

Commerce applied this same methodology in the Investigation and in the First Administrative Review. *See Phosphate Fertilizers from the Kingdom of Morocco: Final Results of Countervailing Duty Administrative Review: 2020-2021*, 88 Fed. Reg. 76,726 (Int'l Trade Admin. Nov. 7, 2023), and accompanying Issues and Decision Memorandum at 27; *see also* Investigation Prelim. Calc. Memo (Nov. 24, 2020) (ACCESS Barcode 4058320-01) at 3 ("we were able to extract from these data sources prices which correspond to phosphate rock which has a BPL or $P_20_5$ content which corresponds to the range of BPL or $P_20_5$ content reported by OCP"). OCP did not appeal Commerce's decision in either proceeding. *See id.* The Court should affirm Commerce's similar decision here, because it is reasonable and supported by substantial evidence.

OCP argues that Commerce's methodology is unlawful for two reasons, neither of which has merit. First, OCP incorrectly argues that Commerce's methodology "does not account for prevailing market conditions for phosphate rock in Morocco" because it "failed to consider that OCP produced significantly more phosphate rock of a lower BPL content in 2022." OCP Br. at 36-37. OCP is incorrect that the statute's requirement to "account for prevailing market conditions" requires weight-averaging of BPL levels. Section 771(5)(E)(iv) of the Tariff Act of

1930, as amended (the "Act"), provides that the adequacy of remuneration for government-provided goods or services is to be measured "in relation to prevailing market conditions for the good or service being provided … in the country which is subject to … review." 19 U.S.C. § 1677(5)(E)(iv). This section further states that "{p}revailing market conditions include price, quality, availability, marketability, transportation, and other conditions of purchase or sale." *Id.* This provision says nothing about weight-averaging, or about reducing the characteristics of a subsidized product to a single data point, for purposes of benchmarking. Moreover, OCP fails to cite any case law, Commerce determination, or other legal authority for its proposition that the Act requires weight-averaging in this instance. OCP does not even explain how this issue constitutes a prevailing market condition that Commerce should have considered.

Importantly, and as Commerce noted in the *Final Results*, its approach here is consistent with its approach in other cases, because "{t}here is no requirement in the statute or {the Department's} regulations that a benchmark price match precisely all of the characteristics" of the subsidized product. *See* IDM at 16 (citing *Notice of Final Results of Countervailing Duty Administrative Review: Certain Softwood Lumber Products*, 70 Fed. Reg. 73,448 (Int'l Trade Admin. Dec. 12, 2005), and accompanying Issues and Decision Memorandum at 29). Accordingly, there is no support for OCP's contention that failing to adopt a weight-averaged methodology is unlawful—and this Court should reject OCP's arguments and affirm Commerce's approach.

Second, OCP argues that Commerce's approach is unsupported by substantial evidence, and thus contrary to its obligation to calculate CVD margins as accurately as possible, because it allegedly "fails to consider the **[ ]** different quantities" of the kinds of rock that OCP produces. OCP Br. at 36. However, contrary to OCP's argument, OCP's proposed weighted-

average approach would not result in a more accurate benchmark. Commerce evaluated the full range of BPL levels in OCP's phosphate rock produced during the POR, and it is a comparison against that full range—not against a single weight-averaged figure—that yields the accurate benchmark the statute requires. *See* IDM at 16 ("Such a methodology accounts for variations within the BPL levels of OCP's phosphate rock and reflects the full range of the type(s) of phosphate rock (in terms of BPL content) OCP produces"); *see also* Mosaic Rebuttal Br. at 14, P.R. 434, C.R. 391 (noting that the "true range of BPLs for OCP's phosphate rock produced during the POR was **[ ]** to **[ ]**. Again, these figures … are already averages, and thus they are representative of OCP's production during the POR."); OCP IQR at 91, P.R. 59, C.R. 44; OCP IQR, Exhibit MIN-21, P.R. 76, C.R. 81.

In the *Preliminary Results*, Commerce took the **[ ]**, and selected benchmark prices for phosphate rock of comparable BPL content. *See* OCP Prelim. Calc. Memo at 3, P.R. 299, C.R. 288. Other record evidence from OCP's website shows that OCP produces phosphate rock with BPL levels as high as 75 percent. *See* Mosaic 11/13/23 Comments, Exhibit 20, P.R. 174, 180, C.R. 189, 195.

Rather than relying upon this complete and accurate information in the record, OCP's proposed approach would result in a less accurate benchmark involving **[ ]**. OCP Br. at 39-40. This inaccurate metric would not reflect the full range of phosphate rock that OCP produced during the POR, thereby resulting in a benchmark that does not properly reflect "prevailing market conditions" as is required by Section 771(5)(E)(iv). OCP's approach would exclude the following benchmark prices used in the *Final*

*Results*, each of which appropriately overlaps with the BPL content of the phosphate rock that OCP produced during the POR: **[**

**]**.[5] *See* Final Calc. Memo., Attachment 2, Calculation Worksheet: Phosphate Rock Benchmark Prices, P.R. 453, C.R. 399.[6]

Additionally, OCP wrongly argues that Commerce "effectively presumes that OCP produced equal quantities of low and high BPL content rock in 2022." OCP Br. at 38. This argument reflects a misunderstanding of the logic behind Commerce's selection of countries for the benchmark. Commerce first identified the BPL levels of OCP's phosphate rock consumed locally and exported for each of its two mining sites. IDM at 15. Then, Commerce identified countries whose phosphate rock exports have overlapping BPL levels and used them to construct the benchmark. *Id.* Contrary to OCP's assertions, this approach does not require Commerce to make any assumption at all about the volume of rock OCP produced. Rather, it enables Commerce to select benchmark data from countries whose phosphate rock is comparable to the full range of phosphate rock that OCP produced in Morocco.

Simply put, OCP produces phosphate rock with BPL levels that overlap with the benchmark prices that Commerce selected, and these benchmarks thus represent world market prices for phosphate rock that are comparable to OCP's rock in terms of BPL content. OCP fails

[5] This information is bracketed in the original. *See* Final Calc. Memo., Attachment 2, Calculation Worksheet: Phosphate Rock Benchmark Prices, P.R. 453, C.R. 399. However, Mosaic does not claim proprietary treatment for this information.

[6] OCP's approach would also exclude **[** **]**; however, as Mosaic has argued, phosphate rock prices from **[** **]** are not suitable for inclusion in the benchmark because **[** **]** phosphate rock is of lower quality, and its prices are distorted by government intervention. *See* Mosaic Br. at 20-28.

to identify any errors in Commerce's approach. Accordingly, this Court should affirm Commerce's lawful and accurate methodology.

## IV. Commerce's Decision to Seek Information Regarding "Other Assistance" Is Lawful

OCP challenges Commerce's request for information regarding the five "other assistance" programs that GOM provided to OCP during the POR. *See* OCP Br. at 41. This Court has twice considered and rejected virtually the same arguments from OCP regarding these programs and it should do so again for this case. *See Mosaic I*, 659 F. Supp. 3d at 1313; *Mosaic Co. v. United States*, 774 F. Supp. 3d 1362, 1383 (CIT 2025) ("*Mosaic III*").

First, this Court has held that Commerce's investigation of the "other assistance" and "other benefits" that OCP received from the GOM was reasonable and otherwise in accordance with law. *Mosaic I*, 659 F. Supp. 3d at 1313-14; *Mosaic III*, 774 F. Supp. 3d at 1383. Commerce has broad investigative discretion under 19 U.S.C. §§ 1671a(a) and 1677 and this Court has upheld Commerce's exercise of this authority to request information about "other forms of assistance" that respondents received during the POI. *See Changzhou Trina Solar Energy Co. v. United States*, 195 F. Supp. 3d 1334, 1341-46 (CIT 2016). Commerce's inquiry into the five programs is also consistent with its statutory mandate, pursuant to 19 U.S.C. § 1677d, to "consolidate in one investigation … all subsidies known by petitioning parties to the investigation or by {the Department} relating to that merchandise." *See Jiangsu Zhongji Lamination Materials Co. v. United States*, 405 F. Supp. 3d 1317, 1343 (CIT 2019) (citing S. Rep. No. 96-249 at 98 (1979), *reprinted in* 1979 U.S.C.C.A.N. 381, 484; 19 U.S.C. §§ 1671a(a) and 1677d).

In each of these prior cases, this Court squarely rejected OCP's argument that Commerce's request for information about other assistance or benefits that the GOM provided to OCP exceeded its statutory authority. In *Mosaic I*, the Court found that OCP's statutory

interpretation had "fatal flaws," finding that (1) the plain text of 19 U.S.C. § 1677d does not prescribe any limitation on the means by which Commerce "discovers a practice which appears to be a countervailable subsidy" and (2) OCP's narrow interpretation is contrary to Congress' intent to write the statute "as an expansion, not a limitation" on Commerce's investigative authority. *Mosaic I*, 659 F. Supp. 3d at 1313. In *Mosaic III*, the Court again found that OCP failed to address the two flaws identified in *Mosaic I*. *See Mosaic III*, 774 F. Supp. 3d at 1383. In this case, OCP repeated virtually the same argument from the previous cases without presenting any legal arguments or evidence addressing the "fatal flaws" that the Court identified in *Mosaic I* and *Mosaic III*. OCP's interpretation is unsupported by the statute and its legislative history, and the Court should reject it again.

Second, OCP argues that Commerce must possess information demonstrating the appearance of a countervailable subsidy before seeking information on purported programs for which no allegation has been made. OCP Br. at 42. To the contrary, section 1677d of the Act grants Commerce broad authority to investigate any practice that "appears" to be a countervailing subsidy but was not included in a countervailing duty petition. *See* 19 U.S.C. § 1677d. In interpreting section 1677d, this Court has recognized that the statute "vests {Commerce} with broad investigative discretion" and, further, that "Commerce's inquiry concerning the full scope of governmental assistance provided by {a government} and received by Respondents in the production of subject merchandise {is} within the agency's independent investigative authority pursuant to 19 U.S.C. §§ 1671a(a) and 1677d." *Guizhou Tyre Co. v. United States*, 523 F. Supp. 3d 1312, 1339 (CIT 2021) (quoting *Changzhou Trina Solar Energy Co.*, 195 F. Supp. 3d at 1346). Nothing in the statute requires Commerce to possess information

demonstrating the "appearance" of a countervailable subsidy before it may request information about the program.

This Court rejected OCP's statutory interpretation in *Mosaic I*, finding that "the provision expresses no limitations on the means or methods by which Commerce 'discovers a practice which appears to be a countervailable subsidy'" as long as the discovery occurs in the course of a proceeding. *Mosaic I*, 659 F. Supp. 3d at 1313 (quoting 19 U.S.C. § 1677d). The Court further found that the legislative history of the Act demonstrates that section 1677d cannot be interpreted as an "evidentiary standard" that would preclude Commerce from seeking information about other assistance programs. OCP's interpretation, which would invent an evidentiary requirement prohibiting Commerce from investigating potential subsidies without evidence of appearance as a countervailable subsidy, is not supported by the statute and legislative history and would unlawfully "impose an unwarranted limitation on the investigative authority Congress intended Commerce to have." *Id.*; *Mosaic III*, 774 F. Supp. 3d at 1383.

Third, OCP argues that the factual context here is different from *Mosaic I* and *Mosaic III* because "Commerce had affirmative evidence *that none* {of the five programs at issue} *were countervailable subsidies*." OCP Br. at 43 (emphasis in original). This is false. Commerce found that the programs did not confer benefits during the previous periods of review ("POR"), *see* IDM at 11-12, but it clearly stated that it "has not yet made a final determination with respect to the countervailability of these programs," and it exercised its investigative discretion not to examine the financial contribution or specificity of each program. *See id.* The record also shows that Commerce stated in its questionnaire that "Commerce has not yet made a {countervailable} determination" with respect to the five programs and listed them under "Programs Not Used or Provided No Measurable Benefits" or "Programs on Which Commerce Has Not Yet Made a

Final Countervailable Determination." *See id.* at 11; GOM 2023/06/27 IQR at II-25, II-26, P.R. 21.

OCP's argument also relies on the false premise that a finding that a program did not confer a benefit in a prior review precludes Commerce from seeking information about the same program in this review. *See* OCP Br. at 42-43. As Commerce reasonably explained in the *Final Results*, a finding that an alleged subsidy program does not meet one of the criteria for a countervailable subsidy is a POR-specific determination. IDM at 11. Such a finding does not mean that the program does not have an "appearance" of a countervailable subsidy or cannot be subject to further investigation because "Commerce has not yet made a determination upon aspects of the program in question (*i.e.*, financial contribution and specificity)." *Id.* For this reason, Commerce correctly rejected OCP's argument because "a finding in a given POI or POR of a case that a respondent or respondents received no benefit or no measurable benefit for recurring subsidies is not a basis for precluding an examination of whether a benefit has been conferred in a future proceeding." *See id.* at 12. Nothing in the Act supports OCP's argument, which would prohibit Commerce from seeking information about an alleged subsidy for the POR simply because it was determined not to meet one of the criteria for countervailability in a previous POR.

Fourth, the cases and determinations that OCP cited as evidence of Commerce's practice are unavailing. Unlike this case, which concerned subsidies for which Commerce did not make any countervailability determination, all of the cases and determinations that OCP cites concerned subsidies that Commerce had already determined *not* to be countervailable. *See* OCP Br. at 44; *KG Dongbu Steel Co., Ltd. v. United States*, 695 F. Supp. 3d 1338, 1345 (CIT 2024) (explaining that Commerce "does not usually re-evaluate *prior determinations on*

*countervailability*" which are limited to "prior financial contribution and specificity determination" and do not include the benefit determination (emphasis added)); *PPG Indus., Inc. v. United States*, 978 F.2d 1232, 1242 (Fed. Cir. 1992) (explaining that the Commerce has a practice of "not reinvestigating a program *determined not to be countervailable*," (emphasis added), and that "Commerce has discretion in deciding whether to reinvestigate a program previously found not countervailable in a final agency determination; in reaching its decision Commerce is entitled to draw upon its own knowledge and expertise and facts capable of judicial notice" (quoting *PPG Indus., Inc. v. United States*, 746 F. Supp. 119, 135 (CIT 1990)); *Allegheny Ludlum Corp. v. United States*, 25 CIT 816, 824 (2001) (affirming Commerce's decision not to reinvestigate investments that were determined not to be a subsidy); *Stainless Steel Sheet and Strip in Coils From France: Final Results of Countervailing Duty Administrative Review*, 67 Fed. Reg. 62,098 (Int'l Trade Admin. Oct. 3, 2002) and accompanying Issues and Decision Memorandum at 8 (finding that there was no basis to request information on a program determined not to be countervailable). None of these cases addresses Commerce's approach in proceedings where it has not yet made a determination on the potential countervailability of a program, as was the case here.

Fifth, OCP argues that Commerce's investigation of the Bond program was unreasonable because it is not a recurring subsidy like the other four programs. *See* OCP Br. at 44. This argument fails, because it ignores the record evidence demonstrating that Commerce's approach was reasonable. Commerce explained that, unlike the four recurring subsidies, the OCP bond program did not confer a benefit during the period of investigation because the benchmark interest rates at the time were equal to the interest rates offered to private entities. *See* IDM at 12; *Phosphate Fertilizers from the Kingdom of Morocco: Final Affirmative Countervailing Duty*

*Determination*, 86 Fed. Reg. 9,842 (Int'l Trade Admin. Feb. 16, 2021), and accompanying Issues and Decision Memorandum at 60-61 (finding that there was no benefit conferred on OCP because the bonds were "sold at the same interest rate to government entities, private entities, and mutual funds"). This does not preclude a finding that the OCP bond program may confer a benefit in later years, based on prevailing interest rates, and Commerce's continued inquiry into this program was thus supported by substantial evidence and in accordance with law.

Sixth*,* OCP's reliance on *Allegheny Ludlum* is misguided. This case concerned Commerce's decision not to investigate an untimely subsidy allegation made by the petitioner. *Allegheny Ludlum*, 25 CIT at 816-18. This Court held that "{section 1677d} does not force Commerce to fully investigate any subsidy" and that Commerce must be afforded "sufficient latitude to weigh and analyze both negative and positive evidence" to determine whether a business practice appears to be a countervailable subsidy. *Id.* at 824. The court in *Allegheny Ludlum* did not address the entirely separate question of whether Commerce may request information on any "other forms of assistance" provided by a subject government that are not described in the petition. Instead, this Court specifically addressed this point in *Changzhou Trina Solar Energy Co*., holding that, on questions of "whether Commerce reasonably exercised its own independent investigative authority, *Allegheny Ludlum* is not controlling." *Changzhou Trina Solar Energy Co*., 195 F. Supp. 3d at 1342. In *Mosaic I*, this Court specifically dismissed OCP's reliance on *Allegheny Ludlum* and found that the case does not limit Commerce's broad discretion to investigate a practice that appears to be countervailable. *See Mosaic I*, 659 F. Supp. 3d at 1313-14.

Further, in every case in which this Court has examined Commerce's authority to investigate subsidies reported in response to a question regarding "all other assistance," the Court

has affirmed that the agency acted within the scope of its statutory authority and rejected the arguments that OCP makes here. In *Changzhou Trina Solar Energy Co.*, the Court rejected the respondents' argument that Commerce's inquiry into "other forms of assistance" unlawfully circumvented the petition requirements set forth in 19 U.S.C. § 1671a(a) and wrote out of existence the language in § 1677d that practices newly discovered during an investigation "appear{} to be a countervailable subsidy." 195 F. Supp. 3d at 1340-46. The court rejected these arguments, holding that Commerce has broad investigative authority under the statute and that section 1677d contains no limiting language as to how the agency is to "discover" apparent subsidies during the course of an investigation. *See id.*

Similarly, in *Jiangsu Zhongji*, Commerce had asked the GOC in its initial questionnaire if the GOC had provided "any other forms of assistance" to the subject producers, but the GOC refused to respond on the grounds that Commerce's request was "premature absent a more direct inquiry supported by credible evidence and the initiation of a discrete investigation." 405 F. Supp. 3d at 1342. Zhongji then challenged Commerce's determination, arguing that Commerce had acted unlawfully because it "failed to identify any evidence that the subsidies appeared to be specific and countervailable before initiating an investigation into the programs, in violation of 19 U.S.C. § 1677d." *Id.* The court disagreed, stating:

> Commerce must determine whether a program appears to be countervailable by looking at record evidence. In order to make that determination, therefore, Commerce is permitted to request that information be placed on the record regarding any reported subsidies. Zhongji's argument to the contrary would permit Commerce to examine unalleged subsidies only where record evidence tangentially demonstrates that a subsidy is actually countervailable. This reading of the statute is too restrictive. Rather, because Commerce is urged to ensure "proper aggregation of subsidization practices," and given its investigative authority under 19 U.S.C. §§ 1671a(a) and 1677d, Commerce is permitted to request that documentation be placed on the record so that it may determine whether subsidies discovered during the investigation are countervailable.

*Id.* at 1343 (citations omitted). Here, OCP's interpretation of section 1677d of the Act is overly restrictive and "would impose an unwarranted limitation on the investigative authority Congress intended Commerce to have." *Mosaic I*, 659 F. Supp. 3d at 1313. As it did previously, this Court should continue to reject OCP's claims regarding "other assistance" and find that Commerce's request for information about the five programs was in accordance with law.

## V. Commerce's Decision to Seek Information About Potential Subsidies Based on OCP's Response to the "Other Benefits" Question is Lawful

OCP raises a similar argument that Commerce acted unlawfully when it requested information regarding "other benefits" OCP received from the GOM and investigated 12 potential subsidies based on OCP's responses. OCP Br. at 45. This argument also lacks merit, and the Court should find that Commerce's investigation of these other benefits was lawful.

OCP concedes that this Court has already rejected this argument, finding that Commerce's request for OCP to provide information regarding unspecified "other forms of assistance" and "other benefits" are lawful exercises of Commerce's investigative authority under section 1677d of the Act. *Id.* at 46 (citing *Mosaic I*, 659 F. Supp. 3d at 1312-14 and *Mosaic III*, 774 F. Supp. 3d at 1383). OCP nonetheless cites *Allegheny Ludlum* and contends that Commerce's inquiry was an unlawful "fishing expedition" because Commerce requested disclosure of other benefits that "Commerce might imagine OCP had received from GOM" "without any evidentiary or legal basis for doing so." *Id.*

In *Mosaic I*, this Court specifically rejected OCP's argument, including its reliance on *Allegheny Ludlum*. *Mosaic I*, 659 F. Supp. 3d at 1313. As Mosaic demonstrated in the preceding section, nothing in section 1677d of the Act requires Commerce to possess information demonstrating that potential subsidies have the appearance of a subsidy before seeking information about the potential subsidy. *See id.*; *Mosaic III*, 774 F. Supp. 3d at 1383.

Moreover, the record shows that Commerce's inquiry was not a "fishing expedition" based on "imaginary" benefits, because Commerce determined that two of the potential subsidies—the revenue exclusions for minimum tax contributions and customs duty exemptions—were countervailable. *See* IDM at 6.

Instead of making a serious attempt to persuade the Court to revisit its prior conclusion, OCP appeals to the "great time and effort" that it expended to respond to Commerce's investigation into the twelve potential subsidies. OCP Br. at 46-47. Nothing in the statute requires Commerce to consider the respondent's supposed burden in preparing a response to Commerce's request for information regarding potential subsidies. Moreover, this Court previously rejected a similar argument from a respondent that Commerce's request for information about other forms of assistance "placed an impossible burden on the Respondents, who in good faith may be unable to exhaustively ascertain all forms of governmental assistance provided." *Changzhou Trina Solar Energy Co.*, 195 F. Supp. 3d at 1346. OCP's interpretation would render Commerce's statutory obligation to investigate potential subsidies secondary to the respondents' convenience. The Court should reject it.

As it did in *Mosaic III*, OCP states that it is raising this argument "for purposes of preserving it for any future appeal." OCP Br. at 47; *Mosaic III*, 774 F. Supp. 3d at 1383. OCP fails to present any argument or evidence that should alter the Court's previous conclusion regarding "other benefits" and this Court should continue to find that Commerce's inquiry was in accordance with law.

## CONCLUSION

Mosaic respectfully requests that the Court find that Commerce's determinations addressed above are reasonable, supported by substantial evidence, and otherwise in accordance with law and deny OCP's motion for judgment on the agency record.

Respectfully submitted,

/s/ Stephanie E. Hartmann
David J. Ross
Stephanie E. Hartmann
Alexandra Maurer
Jake A. Laband
Min Seong Kim

Wilmer Cutler Pickering Hale and Dorr LLP
2100 Pennsylvania Avenue NW
Washington, DC 20037
Telephone: (202) 663-6300
Facsimile: (202) 663-6363
Email: stephanie.hartmann@wilmerhale.com

*Counsel for The Mosaic Company*

Dated: July 13, 2026

**CERTIFICATE OF COMPLIANCE**

Pursuant to paragraphs 2(B)(1) and (2) of the U.S. Court of International Trade's Standard Chambers Procedures, the undersigned certifies that this Memorandum in Opposition to OCP's Rule 56.2 Motion for Judgment on the Agency Record complies with the word limitation requirement. The word count for the Memorandum, as computed by WilmerHale's word processing system, is 12,447 words, including footnotes, and excluding the title page, table of contents, table of authorities, counsel's signature block, and this certificate.

/s/ Stephanie E. Hartmann
(Signature of Attorney)

Stephanie E. Hartmann
(Name of Attorney)

The Mosaic Company
(Representative Of)

July 13, 2026
(Date)